WILSON PETTY KOSMO & TURNER LLP
FREDERICK W. KOSMO, JR. (138036)
THERESA OSTERMAN-STEVENSON (129272)
550 West C Street, Suite 1050
San Diego, California 92101
Telephone: (619) 236-9600
Facsimile: (619) 236-9669
E-mail: fkosmo@wpkt.com
E-mail: tstevenson@wpkt.com

Attorneys for Defendant and Counterclaimant
HTC CORPORATION

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DATAQUILL LIMITED,<br><br>　　　　Plaintiff,<br><br>v.<br><br>HIGH TECH COMPUTER CORP.,<br><br>　　　　Defendant. | Case No. 08-cv-00543 IEG (LSP)<br><br>**HTC CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**<br><br>**DEMAND FOR JURY TRIAL** |
| HTC CORPORATION,<br><br>　　　　Counterclaimant,<br><br>v.<br><br>DATAQUILL LIMITED,<br><br>　　　　Counterdefendant. | Complaint Filed: March 25, 2008<br><br>Judge:　　　Hon. Irma E. Gonzalez<br><br>Magistrate<br>Judge:　　　Hon. Leo S. Papas<br><br>Trial Date: Not Set |

Defendant HTC Corporation ("HTC"), formerly known as High Tech Computer Corporation, files the following answer, affirmative defenses, and counterclaims in response to Plaintiff DataQuill Limited's ("DataQuill's") Complaint for Patent Infringement ("Complaint").

## ANSWERS TO DATAQUILL'S ALLEGATIONS OF PATENT INFRINGEMENT

HTC answers the allegations in the separately numbered paragraphs of DataQuill's Complaint as follows:

1. HTC admits that this Court has subject matter jurisdiction over the present action. HTC denies all other allegations of Paragraph 1.

2. HTC admits that on May 2, 2000, United States Patent No. 6,058,304 ("the '304 patent") was issued by the United States Patent and Trademark Office and that the '304 patent is entitled "Data Entry System." HTC also admits that on Nov. 21, 2006, United States Patent No. 7,139,591 ("the '591 patent") was issued by the United States Patent and Trademark Office and that the '591 patent is entitled "Hand Held Telecommunications and Data Entry Device." HTC is without sufficient information to form a belief as to the truth or falsity of the remaining allegations of Paragraph 2 and therefore denies same.

3. With regard to the allegations of Paragraph 3, HTC -- formerly known as High Tech Computer Corp. – admits it is organized under the laws of the Republic of China. HTC denies its executive offices are a 23 Hsin Hua Road, and any remaining allegations of Paragraph 3.

4. HTC denies the allegations of Paragraph 4.

5. HTC admits the allegations of Paragraph 5.

6. HTC denies the allegations of Paragraph 6.

7. With regard to the allegations of Paragraph 7, which are dependent on Paragraphs 4-6, HTC denies the same.

8. HTC admits that venue is proper in this District under 28 U.S.C. §§ 1391(d) for this action.

## COUNT I – PATENT INFRINGEMENT

9. HTC denies the allegations of Paragraph 9.

10. HTC is without sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 10 and therefore denies same.

11. Regarding the allegations of Paragraph 11, HTC admits it received letters on the dates the allegations of Paragraph 11.

HTC CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

12.     HTC denies all allegations of Paragraph 12.

13.     HTC denies all allegations of Paragraph 13.

## RESPONSE TO DATAQUILL'S PRAYER FOR RELIEF

The allegations in the paragraph requesting relief are in the nature of prayer.  Although no answer is required, HTC responds to the individual requests for relief as follows:

a.     HTC denies that DataQuill is entitled to the requested damages and prejudgment and post-judgment interest and denies any and all liability for DataQuill's claims.

b.     HTC denies that DataQuill is entitled to the requested enhanced damages and denies any and all liability for DataQuill's claims.

c.     HTC denies that DataQuill is entitled to the requested finding that this is an exceptional case or to the requested attorney's fees and expenses and denies any and all liability for DataQuill's claims.

d.     HTC denies that DataQuill is entitled to the requested injunctive relief and denies any and all liability for DataQuill's claims.

e.     HTC denies that DataQuill is entitled to any other relief from HTC in this case, denies that any relief sought by DataQuill is warranted, denies any and all liability for the alleged conduct, and requests that DataQuill's requested relief be denied.

## DEFENSES AND AFFIRMATIVE DEFENSES

### Non-Infringement

1.     Upon information and belief, HTC has not infringed and does not infringe any of the claims of the '304 patent or the '591 patent (collective referred to as "the patents-in-suit"), literally, under the doctrine of equivalents, directly, contributorily, by inducement, or in any other manner.

### Patent Invalidity

2.     Upon information and belief, each of the claims of the patents-in-suit are invalid for failing to comply with one or more of the conditions and requirements for patentability as set forth in the United States Patent Laws, Title 35 U.S.C., including specifically §§ 102, 103, and/or 112 (including specifically lack of written description, enablement, best mode, particularly pointing out and/or distinctly claiming), and the rules, regulations, and laws pertaining thereto.

HTC CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

**Prosecution History Estoppel**

3.      Because of proceedings in the United States Patent and Trademark Office during the prosecution of the application that resulted in the patents-in-suit, as shown by the prosecution histories thereof, DataQuill is estopped to claim a construction of the patents-in-suit that would cause any valid claim thereof to cover or include any products that are or have been manufactured, used, sold, imported, or offered for sale by HTC, either literally or under the doctrine of equivalents.

4.      DataQuill is estopped by reason of prosecution history estoppel from asserting infringement of the patents-in-suit under the doctrine of equivalents.

**License**

5.      Upon information and belief and after reasonable opportunity for discovery, the relief sought by DataQuill based on HTC's alleged infringement of the patents-in-suit is barred in whole or in part to the extent that HTC is directly or indirectly licensed to practice the patents-in-suit, either expressly or impliedly.

