1  WILSON PETTY KOSMO & TURNER LLP
   FREDERICK W. KOSMO, JR. (138036)
2  THERESA OSTERMAN-STEVENSON (129272)
   550 West C Street, Suite 1050
3  San Diego, California 92101
   Telephone: (619) 236-9600
4  Facsimile: (619) 236-9669
   E-mail: fkosmo@wilsonturnerkosmo.com
5  E-mail: tstevenson@wilsonturnerkosmo.com

6  HOWREY LLP
   PETER J. CHASSMAN (Admitted Pro Hac Vice)
7  GREGORY A. DUFFEY (Admitted Pro Hac Vice)
   1111 Louisiana, 25th Floor
8  Houston, Texas 77002
   Telephone: (713) 787-1400
9  Facsimile: (713) 787-1440
   E-mail: chassmanp@howrey.com
10 E-mail: duffeyg@howrey.com

11 Attorneys for Defendant and Counterclaimant HTC CORPORATION

12                   **UNITED STATES DISTRICT COURT**

13                **SOUTHERN DISTRICT OF CALIFORNIA**

14

15 DATAQUILL LIMITED,                    Case No. 08cv543 IEG (BGS)

16            Plaintiff,
                                         **HTC CORPORATION'S FIRST**
17 v.                                    **AMENDED ANSWER,**
                                         **AFFIRMATIVE DEFENSES, AND**
18 HIGH TECH COMPUTER CORP.,             **COUNTERCLAIMS**

                                         **DEMAND FOR JURY TRIAL**
19            Defendant.

20
                                         Complaint Filed: March 25, 2008
21 HTC CORPORATION,
                                         Judge:     Hon. Irma E. Gonzalez
22            Counterclaimant,
                                         Magistrate
23 v.                                    Judge:     Hon. Bernard G. Skomal

24 DATAQUILL LIMITED,                    Trial Date: Not Set

25            Counterdefendant.

26

27

28
                                  -1-              Case No. 08cv543 IEG (BGS)
   HTC CORPORATION'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND
                              COUNTERCLAIMS
                                                              **Exh. A-3**

FILED

JUL 2 7 2010

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                        DEPUTY

1   Defendant HTC Corporation ("HTC"), formerly known as High Tech Computer Corporation,

2   files the following first amended answer, affirmative defenses, and counterclaims in response to

3   Plaintiff DataQuill Limited's ("DataQuill's") Complaint for Patent Infringement ("Complaint").

4   **ANSWERS TO DATAQUILL'S ALLEGATIONS OF PATENT INFRINGEMENT**

5   HTC answers the allegations in the separately numbered paragraphs of DataQuill's

6   Complaint as follows:

7   1.   HTC admits that this Court has subject matter jurisdiction over the present action.

8   HTC denies all other allegations of Paragraph 1.

9   2.   HTC admits that on May 2, 2000, United States Patent No. 6,058,304 ("the '304

10   patent") was issued by the United States Patent and Trademark Office and that the '304 patent is

11   entitled "Data Entry System."  HTC also admits that on Nov. 21, 2006, United States Patent No.

12   7,139,591 ("the '591 patent") was issued by the United States Patent and Trademark Office and that

13   the '591 patent is entitled "Hand Held Telecommunications and Data Entry Device."  HTC is

14   without sufficient information to form a belief as to the truth or falsity of the remaining allegations

15   of Paragraph 2 and therefore denies same.

16   3.   With regard to the allegations of Paragraph 3, HTC -- formerly known as High Tech

17   Computer Corp. – admits it is organized under the laws of the Republic of China.  HTC denies its

18   executive offices are a 23 Hsin Hua Road, and any remaining allegations of Paragraph 3.

19   4.   HTC denies the allegations of Paragraph 4.

20   5.   HTC admits the allegations of Paragraph 5.

21   6.   HTC denies the allegations of Paragraph 6.

22   7.   With regard to the allegations of Paragraph 7, which are dependent on Paragraphs 4-

23   6, HTC denies the same.

24   8.   HTC admits that venue is proper in this District under 28 U.S.C. §§ 1391(d) for this

25   action.

26   **COUNT I – PATENT INFRINGEMENT**

27   9.   HTC denies the allegations of Paragraph 9.

28   10.   HTC is without sufficient information to form a belief as to the truth or falsity of the

-2-                              Case No. 08cv543 IEG (BGS)

HTC CORPORATION'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES. AND
COUNTERCLAIMS

Exh. A-4

1  allegations in Paragraph 10 and therefore denies same.

2  11.    Regarding the allegations of Paragraph 11, HTC admits it received letters on the dates

3  the allegations of Paragraph 11.

4  12.    HTC denies all allegations of Paragraph 12.

5  13.    HTC denies all allegations of Paragraph 13.

6  ## RESPONSE TO DATAQUILL'S PRAYER FOR RELIEF

7  The allegations in the paragraph requesting relief are in the nature of prayer.  Although no

8  answer is required, HTC responds to the individual requests for relief as follows:

9  a.    HTC denies that DataQuill is entitled to the requested damages and prejudgment and

10  post-judgment interest and denies any and all liability for DataQuill's claims.

11  b.    HTC denies that DataQuill is entitled to the requested enhanced damages and denies

12  any and all liability for DataQuill's claims.

13  c.    HTC denies that DataQuill is entitled to the requested finding that this is an

14  exceptional case or to the requested attorney's fees and expenses and denies any and all liability for

15  DataQuill's claims.

16  d.    HTC denies that DataQuill is entitled to the requested injunctive relief and denies any

17  and all liability for DataQuill's claims.

18  e.    HTC denies that DataQuill is entitled to any other relief from HTC in this case, denies

19  that any relief sought by DataQuill is warranted, denies any and all liability for the alleged conduct,

20  and requests that DataQuill's requested relief be denied.

21  ## DEFENSES AND AFFIRMATIVE DEFENSES

22  ### Non-Infringement

23  1.    Upon information and belief, HTC has not infringed and does not infringe any of the

24  claims of the '304 patent, including the '304 Reexamination Certificate described below, or the '591

25  patent, including the '591 Reexamination Certificate described below (collective referred to as "the

26  patents-in-suit"), literally, under the doctrine of equivalents, directly, contributorily, by inducement,

27  or in any other manner.

28

1

## Patent Invalidity

2        2.        Upon information and belief, each of the claims of the patents-in-suit including those

3   contained in the respective Reexamination Certificates for the '304 and '591 patents is invalid for

4   failing to comply with one or more of the conditions and requirements for patentability as set forth in

5   the United States Patent Laws, Title 35 U.S.C., including specifically §§ 102, 103,  112, and/or 305

6   (including specifically lack of written description, enablement, best mode, particularly pointing out

7   and/or distinctly claiming, and/or impermissible broadening of claims), and the rules, regulations,

8   and laws pertaining thereto.

