Gregory S. Markow
HECHT SOLBERG ROBINSON GOLDBERG BAGLEY LLP
600 West Broadway, 8th Floor
San Diego, California  92101
Telephone:     (619) 239-3444
Facsimile:     (619) 232-6828

Greg Smith
55 West Monroe, Suite 1930
Chicago, Illinois  60603
Telephone:     (312) 629-1918
Facsimile:     (312) 629-1988

Counsel for Plaintiff
DataQuill Limited, a British Virgin Islands Company

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DATAQUILL LIMITED,** | **No. 08-CV-00543 IEG (BGS)** |
| **Plaintiff,** | **DATAQUILL'S OPENING CLAIM CONSTRUCTION BRIEF** |
| **v.** | |
| **HIGH TECH COMPUTER CORP.** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |
| **HTC CORPORATION,** | Judge: Irma E. Gonzalez |
| **Counterplaintiff,** | Magistrate Judge: Bernard G. Skomal |
| **v.** | Claim Construction Hearing Date: January 28, 2011, 9:00 a.m. |
| **DATAQUILL LIMITED,** | |
| **Counterdefendant.** | |

# Table of Contents

Table of Contents ................................................................................................................ ii

Table of Authorities......................................................................................................... iii

I.      INTRODUCTION .................................................................................................. 1

II.     CLAIM INTERPRETATION PRINCIPLES ........................................................ 1

III.    ARGUMENT: INTERPRETATION OF THE PATENT CLAIMS ...................... 4

     1.    "a reading sensor" and "sensor" ............................................................. 4

          a)  "a reading sensor" ..................................................................... 4

          b)  "a sensor" ................................................................................ 10

     2.    "to … process said input signals"......................................................... 11

     3.    "to download"; "downloading" ............................................................ 14

     4.    "… up to date …"; "… updating …" ................................................... 166

     5.    "wherein programs in said data entry device are updateable remotely from a processing center" .................................................................... 25

     6.    "a camera" ............................................................................................ 27

     7.    "written text" ........................................................................................ 30

     8.    "natural language characters" ............................................................... 33

     9.    "additionally comprising as well as or instead of said display screen, and separate from said data entry device, means for displaying a selectable item with associated data sources for user selection of an item by operation of said data entry device" ............................................ 34

     10.   "a carrier" ............................................................................................. 35

     11.   "means for displaying a plurality of selectable items" ........................ 37

     12.   "comprises one or two manually operable switches for scrolling said display in a first and/or second direction" ............................................. 39

1

**Table of Authorities**

2

**Cases**

3

Acromed Corp. v. Sofamor Danek Group,
   1997 U.S. Dist. Lexis 23989 (N.D. Ohio 1997) ........................................................35

4

5

Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.,
   265 F.3d 1294 (Fed. Cir. 2001) .................................................................................22

6

Advanced Commun. Design, Inc. v. Premier Retail Networks, Inc.,
   46 Fed. Appx. 964, 980-81 (Fed. Cir. 2002) ....................................2, 10, 11, 27, 30

7

AquaTex Indus. v. Techniche Solutions, 419 F.3d 1374 (Fed. Cir. 2005) ....................................3

8

Atlantic Thermoplastics Co. v. Faytex Corp., 974 F.2d 1299 (Fed. Cir. 1992) ...........................20

9

Conoco, Inc. v. Energy & Envtl. Int'l, L.C., 460 F.3d 1349 (Fed. Cir. 2006) ..........................2, 37

10

Cordis Corp. v. Boston Sci. Corp., 561 F.3d 1319 (Fed. Cir. 2009) ...............................................8

11

DataQuill Ltd. v. Handspring, Inc., 2003 U.S. Dist. Lexis 2981 (N.D. Ill. 2003) ....................3, 14

12

Globetrotter Software v. Elan Computer Group, 236 F.3d 1363 (Fed. Cir. 2001) .......................22

13

Golight v. Wal-Mart Stores, 355 F.3d 1327 (Fed. Cir. 2004) ........................................................9

14

Harris Corp. v. Fed. Express Corp., 698 F. Supp. 2d 1345 (M.D. Fla. 2010) ..............................11

15

Hoganas AB v. Dresser Indus., 9 F.3d 948 (Fed. Cir. 1993) ........................................................20

16

In re Hayes Microcomputer Products, Inc. Patent Litigation,
   982 F.2d 1527 (Fed. Cir. 1992) .................................................................................35

17

18

Innovad Inc. v. Microsoft Corp., 260 F.3d 1326 (Fed. Cir. 2001) ...........................................39, 40

19

Inverness Med. Switz. GmbH v. Warner Lambert Co.,
   309 F.3d 1373 (Fed. Cir. 2002) ...................................................................................2

20

Kara Tech. Inc. v. Stamps.com Inc., 582 F.3d 1341 (Fed. Cir. 2009) ......................................4, 10

21

Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898 (Fed. Cir. 2004) ...................................14, 31

22

Linear Tech. Corp. v. ITC, 566 F.3d 1049 (Fed. Cir. 2009) ...................................................20, 22

23

Medtronic, Inc. v. Guidant Corp., 2004 U.S. Dist. Lexis 10020 (D. Minn. 2004) .......................22

24

Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259 (Fed. Cir. 1999) .........................................35

25

Outlast Techs., Inc. v. Frisby Techs., Inc., 128 Fed. Appx. 122 (Fed. Cir. 2005) ........................21

26

Personalized Media Commun., L.L.C. v. Int'l Trade Comm.,
   161 F.3d 696 (Fed. Cir. 1998) .....................................................................................5

27

28

Pfizer, Inc. v. Teva Pharm. USA. Inc., 429 F.3d 1364 (Fed.Cir. 2005) .......................................10

Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...................................1, 2, 3, 14

ResQNet.com, Inc. v. Lansa, Inc., 346 F.3d 1374 (Fed. Cir. 2003)..........................................20, 22

Rexnord Corp. v. Laitram Corp., 274 F.3d 1336 (Fed. Cir. 2001)..............................................3, 10

Sandisk Corp. v. Memorex Prods., 415 F.3d 1278 (Fed. Cir. 2005)......................................3, 9, 20

Schwing GmbH v. Putzmeister, 305 F.3d 1318 (Fed. Cir. 2002) ...................................................20

Shire LLC v. Sandoz, Inc., 2008 U.S. Dist. Lexis 110168 (D. Colo. 2008) ..................................19

Springs Window Fashions LP v. Novo Indus., L.P.,
    323 F.3d 989 (Fed. Cir. 2003) ...............................................................................................19, 20

SRI Int'l v. Matsushita Elec. Corp. of America,
    775 F.2d 1107 (Fed. Cir. 1985) (en banc) .................................................................................3

Superguide Corp. v. DirecTV Enters., 358 F.3d 870 (Fed. Cir. 2004) ..........................1, 2, 4, 7, 18

Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313 (Fed. Cir. 2002) ...................................3, 13

Therasense, Inc. v. Becton, Dickinson and Co.,
    2006 U.S. Dist. Lexis 66437 (N.D. Cal. 2006) ............................................................................6

Ventana Med. Sys. v. Biogenex Labs, Inc., 473 F.3d 1173 (Fed. Cir. 2006) ..............1, 3, 6, 22, 31

Verizon Cal. Inc. v. Ronald A. Katz Tech. Licensing, L.P.,
    326 F. Supp. 2d 1060 (C.D. Cal. 2003)......................................................................................11

Versa Corp. v. Ag-Bag Int'l Ltd., 392 F.3d 1325 (Fed. Cir. 2004)................................................38

Vita-Mix Corp. v. Basic Holding, Inc., 581 F.3d 1317 (Fed. Cir. 2009) ........................................3

Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576 (Fed. Cir. 1996) .................................1, 2, 41

**Rules and Statutes**

35 U.S.C. § 112, ¶ 6 ....................................................................................................34, 35, 37, 38

Fed. Cir. Rule 32.1(a) ......................................................................................................................2

**Dictionaries**

AMERICAN HERITAGE DICTIONARY (3rd Ed. 1992)..........................................................................15

IEEE STANDARD DICTIONARY OF ELECTRICAL AND ELECTRONICS TERMS (3rd Ed. 1984)............11

MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS (5th Ed. 1994)....................11

www.merriam-webster.com .............................................................................................................15

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th Ed. 1993)........5, 11, 15, 18, 30, 35, 39, 40

RANDOM HOUSE COLLEGE DICTIONARY (Rev. Ed. 1988) ............................................................30

## I.     INTRODUCTION

The patents-in-suit are U.S. patents no. 6,058,304 and no. 7,139,591.  Their specifications are the same in relevant substance.  Both were subject to reexamination in the Patent Office; reexamination certificates issued April 13, 2010 and October 27, 2009.  (See Smith Dec., Tabs A, B, C, D.)  The reexaminations resulted in renumbering of certain claims and amendment of others.

HTC's claim construction proposals ignore basic rules:  That claim terms have their ordinary meaning, unless there is evidence clearly demonstrating that the patentee intended to deviate from ordinary meaning or to disavow claim scope; That it is improper to import limitations into claims from embodiments in the patent specification; That statements made by a patentee during prosecution before the Patent Office cannot limit claim language unless they constitute "clear and unmistakable" disclaimer of claim scope.

The claims of DataQuill's patents use understandable terms in their ordinary sense. DataQuill proposes claim interpretations consistent with ordinary meaning, other claims, the patent specification, the prosecution history, and other district courts' interpretations of the same claim language.  DataQuill's proposals should be adopted.

## II.     CLAIM INTERPRETATION PRINCIPLES

Claim Language /Ordinary meaning.  Claim interpretation starts with "the words of the claims themselves."  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms."  Phillips v. AWH Corp., 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).[1]

"There is a heavy presumption that the terms used in patent claims mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art."  Superguide Corp. v. DirecTV Enters., 358 F.3d 870, 874-75 (Fed. Cir. 2004).

---

[1] "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Ventana Med. Sys. v. Biogenex Labs., Inc.,* 473 F.3d 1173, 1181 (Fed. Cir. 2006).

Ordinary meaning "may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Phillips, 415 F.3d at 1314.[2]  Elaboration beyond a claim's actual words is not warranted for each term: "[I]f a claim term (e.g., 'directly connected') is sufficiently clear such that no other definition is needed, the district court simply has no duty to wave into existence a different definition, one that uses different words than the words actually used in the claim language itself."  Advanced Commun. Design, Inc. v. Premier Retail Networks, Inc., 46 Fed. Appx. 964, 980-81 (Fed. Cir. 2002).[3]

Surrounding Claim Language and Other Claims.  The Federal Circuit instructs that "the context of the surrounding words of the claim … must be considered in determining the ordinary and customary meaning of those terms." Phillips, 415 F.3d at 1314.  Also, "[o]ther claims of the patent in question, both asserted and unasserted, can be valuable sources of enlightenment as to the meaning of a claim term." Id.

Specification and Prosecution History.  These sources cannot dictate a departure from ordinary meaning unless specific factors are met, factors not present here.   The heavy presumption of ordinary meaning controls "unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." Superguide, 358 F.3d at 874-75.  See also Conoco, Inc. v. Energy & Envtl. Int'l, L.C., 460 F.3d 1349, 1357 (Fed. Cir. 2006).  Any "special definition" must be "clearly stated in the patent specification or file history." Vitronics, 90 F.3d at 1582.  "[A]n accused infringer cannot overcome the 'heavy presumption' that a claim term takes on its ordinary meaning simply by pointing to the preferred

---

[2] "In such circumstances, general purpose dictionaries may be helpful." *Id.  See also Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1378-79 (Fed. Cir. 2002).

[3] The opinion includes a notice regarding unpublished opinions, but no legend designating it "nonprecedential". *See* Fed. Cir. Rule 32.1(a): "A nonprecedential disposition shall bear a legend designating it as nonprecedential."