**Inequitable Conduct**

6.      Upon information and belief, DataQuill's allegations of infringement of the patents-in-suit are barred because the patents-in-suit are unenforceable pursuant to 37 C.F.R. § 1.56 and the doctrine of inequitable conduct.  The bases for and specifics of HTC's inequitable conduct defense are set forth in more detail in HTC's declaratory judgment count seeking a declaration that the patents-in-suit are unenforceable based on DataQuill's inequitable conduct in the procurement of those patents.

**No Irreparable Harm**

7.      DataQuill is not entitled to injunctive relief because any injury to DataQuill as a result of HTC's alleged activities is not immediate or irreparable, and DataQuill has an adequate remedy at law.

WHEREFORE HTC prays that this Court dismiss DataQuill's action and enter judgment that DataQuill take nothing on its claims against HTC and award HTC its attorney's fees and costs of defending this action and such other and further relief as it may be entitled.

HTC CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

## COUNTERCLAIMS

### Parties

1.    HTC Corporation ("HTC") is a corporation organized under the laws of the Republic of China, with executive offices as No. 23 Xinghua Rd., Taoyuan 330, Taiwan, R.O.C.

2.    Upon information and belief, Plaintiff DataQuill Limited ("DataQuill") is a limited company organized and existing under the laws of the British Virgin Islands, having its principal place of business in Tortola, British Virgin Islands.

### Jurisdiction and Venue

3.    This Court has subject matter jurisdiction over HTC's counterclaims pursuant to 28 U.S.C. §§ 2201-2202, 1338 and 1331.  A real, immediate, and justiciable controversy exists between HTC and DataQuill.    The controversy relates to the invalidity, non-infringement, and unenforceability of the patents-in-suit.  DataQuill has accused HTC of infringing the patents-in-suit.

4.    As the plaintiff in the above-captioned lawsuit, DataQuill has consented to jurisdiction and venue in this Court.

### COUNT I

### (Request for Declaratory Judgment of Non-Infringement of U.S. Patent No. 6,058,304)

5.    HTC re-alleges and incorporates by reference each preceding allegation as though expressly stated herein.

6.    HTC has not infringed, contributed to the infringement of, or induced infringement of any valid and enforceable claim of the '304 patent, either literally or under the doctrine of equivalents.

7.    Based on statements made by the applicant during prosecution of the '304 patent, DataQuill is estopped from asserting that HTC infringes the '304 patent.

8.    Accordingly, HTC seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 that the '304 patent is not infringed by HTC.

HTC CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

## COUNT II

### (Request for Declaratory Judgment of Patent Invalidity of U.S. Patent No. 6,058,304)

9.      HTC re-alleges and incorporates by reference each preceding allegation as though expressly stated herein.

10.     Upon information and belief, each of the claims in the '304 patent are invalid for failing to comply with the conditions and requirements for patentability as set forth in the United States Patent Laws, Title 35 U.S.C., including specifically §§ 102, 103 and/or 112 (including specifically lack of written description, enablement, best mode, particularly pointing out and/or distinctly claiming), and the rules, regulations, and laws pertaining thereto.

11.     Accordingly, HTC seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 that the '304 patent is invalid.

## COUNT III

### (Request for Declaratory Judgment of Non-Infringement of U.S. Patent No. 7,139,591)

12.     HTC re-alleges and incorporates by reference each preceding allegation as though expressly stated herein.

13.     HTC has not infringed, contributed to the infringement of, or induced infringement of any valid and enforceable claim of the '591 patent, either literally or under the doctrine of equivalents.

14.     Based on statements made by the applicant during prosecution of the '591 patent, DataQuill is estopped from asserting that HTC infringes the '591 patent.

15.     Accordingly, HTC seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 that the '591 patent is not infringed by HTC.

HTC CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

**COUNT IV**

**(Request for Declaratory Judgment of Patent Invalidity of
U.S. Patent No. 7,139,591)**

16.     HTC re-alleges and incorporates by reference each preceding allegation as though expressly stated herein.

17.     Upon information and belief, each of the claims in the '591 patent are invalid for failing to comply with the conditions and requirements for patentability as set forth in the United States Patent Laws, Title 35 U.S.C., including specifically §§ 102, 103 and/or 112 (including specifically lack of written description, enablement, best mode, particularly pointing out and/or distinctly claiming), and the rules, regulations, and laws pertaining thereto.

18.     Accordingly, HTC seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 that the '591 patent is invalid.

**COUNT V**

**(Request for Declaratory Judgment of Unenforceability of the Patents-in-suit)**

19.     HTC re-alleges and incorporates by reference each preceding allegation as though expressly stated herein.

20.     Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Patent and Trademark Office ("PTO"). That duty includes a duty to disclose to the PTO all information known to that individual to be material to the patentability of the claimed invention. A breach of a patent applicant's duty of candor renders unenforceable all claims which eventually issue from the application in connection with which such breach occurred and all claims that issue from any related applications.

21.     Upon information and belief, DataQuill committed inequitable conduct during the prosecution of the patents-in-suit by (1) failing to disclose the two-page brochure publicly distributed at ScanTech; (2) failing to disclose the Glasgow Herald publication; (3) mischaracterizing the two-page brochure publicly distributed at ScanTech; (4) failing to disclose the one-page flyer publicly distributed at ScanTech; (5) failing to disclose actions in European counterpart applications; (6) failing to disclose Garry Robb's '790 patent application and art cited

1   therein; (7) failing to disclose proper inventorship; and (8) by excerpting and intentionally

2   withholding an Anticipation Exhibit from an Invalidity Report which contradicted information

3   submitted by DataQuill regarding patent validity.