9

## Prosecution History Estoppel or Disclaimer

10       3.        Because of proceedings in the United States Patent and Trademark Office during the

11  prosecution of the applications that resulted in the patents-in-suit (and related applications), and

12  prosecution of the reexaminations of the patents-in-suit, as shown by the prosecution histories

13  thereof, DataQuill is estopped to claim a construction of the patents-in-suit that would cause any

14  valid claim thereof to cover or include any products that are or have been manufactured, used, sold,

15  imported, or offered for sale by HTC, either literally or under the doctrine of equivalents.

16       4.        DataQuill is estopped by reason of prosecution history estoppel from asserting

17  infringement of the claims of the patents-in-suit including the claims of the Reexamination

18  Certificates under the doctrine of equivalents.

19

## License

20       5.        Upon information and belief and after reasonable opportunity for discovery, the relief

21  sought by DataQuill based on HTC's alleged infringement of the patents-in-suit is barred in whole or

22  in part to the extent that HTC is directly or indirectly licensed to practice the patents-in-suit, either

23  expressly or impliedly.

24

## Inequitable Conduct

25       6.        Upon information and belief, DataQuill's allegations of infringement of the patents-

26  in-suit are barred because the patents-in-suit are unenforceable pursuant to 37 C.F.R. § 1.56 and the

27  doctrine of inequitable conduct.  The bases for and specifics of HTC's inequitable conduct defense

28  are set forth in more detail in HTC's declaratory judgment count seeking a declaration that the

claims of patents-in-suit, including those contained within the respective Reexamination Certificates for the '304 and '591 patents, are unenforceable based on DataQuill's inequitable conduct in the procurement of those patents.

### No Irreparable Harm

7.    DataQuill is not entitled to injunctive relief because any injury to DataQuill as a result of HTC's alleged activities is not immediate or irreparable, and DataQuill has an adequate remedy at law.

### Intervening Rights

8.    DataQuill's claims are limited or barred by intervening rights under 35 U.S.C. §§ 307(b) and 252.

### Damages Barred by Lack of Notice and Failure to Mark

9.    Upon information and belief, DataQuill is barred in whole or in part from recovering damages by operation of 35 U.S.C. § 287.  The averments of this paragraph are likely to have evidentiary support after HTC has had a reasonable opportunity for further investigation and discovery.

### Time Limitation on Damages

10.    DataQuill is barred in whole or in part from recovering damages by operation of 35 U.S.C. § 286.

### Laches

11.    DataQuill is estopped from asserting the patents-in-suit against HTC to the extent that HTC unreasonably delayed in filing suit against HTC.

### No Costs

12.    Upon information and belief, DataQuill is precluded from seeking recovery of its costs under the provisions of 35 U.S.C. § 288.

13.    WHEREFORE HTC prays that this Court dismiss DataQuill's action and enter judgment that DataQuill take nothing on its claims against HTC and award HTC its attorney's fees and costs of defending this action and such other and further relief as it may be entitled.

HTC CORPORATION'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Exh. A-7

## COUNTERCLAIMS

### Parties

1.      HTC Corporation ("HTC") is a corporation organized under the laws of the Republic of China, with executive offices as No. 23 Xinghua Rd., Taoyuan 330, Taiwan, R.O.C.

2.      Upon information and belief, Plaintiff DataQuill Limited ("DataQuill") is a limited company organized and existing under the laws of the British Virgin Islands, having its principal place of business in Tortola, British Virgin Islands.

### Jurisdiction and Venue

3.      This Court has subject matter jurisdiction over HTC's counterclaims pursuant to 28 U.S.C. §§ 2201-2202, 1338 and 1331. A real, immediate, and justiciable controversy exists between HTC and DataQuill. The controversy relates to the invalidity, non-infringement, and unenforceability of the patents-in-suit. DataQuill has accused HTC of infringing the patents-in-suit.

4.      As the plaintiff in the above-captioned lawsuit, DataQuill has consented to jurisdiction and venue in this Court.

5.      On November 27, 2006, an *Ex Parte* Request for Reexamination was filed by a third party with the United States Patent and Trademark Office ("PTO") of all 63 claims originally issued in the '304 patent. The Request for Reexamination was refiled on January 25, 2007, and the PTO assigned it reexamination control number 90/008,340. On April 13, 2007, the PTO determined a substantial new question of patentability existed for all of the issued claims of the '304 patent and ordered reexamination of all claims. The reexamination of the '304 patent resulted in the April 13, 2010 issuance of the Reexamination Certificate entitled "Ex Parte Reexamination Certificate (7454th) US 6,058,304 C1" ("the '304 Reexamination Certificate"). During reexamination, DataQuill cancelled or amended each of the independent claims of the '304 patent to add additional limitations; thus, the scope of each of the non-cancelled claims was narrowed during reexamination to overcome prior art. Rather than amending certain claims, DataQuill added new claims of narrowed scope.

6.      On December 21 2006, a third party filed, with the PTO, an *Ex Parte* Request for Reexamination of all claims originally issued in the '591 patent. The Request was refiled on January

HTC CORPORATION'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND
COUNTERCLAIMS

**Exh. A-8**

February 9, 2007, and the PTO assigned it reexamination control number 90/008,394.  On May 4, 2009, the PTO determined a substantial new question of patentability existed for all of the issued claims of the '591 patent and ordered reexamination of all claims.  The reexamination of the '591 patent resulted in the October 27, 2009 issuance of the Reexamination Certificate entitled "Ex Parte Reexamination Certificate (7125th) US 7,139,591 C1" ("the '591 Reexamination Certificate"). During reexamination, DataQuill amended each of the independent claims of the '591 patent to add additional limitations; thus, the scope of each of the claims was narrowed during reexamination to overcome prior art.

## COUNT I

**(Request for Declaratory Judgment of Non-Infringement of
U.S. Patent No. 6,058,304 including the 7454th Reexamination Certificate
for U.S. Patent No. 6,058,304, issued April 13, 2010)**

7.     HTC re-alleges and incorporates by reference each preceding allegation as though expressly stated herein.

8.     HTC has not infringed, contributed to the infringement of, or induced infringement of any valid and enforceable claim of the '304 patent including those contained within the '304 Reexamination Certificate, either literally or under the doctrine of equivalents.

9.     Based on statements made by the applicant during prosecution, including reexamination, of the '304 patent, DataQuill is estopped from asserting that HTC infringes claims of the '304 patent including claims contained in the '304 Reexamination Certificate.

10.     Accordingly, HTC seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 that the claims of the '304 patent including those contained within the '304 Reexamination Certificate are not infringed by HTC.