1   embodiment or other structures or steps disclosed in the specification or prosecution history."

2   Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1327-28 (Fed. Cir. 2002).

3       In regard to the specification, embodiments there are not to be imported into claims:

4   "[A]lthough the specification often describes very specific embodiments of the invention, we

5   have repeatedly warned against confining the claims to those embodiments…. [C]laims may

6   embrace 'different subject matter than is illustrated in the specific embodiments in the

7   specification'." Phillips, 415 F.3d at 1323. See also Ventana Med. Sys. v. Biogenex Labs, Inc.,

8   473 F.3d 1173, 1182 (Fed. Cir. 2006) ("When the claim addresses only some of the features

9   disclosed in the specification, it is improper to limit the claim to other, unclaimed features.").

10      The Federal Circuit has held:

11          "Our case law is clear that an applicant is not required to describe in the
            specification every conceivable and possible future embodiment of his invention.
12          'If structural claims were to be limited to devices operated precisely as a
            specification-described embodiment is operated, there would be no need for
13          claims. Nor could an applicant, regardless of the prior art, claim more broadly
            than that embodiment.' In short, it is the claims that measure the invention, as
14          informed by the specification. As we noted long ago: 'Specifications teach.
            Claims claim.'"
15

16   Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1344 (Fed. Cir. 2001) (citing SRI Int'l v.

17   Matsushita Elec. Corp. of America, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc).).

18      In regard to prosecution history: "[B]ecause the prosecution history represents an ongoing

19   negotiation, 'it often lacks the clarity of the specification and thus is less useful for claim

20   construction purposes.'" AquaTex Indus. v. Techniche Solutions, 419 F.3d 1374, 1381 (Fed. Cir.

21   2005). For a patentee's statement in prosecution to limit claim terms, a patentee must "mak[e] a

22   clear and unmistakable disavowal of scope during prosecution." Vita-Mix Corp. v. Basic

23   Holding, Inc., 581 F.3d 1317, 1324 (Fed. Cir. 2009). "An ambiguous disclaimer…does not

24   advance the patent's notice function or justify public reliance, and the court will not use it to limit

25   a claim term's ordinary meaning." Sandisk Corp. v. Memorex Prods., 415 F.3d 1278, 1287 (Fed.

26   Cir. 2005).

27      Other District Court Claim Constructions. The Northern District of Illinois interpreted

28   certain terms of the '304 patent claims in the context of summary judgment. DataQuill Ltd. v.

1  Handspring, Inc., 2003 U.S. Dist. Lexis 2981, *13-27 (N.D. Ill. 2003).  Also, this District in a

2  prior matter held a three-day claim construction hearing (plus a supplemental hearing on "reading

3  sensor"), considered each term of the '304 patent claims, and issued claim interpretation orders

4  on several terms at issue here.   And, the Northern District of Texas also issued a claim

5  construction ruling construing terms of the '304 and '591 patent claims.  (See Smith Dec. Tabs 1-

6  3: 10/25/05 Order Reconsidering Construction of "Reading Sensor" and 10/25/05 Superseding

7  Claim Construction Order (S.D. Cal., Brewster, J.); 08/14/08 Order (N.D. Tex., Godbey, J.).)[4]

8  **III.     ARGUMENT: INTERPRETATION OF THE PATENT CLAIMS**

9        **1.  "a reading sensor" and "sensor"**

10            **a)  "a reading sensor"**

| HTC | DataQuill |
|---|---|
| **reading sensor:**  a structure capable of detecting a stimulus, visually, magnetically, or by locational movement of the structure across a surface, and that transmits a resulting signal for use by a controller to determine the data or commands represented by the stimulus. | **a reading sensor:**  a structure capable of detecting and reporting data;<br><br>Alternatively: a sensor capable of detecting and reporting commands or data. |

15  HTC's proposal is overly narrow and limits the term to parts of particular embodiments

16  from the specification, yet excludes other embodiments.   HTC also proposes extraneous

17  limitations that do not define the term "a reading sensor" but improperly concern other terms –

18  the function of "a controller".  HTC's proposal invites legal error.

19       DataQuill's proposal adopts an understanding of "a reading sensor" based on the words

20  and intrinsic record, giving the term its full, ordinary meaning and recognizing that the record

21  does not contain "words or expressions of manifest exclusion or restriction, representing a clear

22  disavowal of claim scope."   Superguide, 358 F.3d at 874-75.   See also Kara Tech. Inc. v.

23  Stamps.com Inc., 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The patentee is entitled to the full

24  scope of his claims, and we will not limit him to his preferred embodiment or import a limitation

25  from the specification into the claims.").

26

27  _____

[4] The other district courts' claim interpretations are in the prosecution record of the reexamined patents.

28  Also, while not binding they are relevant precedent and should be considered.

Plain Language.  The word "sensor" used here is a common and generally understood term.[5]  E.g., Personalized Media Commun., L.L.C. v. Int'l Trade Comm., 161 F.3d 696, 703-705 (Fed. Cir. 1998) ("'detector' had a well-known meaning to those of skill in the electrical arts"). A "sensor" senses; for example, a dictionary defines sensor as "a device that responds to a physical stimulus (as heat, light, sound, pressure, magnetism, or a particular motion) and transmits a resulting impulse (as for measurement or operating a control)".  (Smith Dec. Tab 4, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th Ed. 1993), herein "WEBSTER'S 10th Ed.") The patent uses "reading sensor" in a general way to identify a structure capable of detecting and reporting data.

Surrounding Claim Language and Other Claims.  The surrounding language of the claims in which the term "a reading sensor" appears confirms its general scope.  Independent claims recite:

> "a reading sensor responsive to commands and/or sensed commands and data to produce input signals" ('304 patent, claims 62, 64, 80, 82-106);

> "a reading sensor for sensing commands and/or data and for producing input signals in response to said sensed commands and/or data" ('304 patent, claims 78, 107-118; and '591 patent claim 1);

> "a reading sensor operable for sensing commands and/or data" ('591 patent, claim 62).[6]

As indicated, some independent claims, for example, further require "a reading sensor" as "responsive to commands and/or sensed commands and data to produce input signals," while other claims only require "a reading sensor" as operable for "for sensing commands and/or data" etc.  It would be improper to read all these limitations into the general term "a reading sensor".

As further support, dependent claims and an independent claim recite further limitations, identifying particular types of "reading sensors".  By reciting particular reading sensor types, these claims exemplify the general purpose scope of the term, and instruct that the general term "a reading sensor" includes – but is not limited to – these particular types or functions:

---

[5] Its construction is addressed in the next section below.

[6] Only independent claims are cited in this list; the term is also in corresponding dependent claims.

"a touch sensitive screen forming a said reading sensor" ('304 patent, claims 62, 9, 40);

"a said reading sensor is a motion detector or a scanning device" ('304 patent, claims 12, 44);

"said scanning device is a camera"; "said readings sensor comprises a camera" ('304 claims 13, 45, 46);

"said sensor is a bar code and/or dot code reader" ('304 patent, claims 43, 82, 83, 84);

"a said reading sensor is a roller ball responsive to movement cause by a user" ('304 patent, claim 76);

"a said reading sensor is a bar code reader device or other optical code reader device" ('304 patent, claim 77);

"a said reading sensor is for reading coded data" ('304 patent, claims 41, 42);

"a said reading sensor is for reading coded data such as fingerprints or signatures or written text" ('304 patent, claims 80, 82, 83, 84);

"further limitations, wherein by utilizing a said reading sensor said hand held device is operable to sense coded data associated with alphabetic characters" ('304 patent, claim 65);

"further limitations wherein utilizing a said reading sensor said hand held device is operable to… sense a code which is made of user understandable language" ('304 patent, claim 71);

"a reading sensor operable for sensing commands and/or data"; "(ii) said data sensed is coded data…and wherein each coded data of said plurality of coded data corresponds to an individual item of said user selectable items" ('591 patent, claim 62).

The general term "a reading sensor" is not to be limited to the specifically claimed embodiments.  See, e.g., Therasense, Inc. v. Becton, Dickinson and Co., 2006 U.S. Dist. Lexis 66437, *28-29 (N.D. Cal. 2006) ("that Plaintiffs identify specific processes in Claims 33, 34, and 35, which are all dependent on Claim 16, implies that no such limitation exists in Claim 16"); Ventana, 473 F.3d at 1181-82 ("[E]ach claim does not necessarily cover every feature disclosed in the specification. When the claim addresses only some of the features disclosed in the specification, it is improper to limit the claim to other, unclaimed features.").

Specification and Prosecution History.  The specification and prosecution history do not demonstrate any "intent to deviate from the ordinary and accustomed meaning" by "words or

expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."

<u>Superguide</u>, 358 F.3d at 874-75.  The specification states that:  "Exemplary embodiments of the invention" are described "by way of example only"; and, "[a]lthough specific embodiments of the invention have been described hereinabove, it will be appreciated that many modifications and/or additions are possible within the scope of the present invention." (5:57-58; 16:43-46.)[7]

The specification uses "a reading sensor" in a general way, for example, stating "a reading sensor for sensing commands and/or data."   (Abstract; <u>see</u> <u>also</u> 2:13-17.)   It also describes example embodiments of reading sensors, such as a motion detector, touch sensitive screen, sensing means in the manner of a personal computer mouse, rolling ball, camera, scanner, bar code scanner, dot code scanner, blob code scanner, scanning sensor, and magnetic strip sensor.  These embodiments are clearly described as examples, and also refer to structures which may sense, more generally, <u>e.g.</u>, "data", "commands", "data representations", or "coded data".  <u>See</u> '304 patent specification:

> "Preferably, the hand held unit comprises a sensor for reading coded data" (3:47);
>
> "The invention finds particular, but not exclusive application to the reading of bar codes and/or binary dot codes whereby the sensor is a bar code and/or dot code reader.  It will be appreciated that the invention also applies to other forms of codes." (3:47-55);
>
> The unit "may comprise" (reading sensor that traces movements) (3:56-65);
>
> "alternate types of reading head" to be connected (4:54);
>
> "As an alternative to the use of bar codes, other data representations could be used." (5:35-43);
>
> "a reading sensor in the form of a camera…" (5:37-38);
>
> "As an example of a possible mode of operation…(e.g., a bar code reading head)" (5:44-47);
>
> "one embodiment…for example"; "Other types of reading head may be provided" (6:28-32, 39-42);
>
> "data captured by the reader head" (8:59-63);

---

[7] The '304 and '591 patents' specifications are the same in relevant substance.  Except where noted, DataQuill's citations in this Brief are all to the pagination, columns and lines of the '304 patent, in the format [col. #]:[line #s].

"a light sensor" (10:1-2);

"another example"; touch sensitive screen "entry can be used in place of or in addition to the entry of commands by scanning the bar codes" (12:65 to 13:34);

"The invention is also applicable to the reading of other coded data sources such as, for example, magnetic strips, graphical representations and/or alphanumeric characters, by the provision of an appropriate reading head and control logic." (13:36-48);

"Alternative…. For example" (computer mouse-like roller ball) (13:49-64);

"codes other than bar codes or dot codes could be used" – examples of a camera or other scanning sensor (17:48-58);

"bar codes or other codes" (17:59).

Of particular note is the example embodiment of a touch sensitive screen as a reading sensor, in that HTC's proposal appears to exclude this embodiment.  The specification states: "One or more touch sensitive areas can be defined on the touch sensitive screen area, in combination with data displayed … for the entry of commands and/or the selection of displayed items" and, for example, can be used "in place of" the bar code scanner which forms the reading sensor in other embodiments.  (12:65 to 13:21, 33-35.)  (See also '304 claims 9, 40, 62.)