4       22.    These misrepresentations and omissions by DataQuill were material because

5   DataQuill failed to disclose non-cumulative invalidating prior art and information regarding that art

6   that would have by itself or in combination with other information established a prima facie case of

7   unpatentability of the claims of the patents-in-suit.

8       23.    The information withheld by DataQuill was also inconsistent with positions taken by

9   DataQuill in opposing arguments of unpatentability made by the PTO and arguments of patentability

10   made by DataQuill.

11       24.    Upon information and belief, DataQuill committed these acts with the intent to

12   deceive the PTO in order to obtain the patents-in-suit.

13       25.    Upon information and belief, HTC makes the following allegations with respect to

14   the prior art that forms the basis of it inequitable conduct claims:

15       **(a)  Failure to Disclose the Two-Page Brochure Publicly Distributed at ScanTech**

16       26.    United Kingdom patent application no. 9321133 was filed October 13, 1993, in the

17   name of Garry Robb alone (the "Robb GB application"). On September 27, 1994, a PCT application

18   -- PCT/GB94/02101 ("the PCT application") -- was filed. The PCT application attempted to claim

19   priority to the Robb GB application, and was filed as a continuation-in-part of the Robb GB

20   application, as it added two new inventors (Francis John Callaghan and Paul Marshall Doran), three

21   new figures (10, 11, and 12), text describing the same, and added references to "cellular" throughout

22   the specification, *inter alia*. The PCT application designated the U.S., was nationalized in the U.S.,

23   and became the '304 patent once issued. Upon information and belief, the asserted claims are not

24   supported by the Robb GB application pursuant to 35 U.S.C. § 112, and the priority claim in the

25   PCT application to the Robb GB application is improper under 35 U.S.C. § 119.

26       27.    Before filing the PCT application leading to the '304 patent, named inventor Garry

27   Robb formed a company called Winfair Systems, upon information and belief. Upon information

28   and belief, personnel involved with Winfair Systems prepared a two-page brochure to market a

HTC CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

1  prototype device, referred to as a "DataQuill" "pen" because of its pen-like shape. Upon

2  information and belief, the two-page brochure was publicly distributed in a double-sided copy on A4

3  paper. Specifically, named inventor Garry Robb and others including Jan Orkisz publicly distributed

4  approximately 250-300 brochures at a trade show, called "ScanTech," held at the National

5  Exhibition Centre in Birmingham, England, on or about June of 1992, on information and belief.

6  The ScanTech trade show was an exhibition directed to those interested in bar code scanning

7  technology and was described in the Glasgow Herald at the time as being regarded by those in the

8  business as the most important scanning technology exhibition in the world.

9        28.     Upon information and belief, Mr. Robb was aware of the prior publication of the two-

10  page brochure because he was instrumental in the public distribution of that brochure at ScanTech.

11  The public distribution of that brochure in June of 1992 was more than one year before the filing of

12  the PCT application on September 27, 1994, and more than one year before the filing of the Robb

13  GB patent application on October 13, 1993. Thus, the prior publication of the two-page brochure is

14  prior art under 35 U.S.C. § 102(b) regardless of whether the priority claim to the Robb GB

15  application was proper. Further, the two-page brochure was material to patentability of the claims of

16  the application leading to the '304 patent; for instance, the two-page brochure anticipates at least

17  claims 29 and/or 31 of the '304 patent. But, Mr. Robb failed to disclose the two-page brochure to

18  the USPTO during the prosecution of the '304 patent, upon information and belief. It would have

19  been important to a reasonable examiner to know of the prior publication of the two-page brochure

20  when examining the claims of the application leading to the '304 patent. The high degree of

21  materiality creates an inference that the failure to disclose was intentional, rendering the '304 patent

22  unenforceable.

23        **(b) Failure to Disclose the Glasgow Herald Publication**

24        29.     On August 25, 1992, in Glasgow, Scotland, the Glasgow Herald published an article

25  entitled "Winfair Launches Two-Way Bar Code Reader," showing a pen-shaped device reading a bar

26  code ("the Glasgow Herald article"). The article paraphrased Mr. Robb's comments to a Glasgow

27  Herald reporter with respect to his involvement with Winfair Systems and the DataQuill pen-shaped

28  device. The Glasgow Herald article was published more than one year prior to the September 27,

1   1994 filing of the PCT application, and more than a year prior to the October 13, 1993 filing of the

2   Robb GB application; and thus, constituted prior art under 35 U.S.C. §102 regardless of whether the

3   priority claim under 35 U.S.C. § 119 to the Robb GB application was proper.

4         30.     It would have been important to a reasonable examiner to be informed that the named

5   inventor Robb had publicly disclosed the subject matter of the claimed invention via the Glasgow

6   Herald article describing the DataQuill pen-shaped device more than one year before filing the Robb

7   GB application and/or the PCT application.  Upon information and belief, at least Mr. Robb was

8   aware of the Glasgow Herald article, having been interviewed for the article, and intentionally failed

9   to disclose the article to the USPTO during prosecution of the '304 patent.  Further, combining the

10  Glasgow Herald Publication with the two-page brochure discussing the same device and the same

11  ScanTech tradeshow would have rendered at least claims 29 and/or 31 obvious under 35 U.S.C.

12  §103.  The high degree of materiality of the Glasgow Herald article creates an inference that Mr.

13  Robb possessed intent to withhold this information from the USPTO.  Mr. Robb's intentional failure

14  to disclose this material information to the USPTO constituted inequitable conduct and renders the

15  '304 patent unenforceable.

16         **(c) Mischaracterization of Two-Page Brochure Publicly Distributed at ScanTech**

17         31.     The '591 patent issued from patent application 10/869,215, which was a continuation

18  of application 09/548,565, which was a continuation of the application leading to the '304 patent.