## COUNT II

**(Request for Declaratory Judgment of Patent Invalidity of
U.S. Patent No. 6,058,304 including the 7454th Reexamination Certificate
for U.S. Patent No. 6,058,304, issued April 13, 2010)**

11.     HTC re-alleges and incorporates by reference each preceding allegation as though expressly stated herein.

-7-                                     Case No. 08cv543 IEG (BGS)

HTC CORPORATION'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES. AND
COUNTERCLAIMS

**Exh. A-9**

12.     Upon information and belief, each of the claims in the '304 patent including those contained in the '304 Reexamination Certificate is invalid for failing to comply with the conditions and requirements for patentability as set forth in the United States Patent Laws, Title 35 U.S.C., including specifically §§ 102, 103, 112, and/or 305 (including specifically lack of written description, enablement, best mode, particularly pointing out and/or distinctly claiming, and/or impermissible broadening of the claims), and the rules, regulations, and laws pertaining thereto.

13.     Accordingly, HTC seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 that the claims of the '304 patent including those contained in the '304 Reexamination Certificate are invalid.

## COUNT III

**(Request for Declaratory Judgment of Non-Infringement of
U.S. Patent No. 7,139,591 including the 7125th Reexamination Certificate
for U.S. Patent No. 7,139,591, issued October 27, 2009)**

14.     HTC re-alleges and incorporates by reference each preceding allegation as though expressly stated herein.

15.     HTC has not infringed, contributed to the infringement of, or induced infringement of any valid and enforceable claim of the '591 patent including those contained in the '591 Reexamination Certificate, either literally or under the doctrine of equivalents.

16.     Based on statements made by the applicant during prosecution including reexamination of the '591 patent, DataQuill is estopped from asserting that HTC infringes claims of the '591 patent.

17.     Accordingly, HTC seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 that the claims of the '591 patent including those contained in the '591 Reexamination Certificate is not infringed by HTC.

HTC CORPORATION'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

**Exh. A-10**

## COUNT IV

**(Request for Declaratory Judgment of Patent Invalidity of**
**U.S. Patent No. 7,139,591 including the 7125th Reexamination Certificate**
**for U.S. Patent No. 7,139,591, issued October 27, 2009)**

18.     HTC re-alleges and incorporates by reference each preceding allegation as though expressly stated herein.

19.     Upon information and belief, each of the claims in the '591 patent including those contained in the '591 Reexamination Certificate is invalid for failing to comply with the conditions and requirements for patentability as set forth in the United States Patent Laws, Title 35 U.S.C., including specifically §§ 102, 103, 112, and/or 305 (including specifically lack of written description, enablement, best mode, particularly pointing out and/or distinctly claiming, and/or impermissible broadening of claims), and the rules, regulations, and laws pertaining thereto.

20.     Accordingly, HTC seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 that the claims of the '591 patent including those contained in the '591 Reexamination Certificate are invalid.

## COUNT V

**(Request for Declaratory Judgment of Unenforceability of the Patents-in-Suit**
**including the Reexamination Certificates for the Patents-in-Suit)**

21.     HTC re-alleges and incorporates by reference each preceding allegation as though expressly stated herein.

22.     Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the PTO. That duty includes a duty to disclose to the PTO all information known to that individual to be material to the patentability of the claimed invention. A breach of a patent applicant's duty of candor renders unenforceable all claims which eventually issue from the application in connection with which such breach occurred and all claims that issue from any related applications. A breach of the patent applicant's duty of candor during the original prosecution of an application cannot be purged by a subsequent disclosure during a reexamination proceeding.

-9-                                    Case No. 08cv543 IEG (BGS)
HTC CORPORATION'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND
COUNTERCLAIMS

**Exh. A-11**

23.    Upon information and belief, DataQuill committed inequitable conduct during the prosecution of the patents-in-suit by (1) failing to disclose the two-page brochure publicly distributed at ScanTech; (2) failing to disclose the Glasgow Herald publication; (3) mischaracterizing the two-page brochure publicly distributed at ScanTech; (4) failing to disclose the one-page flyer publicly distributed at ScanTech; (5) failing to disclose actions in European counterpart applications; (6) failing to disclose Garry Robb's '790 patent application and art cited therein; (7) failing to disclose proper inventorship; and (8) by excerpting and intentionally withholding an Anticipation Exhibit from an Invalidity Report which contradicted information submitted by DataQuill regarding patent validity.

24.    These misrepresentations and omissions by DataQuill were material because DataQuill failed to disclose non-cumulative invalidating prior art and information regarding that art that would have by itself or in combination with other information established a prima facie case of unpatentability of the claims of the patents-in-suit.

25.    The information withheld by DataQuill was also inconsistent with positions taken by DataQuill in opposing arguments of unpatentability made by the PTO and arguments of patentability made by DataQuill.

26.    Upon information and belief, DataQuill committed these acts with the intent to deceive the PTO in order to obtain the patents-in-suit.

27.    Upon information and belief, HTC makes the following allegations with respect to the prior art that forms the basis of it inequitable conduct claims:

(a)  **Failure to Disclose the Two-Page Brochure Publicly Distributed at ScanTech**

28.    United Kingdom patent application no. 9321133 was filed October 13, 1993, in the name of Garry Robb alone (the "Robb GB application"). On September 27, 1994, a PCT application -- PCT/GB94/02101 ("the PCT application") -- was filed. The PCT application attempted to claim priority to the Robb GB application, and was filed as a continuation-in-part of the Robb GB application, as it added two new inventors (Francis John Callaghan and Paul Marshall Doran), three new figures (10, 11, and 12), text describing the same, and added references to "cellular" throughout the specification, *inter alia*. The PCT application designated the U.S., was nationalized in the U.S.,

HTC CORPORATION'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

**Exh. A-12**

1    and became the '304 patent once issued.  Upon information and belief, the asserted claims are not

2    supported by the Robb GB application pursuant to 35 U.S.C. § 112, and the priority claim in the

3    PCT application to the Robb GB application is improper under 35 U.S.C. § 119.  *See also* 35 U.S.C.

4    § 119(a) (no patent shall be granted on an application described in a printed publication in any

5    country more than one year before the date of filing in this country).

6        29.    Before filing the PCT application leading to the '304 patent, named inventor Garry

7    Robb formed a company called Winfair Systems, upon information and belief.  Upon information

8    and belief, personnel involved with Winfair Systems prepared a two-page brochure to market a

9    prototype device, referred to as a "DataQuill" "pen" because of its pen-like shape.  Upon

10   information and belief, the two-page brochure was publicly distributed in a double-sided copy on A4

11   paper.  Specifically, named inventor Garry Robb and others including Jan Orkisz publicly distributed

12   approximately 250-300 brochures at a trade show, called "ScanTech," held at the National

13   Exhibition Centre in Birmingham, England, on or about June of 1992, on information and belief.

14   The ScanTech trade show was an exhibition directed to those interested in bar code scanning

15   technology and was described in the Glasgow Herald at the time as being regarded by those in the

16   business as the most important scanning technology exhibition in the world.