Nor is a "clear and unmistakable" disclaimer of claim scope found in the prosecution history.  In the Joint Claim Chart HTC confusingly cites to statements in the re-examination proceedings for the '304 patent regarding a reference named *Martinez*.  It is unclear how HTC proposes to use its citation to these statements; however, they are inapposite.  In the discussion of *Martinez,* the patentee did not assert that a camera cannot be a reading sensor as HTC's citation appears to imply.  To the contrary, the patentee acknowledged a camera can be a reading sensor, and did not dispute that *Martinez's* camera met the claim 26 limitation of "a reading sensor." Instead, what patentee pointed out was that the camera of *Martinez* did not satisfy the *other* limitations – which were particular to claim 26 (and others with the same language) – required by claim language for the functions of the "reading sensor" recited in those claims.

"A disclaimer must be 'clear and unmistakable,' and unclear prosecution history cannot be used to limit claims."  Cordis Corp. v. Boston Sci. Corp., 561 F.3d 1319, 1329 (Fed. Cir. 2009).  Where "the statements in the prosecution history are subject to multiple reasonable

interpretations, they do not constitute a clear and unmistakable departure from the ordinary meaning of the term." Sandisk, 415 F.3d at 1287 (quoting Golight v. Wal-Mart Stores, 355 F.3d 1327, 1332 (Fed. Cir. 2004)); Id. (statements must "have no reasonable interpretation other than to disavow" alleged subject matter). A person of ordinary skill reviewing the prosecution history would conclude that "reading sensor" is used in a general sense as proposed by DataQuill, not that it was narrowed as HTC proposes.[8]

Other Judicial Construction of Term. Judge Brewster in this District determined that "a reading sensor" is "a structure capable of detecting and reporting data." (Smith Dec., Tab 1, p. 3; Tab 2, p. 3.) Judge Godbey in the Northern District of Texas determined that it is "a sensor capable of detecting and reporting commands or data." (Id., Tab 3, p. 7.)

HTC's Proposal. HTC's proposal invites legal error and should be rejected. HTC proposes to limit "a reading sensor" to a structure capable of detecting a stimulus in only three particular ways: "visually, magnetically, or by locational movement of the structure across a surface".

HTC's proposal improperly excludes embodiments in the specification, and even in dependent claims. For example, it is unclear how a reading sensor in the form of a touch sensitive screen would fit HTC's restriction to devices that detect stimulus "visually, magnetically, or by locational movement of the structure across a surface". Compare '304 patent, claims 62, 9, 40 ("…a touch sensitive screen forming a said reading sensor, said controller being arranged to be responsive to a location at which said screen is touched for user input").

Also, HTC distorts even the examples it cherry-picks, creating further ambiguity. HTC's proposal lists detecting a stimulus "*visually*"; but even dependent claim 77, for example, utilizes a more general term "optical". ('304 claim 77) ("or other optical code reader device"); (see also specification example, 13:39: "optically readable codes…"). Also, HTC lists detecting a stimulus "by *locational* movement of the structure *across a surface*"; but even dependent claims

---

[8] Also, for example, the Examiner in the '304 reexamination found that the Thompson reference "teaches a reading sensor in the form of a touch sensitive screen…." (April 1, 2008 First Office Action in '304 patent reexam. (no. 90/008,340), pg. 15.)

use the more general terms "a motion detector," or "a roller ball responsive to movement cause by a user." ('304 claims 12, 44, 76.)

HTC's proposal both improperly restricts the general term "reading sensor" to only particular embodiments, and at the same time excludes other embodiments of the specification. "The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims". Kara Tech., 582 F.3d at 1348; see also Rexnord Corp., 274 F.3d at 1344 ("[A]n applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention. If structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims."). "A claim construction that excludes a preferred embodiment is 'rarely, if ever, correct.'" Pfizer, Inc. v. Teva Pharm. USA. Inc., 429 F.3d 1364, 1374 (Fed.Cir. 2005).

      **b)  "a sensor"**

| HTC | DataQuill |
|---|---|
| **sensor ['591 patent]:**  a structure capable of detecting a stimulus, such as light, temperature, radiation level, or the like, and that transmits a resulting signal. | **a sensor:** means what it says, "a sensor" and no elaboration is needed.<br><br>Alternatively:  a structure capable of detecting a stimulus, such as light, temperature, radiation level, or the like, and that transmits a resulting signal. |

HTC does not dispute the construction of Judge Godbey (N.D. Texas) for "sensor" which is based on Random House and Webster's dictionaries.  (See Smith Dec., Tab 3, at 6).

However, as noted above, "sensor" is a common and generally understood term; it is a device that senses.  DataQuill believes that it is "a claim term [that] is sufficiently clear such that no other definition is needed" and the Court here is not required "to wave into existence a different definition, one that uses different words than the words actually used in the claim language itself." Advanced Commun. Design, 46 Fed. Appx. at 980-81.  If for economy and simplicity reasons alone, the word "sensor" is sufficiently clear that other words are unneeded.

### 2. "to … process said input signals"

| HTC | DataQuill |
|---|---|
| a controller coupled to said reading sensor to receive and **process said input signals:** perform operations on the input signals, including, but not limited to determining the content represented by the stimulus detected by the reading sensor | a controller coupled to said reading sensor to receive and **process said input signals:** means what it says and no elaboration is needed. Alternatively:  subject the input signals to examination or analysis. Alternatively:  perform any operation or combination of operations on the input signals. Alternatively:  manipulate the input signals. |

Plain Language.  "To process" is a common term used in its ordinary sense.  It is easily understood, and is sufficiently clear that no judicial construction using different words is needed here.  See Advanced Commun., 46 Fed. Appx., supra, at 980-88.[9]  DataQuill alternatively proposes constructions based on dictionary definitions cited by both parties (HTC's dictionary citations support DataQuill, not HTC).

An ordinary definition includes: "To process: to subject to examination or analysis" (Smith Dec., Tab 4, WEBSTER'S 10th Ed.). And, technical dictionary definitions cited by HTC support DataQuill's ordinary understanding, not HTC's narrowing:  "Data processing: Pertaining to any operation or combination of operations on data" (IEEE STANDARD DICTIONARY OF ELECTRICAL AND ELECTRONICS TERMS (3rd Ed. 1984));[10] and "Data Processing: Any operation or combination of operations on data, including everything that happens to data from the time they are observed or collected to the time they are destroyed." (MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS (5th Ed. 1994)).[11]

---

[9] *E.g., Harris Corp. v. Fed. Express Corp.,* 698 F. Supp. 2d 1345, 1347 (M.D. Fla. 2010) ("FedEx initially sought construction of the term 'further processing,' but at the Markman hearing conceded that the term did not require construction.").

[10] *See also* the same IEEE Dictionary (cited by HTC), entry for "Data processor":  "Any device capable of performing operations on data…."

[11] *See also Verizon Cal. Inc. v. Ronald A. Katz Tech. Licensing, L.P.,* 326 F. Supp. 2d 1060 (C.D. Cal. 2003) (not contested:  "'processing' means 'manipulation of data which performs some operation or sequence of operations on the data.'").

<u>Surrounding Claim Language and Other Claims</u>.  The claims recite particular operations that confirm the ordinary usage of the general term "to process."  Some examples:  "…selectively control transmission over said communications interface of command and/or data signals as determined by said input signals processed by said controller"; "…display commands and/or information under control of said input signals processed by said controller".  ('304 claims, e.g., 62, 64, 80, 82, 83.)

<u>Specification</u>.[12]   Example operations here demonstrate the breadth of the general term "processing," and do not express any "clear and unmistakable" disclaimer.  Some examples:

"process the input signals from the sensor for responding to the commands" etc. "processing…of data" (2:19-21; 2:34);

controller arranged "to access the stored information for selectable items to determine natural language characters or images corresponding to the coded data for display" (3:47-51);
controller "to cause the captured data to be displayed on the display" (3:66-67);

controller arranged "to respond to appropriate commands … to issue coded instructions via the telecommunications interface to the data processing centre and to receive programming data (e.g., relating to information for selectable items) from the programming centre for storage in the hand held unit" (4:20-26);

"…display instructions from the processor" (8:53);

"…in the present embodiment signals relating to data captured by the reader head 14 are passed directly to the processor 74 to be processed." (8:61-63);

"In the present embodiment…."; processor "to receive signals from the reading head, to interpret those signals and to derive data therefrom which are displayed on the display 20 and stored in the RAM" (8:59; 9:14-20);

"…decode the changing levels of reflected illumination to generate a numerical value"; "tests the numerical values to determine whether the sensed code relates to data or a command"; "executes that command and causes the display of a human readable command description"; "causes an error message to be displayed on the display screen"; "code … treated as data…. then stored in RAM" (9:66-10:34);

"…performs a series of diagnostic checks…displays an initial message" (11:3-7);

programming using "'dot' commands" (12:35-50).

Also, additional examples:

---

[12] HTC did not cite prosecution history in support of its proposed construction of this term.

"A touch screen interface 88 couples the touch sensitive screen to the bus 84 so that data sensed by the touch sensitive screen can be communicated to the processor 74.  ….the processor 74 can be arranged to display a menu of user selectable items and to be responsive to a location at which the screen is touched for input of a user selection of a menu item" (13:2-17);

"processing functions of the device including: accepting data from the head 14; accepting data from the switches 22 and 24; driving the indicator 26; processing the data received from the head in the manner described with respect to the previous embodiments in order to extract the necessary information; controlling the flow of data in and out of the RAM 78; controlling the flow of data in and out of the ROM 76; interfacing with the power control module 72; implementing the modem function … and also providing the necessary processing and control for integration with a digital telephony system and/or a cellular telephone network; controlling the loudspeaker 95 … accepting input from a microphone 152 to enable the pen in combination with the loudspeaker 95 to operate as a hand set for the purposes of audio telephony; controlling the flow of data to an optional printer socket…." (14:40-49.)

Other Judicial Construction of Term.  In this District, Judge Brewster stated in an earlier matter that "to process" means "to subject to examination or analysis."  (Smith Dec., Tab 2, p. 3.) Judge Godbey's construction was "to produce an output, generated according to some mapping function, when presented with an input." (Id., Tab 3, p. 13.)

HTC's grammatically vague proposal is that "to…process said input signals" requires particular operations on the input signals "including…determining the content represented by the stimulus detected…."   HTC's proposal merely adds words into the ordinary meaning of "process," contradicting even the dictionaries HTC itself cites.  (See technical dictionaries cited above, e.g., "any operation or combination of operations on data".)   While HTC points to embodiments in the specification, it cannot provide a proper basis for restricting the ordinary meaning of "to process".  Moreover, HTC proposes to add ambiguous verbiage that isn't in the embodiments' discussion of processing:  "…determining *the content* represented by the stimulus detected…."  It is unclear in this context what HTC means by adding these words.

There is no proper basis for HTC's proposal; it should be rejected.  Patentee here made no disclaimer in the specification requiring "process" to be limited as HTC proposes.  E.g., Teleflex, 299 F.3d at 1327-28 ("[A]n accused infringer cannot overcome the 'heavy presumption' that a claim term takes on its ordinary meaning simply by pointing to the preferred embodiment or

other structures or steps disclosed in the specification or prosecution history."); <u>Liebel-Flarsheim Co. v. Medrad, Inc.</u>, 358 F.3d 898, 906 (Fed. Cir. 2004) ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'").[13]

### 3. "to download"; "downloading"

| HTC | DataQuill |
|---|---|
| **to download [also for '591 patent]:** to transfer from one place to another. | **to download:** to transfer from one place to storage at another. |
| **downloading:** transferring from one place to another | **downloading:** transferring from one place to storage at another. |

DataQuill proposes a construction that is consistent with ordinary meaning and supported by usage of the term in the specification, surrounding claim language and other claims. HTC's construction creates potential ambiguity, because it fails to specify that the transferred information is transferred to storage. HTC's proposal in effect simply substitutes the word "transfer" for the word used in the claims, "download". It should not be adopted.