19  The '591 application similarly includes a claim to priority to the Robb GB application; however,

20  since the asserted claims of the '591 application are not supported by the Robb GB application under

21  35 U.S.C. § 112, the priority claim under 35 U.S.C. § 119 to the Robb GB application is improper.

22         32.     On March 30, 2005, Mr. Jan Orkisz was deposed in the case of *DataQuill v. Kyocera*,

23  then pending in the U.S. District Court for the Southern District of California.  At his deposition, Mr.

24  Orkisz testified that he and Mr. Robb publicly distributed at the ScanTech exhibition, described

25  above, the *two-page* brochure (Orkisz deposition exhibit 93) depicting a DataQuill pen-shaped

26  device and containing marketing information.

27         33.     Unlike the prosecution of the '304 patent in which the two-page brochure was never

28  cited to the USPTO by DataQuill, DataQuill did submit the two-page brochure during the

HTC CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

1  prosecution of the '591 patent.  On September 19, 2005, just months after Mr. Orkisz's testimony,

2  DataQuill's counsel, Joseph Hetz of the Brinks Hofer law firm, filed an Information Disclosure

3  Statement ("IDS") submitting the two-page brochure to the USPTO, *inter alia.*  However, upon

4  information and belief, DataQuill's counsel mischaracterized the nature of the document that Mr.

5  Orkisz had testified that he and Mr. Robb had publicly distributed at ScanTech.  In the IDS,

6  DataQuill's patent prosecution counsel Hetz represented to the USPTO that the document that had

7  been publicly distributed at ScanTech in June of 1992 was a *one-page* flyer, not the *two-page*

8  brochure that was publicly distributed according to Mr. Orkisz's testimony.  DataQuill's patent

9  prosecution counsel Hetz submitted the *one-page* flyer to the USPTO, identified it as "Document

10  C88" and characterized it by stating:

> Document C88 includes a copy of Winfair Systems (Scotland) Limited flyers believed based on present investigation and recollection of events to have been made available to attendees at a trade show exhibition in the United Kingdom in June 1992. Mr. Garry Robb was a principle [sic] of Winfair Systems.

14  September 19, 2005 IDS.

15       34.     With respect to the *two-page* brochure, however, that Mr. Orkisz testified to having

16  distributed with Mr. Robb at ScanTech, DataQuill's counsel Mr. Hetz only stated in the IDS:  "In

17  addition, Document C111 is a copy of two-sided Winfair System flyers, which flyers are *believed* to

18  have been *made* in 1992."  *Id.* (emphasis added).

19       35.     By mischaracterizing the two-page brochure as "believed to have been made" by

20  Winfair Systems (Scotland), *instead of having actually been made and distributed* publicly more

21  than a year before the filing of the application leading to the '304 patent, and doing so months after

22  receiving Orkisz's testimony directly to the contrary, DataQuill's counsel committed an omission of

23  material information during prosecution of the application for the '591 patent.  Upon information

24  and belief, that material omission implied to the USPTO that the two-page brochure was not prior

25  art.

26       36.     Upon information and belief, at least DataQuill's patent prosecution counsel Hetz and

27  Mr. Robb were aware of the two-page brochure and of Mr. Robb's and Mr. Orkisz's public

28

HTC CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

1  distribution of the two-page brochure, either based on personal knowledge or via Mr. Orkisz's

2  testimony.

3      37.    It would have been important to a reasonable examiner to know that the detailed two-

4  page brochure was publicly disseminated to the relevant public more than a year prior to the filing of

5  the Robb GB application, to which both the '304 and '591 patents attempted to claim priority, and

6  more than one year prior to the filing of the PCT application that became the '304 patent, to which

7  the '591 patent claimed priority.  Further, the two-page brochure anticipates at least claim 1 of the

8  '591 patent.  Thus, the publicly disclosed *two-page* brochure was prior art under 35 U.S.C. § 102(b)

9  regardless of whether the priority claim to the Robb GB application was proper, and material to the

10 patentability of the claims of the '591 patent.  With this high degree of materiality, intent can be

11 inferred, and the '591 patent is unenforceable.

12      **(d) Failure to Disclose the One-Page Flyer Publicly Distributed at ScanTech**

13      38.    During prosecution of the application leading to the '591 patent, after Mr. Hetz

14 submitted IDS on September 19, 2005 containing the mischaracterization of the two-page brochure,

15 as discussed in paragraphs 31-37 above, Mr. Robb was re-deposed in the *DataQuill v. Kyocera* case

16 on October 26, 2005.  In that deposition, Mr. Robb testified that he publicly distributed at least

17 twenty copies of the one-page flyer to interested attendees at ScanTech in June of 1992.  However,

18 Mr. Robb failed to disclose the one-page flyer to the USPTO during the prosecution of the

19 application leading to the '304 patent, upon information and belief.  Examples of the materiality of

20 the one-page flyer include that: the one-page flyer, in combination with the Glasgow Herald article

21 discussed above, renders obvious at least claim 29 and/or 31 of the '304 patent; and, the one-page

22 flyer alone anticipates at least claim 31 of the '304 patent.  With this high degree of materiality,

23 intent can be inferred, and '304 patent is unenforceable.

24      **(e)  Failure to Disclose Actions, Including Priority Date Challenges,
        in European Counterpart Applications**

25

26      39.    Upon information and belief, the '591 patent is unenforceable because, during

27 prosecution of the application for the '591 patent, DataQuill committed inequitable conduct by

28

HTC CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

1  failing to disclose to the USPTO materials relating to proceedings concerning European counterpart

2  applications to the '304 and '591 patents-in-suit.