17       30.    Upon information and belief, Mr. Robb was aware of the prior publication of the two-

18   page brochure because he was instrumental in the public distribution of that brochure at ScanTech.

19   The public distribution of that brochure in June of 1992 was more than one year before the filing of

20   the PCT application on September 27, 1994, and more than one year before the filing of the Robb

21   GB patent application on October 13, 1993.  Thus, the prior publication of the two-page brochure is

22   prior art under 35 U.S.C. § 102(b) regardless of whether the priority claim to the Robb GB

23   application was proper.  Further, the two-page brochure was material to patentability of the claims of

24   the application leading to the '304 patent; for instance, the two-page brochure anticipates at least

25   claims 29 and/or 31 of the '304 patent.  But, Mr. Robb failed to disclose the two-page brochure to

26   the USPTO during the prosecution of the '304 patent, upon information and belief.  It would have

27   been important to a reasonable examiner to know of the prior publication of the two-page brochure

28   when examining the claims of the application leading to the '304 patent.  The high degree of

-11-                                    Case No. 08cv543 IEG (BGS)

HTC CORPORATION'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIMS

Exh. A-13

1   materiality creates an inference that the failure to disclose was intentional, rendering each claim of

2   the '304 patent and the '304 Reexamination Certificate unenforceable.

3   <u>**(b) Failure to Disclose the Glasgow Herald Publication**</u>

4        31.     On August 25, 1992, in Glasgow, Scotland, the Glasgow Herald published an article

5   entitled "Winfair Launches Two-Way Bar Code Reader," showing a pen-shaped device reading a bar

6   code ("the Glasgow Herald article"). The article paraphrased Mr. Robb's comments to a Glasgow

7   Herald reporter with respect to his involvement with Winfair Systems and the DataQuill pen-shaped

8   device. The Glasgow Herald article was published more than one year prior to the September 27,

9   1994 filing of the PCT application, and more than a year prior to the October 13, 1993 filing of the

10  Robb GB application; and thus, constituted prior art under 35 U.S.C. §102 regardless of whether the

11  priority claim under 35 U.S.C. § 119 to the Robb GB application was proper. *See also* 35 U.S.C. §

12  119(a) (no patent shall be granted on an application described in a printed publication in any country

13  more than one year before the date of filing in this country).

14       32.     It would have been important to a reasonable examiner to be informed that the named

15  inventor Robb had publicly disclosed the subject matter of the claimed invention via the Glasgow

16  Herald article describing the DataQuill pen-shaped device more than one year before filing the Robb

17  GB application and/or the PCT application. Upon information and belief, at least Mr. Robb was

18  aware of the Glasgow Herald article, having been interviewed for the article, and intentionally failed

19  to disclose the article to the USPTO during prosecution of the '304 patent. Further, combining the

20  Glasgow Herald Publication with the two-page brochure discussing the same device and the same

21  ScanTech tradeshow would have rendered at least claims 29 and/or 31 obvious under 35 U.S.C.

22  §103. The high degree of materiality of the Glasgow Herald article creates an inference that Mr.

23  Robb possessed intent to withhold this information from the USPTO. Mr. Robb's intentional failure

24  to disclose this material information to the USPTO constituted inequitable conduct and renders each

25  claim of the '304 patent and the '304 Reexamination Certificate unenforceable.

26  <u>**(c) Mischaracterization of Two-Page Brochure Publicly Distributed at ScanTech**</u>

27       33.     The '591 patent issued from patent application 10/869,215, which was a continuation

28  of application 09/548,565, which was a continuation of the application leading to the '304 patent.

-12-                                        Case No. 08cv543 IEG (BGS)

**Exh. A-14**

1    The '591 application similarly includes a claim to priority to the Robb GB application; however,

2    since the asserted claims of the '591 application are not supported by the Robb GB application under

3    35 U.S.C. § 112, the priority claim under 35 U.S.C. § 119 to the Robb GB application is improper.

4          34.    On March 30, 2005, Mr. Jan Orkisz was deposed in the case of *DataQuill v. Kyocera*,

5    then pending in the U.S. District Court for the Southern District of California.  At his deposition, Mr.

6    Orkisz testified that he and Mr. Robb publicly distributed at the ScanTech exhibition, described

7    above, the *two-page* brochure (Orkisz deposition exhibit 93) depicting a DataQuill pen-shaped

8    device and containing marketing information.

9          35.    Unlike the prosecution of the '304 patent in which the two-page brochure was never

10   cited to the USPTO by DataQuill, DataQuill did submit the two-page brochure during the

11   prosecution of the '591 patent.  On September 19, 2005, just months after Mr. Orkisz's testimony,

12   DataQuill's counsel, Joseph Hetz of the Brinks Hofer law firm, filed an Information Disclosure

13   Statement ("IDS") submitting the two-page brochure to the USPTO, *inter alia*.  However, upon

14   information and belief, DataQuill's counsel mischaracterized the nature of the document that Mr.

15   Orkisz had testified that he and Mr. Robb had publicly distributed at ScanTech.  In the IDS,

16   DataQuill's patent prosecution counsel Hetz represented to the USPTO that the document that had

17   been publicly distributed at ScanTech in June of 1992 was a *one-page* flyer, not the *two-page*

18   brochure that was publicly distributed according to Mr. Orkisz's testimony.  DataQuill's patent

19   prosecution counsel Hetz submitted the *one-page* flyer to the USPTO, identified it as "Document

20   C88" and characterized it by stating:

21                     Document C88 includes a copy of Winfair Systems (Scotland) Limited

22                     flyers believed based on present investigation and recollection of

23                     events to have been made available to attendees at a trade show

24                     exhibition in the United Kingdom in June 1992.  Mr. Garry Robb was

25                     a principle [sic] of Winfair Systems.

26

27   September 19, 2005 IDS.

28

HTC CORPORATION'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND
COUNTERCLAIMS

Exh. A-15

36.     With respect to the *two-page* brochure, however, that Mr. Orkisz testified to having distributed with Mr. Robb at ScanTech, DataQuill's counsel Mr. Hetz only stated in the IDS: "In addition, Document C111 is a copy of two-sided Winfair System flyers, which flyers are *believed* to have been *made* in 1992." *Id.* (emphasis added).

37.     By mischaracterizing the two-page brochure as "believed to have been made" by Winfair Systems (Scotland), *instead of having actually been made and distributed* publicly more than a year before the filing of the application leading to the '304 patent, and doing so months after receiving Orkisz's testimony directly to the contrary, DataQuill's counsel committed an omission of material information during prosecution of the application for the '591 patent. Upon information and belief, that material omission implied to the USPTO that the two-page brochure was not prior art.