In *DataQuill v. Handspring,* Judge Kocoras of the Northern District of Illinois ruled: "The claim term 'downloading of information' means that information is both received and stored." <u>DataQuill Ltd. v. Handspring, Inc.</u>, 2003 U.S. Dist. Lexis 2981, *25-27 (N.D. Ill. 2003). Judge Brewster of this District ruled that it means "transferring from one place to storage at another". (Smith Dec., Tab 2, p. 4.) In the Northern District of Texas, infringer RIM (represented by the same lawyers who represent HTC here) agreed with Judge Brewster's construction. (<u>Id</u>., Tab 19, page 20 of Amended Joint Claim Chart in *RIM v. DataQuill*.)

<u>Plain Language</u>. It is common experience to download, for example, a software program, music files, etc. to a personal computer or a handheld device. After downloading, such items are available in storage in the device. A relevant dictionary defines "to download" as "to transfer

---

[13] *Phillips,* 415 F.3d at 1323 ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments…. [C]laims may embrace 'different subject matter than is illustrated in the specific embodiments in the specification'.").

(data) from a usu. large computer to the memory of another device (as a smaller computer)." (Smith Dec., Tab 4, WEBSTER'S 10th Ed.)  The term "the memory" refers to the part of the device that stores information.  (See also Id., Tab 7, AMERICAN HERITAGE DICTIONARY (3rd Ed. 1992), "storage": "The part of a computer that stores information for subsequent use or retrieval.")   The definition of "download" at merriam-webster.com additionally provides examples: "Download (vt): to transfer (as data or files) from a usually large COMPUTER to the memory of another device (as a smaller computer) Examples of DOWNLOAD – He downloaded the FILES onto his computer. – She downloads songs from the INTERNET. – The new program makes downloading faster."  (Id., Tab 5.)

Surrounding Claim Language and Other Claims.  Surrounding claim language indicates that "downloading" requires transferring (e.g. information or data) into storage.  For example, claims recite that "downloading of information" is "for updating information previously stored in said rewritable storage."  (E.g., '304 claims 59, 64, 80-107, 110, 113, 116.)   Other claims recite: "memory…operable for retaining downloaded information…" ('591 claim 3; see also '591 claims 19, 32, 47, 19, 50, 51, 52, 61, 62.)

Specification.  The patent specification also supports DataQuill's proposed construction:

"The item description data can relate, for example, to items from a merchandising catalogue. In this case the rewritable storage capacity of the pen (e.g., the RAM 78) is chosen to be sufficient to store all the items from one or more merchandising catalogues. If the data is stored in volatile memory, this data is downloaded from the remote processing centre via the telecommunications link on restoring power to the memory in the pen…. [T]hrough the use of rewritable memory and control logic enabling the memory to be updated using data downloaded from the remote processing centre, it is possible to keep the pen's memory up to date on a full list of merchandisable items, including product description, availability, price, etc." (10:35-61);

"Where programs are to be downloaded, rewritable program storage will be needed…." (12:35-50).

DataQuill's proposed construction should be adopted over HTC's proposal.

### 4.  "… up to date …"; "… updating …"

| HTC | DataQuill |
|---|---|
| '304 Claim 62 – **wherein said downloading of information … is to bring description information in storage … up to date**:  such that only the information that has changed from the most recent download of information is downloaded to make the information in storage current<br><br>**wherein, a said command to cause  downloading is a command to bring information up to date for an individual user selectable item of a plurality of user selectable items**:  such that the command to cause downloading is a command that causes only the information that has changed from the most recent download of information to be downloaded to bring the description information concerning an individual user selectable item in storage current | '304 Claim 62 – **wherein said downloading of information: is to bring description information in storage corresponding to an individual user selectable item of said plurality of user selectable items up to date for a user**:  means what it says and no elaboration is needed<br><br>**wherein, a said command to cause downloading is a command to bring information up to date for an individual user selectable item of a plurality of user selectable items**:  means what it says and no elaboration is needed |
| '304 Claim 64 – **said controller is responsive to a said command to cause**:  ordinary meaning; no construction required<br><br>**downloading of information from a remote processing center as required for updating information previously stored in said data entry device**:  transferring from the remote processing center only information that has changed from the information most recently stored in the data entry device<br><br>**(d) said controller being responsive to a said command to cause**:  ordinary meaning; no construction necessary<br><br>**downloading of information from a remote processing center as required for updating information previously stored**:  transferring from the remote processing center only information that has changed from the information most recently stored<br><br>**(i) is to bring said information previously stored for said individual item up to date for a user**:  to make information for the individual item previously downloaded and stored in storage current by downloading only the information that has changed from the most recent download<br><br>**(iii) a said command is a command to bring information up to date for an individual user selectable item of a plurality of user selectable items**:  such that the command is a command that changes only the information that has changed from the most recent information for an individual user selectable item | '304 Claim 64 – **said controller is responsive to a said command to cause downloading of information from a remote processing center as required for updating information previously stored in said data entry device**:  means what it says and no elaboration is needed<br><br><br><br>**(d) said controller being responsive to a said command to cause downloading of information from a remote processing center as required for updating information previously stored:  (i) is to bring said information previously stored for said individual item up to date for a user**:  means what it says and no elaboration is needed<br><br><br><br>**(iii) a said command is a command to bring information up to date for an individual user selectable item of a plurality of user selectable items**:  means what it says and no elaboration is needed |
| '304 Claim 80 – **wherein said controller is responsive to a said command to cause downloading of information from a remote processing center as required for updating information previously stored in said data entry device**: See claim 64, element 64(d) | '304 Claim 80 – **wherein said controller is responsive to a said command to cause downloading of information from a remote processing center as required for updating information previously stored in said data entry device**:  means what it says and no elaboration is needed |

| | |
|---|---|
| '304 Claim 81 – **said controller being responsive to a said command to cause**:  ordinary meaning; no construction necessary<br><br>**downloading of information from said remote processing center as required for updating information previously stored in said rewritable storage for one or more of said selectable items**: transferring from the remote processing center only information that has changed from the information most recently stored in the rewritable storage for one or more of the selectable items to bring the information for one or more of the selectable items current | '304 Claim 81 – **said controller being responsive to a said command to cause downloading of information from said remote processing center as required for updating information previously stored in said rewritable storage for one or more of said selectable items**:  means what it says and no elaboration is needed |
| '591 Claim 32 – **memory … operable for retaining information for updating downloaded information previously retained in said memory**:  the memory is operable to store information, the information being only information that has changed from information most recently stored in memory | '591 Claim 32 – **memory … operable for retaining information for updating downloaded information previously retained in said memory**:  means what it says and no elaboration is needed |
| '591 Claim 38 – **in response to entry of a user command to download information from said remote processing center for retention in said memory to update information previously retained in said memory for one or more of said merchandisable items**:  upon a user entering a command, only information that has changed from information most recently stored in the memory for one or more of the merchandisable items is transferred from the remote processing center for storage in memory | '591 Claim 38 – **in response to entry of a user command to download information from said remote processing center for retention in said memory to update information previously retained in said memory for one or more of said merchandisable items**:  means what it says and no elaboration is needed |
| '591 Claim 61 – **to download … in response to entry of a user command, information from said remote processing center for retention in said memory to update information previously retained in said memory for one or more of said merchandisable items**:  to transmit from a remote processing center upon a user entering a command, only information that has changed from information most recently stored in the memory for one or more of the merchandisable items for storage in memory | '591 Claim 61 – **to download … in response to entry of a user command, information from said remote processing center for retention in said memory to update information previously retained in said memory for one or more of said merchandisable items**:  means what it says and no elaboration is needed |
| '591 Claim 62 – **said hand held computer … is operable in response to entry of a user command to download information from said remote processing center for retention in said memory to update information previously retained in said memory for one or more of said items**:  upon a user entering a command, the portable computer initiates the transfer of only information that has changed from information most recently stored in the memory for one or more of the merchandisable items from the remote processing center for storage in memory | '591 Claim 62 – **said hand held computer using said wireless telecommunications interface also is operable in response to entry of a user command to download information from said remote processing center for retention in said memory to update information previously retained in said memory for one or more of said items**:  means what it says and no elaboration is needed |

As shown above there are at least eight different claim phrases that use different formulations of "update" or "updating."  Despite the obvious different language among the claims above, HTC lumps together all claim elements that include a form of the word "update"

(including "up to date", "updating") for the same narrowing construction.  For all such claim elements, HTC proposes to add a limitation that claim language must be limited to:  "only the information that has changed from the most recent download of information"; or "only information that has changed from information most recently stored"; or "only the information that has changed from the most recent information."

HTC's proposal to narrow these claim terms is not supported.

<u>Plain Language</u>.  Initially, the term "update" and its forms are common and easily understood, and there is no need for restricting these terms.  (<u>E.g.</u>, Smith Dec., Tab 4, WEBSTER'S 10th Ed.) (To update: "to bring up to date").

<u>Surrounding Claim Language and Other Claims</u>.  The above claim terms use the language "update," "up to date," "updating" in an understandable manner.  The surrounding language of the claims in which forms of "update" appear does not require the narrowing HTC proposes.  Unasserted '591 claim 19, for example, contradicts HTC's position and indicates that "to download information to update information…" can include "information that has changed or has not changed":

> "19. A portable hand held computer according to claim 3 wherein said wireless telecommunications interface is operable to download information to update information describing one or more of said merchandisable items previously retained **wherein such information has changed or has not changed**."

<u>See</u> <u>Phillips</u>, 415 F.3d at 1314 ("Other claims of the patent in question, both asserted and unasserted, can be valuable sources of enlightenment as to the meaning of a claim term.").

<u>Specification</u>.  The specification does not demonstrate any "intent to deviate from the ordinary and accustomed meaning" by "words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."   <u>Superguide</u>, 358 F.3d at 874-75.   The specification includes different examples of updating, and uses "update" and its forms in an ordinary way.   (<u>E.g.</u>, 10:35-61) ("through the use of rewritable memory and control logic enabling the memory to be updated using data downloaded from the remote processing centre, it is possible to keep the pen's memory up to date on a full list of merchandisable items, including product description, availability, price, etc."; "check on whether an update…is needed")  (<u>See</u>

1   also, e.g., 16:64-17:7) ("…as an alternative to down-loading, for example a complete catalogue,

2   via the telephone line, other data entry means could be provided for the bulk of the data, the

3   telephone line then only being used for updating the stored data"); or (12:42-45), etc..  The patent

4   specification does not require HTC's narrowing.

5       Prosecution History.  In the Joint Claim Construction Chart, HTC cites an April 13, 2000

6   Preliminary Amendment and Remarks filed by DataQuill in application no. 09/548,565,

7   concerning application claims 31 and 76.  The '565 application was a continuation filed after the

8   application that issued as the '304 patent, and before the application that issued as the '591

9   patent.  The '565 application was abandoned.  It appears that HTC relies on patentee's arguments

10  in the abandoned '565 application to justify its position.

11      HTC's reliance on these arguments is improper.  First, these arguments were retracted by

12  the patentee, were made once, and were not restated in the file history.  Second, the retracted

13  arguments would be inapplicable in any event because they concerned different claims, and

14  different claim language, than that in claims at issue here.

15      An applicant is permitted to retract prior arguments on claim scope made in

16  prosecution.[14]  That is what DataQuill did here.  On June 15, 2004, in the prosecution of the '565

17  application, patentee filed an "Amendment" and "Remarks" paper.  In that paper, patentee

18  allowed the '565 application to go abandoned.  Also, referring specifically to the paper filed on

19  April 13, 2000 (the one cited by HTC in the Joint Chart), patentee clearly informed the examiner

20  that:

21      "Applicants also withdraw and disavow reliance on their arguments in regard to
        Claims 31 and 76 made in the paper filed on April 13, 2000."