3      40.    DataQuill filed two European counterpart applications to the patents-in-suit, both of

4  which also included a priority claim to the Robb GB application: EP Application 94927728.9 (the

5  "EP parent application," revoked by the European Patent Office ("EPO") on February 21, 2005) and

6  EP98200196.8 ("the EP divisional application"). Third parties filed "Oppositions" against the

7  issuance of the claims in each EP application. (An EPO Opposition is a proceeding in which third

8  parties can oppose the issuance of a patent, somewhat akin to a reexamination request in the U.S.

9  filed after the patent issues.) The EPO considered and responded to those Oppositions.

10      41.    Three third parties lodged separate Oppositions to the EP divisional application –

11  Philips (May 19, 2004), Nokia (June 24, 2004), and Alcatel (June 23, 2004). Each Opposition relied

12  upon various prior art references and also challenged the EP divisional application's priority date

13  claim to the October 13, 1993 filing date of the Robb GB application (discussed above). Each

14  Opposition argued that the priority date of the EP divisional application should be limited to

15  September 27, 1994 and that the priority date claim to October 13, 1993 was improper. The EPO

16  subsequently sustained this priority challenge. Nevertheless, throughout the prosecution of the U.S.

17  patent application leading to the '591 patent, DataQuill maintained that it was entitled to claim

18  priority to the Robb GB application. In contravention of MPEP 2001.06 and MPEP 2001.06(a),

19  throughout prosecution of the application leading to the '591 patent (issued November 21, 2006),

20  DataQuill, the listed inventors, and their patent prosecution counsel, upon information and belief,

21  failed to inform the USPTO of the challenges to the priority date in the Oppositions and the bases

22  therefore.

23      42.    Upon information and belief, at least named inventors Doran and Callaghan and

24  DataQuill's patent prosecution counsel Mark Milhench were aware of the Oppositions and the

25  priority date challenges. For example, each opposition was prosecuted on behalf of DataQuill, and

26  primarily by Mr. Milhench. In the prosecution of the EP parent application, while responding to the

27  Oppositions, DataQuill's foreign associate requested an extension of time to reply to Oppositions

28  because of Mr. Milhench's transfer from a former firm to Mintz Levin Cohn Ferris Glovsky and

HTC CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

1  Popeo Intellectual Property, LLP ("Mintz Levin"), and to consult with named inventors Frank

2  Callaghan and Paul Doran.  Specifically, in a letter to the EPO dated 8 September 2004, Mintz Levin

3  stated:

> The respondent's principal contact, Mr. Frank Callaghan, was advised
> at the beginning of August by Mr. Milhench that he would be leaving
> Jenkins. … Mr. Callaghan subsequently concurred with his business
> partner, Mr. Paul Doran, on Mr. Doran's return from holiday and with
> his legal advisors in the USA who are currently litigating the
> corresponding US patent, and decided to transfer responsibility for the
> respondent's patent portfolio from Jenkins to ourselves [Mintz Levin]
> because Mr. Milhench has been involved with the DataQuill patent
> portfolio since 1997. … A further point to note is that as the
> respondent is currently litigating his corresponding US patent any
> reply prepared by ourselves should be reviewed by the respondent's
> US advisors prior to filing, and in the time available this is clearly
> impossible.

12  Upon information and belief, Mr. Callaghan and Mr. Doran were similarly consulted in the

13  prosecution of the EP divisional application.

14      43.     Upon information and belief, at least Mr. Doran, Mr. Callaghan, and Mr. Milhench

15  and associates at Mintz Levin knew of the proceedings in the counterpart EP applications and knew

16  that information concerning those proceedings was material to the prosecution of the pending

17  application leading to the '591 patent.

18      44.     Further, upon information and belief, DataQuill's U.S. patent attorney knew of the

19  existence of the Oppositions filed in the EP counterpart application and was also aware of the duty to

20  disclose material information from foreign counterpart applications.

21      45.     For example, in an Information Disclosure Statement ("IDS") filed on October 1,

22  2004 in the prosecution of the U.S. patent application leading to the '591 patent, attorney Joseph

23  Hetz of the Brinks Hoffer Gilson and Lione law firm submitted, to the USPTO, an Office Action

24  (and an English translation thereof) issued by the Japanese Patent Office in a Japanese counterpart

25  application to the '304 patent.  Mr. Hetz also submitted, to the USPTO, copies of prior art references

26  cited in a Japanese Office Action and stated "Applicants also note that [prior art reference]

27  documents A134-A138 were cited in an Official Action in a Japanese patent application

28  corresponding to parent U.S. Patent No. 6,058,304.  A copy of an English translation of that Official

1  Action is enclosed as document A251." Oct. 1, 2004 IDS at 2. By doing so, DataQuill's counsel

2  demonstrated that it understood the materiality of foreign counterpart patent applications, office

3  actions, and prior art cited therein and demonstrated that it understood its duty to disclose that

4  material information to the USPTO.

5       46.    However, when submitting information relating to the European counterpart

6  applications to the USPTO, DataQuill's counsel Hetz submitted only the docket sheets from those

7  EP applications and not material underlying documents from those EP applications, such as

8  documents reflecting the challenges to the priority date in the EP Oppositions mentioned above. In

9  connection with filing a September 19, 2005 IDS in the application leading to the '591 patent,

10  DataQuill's counsel Hetz submitted the docket sheets and stated:

11              Regarding documents C1-C235, multiple of these documents were
   either identified by Kyocera or DataQuill, and/or … identified as

12              additional information in EPO proceedings concerning counterpart
   patent applications. … Documents C181 and C182 are online docket

13              sheets of the EPO proceedings.

14  Sept. 19, 2005 IDS at 2. However, upon information and belief, attorney Hetz remained completely

15  silent that any Opposition proceedings had taken place and that the priority claim was being

16  questioned.

17       47.    It would have been important to a reasonable USPTO examiner examining the

18  application leading to the '591 patent that the priority date of the EP counterpart application was

19  being challenged, because that priority date challenge would impact the priority date for the U.S.