38.     Upon information and belief, at least DataQuill's patent prosecution counsel Hetz and Mr. Robb were aware of the two-page brochure and of Mr. Robb's and Mr. Orkisz's public distribution of the two-page brochure, either based on personal knowledge or via Mr. Orkisz's testimony.

39.     It would have been important to a reasonable examiner to know that the detailed two-page brochure was publicly disseminated to the relevant public more than a year prior to the filing of the Robb GB application, to which both the '304 and '591 patents attempted to claim priority, and more than one year prior to the filing of the PCT application that became the '304 patent, to which the '591 patent claimed priority. Further, the two-page brochure anticipates at least claim 1 of the '591 patent. Thus, the publicly disclosed *two-page* brochure was prior art under 35 U.S.C. § 102(b) regardless of whether the priority claim to the Robb GB application was proper, and material to the patentability of the claims of the '591 patent. With this high degree of materiality, intent can be inferred, and each claim of the '591 patent and '591 Reexamination Certificate is unenforceable.

### (d) Failure to Disclose the One-Page Flyer Publicly Distributed at ScanTech

40.     During prosecution of the application leading to the '591 patent, after Mr. Hetz submitted IDS on September 19, 2005 containing the mischaracterization of the two-page brochure, as discussed in paragraphs 31-37 above, Mr. Robb was re-deposed in the *DataQuill v. Kyocera* case

-14-                                    Case No. 08cv543 IEG (BGS)

on October 26, 2005.  In that deposition, Mr. Robb testified that he publicly distributed at least twenty copies of the one-page flyer to interested attendees at ScanTech in June of 1992.  However, Mr. Robb failed to disclose the one-page flyer to the USPTO during the prosecution of the application leading to the '304 patent, upon information and belief.  Examples of the materiality of the one-page flyer include that: the one-page flyer, in combination with the Glasgow Herald article discussed above, renders obvious at least claim 29 and/or 31 of the '304 patent; and, the one-page flyer alone anticipates at least claim 31 of the '304 patent.  With this high degree of materiality, intent can be inferred, and each claim of the '304 patent and '304 Reexamination Certificate is unenforceable.

### (e)  Failure to Disclose Actions, Including Priority Date Challenges, in European Counterpart Applications

41.     Upon information and belief, the '591 patent is unenforceable because, during prosecution of the application for the '591 patent, DataQuill committed inequitable conduct by failing to disclose to the USPTO materials relating to proceedings concerning European counterpart applications to the '304 and '591 patents-in-suit.

42.     DataQuill filed two European counterpart applications to the patents-in-suit, both of which also included a priority claim to the Robb GB application:  EP Application 94927728.9 (the "EP parent application," revoked by the European Patent Office ("EPO") on February 21, 2005) and EP98200196.8 ("the EP divisional application").  Third parties filed "Oppositions" against the issuance of the claims in each EP application. (An EPO Opposition is a proceeding in which third parties can oppose the issuance of a patent, somewhat akin to a reexamination request in the U.S. filed after the patent issues.)  The EPO considered and responded to those Oppositions.

43.     Three third parties lodged separate Oppositions to the EP divisional application – Philips (May 19, 2004), Nokia (June 24, 2004), and Alcatel (June 23, 2004).  Each Opposition relied upon various prior art references and also challenged the EP divisional application's priority date claim to the October 13, 1993 filing date of the Robb GB application (discussed above). Each Opposition argued that the priority date of the EP divisional application should be limited to September 27, 1994 and that the priority date claim to October 13, 1993 was improper.  The EPO

HTC CORPORATION'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES. AND COUNTERCLAIMS

Exh. A-17

1   subsequently sustained this priority challenge. Nevertheless, throughout the prosecution of the U.S.

2   patent application leading to the '591 patent, DataQuill maintained that it was entitled to claim

3   priority to the Robb GB application. In contravention of MPEP 2001.06 and MPEP 2001.06(a),

4   throughout prosecution of the application leading to the '591 patent (issued November 21, 2006),

5   DataQuill, the listed inventors, and their patent prosecution counsel, upon information and belief,

6   failed to inform the USPTO of the challenges to the priority date in the Oppositions and the bases

7   therefore.

8          44.    Upon information and belief, at least named inventors Doran and Callaghan and

9   DataQuill's patent prosecution counsel Mark Milhench were aware of the Oppositions and the

10  priority date challenges. For example, each opposition was prosecuted on behalf of DataQuill, and

11  primarily by Mr. Milhench. In the prosecution of the EP parent application, while responding to the

12  Oppositions, DataQuill's foreign associate requested an extension of time to reply to Oppositions

13  because of Mr. Milhench's transfer from a former firm to Mintz Levin Cohn Ferris Glovsky and

14  Popeo Intellectual Property, LLP ("Mintz Levin"), and to consult with named inventors Frank

15  Callaghan and Paul Doran. Specifically, in a letter to the EPO dated 8 September 2004, Mintz Levin

16  stated:

17          The respondent's principal contact, Mr. Frank Callaghan, was advised
            at the beginning of August by Mr. Milhench that he would be leaving
18          Jenkins. ... Mr. Callaghan subsequently concurred with his business
            partner, Mr. Paul Doran, on Mr. Doran's return from holiday and with
19          his legal advisors in the USA who are currently litigating the
            corresponding US patent, and decided to transfer responsibility for the
20          respondent's patent portfolio from Jenkins to ourselves [Mintz Levin]
            because Mr. Milhench has been involved with the DataQuill patent
21          portfolio since 1997. ... A further point to note is that as the
            respondent is currently litigating his corresponding US patent any
22          reply prepared by ourselves should be reviewed by the respondent's
            US advisors prior to filing, and in the time available this is clearly
23          impossible.

24  Upon information and belief, Mr. Callaghan and Mr. Doran were similarly consulted in the

25  prosecution of the EP divisional application.

26          45.    Upon information and belief, at least Mr. Doran, Mr. Callaghan, and Mr. Milhench

27  and associates at Mintz Levin knew of the proceedings in the counterpart EP applications and knew

28

HTC CORPORATION'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIMS

Exh. A-18

1    that information concerning those proceedings was material to the prosecution of the pending

2    application leading to the '591 patent.

3         46.    Further, upon information and belief, DataQuill's U.S. patent attorney knew of the

4    existence of the Oppositions filed in the EP counterpart application and was also aware of the duty to

5    disclose material information from foreign counterpart applications.