22  (Smith Dec., Tab 8, "Remarks," p. 3.)

23      This withdrawal and disavowal of the arguments in the April 13, 2000 paper was repeated

24  _____

25  [14] Prosecution history disclaimer "does not apply 'where the alleged disavowal of claim scope is
    ambiguous,' or where the alleged disclaimer is retracted by amendments or other means."  *Shire LLC v.*

26  *Sandoz, Inc.,* 2008 U.S. Dist. Lexis 110168, 20-21 (D. Colo. 2008) (citing *Springs Window Fashions LP v.*
    *Novo Indus., L.P.,* 323 F.3d 989, 996 (Fed. Cir. 2003)).  *See Springs Window,* 323 F.3d at 996 ("If the

27  applicant mistakenly disclaimed coverage of the claimed invention, then the applicant should have
    amended the file to reflect the error, as the applicant is the party in the best position to do so. The

28  applicant [here] never retracted any of his statements distinguishing [the reference]….").

in the child application no. 10/869,215 – which led to the '591 patent.  There, also on June 15, 2004, patentee filed a "Preliminary Amendment" and "Remarks".  In that paper, patentee notified the examiner that it reserved and may revisit patentability of the rejected claims (with their formulation of updating); and, patentee repeated its withdrawal of the arguments it previously advanced on claims 31 and 76, and its disavowal of reliance on them:

> "Applicants reserve the right to later pursue other claims from parent application serial number 09/548,565 in this or another application.  The filing of this continuation application should not be interpreted as an acquiescence by Applicants of the correctness of the rejections in parent application serial number 09/548,565.  Applicants also withdraw and disavow reliance on their arguments in regard to Claims 31 and 76 made in the paper filed on April 13, 2000 in parent application serial number 09/548,565."

(Tab 9, "Preliminary Amendment" and "Remarks," p. 3.)

The purportedly limiting statements HTC cites to were "withdraw[n]," "disavow[ed]," and were not later stated in the prosecution.  The arguments cannot now reasonably be relied on as evidencing a "clear and unmistakable disavowal of claim scope." ResQNet.com, Inc. v. Lansa, Inc., 346 F.3d 1374, 1383 (Fed. Cir. 2003) (statements made during prosecution of the parent patent must "evince a 'clear and unmistakable' disavowal of claim scope that would compel a result different than the claim language"); Linear Tech. Corp. v. ITC, 566 F.3d 1049, 1058 (Fed. Cir. 2009); Springs Window, 323 F.3d at 996.

Likewise, given the purpose of the doctrine of prosecution history disclaimer, it cannot be fairly said that a competitor is reasonably relying on arguments in one part of the prosecution history, while at the same time ignoring that they were expressly retracted in the same prosecution history:  "[I]t cannot be used to limit the scope of a claim unless the applicant took a position before the PTO that would lead a competitor to believe that the applicant had disavowed coverage of the relevant subject matter."  Schwing GmbH v. Putzmeister, 305 F.3d 1318, 1324 (Fed. Cir. 2002).[15]  A disclaimer must be clear and unambiguous and "justify public reliance."

---

[15] "The legal standard for determining what subject matter was relinquished is an objective one, measured from the vantage point of what a competitor was reasonably entitled to conclude, from the prosecution history, that the applicant gave up to procure issuance of the patent."  Hoganas AB v. Dresser Indus., 9 F.3d 948, 952 (Fed. Cir. 1993).

See Sandisk, 415 F.3d at 1287.[16]   See also Atlantic Thermoplastics Co. v. Faytex Corp., 974 F.2d 1299, 1301 (Fed. Cir. 1992) ("Taken as a whole, the prosecution history…does not show that Atlantic intended to limit itself to a process."); Schwing, 305 F.3d at 1325 (same); Outlast Techs., Inc. v. Frisby Techs., Inc., 128 Fed. Appx. 122, 127 n.5 (Fed. Cir. 2005) ("[S]eemingly contradictory statements do not unequivocally or unambiguously disclaim articles [asserted by defendant].   [S]uch contradictory statements are indicative of ambiguity. Contrary to [defendant's] contention, our decision in *Springs Window,* in no way suggests that we should ignore the second of two conflicting statements in the prosecution history.").

Second, in any event, the retracted arguments concerned different claim language than that HTC proposes to construe here.  Patentee's arguments in the abandoned '565 application were directed to the particular language used in claims 31 and 76, arguing for example:  "in a system as set forth in claim 31", "In claim 76," and "in a system according to claim 76…."  (See Abandoned app. no. 09/548,565, April 13, 2000 Remarks, pgs. 16-18, 24.)  These abandoned claims 31 and 76 utilized particular language, different from that in the claims being construed here:

| Abandoned - app. no. 09/548,565, claims 31, 76: |
| --- |
| '31. …said controller being responsive to a said command to cause downloading of information from said remote processing center as required for updating information previously stored in said rewritable storage for selectable items.' |
| '76. …said controller being responsive to a download command to cause downloading of information from said remote processing center as required for updating information previously stored in said rewritable storage for selectable items.' |

In the child application (no. 10/869,215 - which led to the '591 patent), patentee did not present claims 31 and 76.  Patentee presented new claims that omitted the formulation of updating language used in the abandoned application's claims.[17]   These new claims issued as

---

[16] "[P]rosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution. An ambiguous disclaimer, however, does not advance the patent's notice function or justify public reliance, and the court will not use it to limit a claim term's ordinary meaning." *Sandisk,* 415 F.3d at 1287.

[17] Patentee also presented four claims (66, 68, 72, 73) from the abandoned '565 application re-written in independent form as 1-4; these four claims did not include any updating limitation.  (Smith Dec., Tab 9.)

1   claims in the '591 patent. (Nor did patentee restate the retracted arguments in the prosecution

2   history of the '591 patent.)

3        For example, asserted '591 claim 32 refers to "updating" only in its "memory" limitation.

4   It omits phrasing (e.g., "as required" or "…for selectable items") found in abandoned claims 31

5   and 76, and uses broader terminology than those claims did: "memory…operable for retaining

6   information for updating downloaded information previously retained in said memory".  All the

7   asserted claims in the '591 patent (e.g., claims 32, 38, 61, 62) are materially different from the

8   claims argued in the abandoned application.  (E.g., '591 claim 61 omits "as required", uses "for

9   one or more merchandisable items".)

10        Under Federal Circuit precedent this difference is legally relevant.  "Although a parent

11   patent's prosecution history may inform the claim construction of its descendent, the [parent]

12   patent's prosecution history is irrelevant to the meaning of this limitation because the two patents

13   do not share the same claim language." ResQNet.com, 346 F.3d at 1383; Ventana, 473 F.3d at

14   1183 (same).  "[Defendant] primarily relies on portions of the prosecution history directed at

15   claims having different limitations than claim 55. Therefore, [defendant's] arguments concerning

16   the prosecution history are not relevant."  Globetrotter Software v. Elan Computer Group, 236

17   F.3d 1363, 1369 (Fed. Cir. 2001).[18]

18        Turning to the '304 patent, its asserted claims (e.g., clams 62, 64, 80, 81, 82 etc.) also are

19   different from claims 31 and 76 argued in the abandoned '565 application.  The closest claim

20   language is in '304 patent claims 80 or 81.  They nonetheless are materially different.  Claim 80,

21   rather than claiming "for updating information…for selectable items" as in claims 31 and 76,

22   states simply "for updating information previously stored in said data entry device" – e.g.,

23   without reference to "selectable items" at all.  Claim 81, rather than claiming "for updating

24   information…for selectable items" (plural), as in claims 31 and 76, states "for updating

25

26   [18] There is "no 'clear and unmistakable' disavowal of claim scope where the prosecution history of the
parent patent did not address the same claim limitations".  Linear Tech., 566 F.3d at 1059 (citing

27   ResQNet.com, 346 F.3d at 1383).  See also Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc., 265
F.3d 1294, 1305-06 (Fed. Cir. 2001) (declining to construe a term more narrowly based on the parent

28   patent's prosecution history because common claim terms were not in dispute).

information…for *one or more of* said selectable items".  While a difference of a few words, it is a material difference, changing to a broader "one or more" formulation.[19]  In fact, the language updating information previously stored "for selectable items" does not appear in any of the claim language HTC seeks to limit here.[20]

HTC's proposal to limit claim language based on (withdrawn and disavowed) statements in the prosecution history about different language lacks legal merit and should not be adopted.

Third, patentee's other statements in the prosecution record (subsequent to its withdrawal and disavowal of its prior arguments) do not support HTC's attempt to use the retracted arguments from the abandoned '565 application.  Patentee did not restate the arguments from the abandoned '565 application it had withdrawn and disavowed.  Also, for example, in the re-examination proceedings for the '304 and '591 patents, the third-party requester identified for the examiner what it understood to be patentee's position on relevant claim terms, such as "Updating information[:] Means brings information up to date."  (Smith Dec., Tab 10, Jan. 25, 2007 Request for Reexam. of U.S. 6,058,304, <u>e.g.</u>, pp. 10, 14); (<u>Id</u>., Tab 11, <u>e.g.</u>, pp. 20, 24.)  In the same filing, the third-party requester pointed out to the examiner patentee's other interpretations, for example:

| 6,058,304 - claims | * * * | Plaintiff's Interpretation of Claim language in Dispute |
|---|---|---|
| "said controller is responsive to a said command to cause downloading of information from a remote processing center as required for updating information previously stored in said data entry device." | * * * | **Downloading of information** means that a device receives and stores information.<br>Store means place or leave in a computer memory for preservation or later use.<br>**Required** has its ordinary meaning and does not need to be specially defined.  In the alternative:  As required means as needed.<br>**Updating information** means bringing information up to date.<br>**Stored** means placed or left in a computer memory for preservation or later use. |

---

[19] *See Medtronic, Inc. v. Guidant Corp.,* 2004 U.S. Dist. Lexis 10020, *51-52 (D. Minn. 2004) ("The plural form of a word 'pertain[s] to more than one.'  Thus, the ordinary meaning of the word 'cycles' means more than one cycle. ….  The claim does not state 'one or more cardiac cycles.'  Had the claim included that language, there would be no question that the claim was intended to include the singular.").

[20] Among other differences, the retracted arguments focused on a "for selectable items" (plural) formulation not found here.  (*See* April 13, 2000 Remarks, *e.g.*, pp. 16-18.)  Also, HTC's use of the retracted arguments is otherwise suspect.  For example, the retracted arguments' discussed "information that has changed".  They did not articulate specific types of change as HTC wants to add in its proposal – "information that has changed *from the most recent download*" – verbiage not in the retracted arguments.

(Id., Tab 10, "Exhibit V," 4/28/05 Joint Claim Construction Chart for U.S. Patent No. 6,058,304, *DataQuill Ltd.  v. Kyocera Wireless,* No. 01 CV2302B (BLM) (S.D. Cal.), e.g., pp. 12-13.)[21]

Also in the '304 and '591 patent re-examination proceedings, patentee submitted a "Supplemental Response" to the first office action, including a declaration to the examiner with attached claim charts showing the applicability of claims to exemplary products of patentee's licensees.  Contrary to expressing any narrowing of claim scope, the patentee indicated to the examiner and public that, e.g., the "downloading of information…as required for updating information previously stored…" claim language in the '304 patent is inclusive of example operations such as "refresh" or "reload" of a web page, and other inclusive operations.  (Smith Dec., Tab 14, Supplemental Response "Declaration of John Donnelly," "Exhibit C," pp. DQ11265-66, DQ11270, DQ11277, DQ11280, DQ11393, DQ11404, DQ11406-07, DQ11417, DQ11437-38, DQ10332.)[22]  In the same submission to the examiner, patentee also indicated that it was construing claims in the charts consistent with Judge Brewster's prior rulings:  "For claim construction, see J. Brewster's October 25, 2005 Markman Order, S.D. California."  (Id., Tab 14, e.g., pp. DQ11388, DQ11392-93, DQ11404-07, DQ11416-17, DQ11437-38, DQ10332-33.)  The Markman Orders of Judge Brewster – which were submitted as part of the prosecution history record (e.g., U.S. 7,139,591 B1, p. 11, top left; Smith Dec., Tab 12, entries D4, D5; Tab 13, same) – did not narrow the claim terms in regard to "update" and "updating" as HTC proposes. (Id., Tab 2, e.g., pp. 4, 9.)