20  application leading to the '591 patent, which also purports to claim priority therefrom. A U.S. patent

21  application's claim for priority is highly material to the patentability of what the application claims

22  to be the invention because a priority date defines the temporal scope of the prior art and,

23  accordingly, may determine validity, whether an issue arises in prosecution or later in court

24  challenges to validity. The challenge to the priority date in the EP divisional application refutes or,

25  at the least, is inconsistent with the position that DataQuill takes in asserting that the U.S. application

26  leading to the '591 patent was proper. It would have been important to a reasonable examiner to

27  consider the arguments concerning the priority date in the EP Oppositions.

28

48.     Thus, upon information and belief, Mr. Callaghan, Mr. Doran, and Mr. Hetz withheld from the USPTO material information concerning the Oppositions in the European divisional application, including information concerning the priority date challenges.  Based on this showing of materiality, intent can be inferred, and the '591 patent is unenforceable.

### (f) Failure to Disclose Garry Robb's '790 Patent Application and Art Cited Therein

49.     On July 16, 1998, Garry Robb filed U.S. Patent Application S/N 09/101,790 ("the Robb '790 application") in his own name.  The Robb '790 application included disclosure and claims that were closely related to the disclosures of the '304 and '591 patents-in-suit.  More specifically, the specification of each of the Robb '790 application and '304 and '591 patents discloses a device having a display, a reading sensor, and a telecommunications interface, for example.  As an example of claim similarity, during the prosecution of the Robb '790 application, Mr. Robb added claim 30 in a preliminary amendment filed on July 16, 1998.  Claim 30 was directed to:

> [a] personal communication device, comprising: a display for displaying data and video signals; a loudspeaker for generating an audible signal; a microphone for receiving an audio signal; a keypad for entering data, a telecommunications interface for receiving and transmitting information; and an integral adjustable reading head for producing an image signal.

Claims of the '304 patent, including claims that DataQuill alleges HTC's products to infringe, include substantially similar limitations.  For example, claim 1 of the '304 patent calls for "[a] data entry device" comprising "a display," the data entry device being integral with a cellular telephone (microphone and loudspeaker), a "reading sensor," "communications interface," and a "reading sensor," *inter alia*.  Accordingly, since at least as of July 16, 1998, the claims of the Robb '790 application could have conceivably served as the basis of a double patenting rejection in the prosecution of the patents-in-suit; therefore, the existence of the Robb '790 application was highly material to patentability of the '304 patent.

50.     Further, during the prosecution of the Robb '790 application, in an Office Action dated October 27, 1999, examiner Ramakrishnaiah rejected claim 30 and others as obvious over GB2289555A in view of U.S. Patent No. 5,436,654 (dated Feb. 7, 1994), *inter alia*.  On April 26,

HTC CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

2000, applicants to the Robb '790 application limited claim 30 by narrowing the scope in an attempt to avoid the prior art references. The fact that examiner Ramakrishnaiah rejected claim 30 and others on the basis of prior art was material to the prosecution of the '304 patent for at least two reasons.

51.    First, as demonstrated by claim 30, for example, at least some claims of the Robb '790 application were substantially similar to claims of the '304 patent. By prosecuting the claims of the '304 patent, DataQuill was necessarily asserting to the USPTO that those claims were patentable. However, the USPTO's rejection of a substantially similar claim, such as claim 30 of the '790 Robb application, refutes and is inconsistent with this position. Such a contrary decision by another USPTO examiner reviewing a substantially similar claim was highly material to the prosecution of the '304 patent.

52.    Second, the prior art rejection of claim 30 and others would have been important to the Examiner of the application leading to the '304 patent, because Mr. Robb's response of narrowing the scope of the claims in place of asserting any claim to priority such as to the Robb GB application at least call into question the viability of the priority claim for the patents-in-suit.

53.    Other prior art considered by the USPTO during prosecution of the Robb '790 application also was material to the examination of the pending claims of the claims of the applications leading to the patents-in-suit. For example, one prior art reference cited during the prosecution of the Robb '790 application was U.S. Patent No. 5,491,507 to Umezawa ("Umezawa"). Umezawa disclosed a portable handheld computer that could include an integrated camera. Upon information and belief, this reference would have been important to a reasonable examiner examining the application leading to the '304 patent for at least the reason that the '304 patent contains claims directed to a hand holdable unit that includes an integrated camera, such as claims 13, 45, and 46. Further, the USPTO has already determined that "a reasonable examiner would consider the above prior references [including the Umezawa patent] important, alone or in combination as stated in the Request, in making a decision as to the patentability of claims 1-62 of the '591 patent" in an Order dated May 4, 2007, in application control number 90/008,394

HTC CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

1   (reexamination of the '591 patent), at pp. 2-3.  The claims of the '591 patent are patentably indistinct

2   from those of the '304 patent.

3       54.    Upon information and belief, at least Mr. Robb withheld the existence of the Robb

4   '790 application from the USPTO examiner who evaluated the applications leading to the patents-in-

5   suit.  The existence of the Robb '790 application, examiner Ramakrishnaiah's rejections of the

6   claims, and prior art cited during prosecution of the '790 application each would have been

7   important to a reasonable examiner examining the applications leading to the '304 patent.

8       55.    At least Mr. Robb (and possibly others involved in prosecuting the application

9   leading to the '304 patent) failed to satisfy his duty of disclosure to the USPTO by intentionally

10  withholding the material information described above, upon information and belief.  USPTO rules

11  provide that "[i]ndividuals … cannot assume that the examiner of a particular application is

12  necessarily aware of other applications which are 'material to patentability' of the application in

13  question, but must instead bring such other applications to the attention of the examiner."  Manual of

14  Patent Examination Procedure ("MPEP") 2001.06(b).  The showing of materiality of the withheld

15  information creates an inference that the failure to disclose the Robb '790 application and the prior

16  art cited therein was intentional.  This intentional failure to disclose highly material information to

17  the USPTO during prosecution of the application leading to the '304 patent constituted inequitable

18  conduct, rendering the '304 patent unenforceable.