6         47.    For example, in an Information Disclosure Statement ("IDS") filed on October 1,

7    2004 in the prosecution of the U.S. patent application leading to the '591 patent, attorney Joseph

8    Hetz of the Brinks Hoffer Gilson and Lione law firm submitted, to the USPTO, an Office Action

9    (and an English translation thereof) issued by the Japanese Patent Office in a Japanese counterpart

10   application to the '304 patent.  Mr. Hetz also submitted, to the USPTO, copies of prior art references

11   cited in a Japanese Office Action and stated "Applicants also note that [prior art reference]

12   documents A134-A138 were cited in an Official Action in a Japanese patent application

13   corresponding to parent U.S. Patent No. 6,058,304.  A copy of an English translation of that Official

14   Action is enclosed as document A251." Oct. 1, 2004 IDS at 2.  By doing so, DataQuill's counsel

15   demonstrated that it understood the materiality of foreign counterpart patent applications, office

16   actions, and prior art cited therein and demonstrated that it understood its duty to disclose that

17   material information to the USPTO.

18        48.    However, when submitting information relating to the European counterpart

19   applications to the USPTO, DataQuill's counsel Hetz submitted only the docket sheets from those

20   EP applications and not material underlying documents from those EP applications, such as

21   documents reflecting the challenges to the priority date in the EP Oppositions mentioned above.  In

22   connection with filing a September 19, 2005 IDS in the application leading to the '591 patent,

23   DataQuill's counsel Hetz submitted the docket sheets and stated:

> Regarding documents C1-C235, multiple of these documents were either identified by Kyocera or DataQuill, and/or ... identified as additional information in EPO proceedings concerning counterpart patent applications. ... Documents C181 and C182 are online docket sheets of the EPO proceedings.

24

25

26

27

28

HTC CORPORATION'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIMS

**Exh. A-19**

1    Sept. 19, 2005 IDS at 2. However, upon information and belief, attorney Hetz remained completely

2    silent that any Opposition proceedings had taken place and that the priority claim was being

3    questioned.

4         49.     It would have been important to a reasonable USPTO examiner examining the

5    application leading to the '591 patent that the priority date of the EP counterpart application was

6    being challenged, because that priority date challenge would impact the priority date for the U.S.

7    application leading to the '591 patent, which also purports to claim priority therefrom. A U.S. patent

8    application's claim for priority is highly material to the patentability of what the application claims

9    to be the invention because a priority date defines the temporal scope of the prior art and,

10    accordingly, may determine validity, whether an issue arises in prosecution or later in court

11    challenges to validity. The challenge to the priority date in the EP divisional application refutes or,

12    at the least, is inconsistent with the position that DataQuill takes in asserting that the U.S. application

13    leading to the '591 patent was proper. It would have been important to a reasonable examiner to

14    consider the arguments concerning the priority date in the EP Oppositions.

15         50.     Thus, upon information and belief, Mr. Callaghan, Mr. Doran, and Mr. Hetz withheld

16    from the USPTO material information concerning the Oppositions in the European divisional

17    application, including information concerning the priority date challenges. Based on this showing of

18    materiality, intent can be inferred, and each claim of the '591 patent and '591 Reexamination

19    Certificate is unenforceable.

20         **(f) Failure to Disclose Garry Robb's '790 Patent Application and Art Cited Therein**

21         51.     On July 16, 1998, Garry Robb filed U.S. Patent Application S/N 09/101,790 ("the

22    Robb '790 application") (now U.S. Patent No. 6,177,950 in his own name. The Robb '790

23    application included disclosure and claims that were closely related to the disclosures of the '304

24    and '591 patents-in-suit. More specifically, the specification of each of the Robb '790 application

25    and '304 and '591 patents discloses a device having a display, a reading sensor, and a

26    telecommunications interface, for example. As an example of claim similarity, during the

27    prosecution of the Robb '790 application, Mr. Robb added claim 30 in a preliminary amendment

28    filed on July 16, 1998. Claim 30 was directed to:

HTC CORPORATION'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIMS

Exh. A-20

1       [a] personal communication device, comprising: a display for
        displaying data and video signals; a loudspeaker for generating an
2       audible signal; a microphone for receiving an audio signal; a keypad
        for entering data, a telecommunications interface for receiving and
3       transmitting information; and an integral adjustable reading head for
        producing an image signal.

4

5   Claims of the '304 patent, including claims that DataQuill alleges HTC's products to infringe,

6   include substantially similar limitations.  For example, claim 1 of the '304 patent calls for "[a] data

7   entry device" comprising "a display," the data entry device being integral with a cellular telephone

8   (microphone and loudspeaker), a "reading sensor," "communications interface," and a "reading

9   sensor," *inter alia*.  Accordingly, since at least as of July 16, 1998, the claims of the Robb '790

10  application could have conceivably served as the basis of a double patenting rejection in the

11  prosecution of the patents-in-suit; therefore, the existence of the Robb '790 application was highly

12  material to patentability of the '304 patent.

13      52.    Further, during the prosecution of the Robb '790 application, in an Office Action

14  dated October 27, 1999, examiner Ramakrishnaiah rejected claim 30 and others as obvious over

15  GB2289555A in view of U.S. Patent No. 5,436,654 (dated Feb. 7, 1994), *inter alia*.  On April 26,

16  2000, applicants to the Robb '790 application limited claim 30 by narrowing the scope in an attempt

17  to avoid the prior art references.  The fact that examiner Ramakrishnaiah rejected claim 30 and

18  others on the basis of prior art was material to the prosecution of the '304 patent for at least two

19  reasons.

20      53.    First, as demonstrated by claim 30, for example, at least some claims of the Robb

21  '790 application were substantially similar to claims of the '304 patent.  By prosecuting the claims

22  of the '304 patent, DataQuill was necessarily asserting to the USPTO that those claims were

23  patentable.  However, the USPTO's rejection of a substantially similar claim, such as claim 30 of the

24  '790 Robb application, refutes and is inconsistent with this position.  Such a contrary decision by

25  another USPTO examiner reviewing a substantially similar claim was highly material to the

26  prosecution of the '304 patent.

27      54.    Second, the prior art rejection of claim 30 and others would have been important to

28  the Examiner of the application leading to the '304 patent, because Mr. Robb's response of

HTC CORPORATION'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND
COUNTERCLAIMS

**Exh. A-21**

1   narrowing the scope of the claims in place of asserting any claim to priority such as to the Robb GB

2   application at least call into question the viability of the priority claim for the patents-in-suit.

3       55.     Other prior art considered by the USPTO during prosecution of the Robb '790

4   application also was material to the examination of the pending claims of the claims of the

5   applications leading to the patents-in-suit. For example, one prior art reference cited during the

6   prosecution of the Robb '790 application was U.S. Patent No. 5,491,507 to Umezawa ("Umezawa").

7   Umezawa disclosed a portable handheld computer that could include an integrated camera. Upon

8   information and belief, this reference would have been important to a reasonable examiner

9   examining the application leading to the '304 patent for at least the reason that the '304 patent

10  contains claims directed to a hand holdable unit that includes an integrated camera, such as claims

11  13, 45, and 46. Further, the USPTO has already determined that "a reasonable examiner would

12  consider the above prior references [including the Umezawa patent] important, alone or in

13  combination as stated in the Request, in making a decision as to the patentability of claims 1-62 of

14  the '591 patent" in an Order dated May 4, 2007, in application control number 90/008,394

15  (reexamination of the '591 patent), at pp. 2-3. The claims of the '591 patent are patentably indistinct

16  from those of the '304 patent.