Patentee also otherwise indicated in the record that its statements should not be relied on to narrow the claims' scope:   "Patentee's statements in the prosecution of this and the applications leading to the '591 patent should not be relied upon as expressions of exclusion or narrowing, or as representing a disavowal or disclaimer, of claim scope or subject matter." (Smith Dec. Tab 16, April 13, 2009, Comments on Reasons for Patentability, file no. 90/008,394,

---

[21] *See also* Smith Dec., Tab 11, the Feb. 2, 2007, Request for Reexam. of U.S. 7,139,591, *e.g.*, pp. 20, 24, which includes the same claim construction references.  *See also id.,* "Exhibit AF," cover sheet showing that same Joint Claim Chart was submitted by third-party requester in the '591 patent reexamination.

[22] See also Smith Dec., Tab 15, submission of same Donnelly declaration in '591 patent reexamination.

1  pg. 5.)[23]

2       Other Judicial Construction of Term.  See Judge Brewster's Claim Construction Order in

3  this District, in *DataQuill v. Kyocera Wireless*, discussed above:  "updating" terminology

4  construed as written.  (Smith Dec., Tab 2, <u>e.g.</u>, pp. 4, 9.)  In the Northern District of Texas,

5  accused infringer RIM and patentee both agreed in a Joint Claim Construction Chart that the

6  "updating" phrases mean what they say, <u>e.g.</u>, "updating" "means what it says and no elaboration

7  is needed."  These "updating" phrases (including most of those at issue here) were not construed

8  as disclaiming any scope as HTC proposes here.  (<u>Id.</u>, Tab 19, 10/02/07 Joint Claim Construction

9  Chart, *RIM v. DataQuill Ltd.*, No. 06 CV0973 (N.D. Tex.), <u>e.g.</u>, pp. 2, 18-19, 47, 52-55, 69, 82-

10  84, 88-89, 93-94.)   This Joint Chart was submitted to the examiner for the record in the

11  reexamination proceedings.  (<u>See</u> Smith Dec., Tab 13, Aug. 7, 2007 Supp. Information Discl.

12  Statements, pg. 5, referring to "claim construction process" in *RIM v. DataQuill* litigation.  <u>See</u>

13  <u>also id.</u>, Tabs 20 and 21, Oct. 3, 2007 Supp. Information Discl. Statements in both files, referring

14  to document L10, Joint Claim Chart.)

15       The above claim terms mean what they say.  HTC's proposal to add limitations lacks

16  merit and should be rejected.

17  **5.   "wherein programs in said data entry device are updateable remotely from a**
   **processing center"**

18

| HTC | DataQuill |
|---|---|
| '304 Claim 97 – **wherein programs in said data entry device are updateable remotely from a processing center:**  such that programs stored in the data entry device are made current by downloading only the changes to the most recently | '304 Claim 97 – **wherein programs in said data entry device are updateable remotely from a processing center:**  means what it says and no elaboration is needed |

---

[23] *See also id.,* Tab 17, Oct. 26, 2009 Patentee's Second Response to Second Office Action and Response to Advisory Action, file no. 90/008,340, p. 67 n.1:  "No statements by Patentee in this or related applications should be utilized by the public to show a disclaimer, narrowing or surrender of any subject matter of claims in this or the related applications, or *vice versa.*  To the extent not already clear under the law, any withdrawn or statements in pre-corrected form should not be relied on or utilized by the public."; *see also id.,* Tab 18,, December 15, 2009, Patentee's Comments on Reasons for Patentability and/or Confirmation, in file no. 90/008,340, pp. 1-2: "…Patentee's statements in the prosecution record of this reexamination application and the application leading to the '304 patent (and the application records of related patents including the related '591 and '785 patents) should not be read or perceived by the public as expressions of exclusion, narrowing, or as representing a disavowal or disclaimer, of an issued claim's scope or subject matter."

| | |
|---|---|
| stored programs upon initiation by the remote processing center | |
| '304 Claim 113 – **wherein programs in said hand holdable unit are updateable remotely from said processing center:**  such that programs stored in the hand holdable unit can be made current by downloading only the changes to the most recently stored programs upon initiation by the remote processing center | '304 Claim 113 – **wherein programs in said hand holdable unit are updateable remotely from said processing center:**  means what it says and no elaboration is needed |

HTC lumps the above claim limitations together with those discussed in the preceding section, and attempts to apply the same prosecution history to narrow them.  Yet this claim language is as materially different as that discussed in the previous section (if not more so) from the claim language to which the withdrawn arguments in the abandoned '565 application were directed.  DataQuill's response in the preceding section applies equally here to refute HTC's proposal to limit this claim language: the subject prosecution arguments were withdrawn and disavowed; they addressed different claim language; and did not even argue the ambiguous verbiage HTC wants to insert, e.g., "…to the most recently stored programs…."

In addition, HTC proposes to add to the above claim limitations the additional requirement of "…upon initiation by the remote processing center."  This proposal should be rejected as well.  First, the plain claim language has no indication that updating of programs is initiated by the claimed processing center.  Second, neither the prosecution history HTC points to, nor the patent specification have a "clear and unmistakable disclaimer" that requires HTC's insertion of this requirement.  To the contrary, examples in the specification contradict HTC's proposal, referring to examples of initiation of programming via the hand held unit:

> "The controller in the hand held unit is preferably arranged to respond to appropriate commands input, for example via the reading sensor, to issue coded instructions via the telecommunications interface to the data processing centre and to receive programming data (e.g., relating to information for selectable items) from the programming centre for storage in the hand held unit."

(4:20-26.)  Also:

> "As an example of a possible mode of operation, a command character (e.g., a bar code) can be read using the reading head (e.g., a bar code reading head) and this can be used to load down remote data from a remote station."

(5:44-47.)

> "If the code read is not recognised, for example, the pen can be programmed automatically to call up the remote processing centre to check on whether an update of the pen's storage is needed when the pen is replaced in the base unit."

(10:57-61.  <u>See also</u> 11:56-61, FIG. 6 example: "after entering the desired items, a phone number is then entered in step S6 by scanning the command bar code 'Phone' followed by the number of the processing centre 108 to be called. As an alternative to entering separately the telephone number, this could be pre-stored in memory…").

There is no indication that operation is required to be "…upon initiation by the remote processing center," as HTC proposes.[24]  HTC's proposals to restrict this claim language invite legal error, and should not be adopted.

### 6. "a camera"

| HTC | DataQuill |
|---|---|
| **camera [also in '591 patent]:** a device that can capture an image, which could be an image of one or more characters, and recognize the contents of the image when used in combination with a processor which may execute image recognition software | **camera:** means what it says and no elaboration is needed |

<u>Plain Language</u>.  The term "a camera" identifies a common and well known device. "Camera" is a generally understood term; no judicial construction using different words is needed.  <u>See</u> <u>Advanced Commun.</u>, 46 Fed. Appx., supra, at 980-88.  In contrast, HTC's proposal, aside from being awkward to follow, merely seeks to add on limitations to restrict an otherwise easily understood term.  HTC's proposal is without merit.

<u>Surrounding Claim Language and Other Claims</u>.  Camera is a general, generic term that is used in various claims.  These various claims, however, recite different functions required of a "camera" that are specific to that claim in which the term appears.  For example, '304 claim 73 recites:  "a camera…operable to sense and capture data relating to a plurality of selectable items" and "said data is made of one or more images".  And, '304 claim 74 recites "further limitations wherein said camera is operable to sense and capture user visible codes".   For example, '591 claims 3, 35, 37 and 62 recite:  "a sensor operable to sense and capture data wherein said sensor is a camera".  And, '591 claims 50 and 52 recite "a camera operable for sensing and capturing

---

[24] Optionally, the specification states generally that commands also can be received from the remote data processing centre.  (2:38-44, 13:51-57.)

data".  The claims show that "a camera" is a generic term that includes different subclasses of cameras with different functions depending on the claim in which it is used.  It would be improper to read all the limitations into the meaning of "a camera".

Specification.  In an exemplary embodiment, the patent describes a camera-equipped "data entry device": "[I]f the data entry device is provided with a reading sensor in the form of a camera or other scanning sensor rather than a bar code reader, *and* the *data entry device* is provided with character or image recognition logic…." (5:35-43.)  It describes an embodiment with a camera, with provision for adding "character or image recognition logic".  Moreover, it is "the data entry device" that is provided with such character or image recognition logic; it does not require or limit "a camera" to having such.  (5:35-43.  See also 17:48-58.)

Prosecution History.  In the Joint Chart, HTC cites to patentee's June 2, 2008 response to an April 1, 2008 office action in the reexamination of the '304 patent.  HTC appears to be relying on patentee's remarks concerning a cited *Martinez* reference.  This prosecution history, however, does not support HTC's assertion.  Initially, the cited file history is inapposite because it does not address the claim term "a camera" but rather addresses particular claim language that relates to "a reading sensor".

The April 1, 2008 office action rejected claims 1 and 26 and others based on *Martinez*.  In its response, patentee pointed out that in regard to claim 1 the particular video camera described in the *Martinez* reference did not meet claim 1's requirement that claim 1's "reading sensor" be "responsive to commands and/or sensed commands…."  Patentee did not assert that any camera cannot be a reading sensor (or even the particular one recited in claim 1), nor did patentee assert that those claims that use the term "a camera" were somehow restricted.  Patentee simply asserted that the particular camera *of Martinez* did not qualify to meet the particular reading sensor limitations further claimed *in claim 1*:  "*Martinez* does not disclose a camera that is responsive to commands or to sensed commands.  Instead, at the cited passage, *Martinez* discloses a video camera 'to view the user or a customer, and to generate a video signal.'" (June 2, 2008 Response, at 78.)

In fact, patentee did not dispute that even *Martinez's* camera met the broader "reading

sensor" type claimed, _e.g.,_ in claims 26 and 29, which recite: "a reading sensor for sensing commands and/or data…." (Id., pp. 86-88.)[25]  Instead, it distinguished claims 26 and 29 on other grounds, for example, that _Martinez's_ camera did not qualify for other limitations in the claims: "_Martinez_ … has no disclosure or teaching at all of using its camera to select from a plurality of items that have information programmed into storage, as required by Elements 26.2 and 29.2." (Id., p. 87)

It is unclear what HTC hopes to argue from this citation.  Patentee's cited remarks did not address the definition of the claim term "a camera."  Patentee did point out that the particular camera described in _Martinez_ did not meet certain added limitations for "a reading sensor" as claimed in particular claims.  Patentee's statements certainly did not narrowly construe the claim term "a camera" as HTC proposes.

HTC Proposal.  HTC proposes to add a limitation requiring that a camera "…can capture an image, which could be an image of one or more characters…."[26]  Such a construction is contradicted by the language of the patents' claims.  For example, for claims that recite "a camera operable for sensing and capturing data" ('591 claims 50, 52; see also claim 32), HTC offers no reasoned basis for requiring that the claimed camera must be able capture a specific type of data ("images") as proposed by HTC.  So long as the limitations of these claims are met, if there are cameras capable of capturing data which are not images, they are not excluded.