19  **(g) Failure to Disclose Proper Inventorship**

20      56.    Upon information and belief, personnel at the University of Edinburgh, Jimmy

21  Johnstone and Rainer Thonnes, contributed to the conception of the subject matter of the alleged

22  invention of each of the patents-in-suit by their collaboration with Mr. Robb on a device for barcode

23  scanning.  For example, software and/or firmware would have been necessary to practice even a

24  single embodiment of the alleged inventions of the '304 and '591 patents.  It was at least Mr.

25  Thonnes who worked for almost five years in an effort to create such software and/or firmware for

26  DataQuill's pen-shaped prototype device, upon information and belief.  Upon information and

27  belief, Mr. Thonnes contributed to the conception of the subject matter related to the

28  software/firmware in the pen in an effort to cause the controller to be responsive to a command to

HTC CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

1   cause downloading of information from a remote processing center for updating information

2   previously stored in the data entry device, as is claimed in '304 patent 1 and 2 (and claims dependent

3   therefrom) and '591 patent claims 61 and 62. Upon information and belief, Mr. Johnstone

4   contributed to the conception of the subject matter related to the "telecommunications interface"

5   claimed in at least claims 1 and 2 of the '304 patent (and claims dependent therefrom) and claim 1 of

6   the '591 patent.  Upon information and belief, others in the United Kingdom, including Alec Tait,

7   Jan Orkisz, and Anthony Hopkin, contributed to the conception of the subject matter of at least one

8   claim of each of the patents-in-suit, including the software for the telecommunications interface of at

9   least claims 1 and 2 of the '304 patent (and claims dependent therefrom) and claim 1 of the '591

10   patent.

11        57.    The proper identity of inventors is material to patentability, since a patent cannot

12   issue if the named inventors did not invent the subject matter sought to be patented under 35 U.S.C.

13   § 102(f).  It would have been important to a reasonable examiner to be informed that the inventive

14   entity named on the application leading to each of the '304 and '591 patents-in-suit was incorrect.

15   The high degree of materiality of the identification of proper inventorship creates an inference that

16   the misrepresentation of inventorship to the USPTO was intentional.  Moreover, upon information

17   and belief, at least named inventor Robb was aware of the inventive contributions of Mr. Johnstone,

18   Prof. Thonnes, Mr. Tait, Mr. Orkisz and/or Mr. Hopkin because of his collaboration with those

19   individuals, and Mr. Robb intentionally withheld disclosure of the contributions of any and all of

20   those omitted inventors to the USPTO during prosecution of the applications for both the '304 and

21   '591 patents.  Therefore Mr. Robb committed inequitable conduct, and, as a result, each of the

22   patents-in-suit is therefore unenforceable.

23        **(h) Failure to Disclose Invalidity/Anticipation Charts from Kyocera Case**

24        58.    In the prior *DataQuill v. Kyocera* case mentioned above, upon information and belief,

25   DataQuill obtained received a supplemental expert report submitted by Kyocera's technical expert

26   Royce Fletcher, which contained Mr. Fletcher's expert opinion that the claims the '304 patent were

27   invalid on the basis of certain prior art references.   This supplemental expert report was dated

28   August 5, 2005 ("August 5, 2005 Invalidity Report").  On information and belief, the August 5, 2005

1   Invalidity Report consisted of the following:  a 4-page report (numbered SUP_1-4); an Anticipation

2   Exhibit (pages ANT_SUP1-67) (the "Anticipation Exhibit"); a 38-page Obviousness Exhibit (page

3   numbers OBV_SUPP 1-38); a 3-page exhibit on one of skill in the art (numbered IMP_SUP 1-3); a

4   supplementation of documents reviewed (numbered DOC_SUP 1-2); and two attachments

5   (Attachment I and Attachment II).

6        59.     The Anticipation Exhibit included numerous pages of detailed claim charts explaining

7   how references, including the following, anticipated the claims of DataQuill's '304 patent: U.S.

8   Patent No. 5,465,401 to Thompson; a prior art device referred to as the EO Personal Communicator

9   as described in the book *AT&T EO Personal Communicator: The Digital Nomad's Guide*, (1993);

10  and the publication of the Winfair materials (described above), upon information and belief.  The

11  Anticipation Exhibit is expressly referenced in the Invalidity Report, at page SUP_2 for example.

12       60.     DataQuill's attorney Joseph Hetz submitted an Information Disclosure Statement

13  ("IDS") dated September 19, 2005, to the USPTO during the prosecution of the application leading

14  to the '591 patent.  In that IDS, Mr. Hetz submitted several pleadings and documents from various

15  technical experts, including a document from DataQuill's technical expert, Edward Koch, presenting

16  *inter alia* DataQuill's position that claims of the '304 patent were valid.  Among those documents

17  that Mr. Hetz submitted was "Edward Koch's Rebuttal to Certain New Contentions Raised by

18  Kyocera, dated 06/23/05, numbered PX12-1-8," as IDS entry number C45 (referred to hereinafter as

19  the "Koch Rebuttal").  In the Koch Rebuttal, DataQuill's expert Mr. Koch opined that claims of the

20  '304 patent were not invalidated by the Thompson '401 patent, by the AT&T EO personal

21  communicator, or the Winfair documents.