17      56.     Upon information and belief, at least Mr. Robb withheld the existence of the Robb

18  '790 application from the USPTO examiner who evaluated the applications leading to the patents-in-

19  suit. The existence of the Robb '790 application, examiner Ramakrishnaiah's rejections of the

20  claims, and prior art cited during prosecution of the '790 application each would have been

21  important to a reasonable examiner examining the applications leading to the '304 patent.

22      57.     At least Mr. Robb (and possibly others involved in prosecuting the application

23  leading to the '304 patent) failed to satisfy his duty of disclosure to the USPTO by intentionally

24  withholding the material information described above, upon information and belief. USPTO rules

25  provide that "[i]ndividuals ... cannot assume that the examiner of a particular application is

26  necessarily aware of other applications which are 'material to patentability' of the application in

27  question, but must instead bring such other applications to the attention of the examiner." Manual of

28  Patent Examination Procedure ("MPEP") 2001.06(b). The showing of materiality of the withheld

1    information creates an inference that the failure to disclose the Robb '790 application and the prior

2    art cited therein was intentional.  This intentional failure to disclose highly material information to

3    the USPTO during prosecution of the application leading to the '304 patent constituted inequitable

4    conduct, rendering each claim of the '304 patent and the '304 Reexamination Certificate

5    unenforceable.

6                          **(g) Failure to Disclose Proper Inventorship**

7            58.    Upon information and belief, personnel at the University of Edinburgh, Jimmy

8    Johnstone and Rainer Thonnes, contributed to the conception of the subject matter of the alleged

9    invention of each of the patents-in-suit by their collaboration with Mr. Robb on a device for barcode

10   scanning.  For example, software and/or firmware would have been necessary to practice even a

11   single embodiment of the alleged inventions of the '304 and '591 patents.  It was at least Mr.

12   Thonnes who worked for almost five years in an effort to create such software and/or firmware for

13   DataQuill's pen-shaped prototype device, upon information and belief.  Upon information and

14   belief, Mr. Thonnes contributed to the conception of the subject matter related to the

15   software/firmware in the pen in an effort to cause the controller to be responsive to a command to

16   cause downloading of information from a remote processing center for updating information

17   previously stored in the data entry device, as is claimed in '304 patent 1 and 2 (and claims dependent

18   therefrom) and '591 patent claims 61 and 62. Upon information and belief, Mr. Johnstone

19   contributed to the conception of the subject matter related to the "telecommunications interface"

20   claimed in at least claims 1 and 2 of the '304 patent (and claims dependent therefrom) and claim 1 of

21   the '591 patent.  Upon information and belief, others in the United Kingdom, including Alec Tait,

22   Jan Orkisz, and Anthony Hopkin, contributed to the conception of the subject matter of at least one

23   claim of each of the patents-in-suit, including the software for the telecommunications interface of at

24   least claims 1 and 2 of the '304 patent (and claims dependent therefrom) and claim 1 of the '591

25   patent.

26           59.    Further, upon information and belief, Mr. Stephen Patton formed DataQuill Limited

27   with co-founder Garry Douglas Robb.  While a student at the University of Paisley, Mr. Patton held

28   the principal technical position and developed the hand-held bar code reader related to the '304

                                                          -21-                    Case No. 08cv543 IEG (BGS)
HTC CORPORATION'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND
                                          COUNTERCLAIMS

                                                                                            **Exh. A-23**

1  patent.  Upon information and belief, Mr. Patton contributed to the subject matter of the patents-in-

2  suit.

3       60.     The proper identity of inventors is material to patentability, since a patent cannot

4  issue if the named inventors did not invent the subject matter sought to be patented under 35 U.S.C.

5  § 102(f).  It would have been important to a reasonable examiner to be informed that the inventive

6  entity named on the application leading to each of the '304 and '591 patents-in-suit was incorrect.

7  The high degree of materiality of the identification of proper inventorship creates an inference that

8  the misrepresentation of inventorship to the USPTO was intentional.  Moreover, upon information

9  and belief, at least named inventor Robb was aware of the inventive contributions of Mr. Johnstone,

10  Prof. Thonnes, Mr. Tait, Mr. Orkisz, Mr. Hopkin and/or Mr. Patton because of his collaboration with

11  those individuals, and Mr. Robb intentionally withheld disclosure of the contributions of any and all

12  of those omitted inventors to the USPTO during prosecution of the applications for both the '304 and

13  '591 patents.  Therefore Mr. Robb committed inequitable conduct, and, as a result, each claim of the

14  '304 patent and '304 Reexamination Certificate and each claim of the '591 patent and '591

15  Reexamination Certificate is therefore unenforceable.

16                **(h) Failure to Disclose Invalidity/Anticipation Charts from Kyocera Case**

17       61.     In the prior *DataQuill v. Kyocera* case mentioned above, upon information and belief,

18  DataQuill obtained received a supplemental expert report submitted by Kyocera's technical expert

19  Royce Fletcher, which contained Mr. Fletcher's expert opinion that the claims the '304 patent were

20  invalid on the basis of certain prior art references.  This supplemental expert report was dated

21  August 5, 2005 ("August 5, 2005 Invalidity Report").  On information and belief, the August 5, 2005

22  Invalidity Report consisted of the following:  a 4-page report (numbered SUP_1-4); an Anticipation

23  Exhibit (pages ANT_SUP1-67) (the "Anticipation Exhibit"); a 38-page Obviousness Exhibit (page

24  numbers OBV_SUPP 1-38); a 3-page exhibit on one of skill in the art (numbered IMP_SUP 1-3); a

25  supplementation of documents reviewed (numbered DOC_SUP 1-2); and two attachments

26  (Attachment I and Attachment II).

27       62.     The Anticipation Exhibit included numerous pages of detailed claim charts explaining

28  how references, including the following, anticipated the claims of DataQuill's '304 patent: U.S.

-22-          Case No. 08cv543 IEG (BGS)

Patent No. 5,465,401 to Thompson; a prior art device referred to as the EO Personal Communicator as described in the book *AT&T EO Personal Communicator: The Digital Nomad's Guide*, (1993); and the publication of the Winfair materials (described above), upon information and belief. The Anticipation Exhibit is expressly referenced in the Invalidity Report, at page SUP_2 for example.