HTC also proposes to restrict "a camera" to devices that "can…recognize the contents of the image when used in combination with a processor which may execute image recognition software".   HTC's proposal is inconsistent with the patent claims and specification, and ambiguous to the point of being incomprehensible.  It should be rejected.

---

[25] For example, Patentee stated: "In that regard, for Element 26.1, adopted Exhibit S relies upon _Martinez's_ camera to meet the 'reading sensor' requirement.  Requester, however, for Element 26.3 points out nothing about _Martinez's_ camera that senses data to which the controller responds to select an item, let alone 'to select a said item' as required by Element 26.3.  (Requester's analysis does not even identify what it asserts are the purported selectable items. …)" (_Id._, p. 88.)

[26] HTC's proposal for language saying what an image "could be" is at best ambiguous; it either adds nothing or, if intended as a limitation, is not understandable.

As set forth above, claims refer to a camera "sensing and capturing data"; they do not require the camera to be capable of "recognizing" data.  Likewise in the specification, in the camera-equipped examples it is "the data entry device" that "is provided with character or image recognition logic."  (5:35-43.)  Image recognition is not required of the camera.  (5:35-43.)  In another reference to a camera-equipped embodiment, the patent states: "With a camera and appropriate recognition logic, *the pen* could be used, for example, for fingerprint recognition." (17:47-58, emphasis added.)  The camera itself, even in these embodiments, does not have to "recognize".

Also, HTC's proposed added "recognize" limitation does not even construe the term "camera"; rather, it specifies what a processor might do – if it receives data captured by a camera, and if it has image recognition software.  HTC's proposal should be rejected.

### 7.  "written text"

| HTC | DataQuill |
|---|---|
| **written text:**  handwritten text | **written text:** means what it says and no elaboration is needed |

HTC proposes to change the claim language so it says "handwritten" instead of "written." HTC's proposal is not claim construction; it is claim re-writing.  There is no need for a judicial construction of "written text."

Plain Language.  "Written text" is a generally understood term; no judicial construction using different words is needed.  *Advanced Commun.*, 46 Fed. Appx., supra, at 980-88.   A dictionary defines "written" as "expressed in writing (opposed to spoken)."  (Smith Dec., Tab 6, RANDOM HOUSE COLLEGE DICTIONARY (Rev. Ed. 1988).)

HTC cites a dictionary entry defining the verb form "write/written" rather than the adjective "written."  But even the definitions HTC picked do not support its proposal to restrict "written" to "handwritten."  HTC picked "write/written: 1(a) to form (as characters or symbols) on a surface with an instrument (as a pen); b: to form (as words) by inscribing the characters or symbols of on a surface."  (WEBSTER'S TENTH NEW COLLEGIATE DICTIONARY (1993).)  Although definition 1(a) gives the example of a pen, writing can be accomplished with other instruments

(e.g., a typewriter, a printing press, a computer) that do not imply handwriting.  Definition 1(b) does not mention or imply handwriting; for example, words inscribed on buildings and billboards typically are not handwritten.[27]

Surrounding Claim Language and Other Claims.  The '304 claims recite:  "…coded data such as fingerprints or signatures or written text" ('304 claims 80, 82, 83, 84); "…wherein said coded data comprises fingerprints, or signatures, or written text" ('304 claim 81); and "…said coded data is coded data having user visible written text" ('304 claims 80, 81).

Specification.  For example, the specification describes an embodiment "…wherein the reading sensor traces movements of the reading head and wherein the controller is responsive to signals from the sensor representative of the movements for identifying characters traced…" (5:58-61), but this example is not limited to using handwriting.

In another section, the specification discusses an example of movement of "the data entry pen" rather than a reading head for "'writing' down" characters by use of "a rolling ball in a holder in the reading head…."  (13:52-64.)   But even this example is not confined to "handwriting" and instead refers to "defining a series of vectors as the pen is moved over a surface and for performing pattern recognition on the resulting vector patterns…." (13:56-61.)  It is clearly an example (starting out "For example"), and does not represent any "clear disavowal," or "contrary definition" limiting "written" to "handwritten".  E.g., Ventana, 473 F.3d at 1181 ("dispensing" does not mean "direct dispensing": "Although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").  Moreover, even if this were the sole example, the claims would not be so restricted.[28]

---

[27] Other definitions in the same entry (not referenced by HTC) weigh against HTC's construction:  "to set down in writing" with the example of a will, typically not a handwritten document; "to form or produce written letters, words, or sentences" (does not say handwritten); and "to compose, communicate by, or send a letter" (need not be handwritten).  (Id.)

[28] See Liebel-Flarsheim, 358 F.3d at 906 ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'").

As further context, other examples:  Fig. 6 shows written text (there coded by use of bar codes) that is not handwritten.  In another embodiment, coded data includes "a plurality of codes, each for a respective one of a plurality of natural language and/or numeric characters…."  (5:18-41.)  Each code is "associated with a visual representation of the corresponding natural language or numeric character or command and/or of a graphical representation thereof."  (Id.)  This example describes writing text (here a "specific product code") without handwriting by entering individual codes in the unit:  "The various characters and commands could be arranged in the manner of a standard typewriter keyboard layout to facilitate entry of individual codes to make up a desired code sequence (e.g., for a specific product code)."  (5:52-56.)  The individual codes used to create the "product code" may be, e.g., bar codes.  (5:18-29.)  But:  "As an alternative to the use of bar codes, other data representations could be used," including "alphanumeric data representations" utilized with "character or image recognition logic".  (5:35-41.)  Likewise, in another section the specification discusses text in the form alphabet characters, e.g., arranged as a keyboard layout:

> "[I]f desired a set of bar codes for the complete alphabet could be provided. Alternative arrangements of the codes would also be possible, for example a complete set of codes and corresponding characters could be arranged in the format of a standard typewriter keyboard layout. The codes could also be incorporated in the letters and numerals, for example extending as a strip across the letters and numerals. For example, a bar code could replace the cross bar in a capital 'A', and similar modifications for the other letters of the alphabet."  (17: 38-47);

> "Indeed, in other embodiments of the invention full character recognition (OCR) could be employed…."  (17:52-53).

Again, the specification does not indicate that such examples of text must be handwritten. Also, the specification refers to use of text (displayed on a screen) associated with selectable options, which is not handwritten.  For instance, an example related to Fig. 7 (10:62-67) discusses text displayed on the hand held device, which by scrolling with keys is "…presented on successive screens of data items on the display 20."  (11:8-12.  See also 11:13-24:  "an option 'Left-handed operation' is encountered on the screen"; "the text is displayed in an orientation appropriate for the user.")  This text is associated with particular functions or items, and, in this

example, can be selected for operation by scroll keys and bar code scanner. (11:26-29: "'Right-handed operation' can be selected by scrolling the display using the 'Down' and 'Up' key switches 22 and 24 and then scanning the 'Enter command bar code when the appropriate option is displayed.")

HTC's proposed "construction" would improperly exclude the above-described example embodiments. It is incorrect and should not be adopted.

### 8.  "natural language characters"

| HTC | DataQuill |
|---|---|
| **natural language characters:** user understandable language characters such as common English | **natural language characters:**  means what it says and no elaboration is needed;<br><br>Alternatively: user understandable language characters such as common English |

For the term "natural language characters," DataQuill's position is that no elaboration is needed, and it is unnecessary to restate the term in other words.  The term is not otherwise disputed.  See patent specification, e.g., 9:66-10:61, 11:30-32 (display of "item description" is in natural language characters, such as English, other languages.).

**9.** **"additionally comprising as well as or instead of said display screen, and separate from said data entry device, means for displaying a selectable item with associated data sources for user selection of an item by operation of said data entry device"**[29]

| HTC | DataQuill |
|---|---|
| **additionally comprising as well as or instead of said display screen, and separate from said data entry device, means for displaying a selectable item with associated data sources for user selection of an item by operation of said data entry device** | **additionally comprising as well as or instead of said display screen, and separate from said data entry device:** means what it says and no elaboration is needed |
| Function: displaying a selectable item with associated data sources for user selection of an item by operation of said data entry device. | **means for displaying a selectable item with associated data sources for user selection of an item by operation of said data entry device:** means plus function term |
| Structure: The structure described in the specification of the '304 patent for performing this function, and which comprises as well as or instead of said display screen and separate from the data entry device, is a television screen. | Function: displaying a selectable item with associated data sources for user selection of an item by operation of said data entry device. |
| | Structure: The corresponding structures described in the specification at 17:59-67, 4:62-5:10, and equivalents thereof. |

Interpreting a "mean plus function" claim element is straightforward: "An element in a claim … expressed as a means or step for performing a specified function without the recital of structure … shall be construed to cover corresponding structure, material, or acts described in the specification and equivalents thereof." (35 U.S.C. § 112, ¶ 6.)

The parties agree on what the claimed function is. But HTC improperly restricts the corresponding structures, and also excludes the statutory "and equivalents thereof" and proposes a construction that purports to summarize the statutory "equivalents". HTC's proposal invites legal error and should not be adopted.

First, contrary to HTC's assertion, the specification shows that the "means for displaying a selectable item with associated data sources for user selection of an item by operation of said data entry device" in this means-plus-function limitation is not restricted to the structure of a television screen. The means includes the structures disclosed at '304 patent 17:59-67:

"In a merchandising system, where bar codes or other codes are associated with merchandisable items, this could be achieved simply **by means of** a printed

---

[29] This construction also applies to the nearly identical claim term in '304 claims 107 and 109, but the proposed construction should substitute for the words "data entry device" the words "hand holdable unit" which is used in claims 107 and 109.

catalogue, or some other form of list, or as a result of codes applied to examples of the products in question, or as a result of codes displayed, for example, on a TV screen with images relating to those products. The only requirement is that the display of the codes are readable by the data entry system of the present invention."

And at 4:62-5:10:

"It enables the user to make shopping selections from a catalogue **or** from a series of options displayed on a television screen from the comfort of his or her home without the need to connect the device to a conventional telephone network."

By statute, this claim element "shall be construed to cover" the above structures "described in the specification and equivalents thereof."  (35 U.S.C. § 112, ¶ 6.)

In addition, HTC improperly omits from its proposed construction "and equivalents thereof," required by § 112, ¶ 6.  The determination of what are the equivalents is not a *Markman* issue but a fact question left for the jury.  See In re Hayes Microcomputer Products, Inc. Patent Litigation, 982 F.2d 1527, 1541 (Fed. Cir. 1992) ("The determination of literal infringement is a question of fact, as is the determination of equivalent structure under 35 U.S.C. § 112, paragraph 6."); Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1269 (Fed. Cir. 1999) (same); Acromed Corp. v. Sofamor Danek Group, 1997 U.S. Dist. Lexis 23989, *9 (N.D. Ohio 1997) (whether accused device is "an equivalent to the disclosed structure is a question of fact for the jury").

### 10. "a carrier"

| HTC | DataQuill |
|---|---|
| **carrier:** a physical medium, separate from and external to the data entry device that carries coded data recognizable by the data entry device as corresponding to data or commands | **a carrier:** a medium which carries one or more data and/or command code, character, image, or graphical or alphanumeric data representation; Alternatively: a medium that carries one or more data and/or command codes |

HTC's proposal to limit a carrier to a medium "separate from and external to the data entry device" improperly imports limitations from some embodiments, while excluding others, some of which are claimed.  It is incorrect and should be rejected.

Plain Language.  A "carrier" is another term that is generally understood.  It takes its name from the function it performs.  A relevant dictionary defines a "carrier" as "a device or machine that carries."  (Smith Dec., Tab 4, WEBSTER'S 10th Ed.)