22       61.     Also buried within the numerous pages of references on the IDS was the listing C168:

23  "*Excerpts* of Supplemental Expert Report of Royce W. Fletcher relating to validity, Kyocera

24  Wireless, dated 08/05/05, SUP-1 to -4; OBV_SUP-1 to -38; IMP_SUP-1 to -3; DOC_SUP-1 to -2;

25  Attachment I; Attachment II." (emphasis added).   Upon information and belief, DataQuill

26  intentionally excerpted and omitted the Anticipation Supplement from submission to the USPTO,

27  despite DataQuill's submission of other selected materials from Mr. Fletcher.

28

HTC CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

62.     Given that DataQuill submitted what appear to be the complete opinions of its own expert Mr. Koch regarding the validity of claims of the '304 patent, the complete opinions of Kyocera's opposing expert Mr. Fletcher on the same issue would have been material to the examination of the pending claims of the related application leading to the '591 patent. Therefore, DataQuill's intentional failure to disclose the Anticipation Exhibit (indeed its excerption of the Anticipation Exhibit from the Invalidity Report), at least through attorney Hetz, during prosecution of the application leading to the '591 patent constituted inequitable conduct, rendering the '591 patent unenforceable.

### (i) Infectious Unenforceability

63.     Under the doctrine of infectious unenforceability, the existence of inequitable conduct during prosecution of a patent can lead to the unenforceability of a related patent if the inequitable conduct has an immediate and necessary relation to the equity that DataQuill seeks in respect of the matter in litigation. The application leading to the '591 patent is a continuation of U.S. patent application 09/548,565, which is a continuation of the application leading to the '304 patent. The disclosure and claims of the '591 patent are substantially the same as that of the '304 patent. Thus, inequitable conduct occurring during the prosecution history of the '304 patent necessarily relates to the claims of the '591 patent. As such, while HTC has set forth independent bases for the unenforceability of the '591 patent, to the extent that the '304 patent is unenforceable due to inequitable conduct, the '591 patent is also unenforceable based on the doctrine of infectious unenforceability. Therefore, each basis for inequitable conduct set forth above with respect to the '304 patent further relates to and taints all issued claims of the '591 patent and thus further renders the '591 patent unenforceable.

64.     In light of the foregoing, accordingly, HTC seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 that the '304 patent and the '591 patents are unenforceable.

### COUNT VI

### (Request for Attorneys Fees and Costs)

65.     HTC re-alleges and incorporates by reference each preceding allegation as though expressly stated herein.

HTC CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

66.     HTC is entitled to a declaration that this is an "exceptional" case within the meaning of 35 U.S.C. § 285, entitling HTC to an award of its reasonable and necessary attorneys' fees, expenses, and costs incurred in this action.

### JURY DEMAND

67.     Under Rule 38(b) of the Federal Rules of Civil Procedure, HTC respectfully requests a jury trial on all issues and claims.

### PRAYER FOR RELIEF

WHEREFORE, HTC prays for judgment against DataQuill, and that the Court award the following relief:

A.     Declare that HTC has not infringed, has not contributed to infringement of, and has not induced infringement of any claims of the patents-in-suit, either literally or under the doctrine of equivalents;

B.     Declare that the claims of the patents-in-suit are invalid;

C.     Declare that the patents-in-suit are unenforceable;

D.     Declare this case exceptional under 35 U.S.C. § 285 and award HTC its reasonable attorneys' fees, expenses and costs incurred in this action; and

E.     Award HTC such other and further relief as this Court deems just and proper.

Dated:     December 8, 2008          Respectfully submitted,

**WILSON PETTY KOSMO & TURNER LLP**

By:     /s/ Frederick W. Kosmo, Jr.
        Attorney for Defendant and Counterclaimant
        HTC CORPORATION
        E-mail: fkosmo@wpkt.com

HTC CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

WILSON PETTY KOSMO & TURNER LLP
FREDERICK W. KOSMO, JR. (138036)
THERESA OSTERMAN-STEVENSON (129272)
550 West C Street, Suite 1050
San Diego, California  92101
Telephone:  (619) 236-9600
Facsimile:   (619) 236-9669
E-mail:  fkosmo@wpkt.com
E-mail:  tstevenson@wpkt.com

Attorneys for Defendant and Counterclaimant
HTC CORPORATION

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DATAQUILL LIMITED, | Case No. 08-cv-00543 IEG (LSP) |
| Plaintiff, | **CERTIFICATE OF SERVICE BY ELECTRONIC SUBMISSION** |
| v. | |
| HIGH TECH COMPUTER CORP., | |
| Defendant. | |
| | Complaint Filed:  March 25, 2008 |
| HTC CORPORATION, | |
| Counterclaimant, | |
| v. | Judge:        Hon. Irma E. Gonzalez |
| DATAQUILL LIMITED, | Magistrate |
| Counterdefendant. | Judge:        Hon. Leo S. Papas |
| | Trial Date:  Not Set |

I am familiar with the United States District Court, Southern District of California's practice for collecting and processing electronic filings.  Under that practice, the following documents were electronically filed with the court on December 8, 2008:

1.    **HTC CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**

The court's CM/ECF system will generate a Notice of Electronic Filing (NEF) to the filing party, the assigned judge, and any registered users in the case. The NEF will constitute service of the document(s). Registration as a CM/ECF user constitutes consent to electronic service through the court's transmission facilities. Under said practice, the following CM/ECF users were served:

> Gregory S. Markow
> Hecht Solberg Robinson and Goldberg
> 600 West Broadway, 8th Floor
> San Diego , CA 92101
> Tel: (619)239-3444
> Fax: (619)232-6828
> Email: gmarkow@hsrgb.com
> *Counsel for Plaintiff/Counterdefendant DATAQUILL LIMITED*

I declare that I am employed by the office of a member of the bar of this court at whose direction the service was made.

Executed December 8, 2008, at San Diego, California.

By: _____
    Yolanda Kondan

CERTIFICATE OF SERVICE BY ELECTRONIC SUBMISSION