63.    DataQuill's attorney Joseph Hetz submitted an Information Disclosure Statement ("IDS") dated September 19, 2005, to the USPTO during the prosecution of the application leading to the '591 patent. In that IDS, Mr. Hetz submitted several pleadings and documents from various technical experts, including a document from DataQuill's technical expert, Edward Koch, presenting *inter alia* DataQuill's position that claims of the '304 patent were valid. Among those documents that Mr. Hetz submitted was "Edward Koch's Rebuttal to Certain New Contentions Raised by Kyocera, dated 06/23/05, numbered PX12-1-8," as IDS entry number C45 (referred to hereinafter as the "Koch Rebuttal"). In the Koch Rebuttal, DataQuill's expert Mr. Koch opined that claims of the '304 patent were not invalidated by the Thompson '401 patent, by the AT&T EO personal communicator, or the Winfair documents.

64.    Also buried within the numerous pages of references on the IDS was the listing C168: "*Excerpts* of Supplemental Expert Report of Royce W. Fletcher relating to validity, Kyocera Wireless, dated 08/05/05, SUP-1 to -4; OBV_SUP-1 to -38; IMP_SUP-1 to -3; DOC_SUP-1 to -2; Attachment I; Attachment II." (emphasis added). Upon information and belief, DataQuill intentionally excerpted and omitted the Anticipation Supplement from submission to the USPTO, despite DataQuill's submission of other selected materials from Mr. Fletcher.

65.    Given that DataQuill submitted what appear to be the complete opinions of its own expert Mr. Koch regarding the validity of claims of the '304 patent, the complete opinions of Kyocera's opposing expert Mr. Fletcher on the same issue would have been material to the examination of the pending claims of the related application leading to the '591 patent. Therefore, DataQuill's intentional failure to disclose the Anticipation Exhibit (indeed its excerption of the Anticipation Exhibit from the Invalidity Report), at least through attorney Hetz, during prosecution of the application leading to the '591 patent constituted inequitable conduct, rendering each claim of the '591 patent unenforceable.

HTC CORPORATION'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

**Exh. A-25**

1    66.    Further, during reexamination of each of the '304 patent and '591 patent, DataQuill's

2    attorney Hetz also failed to disclose the Anticipation Exhibit, even though Mr. Hetz and DataQuill

3    were on notice that the Anticipation Exhibit had not been previously disclosed to the PTO during the

4    prosecution of the patents-in-suit.  Such notice was provided at least through the filing of HTC's

5    Original Answer and Counterclaims on December 8, 2008: Counterclaim V(h) found therein

6    expressly contained the basis for this count of inequitable conduct related to DataQuill's failure to

7    disclose the Anticipation Exhibit.  Therefore, DataQuill's attorney's intentional failure to disclose

8    the Anticipation Exhibit (indeed its excerption of the Anticipation Exhibit from the Invalidity

9    Report), at least through attorney Hetz, during prosecution of the reexamination of the '304 patent

10   and the reexamination of the '591 patent constituted inequitable conduct, rendering each claim of the

11   '304 patent and '304 Reexamination Certificate and each claim of the '591 patent and '591

12   Reexamination Certificate unenforceable.

13                              **(i) Infectious Unenforceability**

14   67.    Under the doctrine of infectious unenforceability, the existence of inequitable conduct

15   during prosecution of a patent can lead to the unenforceability of a related patent if the inequitable

16   conduct has an immediate and necessary relation to the equity that DataQuill seeks in respect of the

17   matter in litigation.  The application leading to the '591 patent is a continuation of U.S. patent

18   application 09/548,565, which is a continuation of the application leading to the '304 patent.  The

19   disclosure and claims of the '591 patent are substantially the same as that of the '304 patent.  Thus,

20   inequitable conduct occurring during the prosecution history of the '304 patent necessarily relates to

21   the claims of the '591 patent.  As such, while HTC has set forth independent bases for the

22   unenforceability of the '591 patent, to the extent that the '304 patent is unenforceable due to

23   inequitable conduct, the '591 patent is also unenforceable based on the doctrine of infectious

24   unenforceability.  Therefore, each basis for inequitable conduct set forth above with respect to the

25   '304 patent further relates to and taints all issued claims of the '591 patent and thus further renders

26   the '591 patent unenforceable.

27   68.    In light of the foregoing, accordingly, HTC seeks a declaratory judgment pursuant to

28   28 U.S.C. §§ 2201-2202 that each of the claims of the '304 patent and '304 Reexamination

HTC CORPORATION'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIMS

**Exh. A-26**

1   Certificate and each of the claims of the '591 patent and '591 Reexamination Certificate is

2   unenforceable.

### COUNT VI

### (Request for Attorneys Fees and Costs)

5        69.     HTC re-alleges and incorporates by reference each preceding allegation as though

6   expressly stated herein.

7        70.     HTC is entitled to a declaration that this is an "exceptional" case within the meaning

8   of 35 U.S.C. § 285, entitling HTC to an award of its reasonable and necessary attorneys' fees,

9   expenses, and costs incurred in this action.

### JURY DEMAND

11        71.     Under Rule 38(b) of the Federal Rules of Civil Procedure, HTC respectfully requests

12   a jury trial on all issues and claims.

### PRAYER FOR RELIEF

14        WHEREFORE, HTC prays for judgment against DataQuill, and that the Court award the

15   following relief:

16        A.     Declare that HTC has not infringed, has not contributed to infringement of, and has

17   not induced infringement of any claim of the '304 patent, the '304 Reexamination Certificate, the

18   '591 patent, or the '591 Reexamination Certificate, either literally or under the doctrine of

19   equivalents;

20        B.     Declare that the claims of the '304 patent and of the '304 Reexamination Certificate

21   and that the claims of the '591 patent and the '591 Reexamination Certificate  are invalid;

22        C.     Declare that the claims of the '304 patent and of the '304 Reexamination Certificate

23   and that the claims of the '591 patent and the '591 Reexamination Certificate are unenforceable;

24        D.     Declare this case exceptional under 35 U.S.C. § 285 and award HTC its reasonable

25   attorneys' fees, expenses and costs incurred in this action; and

HTC CORPORATION'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIMS

**Exh. A-27**

1    E.    Award HTC such other and further relief as this Court deems just and proper.

2   Dated: July 8, 2010

3                                    Respectfully submitted,

4                                    **WILSON TURNER & KOSMO LLP**

5

6                                    By: _/s/ Frederick W. Kosmo, Jr._

7                                    FREDERICK W. KOSMO, JR.
                                     550 West C Street, Suite 1050
8                                    San Diego, California  92101
                                     Tel:  619.236.9600
9                                    Fax:  619.236.9669
                                     E-mail: fkosmo@wilsonturnerkosmo.com
10                                   _Attorneys for Defendant and Counterclaimant_
                                     _HTC CORPORATION_
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                     -26-              Case No. 08cv543 IEG (BGS)

HTC CORPORATION'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND
                            COUNTERCLAIMS              **Exh. A-28**