<u>Surrounding Claim Language and Other Claims</u>.   Examples of specific carrier embodiments recited in claims include a "verification card or like carrier…" ('304 claim 52), or "…wherein said carrier comprises a display." ('304 claim  55.)  And directly contrary to HTC's proposal that a carrier be separate from and external to the data entry device, '591 claim 1, for example, expressly recites "a carrier" as an element of the hand held unit:  "said hand held unit comprising: …a carrier…."  <u>See also</u> '591 claim 26 ("…said display interface [which is part of the hand held computer] displays a carrier…"), which also appears inconsistent with HTC's proposal to insert "physical" medium.  <u>See also</u> '591 claims 14, 29.

<u>Specification</u>.  The specification states:  "The carrier is *preferably* in the form of a sheet of material" (5:10-56), but is not restricted to such.  In discussing carriers, the specification also identifies other devices as a carrier such as "a printed catalogue, or some other form of list"; or, "for example…a TV screen with images relating to… products".  (17:36-67.)  A carrier can take many forms:  "The only requirement is that the display of the codes are readable by the data entry system of the present invention."  (<u>Id.</u>)  "Features from the respective embodiments of the invention described above could also be combined as desired to provide a configuration appropriate for a particular application."  (18:1-4.)

Another described embodiment of a carrier is "a verification card (e.g., a credit, payment or other validation card)".  (5:13-14; <u>see also</u> 13:45.)  It is not uncommon to insert a credit card into a scanner for normal use (as in use of an ATM), and it is not "external."  Likewise, nothing restricts, for example, use of a validation card that is inserted into a unit.  The patent does not exclude such non-external use of in its card examples.  It also refers to an example of a base or hand held unit (<u>e.g.</u>, the "pen") being "provided with a socket or connector or reader for a memory device (such as a plug-in ROM, a smart card, etc.)."  (17:4-7.)

In another example, the patent describes a touch sensitive screen embodiment where its display of data, menu of items, etc. used with the integral touch sensitive screen is "in place of" use of "the bar codes on the command bar code card":

> "One or more touch sensitive areas can be defined on the touch sensitive screen area, in combination with the data displayed on the display screen, for the entry of commands and/or the selection of displayed items. In particular, the processor 74

can be arranged to display a menu of user selectable items and to be responsive to a location at which the screen is touched for input of a user selection of a menu item…. Touch screen entry can be used in place of or in addition to the entry of commands by scanning the bar codes on the command bar code card."

(12:65-13:21.)[30]   This display example plainly fits within the ordinary meaning of a "carrier", and supports carriers in forms other than, for example, separate bar code cards.

The patent specification does not "intentionally disclaim or disavow the broad scope of a claim," Conoco, Inc., 460 F.3d at 1357, to restrict "carrier" to a medium which is "separate from" and "external to" the data entry device as HTC proposes.  Such an "intention must be clear, and cannot draw limitations into the claim from a preferred embodiment."  Id. at 1357 ("to deviate from the ordinary and accustomed meaning of a claim term" needs "expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope").

Other Judicial Constructions.  Judge Brewster's construction of "carrier" was "a medium which carries one or more data and/or command code, character, image, or graphical or alphanumeric data representation."  Judge Godbey's construction was "a medium that carries one or more data and/or command codes."  (Smith Dec., Tabs 1, 3.)

HTC's proposal should be rejected and DataQuill's should be adopted.

**11. "means for displaying a plurality of selectable items"**

| HTC | DataQuill |
|---|---|
| **means for displaying a plurality of selectable items:**  means plus function term | **means for displaying a plurality of selectable items:**  means plus function term |
| **Function:** displaying a plurality of selectable items | **Function:** displaying a plurality of selectable items |
| **Structure:**  a display, a display screen, or a touch sensitive screen, and equivalents thereof | **Structure:**  The corresponding structures described in the specification at 2:13-29, 6:51-7:9, 12:65-13:21, and equivalents thereof. |

Note:  This means-plus-function term is different from the "means for displaying…" term addressed above in Section 9.  Interpretation is governed by 35 U.S.C. § 112, ¶ 6.  The function, on which the parties agree, is "displaying a plurality of selectable items."

DataQuill, however, disputes HTC's proposal which appears to truncate the structures

---

[30] See also, e.g., '304 claim 9:  "wherein said display screen comprises a touch sensitive screen forming a said reading sensor".

actually described in the specification.  In accordance with 35 U.S.C. § 112, ¶ 6, the Federal Circuit has "held that 'disclosed structure includes that which is described in the patent specification, including any alternative structures identified.'"  Versa Corp. v. Ag-Bag Int'l Ltd., 392 F.3d 1325, 1329 (Fed. Cir. 2004).

The structures corresponding to the claimed function include those disclosed in the '304 patent at:  2:13-29 ("[A] display screen 20"); or 6:51-7:9 ("[A] conventional two dimensional array of pixels which can be selectively activated in order to provide the display of a wide range of displayable items."  Or "Any suitable display technology can be used which enables the displayed information to be read over a wide enough angular range such that it can be read by the user when the pen is held at an angle suitable for reading a bar code." Or "[A] 2 line by 16 character supertwist LCD display screen….."); or 12:65-13:21 ("[A] touch sensitive screen 90 for the display 20."  Or [A]ny applicable touch sensitive screen technology can be used, either through the use of an addition to an existing conventional display screen, or the use of a display screen with integral touch sensitivity.").

By statute, this claim element "shall be construed to cover" the above structures "described in the specification and equivalents thereof."  (35 U.S.C. § 112, ¶ 6.)[31]  HTC's proposal to truncate and paraphrase structures rather than use that "described in the specification" invites legal error and should not be adopted.

---

[31] Judge Brewster held:  "The function of the above means is: displaying a plurality of selectable items. The structure to perform this function is: cols. 2:13-29; 6:51-7:9; 12:65-13:21, and their equivalents." Judge Godbey held:  "the corresponding structure is 'display 20,' '591 Patent at col. 9, l. 13, "display screen 20," *id.* at col. 7, ll. 14-15, and functional equivalents thereof."  (Smith Dec. Tabs 1, 3.)

**12. "comprises one or two manually operable switches for scrolling said display in a first and/or second direction"**

| HTC | DataQuill |
|---|---|
| said data entry device **comprises one or two manually operable switches for scrolling said display in a first and/or second direction:**  only one or only two devices that can be operated by hand to make or break an electrical connection for moving up or down through a sequential display of information | said data entry device **comprises one or two manually operable switches for scrolling said display in a first and/or second direction:** includes at least <u>but requires only</u> one or two <u>manually operable switches (</u>devices for making, breaking or changing the connections in an electrical circuit, which can be operated by hand<u>)</u>, for stepping through text or graphics displayed on a display[32] |

<u>Comprises one or two</u>.  The phrase "…comprises one or two manually operable switches for scrolling…" does not exclude embodiments that have other manually operable switches.  Nor does the phrase preclude an embodiment that adds other "switches for scrolling" beyond the "one or two" recited in the claim.

The word "comprises" in this phrase means "includes at least."  As the Federal Circuit stated in a similar context:  "[B]y using the transition term 'comprising' at the outset of the claim, the claim drafter signaled an accused device could have additional elements – such as switches – beyond those expressly recited and still literally fall within the claim terms."  <u>Innovad Inc. v. Microsoft Corp.</u>, 260 F.3d 1326, 1333 (Fed. Cir. 2001).  (<u>See also</u> Smith Dec. Tab 4, Webster's 10th Ed.) (Comprise: "1: to include especially within a particular scope").)[33]

Contrary to HTC's proposal, the claim language does not recite "only" one or two scrolling switches.  While the specification describes embodiments with "only" one or two such switches, it contains no clear and unmistakable disclaimer of other embodiments:  "In a preferred embodiment of the invention, the first and/or second switches are the only switches on the hand held unit." (3:37-39.)  (<u>See also</u> 3:43-46, discussing "the provision of only two keys on the hand

---

[32] DataQuill has amended its proposal from that in the Joint Chart as shown for clarification of its position.

[33] Judge Godbey held that "'Comprises one or two manually operable switches for scrolling said display in a first and/or second direction' means that the claimed invention may have only one or two manually operable switches for scrolling the display in a first and/or second direction, although it may have other switches for other functions," and that "the term 'comprises one or two manually operable switches' does not preclude the use of other switches for other functions, but does preclude the use of more than two switches to perform the recited function: scrolling said display in a first and/or second direction."  (Smith Dec., Tab 3, pp. 15-16.)

held unit"; and 17:24-25: "in other embodiments one key switch only could be provided.")  For instance, the specification also goes on to state:  "More key switches could also be provided in other embodiments." (17:23-34.)

In the claims, the drafters chose not to use "only."  It would be error to import the modifier "only" from a preferred embodiment into the claim.  If for an accused device a scrolling function can be performed using one or two switches, then the limitation is met.  In such case, the presence of other, independent switches on an accused device that independently perform scrolling (or other functions) would not remove it from the scope of this limitation.  Innovad, 260 F.3d at 1333.

Switch. Switch is a generally understood word.  A relevant dictionary defines "switch" as "[a] device for making, breaking, or changing the connections in an electrical circuit."  (Smith Dec., Tab 4, WEBSTER'S 10th Ed.)  Judge Brewster construed "manually operable switches" as "devices for making, breaking, or changing the connections in an electrical circuit, which can be operated by hand".  Judge Godbey's definition of "manually operable switches" was "devices that can be operated by hand to make, break, or change connections in an electrical circuit".  (Smith Dec. Tabs 1, 3.)  The patent uses "switches" in an ordinary sense with no intent to depart from the general understanding.

HTC's proposal appears to adopt most of the above definition of "switch," but narrows it by omitting its alternative language of also "changing" connections.  None of HTC's citations in the Joint Chart appear to address HTC's definition of "switch."   HTC's unsupported proposal should be rejected.

Scrolling said display. A relevant dictionary defines "to scroll" as "to move text or graphics up or down or across a display screen as if by unrolling a scroll".  (Smith Dec. Tab 4, WEBSTER'S 10th Ed.)  This meaning is consistent with usage in the patent's specification. (12:12-19: scrolling function "used for stepping through items").  Judge Brewster and Judge Godbey each ruled that "scrolling said display" means "stepping through text or graphics displayed on a display."  (Smith Dec. Tabs 1, 3.)

HTC's proposal adopts the "up or down" part of the above dictionary definition of

"scrolling," but narrows it by omitting its language of also "or across" a display screen.  The claim language itself, however, simply says scrolling "…in a first and/or second direction…"  It appears HTC improperly narrows "scrolling" based on the specification's discussion of an embodiment that utilizes "Up" and "Down" keys to perform scrolling.  (Fig. 7; 8:65-67.)  But the patent specification does not limit scrolling to "up or down," and does not contain any "clearly stated" "special definition."  See, e.g., Vitronics, 90 F.3d at 1582 (a "special definition" must be "clearly stated in the patent specification or file history").  To the contrary, the specification also refers more broadly to "scrolling…in a first and/or second direction" (col.3:33-34), and in an example refers simply to "the sequential display of stored information (scrolling of the display)" (7:15-18.)   (See also 12:14-15, quoted above.)   HTC's unsupported proposal should not be adopted.

### Conclusion

For all of the above reasons, the Court should reject HTC's proposed claim constructions and adopt DataQuill's positions on claim construction as stated herein and in the Joint Chart.


December 3, 2010                              Respectfully Submitted,


                                             /s/ Greg Smith                    /
                                             Greg Smith
                                             Competition Law Group LLC
                                             Counsel for Plaintiff / Counterdefendant
                                             DATAQUILL LTD.


### Certificate of Service

The above document and was served this day of December 3, 2010, via email attachment to counsel for HTC Pete Chassman and Gregg Duffey.


                                             /s/ Greg Smith                    /
                                             Greg Smith
                                             Counsel for Plaintiff / Counterdefendant
                                             DATAQUILL LTD.