Gregory S. Markow
HECHT SOLBERG ROBINSON GOLDBERG BAGLEY LLP
600 West Broadway, 8th Floor
San Diego, California  92101
Telephone:      (619) 239-3444
Facsimile:      (619) 232-6828

Greg Smith
55 West Monroe, Suite 1930
Chicago, Illinois  60603
Telephone:      (312) 629-1918
Facsimile:      (312) 629-1988

Counsel for Plaintiff
DataQuill Limited, a British Virgin Islands Company

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DATAQUILL LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>HIGH TECH COMPUTER CORP.<br><br>Defendant. | No. 08-CV-00543 IEG (BGS)<br><br>**DATAQUILL'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**<br><br>**JURY TRIAL DEMANDED** |
| HTC CORPORATION,<br><br>Counterplaintiff,<br><br>v.<br><br>DATAQUILL LIMITED,<br><br>Counterdefendant. | Judge: Irma E. Gonzalez<br><br>Magistrate Judge: Bernard G. Skomal<br><br>Claim Construction Hearing Date:<br>February 11, 2011, 9:00 a.m. |

# Table of Contents

Table of Contents ........................................................................................................ ii

Table of Authorities ................................................................................................... iv

I.    INTRODUCTION ............................................................................................. 1

II.   ARGUMENT: INTERPRETATION OF THE PATENT CLAIMS ..................... 5

    1.   "a reading sensor" and "sensor" ............................................................ 5

        a)  "a reading sensor" ......................................................................... 5

        b)  "a sensor" .................................................................................... 10

    2.   "to … process said input signals" ........................................................ 11

    3.   "to download"; "downloading" ............................................................ 13

    4.   "… up to date …"; "… updating …" .................................................... 14

        a)  HTC's factual inaccuracies about the file history. .................... 18

        b)  The arguments were retracted, and cannot be properly used to
            make a disclaimer. ....................................................................... 20

        c)  HTC fails to acknowledge the asserted claim language is
            materially different or account for context or other statements in
            file history ................................................................................... 21

        d)  HTC's narrowing is not supported by the retracted arguments .... 26

    5.   "wherein programs in said data entry device are updateable remotely
        from a processing center" ..................................................................... 27

    6.   "a camera" ............................................................................................ 28

    7.   "written text" ....................................................................................... 31

    8.   "natural language characters" ............................................................... 33

    9.   "additionally comprising as well as or instead of said display screen,
        and separate from said data entry device, means for displaying a
        selectable item with associated data sources for user selection of an
        item by operation of said data entry device" ....................................... 34

    10.  "a carrier" ............................................................................................ 34

    11.  "means for displaying a plurality of selectable items" .......................... 35

12. "comprises one or two manually operable switches for scrolling said display in a first and/or second direction" ........................................................ 36

1

**Table of Authorities**

2

Advanced Cardio.  Sys. v. Medtronic, Inc., 265 F.3d 1294 (Fed. Cir. 2001) ...............................24

3

Advanced Commun. Design v. Premier Retail Networks,
46 Fed. Appx. 964 (Fed. Cir. 2002) ......................................................................................16

4

Bicon, Inc. v. Straumann Co., 441 F.3d 945 (Fed. Cir. 2006) .................................................32, 33

5

Biedermann Motech v. Acme Spine, 2007 U.S. Dist. Lexis 98330 (C.D. Cal. 2007) ..................16

6

Cordis Corp. v. Boston Sci. Corp., 561 F.3d 1319 (Fed. Cir. 2009)..............................................27

7

DataQuill Ltd. v. Handspring, Inc., 2003 U.S. Dist. Lexis 2981 (N.D. Ill. 2003) ......................3, 6

8

Enzo Biochem, Inc. v. Applera Corp., 599 F.3d 1325 (Fed. Cir. 2010) ..................................13, 30

9

Garmin Ltd. v. Tomtom, Inc., 2006 U.S. Dist. Lexis 61187 (W.D. Wis. 2006)............................16

10

Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327 (Fed. Cir. 2004)...................................4, 10

11

Hakim v. Cannon Avent Group, PLC, 479 F.3d 1313 (Fed. Cir. 2007) .................................19, 20

12

i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 843 (Fed. Cir. 2010) .................................10, 23

13

Innovad Inc. v. Microsoft Corp., 260 F.3d 1326 (Fed. Cir. 2001) .................................................36

14

Johnson Worldwide Assocs. v. Zebco Corp., 175 F.3d 985 (Fed. Cir. 1999)...............................11

15

Kister Instrumente AG v. United States, 628 F.2d 1303 (Ct. Cl. 1980) ........................................24

16

Laryngeal Mask Co. Ltd. v. Ambu A/S, 618 F.3d 1367 (Fed. Cir. 2010) .....................................24

17

LG Elecs., Inc. v. Bizcom Elecs., Inc., 453 F.3d 1364 (Fed. Cir. 2006).......................................29

18

Pfizer, Inc. v. Teva Pharm. USA. Inc., 429 F.3d 1364 (Fed.Cir. 2005)..........................................6

19

Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005) (en banc) ..............................4, 13, 29, 30

20

Sandisk Corp. v. Memorex Prods., 415 F.3d 1278 (Fed. Cir. 2005)............................9, 10, 23, 27

21

Saunders Group Inc. v. Comfortrac, Inc., 492 F.3d 1326 (Fed. Cir. 2007) .................................24

22

Springs Window Fashions LP v. Novo Indus., L.P., 323 F.3d 989 (Fed. Cir. 2003)....................20

23

Superguide Corp. v. DirecTV Enters., 358 F.3d 870 (Fed. Cir. 2004) .........................8, 16, 29, 34

24

Toro Co. v. Ingersoll-Rand Co., 545 F. Supp. 2d 933 (D. Minn. 2008) .......................................16

25

Ventana Med. Sys. v. Biogenex Labs, Inc., 473 F.3d 1173 (Fed. Cir. 2006) ...............................33

26

Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576 (Fed. Cir. 1996) ...........................................1

27

Western Union Co. v. MoneyGram Payment Sys.,
2010 U.S. App. Lexis 24887 (Fed. Cir. 2010) ...............................................................................4

28

# I.     INTRODUCTION

When construing claims, "[f]irst, we look to the words of the claims themselves…." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996), as DataQuill did in its Opening Brief.  HTC's Opening Brief, on the other hand, improperly starts with the patent specification.[1]  That is where its focus remains.  HTC repeatedly argues to add limitations to claim language, usually for no reason other than that they are in a preferred embodiment.  HTC surveys specification embodiments, plucks out limitations, mischaracterizes them, and proposes to import them into the claims.  HTC does not acknowledge the Federal Circuit's repeated admonitions not to read limitations from embodiments into claims.  Nor does HTC address the requirement of demonstrating a "clear and unmistakable" disavowal of claim scope to justify adding limitations to a term's ordinary meaning.

The '304 and '591 patents issued from an original 1994 PCT application and later continuation application, and claim priority to a 1993 UK application.  The following is a general summary of the patents (and is not intended to alter the actual description or claims which control over this summary):

The patents generally relate, for example, to "a hand held unit" that includes an integral sensor, control, storage, display, and a telecommunications interface enabling the unit to be used in an efficient and self-contained manner for capture, processing, storage, display and transmission of data.  An embodiment can enable telephonic transmission of information relating to a selected item or items from a unit's storage to a remote processing center; and it also can enable telephonic transmission of information relating to selectable items from a remote processing center to the unit's storage.  (E.g., '304 patent 2:13-34; see '591 patent, entitled "Hand Held Telecommunications and Data Entry Device").    Where, for example, the telecommunications interface is a cellular telephone network interface it can facilitate use of a

---

[1] Although Section III of HTC's Brief is entitled "The PATENTS AND ASSERTED CLAIMS," it does not actually consider any claim or claim language.  It discusses the specification and the reexamination proceedings.  HTC goes so far as to characterize the reexamination proceedings as "primary evidence in construing the claims."  (HTC Br. at 5.)

1    data entry system, e.g., "in a user's home or workplace."  (E.g., 3:10-19.)

2        A data entry system embodiment, for example, can also permit user selection of an item

3    of a plurality of selectable items by operation of a hand held unit, and a remote processing center

4    for processing user selections transmitted from the unit. A unit's controller can respond to

5    appropriate commands input, for example via a reading sensor, to issue coded instructions via a

6    telecommunications interface (e.g., cellular) to a processing center and to receive programming

7    data (e.g., relating to information for selectable items) for storage in the hand held unit.  (E.g.,

8    4:14-26.)  Also, in addition to example embodiments that sense data such as bar codes to select

9    items, other sensors are described, including use of a touch sensitive screen where a processor

10   can be arranged to display a menu of user selectable items and to be responsive to a location at

11   which the screen is touched for input of a user selection of a menu item.  (E.g., 13:10-21.)

12       The combination of elements in the hand held unit can also permit use in a merchandising

13   system, where selectable items are merchandisable items, for example.  A remote processing

14   center can process user orders of items transmitted from the hand held unit; and a cellular

15   embodiment can provide "a particularly advantageous device for use, for example, for 'home

16   shopping'."  (E.g., 4:56-67.)  The '304 patent, re-examined claim 115, for example, claims:

17       115.  A data entry system comprising a hand holdable data entry unit, said hand
         holdable unit comprising:

18
         a reading sensor for sensing commands and/or data and for producing input
19       signals in response to said sensed commands and/or data;

20       rewritable storage programmable with information relating to selectable items;

21       a controller connected to receive and process said input signals from said sensor,
         said controller being arranged to respond to commands and/or sensed commands
22       to control said hand holdable unit and to said data to select a said item;

23       a display screen for displaying a user readable representation of said commands
         and said stored information for said selected item; and

24       a telecommunications interface for telephonic transmission of information
         relating to a selected item or items from said storage to a remote processing center
25       via a wireless telecommunications network and for telephonic reception of
         information relating to said selectable items from said remote processing center to
26       said storage via said wireless telecommunications network, wherein said
         telecommunications interface is a telecommunications line interface integral to
27       said hand holdable unit and directly connects said hand-holdable unit to said
         wireless telecommunications network;

28

wherein programs in said hand holdable unit are updateable remotely from said processing center.

(See also, e.g., dependent claims 60, claiming use "as a handset", 40 claiming "a touch sensitive screen forming a said reading sensor" and 57 claiming "merchandisable items").

HTC's summary of the patent specification is inaccurate.[2]  For example, HTC states the "only disclosed embodiment" is a "pen" with "a reading sensor in a reading head."  (HTC Br. at 2.)[3]  That is incorrect.  The patent specification, for example, also describes a hand held embodiment having a "touch sensitive screen" as a reading sensor, whereby "touch screen entry can be used in place of or in addition to the entry of commands by scanning the bar codes on the command bar code card."  (12:65-13:21.)  HTC omits a touch sensitive screen from its listing of disclosed reading sensors.  (HTC Br. at 2.)  HTC's list of example reading sensors also is otherwise inaccurate.[4]  Nor are the patent's embodiments restricted to a "pen" shape:  "the hand held unit could be configured in other shapes."  (16:47-51.)  As stated by another district court:  "Although [defendant] states that the '304 patent essentially covers a pen-shaped bar-code reader, the specification clearly explains how a touch screen can supplement or altogether replace the bar code reader."  DataQuill Ltd. v. Handspring, Inc., 2003 U.S. Dist. Lexis 2981, *14-15 (N.D. Ill. 2003).  (See also Smith Dec., Tab 3; district court, N.D. Texas, p. 2:  "The Patents, which share essentially the same specification, generally disclose a handheld data entry device that can be used for inventorying, purchasing products, and other data management functions.").

---

[2] HTC also incorrectly states that "DataQuill attempted to limit HTC's discovery in the present case," when that is not so.  (HTC Br. at 8 n.4.)  DataQuill in response to HTC's motion to stay argued that this case was closer to being ready for trial than it might first appear, because of the availability of discovery and rulings from prior cases. (Dkt. #26, DataQuill Resp. to HTC M. to Stay, at 7-8.)  DataQuill did not "attempt[] to limit HTC's discovery."  HTC is entitled to its day in court.

[3] HTC's specification cites are inapposite.  HTC cites the '304 patent at 5:35-43 and 6:28-35.  The first passage mentions an alternative embodiment having "a reading sensor in the form of a camera or other scanning sensor rather than a bar code reader…."  (5:35-43.)  The second passage identifies "schematic views" in "FIGS. 1A and 1B" of "one embodiment" that is "substantially pen-shaped."  (6:28-35.)

[4] For example, HTC refers to "a camera with character or image recognition logic."  (HTC Br. at 2, citing '304 patent, 5:35-43.)  The example camera is not so equipped – the very passage cited by HTC makes this clear, describing an alternative embodiment wherein "**the data entry device** is provided with a reading sensor in the form of a camera … and **the data entry device** is provided with character or image recognition logic…."  (5:35-43.)

---

Other embodiments are also described in the patent.  Although its description of example embodiments begins in Col. 2, the "pen" embodiment that HTC focuses on is not mentioned until Col. 4 as "a preferred embodiment" (4:41-48) and at Col. 6 as "one embodiment" (6:29-30), not the only embodiment.   Before that, in discussion HTC ignores, is a cellular telephone embodiment:  "this unit can advantageously combine the functions of the data entry unit and a cellular telephone."  (4:27-32; see also 3:13-15: "the data entry system can be used with the convenience, for example, of a portable cellular phone"; 16:54-58: "in an alternative embodiment other wireless data transmission means, for example radio signals, could be used, in the manner of a portable telephone of the type with a portable handset and a base unit".)

HTC also incorrectly asserts that the patents regard having a keyboard "as problematic" and that the "goal" is "to eliminate a keyboard."  (HTC Br. at 3-4.)  Although minimizing key switches is an aspect of one embodiment, in other embodiments, "a numerical keypad could be provided."  (17:23-34.)   In any event, HTC's fixation on such considerations is misplaced. "[P]atentees [are] not required to include within each of their claims all of [the] advantages or features described as significant or important in the written description."  Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327, 1331 (Fed. Cir. 2004).  "[C]laims may embrace 'different subject matter than is illustrated in the specific embodiments in the specification'."  Phillips v. AWH Corp., 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).

HTC's proposed claim constructions are addressed below.[5]

---

[5] Note, at the end of Section IV of HTC's Brief is this unsupported statement of fact:  "Accordingly, one of ordinary skill would have had a bachelor's degree in electrical engineering and several years of experience in the field or in graduate research."  (HTC Br. at 7.)  Determination of the level of skill in the art is a factual inquiry.  E.g., Western Union Co. v. MoneyGram Payment Sys., 2010 U.S. App. Lexis 24887, *18 (Fed. Cir. 2010).  HTC provides no evidence for such a factual finding.  In any event, HTC's Brief does not appear to apply its proposed finding in its claim construction analysis.

## II.    ARGUMENT: INTERPRETATION OF THE PATENT CLAIMS

### 1.  "a reading sensor" and "sensor"

#### a)  "a reading sensor"

| HTC | DataQuill |
|---|---|
| **reading sensor:**  a structure capable of detecting a stimulus, visually, magnetically, or by locational movement of the structure across a surface, and that transmits a resulting signal for use by a controller to determine the data or commands represented by the stimulus. | **a reading sensor:**  a structure capable of detecting and reporting data;<br><br>Alternatively: a sensor capable of detecting and reporting commands or data. |

HTC states "the difference between a 'sensor' and a 'reading sensor'" is "critical," but HTC does not support or provide proper analysis for its overly narrow construction of "a reading sensor."  HTC proposes that a "reading sensor":  (1) must be limited to detecting a stimulus only in only three particular ways ("visually, magnetically, or by locational movement of the structure across a surface"); and (2) must include additional limitations concerning the separate functioning of "a controller."[6]

HTC's proposed construction is incorrect.  In addition to other factors explained in DataQuill's Opening Brief, HTC's proposal appears to exclude at least the described (and claimed) embodiment of a touch sensitive screen as a reading sensor.  E.g., '304 claims 62, 9 and 40 ("wherein said display screen comprises a touch sensitive screen forming a said reading sensor").  The specification also describes user input via "data sensed by the touch sensitive screen":

> "A touch screen interface 88 couples the touch sensitive screen to the bus 84 so that **data sensed by the touch sensitive screen** can be communicated to the processor 74. Although FIG. 8 shows a touch sensitive screen 90 (e.g., an overlay) separate from a conventional display screen, any applicable touch sensitive screen technology can be used, either though the use of an addition to an existing conventional display screen, or the use of a display screen with integral touch sensitivity. **One or more touch sensitive areas can be defined on the touch sensitive screen area, in combination with the data displayed on the display screen, for the entry of commands and/or the selection of displayed items.** In particular, the processor 74 can be arranged to display a menu of user selectable items and to be responsive to a location at which the screen is touched for input of

---

[6] As DataQuill pointed out in its Opening Brief, HTC's proposal to add "controller" limitations to "reading sensor" (describing what a controller does with signals from the reading sensor) is extraneous to the construction of "reading sensor."  HTC's proposal to add extraneous limitations is improper.

1
2

> a user selection of a menu item. The touch sensitive screen can then thus be used as a dynamic and reconfigurable user interface. **Touch screen entry can be used in place of or in addition to the entry of commands by scanning the bar codes on the command bar code card.**"

3

(12:65 to 13:21, emphasis added.)

4
5

Given the claim language, the dependent claims, and description, HTC cannot credibly argue that a touch sensitive screen cannot be a "reading sensor".  As another district court held:

6
7
8
9

> "A touch sensitive screen is clearly capable of being responsive to commands and sensing commands. In fact, claims 9, 40, and 61-63 specifically employ a touch sensitive screen as the reading sensor…. [Defendant] argues that this language 'does not mean, however, that the reading sensor is the touch screen….' We disagree. These five claims clearly define the reading sensor to be a touch screen that can sense commands."

10

DataQuill Ltd. v. Handspring, Inc., 2003 U.S. Dist. Lexis 2981, *14-15 (N.D. Ill. 2003). The

11

district court stated further:

12
13
14
15

> "Although [defendant] states that the '304 patent essentially covers a pen-shaped bar-code reader, the specification clearly explains how a touch screen can supplement or altogether replace the bar code reader. After describing the use of a touch screen, in particular with reference to Figure 8 of the patent, the specification states: 'Touch screen entry can be used **in place of** or in addition to the entry of commands by scanning the bar codes on the command bar code card.'"

16
17
18

Id., *16 (emphasis original).  As the Federal Circuit has stated:  "A claim construction that excludes a preferred embodiment is 'rarely, if ever, correct.'"  Pfizer, Inc. v. Teva Pharm. USA. Inc., 429 F.3d 1364, 1374 (Fed.Cir. 2005).

19
20
21

Also, for example, the examiner in the '304 reexamination found that a prior art ("Thompson") reference "teaches a reading sensor in the form of a touch sensitive screen…." (HTC Ex. G [1466], April 1, 2008 office action, '304 patent, pg. 15.)

22
23
24

HTC's arguments for its proposal are self-contradicting and nearly incomprehensible. They do not support HTC's proposed limitations on how a reading sensor can detect a stimulus. Nor do they support HTC's proposal to add limitations about a controller.

25
26
27
28

For instance, HTC first argues, erroneously, that its proposed definition describes a "***specific type of sensor*** – one that 'reads.'"  (HTC Br. at 10.)  HTC's argument is about a limitation not even in its proposed definition.  HTC's proposal does not say the reading sensor

---

"reads" – only that it detects a stimulus and transmits a resulting signal.  The balance of HTC's proposal does not address "reading sensor," but instead identifies a different structure ("a controller") that will "determine the data or commands represented by the stimulus" – i.e., "read" signals transmitted to it from the reading sensor.

HTC's argument is also incorrect.  A reading sensor (even a bar code reader embodiment) does not have to "read".  The specification states, for instance of the "pen" embodiment, that: "At this point it should be explained that **the operation of reading** a bar code **is performed by the processor**…." (9:66 to 10:25, emphasis added.)  The reading sensor (in this example a bar code reader with a light sensor) supplies "signals representing changing levels of reflected illuminations … to the processor," which reads them.  (Id.)[7]

The adjective "reading" in "reading sensor" describes what the sensor may be used for (its utility), not a requirement of what it does.  Common examples abound:  reading glasses don't read; they are used as an aid for reading.  Likewise for reading room, reading light, and reading desk.  Also: batting helmet, drinking glass, driving range, shooting gallery, writing desk, sitting room, etc.

HTC's other statements in furtherance of its argument expose *non sequiturs* and inconsistencies in HTC's approach.  For example, HTC states:

"These two terms ["reading sensor" and "process said input signals"] and the functionalities that they claim **work in tandem to implement the 'reading'** of data or commands."  (HTC Br. at 10, emphasis added.)

"the reading sensor serves a particular purpose – to sense or respond to commands and data"  (Id. at 10-11.)

"In order to sense or respond to commands, the reading sensor must be able to ***read*** those commands or data.  This is more than simply sensing a generic, external stimulus – it is ***reading*** and responding to commands and data that the reading sensor senses."  (Id. at 11, emphasis in original.)

Quoting patent's description of alternative embodiment, "wherein the reading sensor traces movements of the reading head and wherein **the controller is responsive to signals from the sensor** representative of the movements **for**

---

[7] HTC, inconsistently, acknowledges this fact in its brief, arguing that information captured by a reading sensor must be "understandable **to the data entry device**."  (HTC Br. at 11, emphasis edited.)

**identifying characters** traced by the reading head as captured data." (Id. at 11, quoting '304 patent at 3:56-65, emphasis added.)

"such a sensor must be able to capture meaningful information that is **understandable** to the data entry device and not just sense information or stimuli generally" (Id. at 11, emphasis in original.)

"**the combination of the reading sensor and a processor** enable the data entry device to determine what has been read by the patent" (Id. at 11, emphasis added.)

None of the above arguments of HTC support, as HTC proposes, adding limitations restricting how a reading sensor can detect a stimulus. Nor do they support, as HTC proposes, adding a description of what a controller does with signals from a reading sensor.

Also, HTC's argument is further contradicted by its arguments in other sections of its Brief. In Section VI.A.2 entitled "Process said input signals," HTC states, inconsistently:

"the controller takes the input signals (generated by the reading sensor) and in turn controls the 'transmission of command and/or data signals as determined by said input signals processed by said controller.' Thus, **the controller determines** what those command and/or data signals are." (HTC Br. at 14, emphasis added.)

"In order for the reading sensor to sense commands, **the data entry device ultimately must be able to interpret the information sensed by the reading sensor** as, in fact, constituting commands or data…. **It is the controller that interprets these input signals** as commands or data." (Id., emphasis added.)

HTC's first argument thus misses the mark, and falls of its own weight.

HTC's second argument is that during reexamination of the '304 patent, "DataQuill argued a distinction between its claimed reading sensor and the sensor (camera) disclosed in the prior art *Martinez* reference." (HTC Br. at 11-12.) In support, HTC quotes from the reexamination record, but provides no meaningful discussion or analysis.[8] HTC does not explain the import of the quotations or how they support its proposed construction. HTC's quotations have no apparent connection with HTC's proposed limitations on how a reading sensor can detect a stimulus and what a controller does with signals from a reading sensor.

Also, HTC's characterization of DataQuill's argument regarding *Martinez* is inaccurate.

---

[8] For example, HTC does not even mention, much less attempt to meet, the legal standard that must be met to show that prosecution statements add limitations to ordinary meaning. Such statements must constitute "words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Superguide Corp. v. DirecTV Enters.*, 358 F.3d 870, 874-75 (Fed. Cir. 2004).

1   To the extent HTC implies DataQuill argued that a camera cannot meet the limitation of "a

2   reading sensor," such a reading of the reexamination file record is not supported.[9]  "The question

3   … is whether any of [the] prosecution arguments to the examiner have no reasonable

4   interpretation other than to disavow [the alleged subject matter]."   Sandisk Corp. v. Memorex

5   Prods., 415 F.3d 1278, 1287 (Fed. Cir. 2005).  That is not the case here.

6        In the reexamination, the April 1, 2008 office action rejected '304 claims 1 and 26 and

7   others based on *Martinez*.  In its response, DataQuill pointed out in regard to claim 1 that the

8   particular video camera described in the *Martinez* reference did not meet claim 1's requirement

9   that claim 1's "reading sensor" type be "responsive to commands and/or sensed commands…."

10  For instance, in the first passage quoted by HTC, DataQuill – unremarkably – argued that

11  "*Martinez* does not disclose the limitations of Element 1.1".  DataQuill did not assert that any

12  camera cannot be a reading sensor (or even the particular one recited in claim 1).  DataQuill

13  simply asserted that the particular camera *of Martinez* did not qualify to meet the particular type

14  of reading sensor with the further limitations claimed *in claim 1*:  "*Martinez* does not disclose a

15  camera that is responsive to *commands* or to *sensed commands.*  Instead, at the cited passage,

16  *Martinez* discloses a video camera 'to view the user or a customer, and to generate a video

17  signal.'"  (HTC Ex. G [1527] 6/2/08 Response, at 78, emphasis in original.)

18       Regarding the second passage quoted by HTC, DataQuill's argument distinguishing

19  *Martinez* did not rely on the term "a reading sensor."  To the contrary, DataQuill acknowledged

20  that even *Martinez's* version of a camera met the "reading sensor" type claimed, e.g., in claims

21  26 and 29, which recite: "a reading sensor for sensing commands and/or data…" more broadly

22  than claim 1.  (Id., pp. 86-88.)  DataQuill noted the Examiner "relies upon *Martinez's* camera to

23  meet the 'reading sensor' requirement of prior Elements 26.1, 27.1, 28.1, 29.1 and 30.1."  (Id. at

24  87.)  DataQuill did not dispute that position.  Instead, DataQuill distinguished *Martinez* on other

25  grounds, for example, that *Martinez's* camera did not meet the limitations of other elements of

26

27

---

[9] For instance, there are (and were at the time of the Response HTC cites) claims specifically reciting a
28  camera as a reading sensor.  ('304 patent, claims 12, 13, 44, 45, 46.)

those claims: "*Martinez,* of course, has no disclosure or teaching at all of using its camera to select from a plurality of items that have information programmed into storage, as required by Elements 26.2 and 29.2." (Id.)

Similarly, on the next page of the same June 2, 2008 Response (not quoted or cited by HTC), DataQuill notes "In that regard, for Element 26.1, adopted Exhibit S relies upon *Martinez's* camera to meet the 'reading sensor' requirement." (Id. at 88.)  Again, DataQuill did not dispute that position, but instead relied on limitations of another Element:  "Requester, however, for Element 26.3 points out nothing about *Martinez's* camera that senses data to which the controller responds to select an item, let alone 'to select a said item' as required by Element 26.3." (Id.)

HTC's proposal should not be adopted.[10]

b) **"a sensor"**

| HTC | DataQuill |
|---|---|
| **sensor ['591 patent]:**   a structure capable of detecting a stimulus, such as light, temperature, radiation level, or the like, and that transmits a resulting signal. | **a sensor:** means what it says, "a sensor" and no elaboration is needed.<br><br>Alternatively:  a structure capable of detecting a stimulus, such as light, temperature, radiation level, or the like, and that transmits a resulting signal. |

DataQuill has reviewed HTC's Opening Brief.  Based on its review, the Opening Brief of DataQuill addresses HTC's arguments.   DataQuill will otherwise address this term at the *Markman* hearing.

_____

[10] *See Sandisk,* 415 F.3d  at 1287 (quoting *Golight*, 355 F.3d at 1332) (where "the statements in the prosecution history are subject to multiple reasonable interpretations, they do not constitute a clear and unmistakable" disclaimer).  "In evaluating whether a patentee has disavowed claim scope, context matters. Together, these statements make clear that what distinguished the Mizuta prior art was not the storage type (file or no file), but rather the separation of a document's content and structure. The statements Microsoft now plucks from the prosecution history do not 'clear[ly] and unmistakabl[y] disavow' storage means that are not files."  *i4i Ltd. P'ship v. Microsoft Corp.,* 598 F.3d 831, 843 (Fed. Cir. 2010).

## 2. "to ... process said input signals"

| HTC | DataQuill |
|---|---|
| a controller coupled to said reading sensor to receive and **process said input signals:** perform operations on the input signals, including, but not limited to determining the content represented by the stimulus detected by the reading sensor | a controller coupled to said reading sensor to receive and **process said input signals:** means what it says and no elaboration is needed. Alternatively:  subject the input signals to examination or analysis. Alternatively:  perform any operation or combination of operations on the input signals. Alternatively:  manipulate the input signals. |

As stated in DataQuill's Opening Brief, the term "to process said input signals" is a general term whose meaning is clear; no elaboration is needed. To "process" is a common term with an understandable meaning. HTC's proposal to restrict "to process said input signals" here to HTC's added processing details is without merit.[11]

As pointed out DataQuill's Opening Brief, HTC's added ambiguous language (e.g., "determining the content represented") is not found in the specification. Also, for instance, the claims themselves already recite, where applicable, particular processing a controller is required to perform in that particular claim. The claims do so using language to specify particular processing operations. HTC merely seeks to rewrite a claim term whose plain meaning is already clear, which is improper. See, e.g., Johnson Worldwide Assocs. v. Zebco Corp., 175 F.3d 985, 989-90 (Fed. Cir. 1999) ("General descriptive terms will ordinarily be given their full meaning; modifiers will not be added to broad terms standing alone.").

HTC quotes '304 patent claim 62. The bolded language in HTC's quotation only confirms DataQuill's point. Claim 62 already uses other language to recite specific processing, e.g., "selectively control transmission over said communications interface ... as determined by said input signals processed by said controller." The claim's use of other additional language to

---

[11] As noted in the preceding section, HTC's proposed construction of this term is inconsistent with the premise upon which HTC based its proposed construction of the term "reading sensor." There, HTC insisted "the reading sensor must be able to **read**...." (HTC Br. at 11, emphasis in original.) In this section, HTC inconsistently states "**[i]t is the controller that interprets** these input signals [from the reading sensor] as commands or data." (Id. at 14, emphasis added.)

specify particular "processing" examples confirms that the general term "to process" should not be limited in the term "to process said input signals".

The patent claims recite other examples of processing or their results, which are particular to those claim limitations.  For example:

"…said controller is responsive to a said command to cause downloading of information...."  (e.g., '304 patent claims 59, 62, 64, 80);

"…said controller being arranged to be responsive to a location at which said [touch sensitive] screen is touched for user input." (e.g., '304 claims 9, 40, 62);

"…wherein subsequent to processing a said code said controller is arranged to cause said display to display information corresponding to said item" ('304 claim 65);

"…subsequent to said controller processing a said code said display displays description information relating to said user selectable item, and said processing includes processing of text of a said code."  ('304 claim 67);

controller, e.g., operable "to determine if corresponding description information, which is available at a remote processing center and is for said individual item, is displayable on said display from storage in said solid state memory … (ii) wherein said selected individual item is determined to be an item of a plurality of selectable items for which corresponding description information for said item is not available from storage in said solid state memory said controller is configured to cause said hand held device to automatically connect … (iii)…to cause said automatic connection subsequent to processing a code associated with said individual item" ('304 claim 69);

"…controller configured to process a said code to cause said display to display alphabetic text associated with a said code, and to cause said hand held device to perform a function in addition to said display displaying alphabetic text associated with a said code" ('304 claim 71);

"…said processing includes processing of text of a said code."  ('304 claim 78);

"…said controller is arranged to access stored information for selectable items to determine natural language characters or images corresponding to the coded data for display" (e.g., '304 claims 41, 42, 80);

controller is user programmable to cause data to be displayed in right-hand and left-hand orientations (e.g., '304 claims 47, 85); or,

"controller being arranged to respond…to said data to select a said item" (e.g., '591 claim 1).

See also, as pointed out in DataQuill's Opening Brief, different examples of processing in the patent specification.  (DQ Op. Br. at 12-13.)  Also as pointed out in DataQuill's Opening Brief, HTC's own citations to technical dictionaries contradict its proposal.  (Id., at 11; e.g., HTC

Ex. C [122], "Data processing: Pertaining to any operation or combination of operations on data" (IEEE STANDARD DICTIONARY OF ELECTRICAL AND ELECTRONICS TERMS (3rd Ed. 1984).)

HTC's proposal should not be adopted.

### 3.   "to download"; "downloading"

| HTC | DataQuill |
|---|---|
| **to download [also for '591 patent]:** to transfer from one place to another. | **to download:** to transfer from one place to storage at another. |
| **downloading:** transferring from one place to another | **downloading:**  transferring from one place to storage at another. |

HTC now states that "HTC believes 'downloading' and 'to download' terms, in isolation, should be given their ordinary meaning."  (HTC Br. at 33.)

Accordingly, HTC concedes that the ordinary meaning applies to these terms.   That ordinary meaning is what DataQuill proposes in its construction:  "to download: to transfer from one place to storage at another."  (DQ Br. at 14.)  (See also, e.g., Smith Dec., Tab 5, merriam-webster.com "Download (vt)**:** to transfer (as data or files) from a usually large COMPUTER to the memory of another device (as a smaller computer) Examples of DOWNLOAD – He downloaded the FILES onto his computer. – She downloads songs from the INTERNET. – The new program makes downloading faster.")

Despite HTC's concession to use an ordinary meaning, HTC, inconsistently, still wants to truncate the ordinary meaning of "download" to just "transfer" in its proposal for the various claim limitations using "update" or "updating".  HTC's proposal to treat the "download" terms inconsistently should be rejected.  E.g., Enzo Biochem, Inc. v. Applera Corp., 599 F.3d 1325, 1342 (Fed. Cir. 2010) ("claim terms are normally used consistently throughout the patent," quoting *Phillips*, 415 F.3d at 1314).  It should be construed as proposed by DataQuill.

4.   "… up to date …"; "… updating …"

| HTC | DataQuill |
|---|---|
| '304 Claim 62 – **wherein said downloading of information … is to bring description information in storage … up to date**:  such that only the information that has changed from the most recent download of information is downloaded to make the information in storage current<br><br>**wherein, a said command to cause  downloading is a command to bring information up to date for an individual user selectable item of a plurality of user selectable items**:  such that the command to cause downloading is a command that causes only the information that has changed from the most recent download of information to be downloaded to bring the description information concerning an individual user selectable item in storage current | '304 Claim 62 – **wherein said downloading of information: is to bring description information in storage corresponding to an individual user selectable item of said plurality of user selectable items up to date for a user**:  means what it says and no elaboration is needed<br><br>**wherein, a said command to cause downloading is a command to bring information up to date for an individual user selectable item of a plurality of user selectable items**:  means what it says and no elaboration is needed |
| '304 Claim 64 – **said controller is responsive to a said command to cause**:  ordinary meaning; no construction required<br><br>**downloading of information from a remote processing center as required for updating information previously stored in said data entry device**:  transferring from the remote processing center only information that has changed from the information most recently stored in the data entry device<br><br>**(d) said controller being responsive to a said command to cause**:  ordinary meaning; no construction necessary<br><br>**downloading of information from a remote processing center as required for updating information previously stored**:  transferring from the remote processing center only information that has changed from the information most recently stored<br><br>**(i) is to bring said information previously stored for said individual item up to date for a user**:  to make information for the individual item previously downloaded and stored in storage current by downloading only the information that has changed from the most recent download<br><br>**(iii) a said command is a command to bring information up to date for an individual user selectable item of a plurality of user selectable items**:  such that the command is a command that changes only the information that has changed from the most recent information for an individual user selectable item | '304 Claim 64 – **said controller is responsive to a said command to cause downloading of information from a remote processing center as required for updating information previously stored in said data entry device**:  means what it says and no elaboration is needed<br><br><br><br>**(d) said controller being responsive to a said command to cause downloading of information from a remote processing center as required for updating information previously stored:  (i) is to bring said information previously stored for said individual item up to date for a user**:  means what it says and no elaboration is needed<br><br><br><br>**(iii) a said command is a command to bring information up to date for an individual user selectable item of a plurality of user selectable items**:  means what it says and no elaboration is needed |
| '304 Claim 80 – **wherein said controller is responsive to a said command to cause downloading of information from a remote processing center as required for updating information previously stored in said data entry device**:  See claim 64, element 64(d) | '304 Claim 80 – **wherein said controller is responsive to a said command to cause downloading of information from a remote processing center as required for updating information previously stored in said data entry device**:  means what it says and no elaboration is needed |

| | |
|---|---|
| '304 Claim 81 – **said controller being responsive to a said command to cause**:  ordinary meaning; no construction necessary<br><br>**downloading of information from said remote processing center as required for updating information previously stored in said rewritable storage for one or more of said selectable items**:  transferring from the remote processing center only information that has changed from the information most recently stored in the rewritable storage for one or more of the selectable items to bring the information for one or more of the selectable items current | '304 Claim 81 – **said controller being responsive to a said command to cause downloading of information from said remote processing center as required for updating information previously stored in said rewritable storage for one or more of said selectable items**:  means what it says and no elaboration is needed |
| '591 Claim 32 – **memory … operable for retaining information for updating downloaded information previously retained in said memory**:  the memory is operable to store information, the information being only information that has changed from information most recently stored in memory | '591 Claim 32 – **memory … operable for retaining information for updating downloaded information previously retained in said memory**:  means what it says and no elaboration is needed |
| '591 Claim 38 – **in response to entry of a user command to download information from said remote processing center for retention in said memory to update information previously retained in said memory for one or more of said merchandisable items**:  upon a user entering a command, only information that has changed from information most recently stored in the memory for one or more of the merchandisable items is transferred from the remote processing center for storage in memory | '591 Claim 38 – **in response to entry of a user command to download information from said remote processing center for retention in said memory to update information previously retained in said memory for one or more of said merchandisable items**:  means what it says and no elaboration is needed |
| '591 Claim 61 – **to download … in response to entry of a user command, information from said remote processing center for retention in said memory to update information previously retained in said memory for one or more of said merchandisable items**:  to transmit from a remote processing center upon a user entering a command, only information that has changed from information most recently stored in the memory for one or more of the merchandisable items for storage in memory | '591 Claim 61 – **to download … in response to entry of a user command, information from said remote processing center for retention in said memory to update information previously retained in said memory for one or more of said merchandisable items**:  means what it says and no elaboration is needed |
| '591 Claim 62 – **said hand held computer … is operable in response to entry of a user command to download information from said remote processing center for retention in said memory to update information previously retained in said memory for one or more of said items**:  upon a user entering a command, the portable computer initiates the transfer of only information that has changed from information most recently stored in the memory for one or more of the merchandisable items from the remote processing center for storage in memory | '591 Claim 62 – **said hand held computer using said wireless telecommunications interface also is operable in response to entry of a user command to download information from said remote processing center for retention in said memory to update information previously retained in said memory for one or more of said items**:  means what it says and no elaboration is needed |

DataQuill addresses these various claim limitations under one heading only because HTC has proposed to narrow them all in essentially the same manner.  However, as indicated by the claim language, these formulations differ, and DataQuill does not intend to treat them the same

1   just because they are under a single heading.  (See claims and DQ Br. at 16-17.)

2        HTC does not assert, and has not pointed out, any ambiguity in the language used in these

3   claim limitations as written.  As such, elaboration beyond the words used should not be required.

4   E.g., Superguide Corp. v. DirecTV Enters., 358 F.3d 870, 874-75 (Fed. Cir. 2004) ("There is a

5   heavy presumption that the terms used in patent claims mean what they say and have the ordinary

6   meaning that would be attributed to those words by persons skilled in the relevant art.");

7   Advanced Commun. Design v. Premier Retail Networks, 46 Fed. Appx. 964, 980-81 (Fed. Cir.

8   2002) (note: no non-precedential legend) (If a claim term is sufficiently clear, "the district court

9   simply has no duty to wave into existence a different definition, one that uses different words

10  than the words actually used in the claim language itself.").[12]

11       Instead, HTC proposes to substantially rewrite the claim language by importing purported

12  limitations from the specification, and using retracted arguments in an abandoned application that

13  were directed to a different formulation of claim language.  HTC's approach is not legally or

14  factually supported.

15       Specification.  While the specification discloses different embodiments, HTC does not

16  point to any passage in the specification that requires that the various "updating" limitations must

17  be restricted to operating as HTC proposes.  See Superguide, 358 F.3d at 874-75 (must have

18  "words or expressions of manifest exclusion or restriction, representing a clear disavowal of

19  claim scope.").  HTC, for example, cites to col. 10:35-39, and asserts it describes a process of

20  "initially storing" information in a device.  (HTC Br. at 20-21.)  But it does not so state, and

21  when read with its next sentence – not cited by HTC – indicates that all items of one or more

22  catalogues can be replaced by downloading all of them: "the rewritable storage capacity of the

23  pen (e.g., the RAM 78) is chosen to be sufficient to store all the items from one or more

24

25  ---

    [12] "As written, however, the claim is unambiguous, and unambiguous claims must be interpreted as
    written."  *Biedermann Motech v. Acme Spine,* 2007 U.S. Dist. Lexis 98330, *33 (C.D. Cal. 2007).  *See

26  also Toro Co. v. Ingersoll-Rand Co.,* 545 F. Supp. 2d 933, 952 (D. Minn. 2008) ("Court concludes that the
    term 'comfortably' is clear and definite within the context of claim element (h) and requires no

27  construction by the Court."); *Garmin Ltd. v. Tomtom, Inc.,* 2006 U.S. Dist. Lexis 61187, *15 (W.D. Wis.
    2006) ("In several instances I found that the disputed claim language was clear and unambiguous as

28  written in the claim and required no judicial construction.").

merchandising catalogues. If the data is stored in volatile 40 memory, this data is downloaded from the remote processing centre via the telecommunications link on restoring power to the memory in the pen." (10:35-42.)

HTC also cites col. 10:49-61, asserting it discloses a process where information for a selectable item "may be updated by sending only the information that has changed – and not information that has not changed". (HTC Br. at 20.) The cite (which HTC has misquoted in part) reads: "Then on reading a bar code relating to an item stored in memory the display on the pen can indicate a description of the item corresponding to the code read, its availability and price. If the code read is not recognised, for example, the pen can be programmed automatically to call up the remote processing centre to check on whether an update of the pen's storage is needed when the pen is replaced in the base unit." (10:54-61.)

HTC also cites to col. 16:64 to 17:7, albeit incompletely referring to it, and its example where information is stored in the hand held unit via "a plug-in ROM" or a "smart card" (not via downloading), and then updating this stored information. It is noted this example appears to contradict HTC's proposed restrictions – such as for '304 claim 64 (d)(i) – "downloading only the information that has changed from *the most recent download,*" because the example includes updating information already stored via "a plug-in ROM," not via downloading from a remote processing center.

HTC's specification cites are to inclusive examples.[13]  They do not have "words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope," Superguide, 358 F.3d at 874-75, that dictate that HTC's narrowing proposals should be added as requirements to each claim phrase with "update" or "updating". Other example passages are not cited by HTC. See, e.g., col. 12:35-50: In addition to discussing programming of data from a remote processing center such as "AMEND CATALOGUE ITEM," also includes programming such as "CLEAR CATALOGUE," or "ADD CATALOGUE ITEM."

---

[13] For example, HTC cites to passages after the lead-in sentence in col. 5 which states: "Exemplary embodiments of the invention will be described hereinafter, by way of example only…." (5:57-58.)

1    <u>File history</u>.   HTC mischaracterizes the record, ignores relevant parts of it, and fails

2    follow Federal Circuit precedent concerning file history.  DataQuill addresses these points below.

3              a)   <u>HTC's factual inaccuracies about the file history</u>.

4    HTC incorrectly characterizes:  "In a December 16, 2003 Office Action, and after

5    considering DataQuill's traverse in an attempt to distinguish the claims from the prior art in its

6    April 13, 2000 Response, the Examiner rejected all pending claims, except for four dependent

7    claims – 66, 68, 72, and 73 based on the *Koenck* reference….  It was only after the Examiner

8    relied on the statements mentioned above did DataQuill attempt to withdraw its disclaimed

9    subject matter."  (HTC Br. at 24.)

10   In the parent '565 application, DataQuill submitted an April 13, 2000 "Preliminary

11   Amendment" with claims and "Remarks."   HTC relies on parts of that filing – statements by

12   DataQuill directed specifically to claims 31 and 76.  (<u>See</u> HTC Ex. E [1045-52 discuss claim 31;

13   1054 discusses claim 76].)   HTC incorrectly characterizes the April 13, 2000 paper as a

14   "traverse," which it was not, as no office action had yet issued in the '565 application.  A first

15   office action issued on December 16, 2003.  (<u>See</u> HTC Ex. E [1196-1208].)  That office action

16   rejected claims 31 and 76 (among others).  (<u>Id</u>. [<u>e.g.</u>, 1197-98; 1202].)   HTC also states the

17   rejections were "based on the *Koenck* reference."  That is not complete; the rejections were based

18   on *Koenck*, *Zook*, *Gombrich*, *Roberts*, *Biss*, and *Martinez* in various combinations.  (HTC Ex. E

19   [1198-1205].)

20   Also, HTC's characterization that "…the Examiner relied on the statements mentioned

21   above…" is unsupported by the record.[14]   The December 16, 2003 office action did not even

22   mention the patentee's arguments that HTC relies on regarding claims 31 and 76.  (<u>See</u> HTC

23   Duffy Ex. E [1196-1208].)  The record shows that the examiner did not accept, and did not rely

24   on, the arguments in support of claim 31 and 76:  the December 13, 2003 office action was

25   "[r]esponsive to communication(s) filed 13 April 2000" (HTC Ex. E [1197]), and it expressly

26

27

----

28   [14] It is also not legally relevant here, as discussed later.

1    rejected claims 31 and 76.  (Id., Ex. E [e.g., 1197-98; 1202].)[15]  Those two claims were then left

2    with the abandoned '565 application and not re-submitted in the continuation application.

3              In any event, HTC's failed attempt to show that the examiner relied on the claim 31 and

4    76 arguments in the abandoned *parent* '565 application would not be relevant here even if

5    successful, because DataQuill submitted two filed papers withdrawing, and disavowing reliance

6    on, those arguments prior to examination of different claims in the *continuation* application

7    (which led to the '591 patent).  (See Smith Dec., Tabs 8, 9, "Remarks".)  The retracted arguments

8    were not relied on in the continuation application.  As the record shows, in the abandoned '565

9    application, examiner Gelin acknowledged DataQuill's June 14, 2004 filing (which included the

10   retraction in its "Remarks") (HTC Ex. E [1237]), and he referred to the Remarks' reference to "a

11   continuation application" as a reason for abandonment in his "Notice of Abandonment."  (HTC

12   Ex. E [1261].)   Later, in the continuation application, the same examiner acknowledged

13   DataQuill's June 14, 2004 filing, which also included its remarks withdrawing and disavowing

14   the claim 31 and 76 arguments.  (See Smith Resp. Dec., Tab 22, 6/11/05 office action, p. 1.)

15   Examiner Gelin understandably did not discuss or address the arguments that had been

16   withdrawn and disavowed, and in any event had been directed to different claims' formulation of

17   updating.  (Id.)

18             DataQuill also notes that, even if an examiner were to have relied on an argument in an

19   earlier *parent* file (not the case here), that circumstance still would not have been a legal barrier

20   to a patentee retracting the argument prior to examination of a later continuation application.[16]

21

22   [15] Another incorrect statement is:  "HTC notes that the file history indicates the Examiner accepted
     Applicants' traverse, as explained above."  (HTC Br. at 24, n.11.)  HTC provides no citation in support,
23   and the explanation HTC refers to does not exist.  (As stated above, they were not a "traverse.")  To
     characterize (as HTC does) the rejection of claims 31 and 76 as "an acceptance" of the arguments made in
24   regard to claims 31 and 76 defies reasoning, and the record.

25   [16] For example, in the *Hakim* case HTC cites, patentee Hakim received a notice of allowance from the
     examiner in his parent application after his arguments were made.  Hakim then abandoned the parent
26   application and filed his continuation application.  The Federal Circuit did not find this sequence to be a
     bar to rescinding the prior disclaimer:  "a disclaimer made during prosecution **can be rescinded**,
27   permitting recapture of the disclaimed scope". *Id.* at 1318 (emphasis added).  Instead, the Court found that
     patentee Hakim prior to examination of the continuation application had not sufficiently placed his
28   examiner on notice that he was retracting his prior arguments. *Id.* at 1318.

b) <u>The arguments were retracted, and cannot be properly used to make a disclaimer</u>.

DataQuill had retracted the arguments.  HTC cites <u>Hakim v. Cannon Avent Group, PLC</u>, 479 F.3d 1313 (Fed. Cir. 2007).  (HTC Br. at 24-25).  <u>Hakim</u> does not support HTC's position. <u>Hakim's</u> facts did not involve an express retraction by the patentee, and the use of a disclaimer was upheld based on circumstances much different than here.  In <u>Hakim</u>, the Federal Circuit found patentee Hakim had made arguments in his parent application limiting his the invention to "include[] the presence of a slit in the flexible material."  <u>Id</u>. at 1315-16.  The examiner issued an allowance for such claims in the parent application.  <u>Id</u>. at 1316.  Hakim then abandoned the parent application and filed a continuation application that had broader claims than those in the parent, with a letter indicating he was broadening the claims.  <u>Id</u>.  Importantly, however, patentee Hakim "did not retract any of his arguments distinguishing the prior art" he had made in the parent application.  <u>Id</u>.  And, on the record before it, the district court made a finding that "the examiner's action in allowing *the continuation* claims without further prosecution was based on Hakim's prosecution argument in the parent [application]."  (<u>Id</u>. at 1317, emphasis added).

Under such facts, the Federal Circuit upheld the district court's use of the statements in the parent application as a disclaimer of claim scope in the continuation.  The Federal Circuit stated, "[a]lthough a disclaimer made during prosecution can be rescinded, permitting recapture of the disclaimed scope, the prosecution history must be sufficiently clear to inform the examiner that the previous disclaimer, and the prior art that it was made to avoid, may need to be re-visited."  <u>Id</u>.  Hakim – unlike DataQuill here – did not retract his earlier statements, but instead only informed the examiner that the claims he was submitting in the continuation application were broader than those in the parent.  <u>Hakim</u>, 479 F.3d at 1316 (quoting district court: "***Because Hakim did not retract any of his arguments*** distinguishing the prior art, he is held to the restrictive claim construction he argued during prosecution of the patent.") (emphasis added).[17]

---

[17] *Compare also Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 996 (Fed. Cir. 2003) (disclaimer applied:  "The applicant never retracted any of his statements distinguishing [the reference]….").

1    DataQuill, in contrast, advised examiner Gelin in two papers, one filed in the abandoned

2    parent '565 application (Smith Dec., Tab 8, "Remarks," p. 3) ("Applicants also withdraw and

3    disavow reliance on their arguments in regard to Claims 31 and 76"), and another separately filed

4    in the continuation application, before he took up examination of the continuation, that it had

5    withdrawn the subject arguments and disavowed reliance on them.  (Id., Tab 9, "Remarks," p. 3.)

6    As DataQuill advised in the continuation application (over a year before the first office action):

7        "Applicants reserve the right to later pursue other claims from parent application
         serial number 09/548,565 in this or another application. The filing of this
8        continuation application should not be interpreted as an acquiescence by
         Applicants of the correctness of the rejections in parent application serial number
9        09/548,565.  Applicants also withdraw and disavow reliance on their arguments in
         regard to Claims 31 and 76 made in the paper filed on April 13, 2000 in parent
10       application serial number 09/548,565."

11   (Id., Tab 9.)  The statements here well exceed the minimum threshold for clarity not met by the

12   patentee in Hakim.  Because the prior arguments on claims 31 and 76 in the abandoned '565

13   application were expressly "withdrawn" and reliance on them "disavowed" in two papers to the

14   examiner prior to examination of the continuation, it would be clear to an examiner that any

15   disclaimer of claim scope he or she had perceived (if any) to avoid prior art based on such

16   arguments would have to, at a minimum, be revisited.

17       Nor is there basis to conclude that the examiner relied on the (retracted) claim 31 and 76

18   arguments in examination of the (different) claims in the original '304 patent.  Also, by the time

19   the reexamination of the '304 patent was initiated in 2007, DataQuill over two years prior had

20   submitted its withdrawal and disavowal statements – in the '565 application where the arguments

21   were made, and again in the application for the '591 patent.  (Smith Dec., Tabs 8, 9.)

22       c)   HTC fails to acknowledge the asserted claim language is materially different or
             account for context or other statements in file history.

23

24       Aside from the retraction of the claim 31 and 76 arguments, other factors prevent their use

25   here.[18]  HTC goes out of its way to emphasize that in the abandoned '565 application DataQuill

26

27   _____
     [18] See also DataQuill Opening Brief at 22 and n.18 discussing case law.  E.g., Ventana, 473 F.3d at 1184
     (arguments of another application with different claim formulation not applicable:  "But here, once again,
28   [defendant] points to statements made [in another application] with respect to claim language that
     expressly required the reagent to be 'dispensable from a lower end of [the] container onto the slide.'

_____

re-filed claims "*identical* to those in the parent application that the Examiner had rejected...." (HTC Br. at 23.)  HTC's emphasis of this fact is of no apparent relevance, and seems to mislead. What is relevant is that claims 31 and 76 of the abandoned '565 application (the subject of the retracted "updating" arguments) are not identical to, and are materially different from, the claim language in the '304 and '591 patent claims at issue here.

Also, HTC avoids acknowledging that the retracted arguments directed themselves to the specific claim language found in (abandoned) claims 31 and 76.  For instance, the arguments were under specific headings "<u>CLAIM 31</u>" and "<u>CLAIM 76</u>".  The arguments repeated:  "in a system as set forth in claim 31", "as set forth in claim 31," "of the claimed system," "as set forth in claim 31," "as set forth in claim 31," "as defined in Claim 31," "In claim 76," and "in a system according to claim 76....") (HTC Ex. E [1045-48; 1051, 1054], 4/13/00 "Remarks," pgs. 15, 16, 17, 18, 21, 24.)

To support its use of the "information that has changed" argument, HTC lifts one quote out of context.   For instance, under "<u>CLAIM 31</u>" which discusses "...information that has changed," HTC omits mention of the paragraph preceding what HTC quoted (all emphasis original):

> "Moreover, the updating process is not directed to a specific 'selected' item, but rather the updating occurs for the ***selectable items*** for which updating *is required* (which could be none, some, or all of the selectable items) in order that the appropriate current information is stored by the rewritable storage in the handheld unit for all selectable items. This means that someone using the system does not have to repeatedly revert to communication with the remote processing center to get updates for each item information that has changed, as the input of a single update command to the hand held unit will cause all information concerning ***selectable items*** that has ***changed*** to be updated.

> "In addition, as the hand held unit only downloads information that has changed, the time taken to update the information in the rewritable storage is dramatically less than the time take to update prior art devices where <u>all the information stored in the device is replaced with a complete new set of information.</u>"

(<u>See</u> <u>Id</u>., Ex. E [1046-47], "Remarks," pgs. 16-17.)

---

Because claims 1 and 5 of the '861 patent do not contain this claim language, these statements are not relevant to the construction of 'dispensing' in claims 1 and 5 the '861 patent.").

"In evaluating whether a patentee has disavowed claim scope, context matters." i4i Ltd., 598 F.3d at 843.  Placed in context above, it is apparent that the argument HTC quotes was directed to the particular claim language found in claims 31 and 76, including its plural "…for selectable items" formulation.  The claim 31 and 76 arguments otherwise went on to emphasize this formulation (all emphasis original):  "***as required***…", "*selectable items*", "**all** information relating to *selectable items*", "the features of Claim 31, including the feature for updating *selectable items*", "'…*for selectable items*' as set forth in claim 31", "*...for selectable items.*"; "***as required***…for selectable items."  (HTC Ex. E [1048, 1050-51, 1054] pgs. 18, 20, 21, 24.)  It ends the "CLAIM 31" section, referring to "the above described combination of features in claim 31." (Id., [1051-52] pgs. 21-22.)  And, in the "CONCLUSION," it refers to: "…the particular combinations of features and functionality recited in any of claims 31 - 77." (Id., [1055] pg. 25.)

Thus, contrary to HTC's use, a reasonable (in fact proper) interpretation of the retracted claim 31 and 76 arguments is that they were directed specifically to, and made in the context of, "the particular combinations of features and functionality recited" in those claims, including the "…for selectable items" formulation found only in (abandoned) claims 31 and 76.  They ought not to form a disclaimer for the asserted claims (which used materially different claim language) here.  "The question…is whether any of [the] prosecution arguments to the examiner have no reasonable interpretation other than to disavow [the alleged subject matter]." Sandisk, 415 F.3d at 1287.  That is not the case here.

### ‘591 patent claims (materially different)

As pointed out in its Opening Brief, the ‘591 patent claim terms that refer to "updating" are materially different from the claim formulations in claims 31 and 76 argued in the abandoned ‘565 application.  After DataQuill submitted its paper retracting the claim 31 and 76 arguments in the abandoned ‘565 application, and a paper doing so in its continuation application, it submitted claims in the continuation application with materially different terms.  (Note, the ‘591 patent claims included limitations – other than "…updating…" limitations – in addition to those found in abandoned claims 31 and 76 that distinguished them from the prior art.)

For example, asserted ‘591 claim 32 refers to "updating" only in its "memory" limitation.

It omits phrasing (e.g., "as required" or "…for selectable items") found in abandoned claims 31 and 76, and uses broader terminology than those claims did: "memory…operable for retaining information for updating downloaded information previously retained in said memory". All the asserted claims in the '591 patent (e.g., claims 32, 38, 61, 62) are materially different from the claims argued in the abandoned application. (E.g., '591 claim 61 omits "as required", uses "for one or more merchandisable items".)

DataQuill, thus, submitted claims with a materially different "updating" formulation, in addition to notifying the examiner that the prior claim 31 and 76 arguments were withdrawn and disavowed. "When the purported disclaimers are directed to specific claim terms that have been omitted or materially altered in subsequent applications (rather than to the invention itself), those disclaimers do not apply." Saunders Group Inc. v. Comfortrac, Inc., 492 F.3d 1326, 1333-34 (Fed. Cir. 2007) (e.g.: "the alleged disclaimer distinguishing the prior art focused on a particular claim limitation – the 'pressure activated seal' limitation found in each of the claims of the [parent] '174 patent – and was not directed to the invention as a whole.").  For example, "omitting the claim term to which the prosecution history disclaimer argument was directed precluded those statements from being applied to the child application." Saunders Group, 492 F.3d at 1333-34 (citing Advanced Cardio. Sys. v. Medtronic, Inc., 265 F.3d 1294, 1305-06 (Fed. Cir. 2001)).  "Defendant's insistence upon this court's reading back into the claims limitations which were originally there and were removed during prosecution of the application through the Patent Office cannot be permitted." Laryngeal Mask Co. Ltd. v. Ambu A/S, 618 F.3d 1367, 1371 (Fed. Cir. 2010) (quoting Kister Instrumente AG v. United States, 628 F.2d 1303, 1308 (Ct. Cl. 1980)).

### '304 patent claims (materially different)

As DataQuill pointed out in its Opening Brief (pg. 22-23), the '304 patent's asserted claims (e.g., clams 62, 64, 80, 81, 82 etc.) also are different from claims 31 and 76 argued in the abandoned '565 application.  The closest claim language is in '304 patent claims 80 or 81. That language though similar, nonetheless is materially different.  Claim 81, for example, rather than claiming "for updating information…for selectable items" (plural), as in claims 31 and 76, states

1  "for updating information…for *one or more of* said selectable items" with its broader "one or

2  more" formulation.   (The '304 patent claims also had claim limitations -- other than

3  "…updating…" limitations -- in addition to those found in abandoned claims 31 and 76 that

4  distinguished them from the prior art.)

5         As noted by the Federal Circuit in a similar situation: "Although the related patents are

6  similar, their claims are not identical.  ….  Claim 1 of the [subject] patent recites 'each of a

7  plurality of fields,' which does not carry the same meaning as 'every field' [used in the parent

8  patent]."  <u>ResQNet.com, Inc. v. Lansa, Inc.</u>, 346 F.3d 1374, 1382 (Fed. Cir. 2003).   The Court

9  concluded:  "Although a parent patent's prosecution history may inform the claim construction of

10  its descendent, the [parent] patent's prosecution history is irrelevant to the meaning of this

11  limitation because the two patents do not share the same claim language."  <u>Id</u>. at 1383.

12         HTC's failure to acknowledge the retracted arguments' context is another flaw in HTC's

13  proposal to apply the retracted arguments as disclaiming scope of the materially different '304

14  claim language.

15         The retracted claim 31 and 76 arguments, for instance, also emphasized:  "Moreover, the

16  updating process <u>is not directed to a specific 'selected' item</u>, but rather the updating occurs for

17  the ***selectable items*** [etc.]"  (HTC's Ex. E [1046], 4/13/00 "Remarks," pg. 16) (underline added).

18  In contrast, '304 claim 62 specifically recites for example:  "wherein said downloading of

19  information:  is to bring description information in storage <u>corresponding to an individual user</u>

20  <u>selectable item</u> of said plurality of user selectable items up to date for a user;" and recites "and

21  wherein, a said command to cause downloading is a command to bring information up to date <u>for</u>

22  <u>an individual user selectable item</u> of a plurality of user selectable items…."  ('304 claim 62,

23  limitation (c)) (underline added).

24         Also, '304 claim 64 specifically recites:  "(d) said controller being responsive to a said

25  command to cause downloading of information from a remote processing center as required for

26  updating information previously stored:  (i)  is to bring said information previously stored <u>for</u>

27  <u>said individual item</u> up to date for a user…."  ('304 claim 64, limitation (d)) (underline added).

28

And, '304 claim 80 specifically recites:  "said controller being responsive to a said command to cause downloading of information from said remote processing center as required for updating information previously stored in said rewritable storage for <u>one or more of</u> said selectable items".[19]

d)   <u>HTC's narrowing is not supported by the retracted arguments.</u>

Finally, even if the retracted claim 31 and 76 arguments had not been retracted (which they were), and were applicable to the asserted claims here (which they are not), HTC's proposed claim construction nonetheless would not be supported by them.

In its proposals, HTC adds language, for example, that a device only downloads information that has changed "*from the* information most recently stored".  But the retracted arguments in regard to abandoned claims 31 and 76 did not so specify, instead stating:  "In addition, as the hand held unit only downloads information that has changed, …." Or stated "cause all information concerning selectable items that has changed to be updated."  Or stated "as all information relating to selectable items stored in the rewritable storage that has changed is updated…."  (<u>See</u> HTC Ex. E [1046-47], 4/13/00 "Remarks," pg. 16-17).

Not deterred by the record, HTC – also without support from even the retracted arguments – simply rewrites "previously stored" in the claims to read "most recently stored". And, HTC – also without support from the retracted arguments – rewrites "downloading" to read "transferring".  Thus, in arguing that its rewriting of claim language is supported by the retracted arguments, HTC resorts to rewriting not only the claims but even the retracted arguments.

In that regard, the record shows that the retracted claim 31 and 76 arguments are not the clear and unmistakable disavowals of claim scope HTC portrays them to be.  Taken in context, the statements regarding claims 31 and 76 are inconclusive on the issue HTC raises.  An example is the retracted statement that HTC's proposals rely so heavily on:  "…the hand held unit only downloads information that has changed…."  The retracted argument did not specify what it

---

[19] Also, '304 claim 80 even more generically recites "information previously stored in said data entry device" without regard to any selectable items.

meant by "information that has changed."  To address this ambiguity, HTC resorts to linking the lifted statement from the retracted arguments to language HTC adds (e.g. "from the most recent download"; "from the information most recently stored"; or "from the most recent information"). The retracted arguments did not address or specify the linkage HTC has added.

To constitute a disclaimer of claim scope as HTC proposes, the retracted claim 31 and 76 arguments would have to be free of such ambiguities.  "An ambiguous disclaimer…does not advance the patent's notice function or justify public reliance, and the court will not use it to limit a claim term's ordinary meaning."  Sandisk, 415 F.3d at 1288.  "A disclaimer must be 'clear and unmistakable,' and unclear prosecution history cannot be used to limit claims." Cordis Corp. v. Boston Sci. Corp., 561 F.3d 1319, 1329 (Fed. Cir. 2009).

### 5.  "wherein programs in said data entry device are updateable remotely from a processing center"

| HTC | DataQuill |
| --- | --- |
| '304 Claim 97 – **wherein programs in said data entry device are updateable remotely from a processing center:**  such that programs stored in the data entry device are made current by downloading only the changes to the most recently stored programs upon initiation by the remote processing center | '304 Claim 97 – **wherein programs in said data entry device are updateable remotely from a processing center:**  means what it says and no elaboration is needed |
| '304 Claim 113 – **wherein programs in said hand holdable unit are updateable remotely from said processing center:**  such that programs stored in the hand holdable unit can be made current by downloading only the changes to the most recently stored programs upon initiation by the remote processing center | '304 Claim 113 – **wherein programs in said hand holdable unit are updateable remotely from said processing center:**  means what it says and no elaboration is needed |

Because HTC lumps everything with the word "updating" together, in its Opening Brief it does not separately discuss nor offer any support for narrowing the above claim language. Because of its lumping together, HTC also proposes to use the retracted claim 31 and 76 arguments of the '565 application as express disavowals of claim scope restricting this different claim language.  As pointed out above, the claim 31 and 76 arguments were retracted and cannot be applied as disavowals of claim scope.  Also as pointed out above, in its April 13, 2000 Remarks, DataQuill had directed its (retracted) arguments particularly to claims 31 and 76.

Of additional relevance here is that when DataQuill's claim 31 and 76 arguments in the '565 application were made, there was a separate claim with "updateable remotely" language

pending in the same '565 parent application:

"49.  A data entry system according to claim 31, wherein programs in said hand held unit are updateable remotely from said processing center."

(HTC Ex. E [1036], 4/13/00 Preliminary Amendment, p. 6.)  The retracted arguments directed to claims 31 and 76 were not directed to the "updateable remotely" language of claim 49.

This fact is instructive because not only does it demonstrate that the retracted arguments were not directed to the subject claim language – "wherein programs…are updateable remotely from said processing center" – but it further demonstrates, as DataQuill argued above, that the claim 31 and 76 arguments (even aside from being retracted) should not be assumed to apply to claim formulations related to "updating" other than as specifically recited in (abandoned) claims 31 and 76.  See also ResQNet.com, 346 F.3d at 1383.

Finally, HTC offers no argument to support its addition to require that operation be "…upon initiation by the remote processing center," as it asserts in the Joint Chart.  As DataQuill pointed out, nothing supports HTC's proposal to add this restriction to the claim language, and its addition as a requirement is contradicted by the intrinsic record.  (See DQ Open. Br. at 25-26.)

### 6.  "a camera"

| HTC | DataQuill |
| --- | --- |
| **camera [in '304 patent claims 13, 45]:**  a device that can capture an image, which could be an image of one or more characters, and recognize the contents of the image when used in combination with a processor which may execute image recognition software | **camera:** means what it says and no elaboration is needed |
| **camera [in '304 patent claim 73, and in '591 patent claims 35, 62]:**  a device that can capture an image | |

HTC's arguments for its two proposed constructions of "camera" are without merit.  HTC fails to justify its proposals to restrict the data a camera can capture to "an image," and to add extraneous language concerning the separate functioning of "a processor which may execute image recognition software."

HTC fails to provide any support for its proposal to restrict the data a camera can capture to "an image."  While there is no reason to do so, there are reasons not to, such as '591 patent

claims 3 and 22. Claim 3 recites "a sensor operable to sense and capture **data** wherein said sensor is a camera."[20] And, '591 patent claim 22, which depends from claim 3, specifically recites "images" as a required type of data: "wherein said data captured by said sensor is one or more images." Given such usage, it would be improper to re-write "data" as "images" as HTC proposes. See, e.g., LG Elecs., Inc. v. Bizcom Elecs., Inc., 453 F.3d 1364, 1377 (Fed. Cir. 2006) (error to read limitations from dependent claim into independent claim); Phillips, 415 F.3d at 1314 ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms"). For these claims, if there are cameras capable of capturing data that are not images, then they are within the scope of the term "camera". E.g., Superguide, 358 F.3d at 880 ("The law does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention").[21]

HTC argues that its extraneous "in combination with a processor" limitation is mandated for claims in which the recited camera is a "reading sensor." (HTC Br. at 15-16.) HTC argues that "the type of camera that would be necessary to constitute a scanning device that constitutes a reading sensor would be one that would have to have the ability to read, i.e., recognize the contents of the data it is sensing." (Id. at 15.)

First, as discussed above (in Section 1), HTC's premise that a reading sensor must read is incorrect.[22] Second, HTC is arguing about something that is not in its proposed construction. Even HTC's proposal does not require that a camera must "recognize the contents of the image" by itself, but that it does so "***when used in combination with a processor which may execute image recognition software***." In HTC's own cited embodiment, it is not a camera which is recognizing; it is "a processor."

---

[20] *See also* '591 patent claims 35, 37 and 62, which contain the same language. A like analysis applies for '591 patent claims 50 and 52 ("a camera operable for sensing and capturing **data**").

[21] *See also* '304 patent claims 13, 45 and 46. For example, "a scanning device" of claim 13 is a camera and "a reading sensor responsive to commands and/or sensed commands and data to produce input signals." ('304 patent claims 13, 12, 80.) No language in those claims requires "scanning" to be of images, nor that "commands and/or sensed commands and data" must be images.

[22] And as noted, HTC's proposed construction does not require that "reading sensor" must "read."

HTC at times acknowledges this fact, and at other times pretends otherwise.  For example, HTC states:  "In order to determine what is being represented, *the data entry device must be able to interpret the captured data*."  (HTC Br. at 16, emphasis added.)  But  HTC also mischaracterizes the specification as disclosing "a camera with character or image recognition logic," or a "camera having character or image recognition capability."  (HTC Br. at 2, 11.)  The specification describes an example where "***the data entry device*** is provided with character or image recognition logic"; and "[w]ith a camera and appropriate recognition logic, *the pen* could be used, for example, for fingerprint recognition."  (5:35-47; 17:52-58; emphasis added.)

In any event, there is no basis for adding HTC's confusing limitation of "recognize the contents of the image when used in combination with a processor which may execute image recognition software."

HTC also improperly proposes to construe the word "camera" as meaning different things in different claims.  HTC's proposal should be rejected.  E.g., Enzo Biochem, 599 F.3d at 1342 ("claim terms are normally used consistently throughout the patent," quoting *Phillips*, 415 F.3d at 1314).

 HTC's argument for inconsistent constructions makes no sense.  (HTC Br. at 16.)  Focusing on the claim language "said camera is operable to sense and capture data relating to a plurality of selectable items," HTC states that the claim "provides no explanation as to how the data is or can be related to the plurality of selectable items ***through operation of the device*.***"  (Id., emphasis added.)  HTC mysteriously adds the last phrase.  The claim instead simply says "data relating to a plurality of selectable items"; it does not have the nonsensical language HTC conjures of "through operation of the device."  HTC then uses its made-up claim language as the premise for an illogical conclusion:  "Accordingly, to the extent that the device is intended to make such a relationship, it must have the capability to comprehend the data that it senses."  (HTC Br. at 16.)  This is just plain nonsense, and it has no logical connection to the constructions HTC proposes.  HTC's proposals should be rejected.

### 7.  "written text"

| HTC | DataQuill |
|---|---|
| **written text:**  handwritten text | **written text:** means what it says and no elaboration is needed |

HTC's proposal to change the word "written" to "handwritten" lacks merit.

For instance, to support its argument HTC points out that the patent claims refer to "written text," whereas the specification refers to "text" on a display, pointing to one example related to Fig. 7.  (HTC Br. at 28.)  Yet, while it is correct that the words "written text" do not appear together in the specification, as DataQuill pointed out in its Opening Brief, there are multiple examples of "written text" in the specification that is not "handwritten" text.  (DQ Br. at 31-33) (e.g., col. 5:18-41: "a specific product code" written by entering individual codes via "various characters and commands…arranged in the manner of a standard typewriter keyboard layout," e.g., using bar codes, or optically recognized characters, etc.; 17:38-47; 17:52-53, etc.).[23]

HTC goes on to erroneously imply that the specification identifies "text" only as "printed text".  (HTC Br. at 28.)  The specification does not say this.  Instead, HTC cites to the specification's use of the word "text" in an example having text appear on a display in different orientations.  (Id., citing 11:13-29.)  HTC concludes that, based on this exemplary use of "text," there must be a distinction between "mere 'text'" in the specification and "written text" in the claims.  Yet HTC's cite to the specification does not limit "text" to printed text, nor does it exclude other forms of text (e.g., written, spoken) from the meaning of "text":

> "FIG. 7 is a flow diagram illustrating an example of a possible series of operations using an example of data entry system such as that described with reference to FIGS. 1 to 6. It will be appreciated that other sequences and modes of operation may be provided in other embodiments of the invention….

> "In this example of operation….  Whereas for right-handed operation, where text is displayed in English, the text is displayed in sequence from the end of the display nearest to the reading head 14 towards the opposite end, for left-handed operation the text display is inverted with the text then reading from the end of the

---

[23] Note, DataQuill's Opening Brief at page 31, should have cited col. 3:58-61 (instead of 5:58-61) in support of its reference to:  "For example, the specification describes an embodiment '…wherein the reading sensor traces movements of the reading head and wherein the controller is responsive to signals from the sensor representative of the movements for identifying characters traced…' (5:58-61), but this example is not limited to using handwriting".

display furthest from the reading head to the end nearest thereto. It can be seen, therefore, that the text is displayed in an orientation appropriate for the user."

(10:62 to 11:29.)  There are no words of definition or restriction or any "clear and unmistakable" disclaimer.  The specification also emphasizes that what is described is one example:  "It will be appreciated that the steps S1 to S7 illustrated above merely form one possible method of operation." (12:12-13.)

The specification also describes other forms of text (here "messages") in audio (as opposed to written) form, when discussing an example of reading of a code which could be confirmed with audio feedback, e.g., "appropriate synthetic or recorded voice messages could be output." (17:8-16; see also 16:17-19:  "The speaker 95 is then used to output any tones or audio messages indicating errors, correct operation, etc.")

In any event, HTC's asserted distinction is a *non sequitur:*  Identifying a difference between "text" and "written text" does not dictate the inconsistent logical leap that "written text" must therefore mean "handwritten text."  (As DataQuill pointed out in its Opening Brief, a dictionary defines "written" as "expressed in writing (opposed to spoken)."  Smith Dec., Tab 6.) (Indeed, HTC's proposal that "written" means "handwritten" is inconsistent with its logic that "text" must be different than "written text.")

HTC's cited dictionary entry for "write/written" is also unsupportive.  This entry states: "write/written: 1(a) to form (as characters or symbols) on a surface with an instrument (as a pen)."  (HTC Ex. C [129].)  Although entry 1(a) gives an example of a pen, writing can be done with other instruments (e.g., a typewriter, a printing press, a computer), without requiring handwriting.  Entry 1(b) of the same definition – omitted from HTC's Brief – does not mention or require handwriting, "b: to form (as words) by inscribing the characters or symbols of on a surface."  (Id.)  For example, words inscribed on buildings and billboards typically are not handwritten.

Finally, the case HTC relies on, Bicon, Inc. v. Straumann Co., 441 F.3d 945, 950 (Fed. Cir. 2006), does not support HTC's proposal that "written" must be construed as "handwritten." There, the patentee had argued that a detailed description of structure in the claim itself should be disregarded.  Bicon, 441 F.3d at 948-951.  The Federal Circuit understandably rejected the

argument.   The Court reasoned that "the effect of adopting [patentee's] proposed claim construction would be to read limitations [a], [b], [e], and [h] out of the claim," which would be "contrary to the principle that claim language should not treated as meaningless…." Id. at 951. No such concern is implicated by DataQuill's proposal here to construe "written" as "written."

HTC's proposal to change "written" to "handwritten" should not be adopted.   E.g., Ventana Med. Sys. v. Biogenex Labs, Inc., 473 F.3d 1173, 1181 (Fed. Cir. 2006) ("dispensing" does not mean "direct dispensing": "Although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").

### 8.  "natural language characters"

| HTC | DataQuill |
|---|---|
| **natural language characters:** user understandable language characters such as common English | **natural language characters:**  means what it says and no elaboration is needed;<br><br>Alternatively: user understandable language characters such as common English |

DataQuill has reviewed HTC's Opening Brief.   Based on its review, the Opening Brief of DataQuill addresses HTC's arguments.   DataQuill will otherwise address this term at the *Markman* hearing.

**9.** "additionally comprising as well as or instead of said display screen, and separate from said data entry device, means for displaying a selectable item with associated data sources for user selection of an item by operation of said data entry device"[24]

| HTC | DataQuill |
|---|---|
| **additionally comprising as well as or instead of said display screen, and separate from said data entry device, means for displaying a selectable item with associated data sources for user selection of an item by operation of said data entry device**<br><br>Function: displaying a selectable item with associated data sources for user selection of an item by operation of said data entry device.<br><br>Structure: The structure described in the specification of the '304 patent for performing this function, and which comprises as well as or instead of said display screen and separate from the data entry device, is a television screen. | **additionally comprising as well as or instead of said display screen, and separate from said data entry device:** means what it says and no elaboration is needed<br><br>**means for displaying a selectable item with associated data sources for user selection of an item by operation of said data entry device:** means plus function term<br><br>Function: displaying a selectable item with associated data sources for user selection of an item by operation of said data entry device.<br><br>Structure: The corresponding structures described in the specification at 17:59-67, 4:62-5:10, and equivalents thereof. |

DataQuill has reviewed HTC's Opening Brief. Based on its review, the Opening Brief of DataQuill addresses HTC's arguments. DataQuill will otherwise address this term at the *Markman* hearing.

**10.** "a carrier"

| HTC | DataQuill |
|---|---|
| **carrier:** a physical medium, separate from and external to the data entry device that carries coded data recognizable by the data entry device as corresponding to data or commands | **a carrier:** a medium which carries one or more data and/or command code, character, image, or graphical or alphanumeric data representation;<br><br>Alternatively: a medium that carries one or more data and/or command codes |

HTC's argument here does not make any sense. While HTC cites to examples in the specification where a carrier is external to the hand held unit, it points to no part of the specification that is a "clear and unmistakable" disclaimer requiring that "a carrier" be limited to a medium external to the hand held unit. See Superguide, 358 F.3d at 874-75 (intrinsic record must have "words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). Also, as DataQuill pointed out in its Opening Brief, another part of

---

[24] This construction also applies to the nearly identical claim term in '304 claims 107 and 109, but the proposed construction should substitute for the words "data entry device" the words "hand holdable unit" which is used in claims 107 and 109.

the specification for, example, discusses "in place of…the entry of commands by scanning the bar codes on the command bar code card," using a display on a touch sensitive screen; this describes a carrier. ('304 patent, 12:65-13:21.)

Also, a number of the claims expressly claim "a carrier" as an element of the claimed data entry device or hand held unit (not external to it). HTC does not address this intrinsic evidence, nor is it apparent how HTC could overcome it to require "a carrier" be external to a unit of which it is a part. For example, '591 claim 1 expressly recites "a carrier" as an element of the hand held unit: "said hand held unit comprising: …a carrier…." See also '591 claim 26 ("…said display interface [which is part of the hand held computer] displays a carrier…"). See also '591 claims 14, 29.

**11. "means for displaying a plurality of selectable items"**

| HTC | DataQuill |
|---|---|
| **means for displaying a plurality of selectable items:** means plus function term | **means for displaying a plurality of selectable items:** means plus function term |
| **Function:** displaying a plurality of selectable items | **Function:** displaying a plurality of selectable items |
| **Structure:** a display, a display screen, or a touch sensitive screen, and equivalents thereof | **Structure:** The corresponding structures described in the specification at 2:13-29, 6:51-7:9, 12:65-13:21, and equivalents thereof. |

DataQuill has reviewed HTC's Opening Brief. Based on its review, the Opening Brief of DataQuill addresses HTC's arguments. DataQuill will otherwise address this term at the *Markman* hearing.

**12. "comprises one or two manually operable switches for scrolling said display in a first and/or second direction"**

| HTC | DataQuill |
|---|---|
| said data entry device **comprises one or two manually operable switches for scrolling said display in a first and/or second direction:** only one or only two devices that can be operated by hand to make or break an electrical connection for moving up or down through a sequential display of information | said data entry device **comprises one or two manually operable switches for scrolling said display in a first and/or second direction:** includes at least but requires only one or two manually operable switches (devices for making, breaking or changing the connections in an electrical circuit, which can be operated by hand), for stepping through text or graphics displayed on a display[25] |

Comprises one or two.  HTC proposes that this phrase should be construed as "comprises **only** one or two."  The claim does not recite "comprises only one or two" scrolling switches.

HTC argues that the claim must be limited to two particular embodiments.  (HTC Br. at 31-32.)  The specification passage on which HTC relies states that, "in the present examples two mechanical key switches are provided" (which is "preferred"); while in others, "one key switch only could be provided"; and that "[m]ore key switches could also be provided in other embodiments."  (17:23-35.)  As DataQuill pointed out in its Opening Brief, the specification used the modifier "only" when that is what was meant.  (E.g., 3:37-39; see also 3:43-46.)

HTC relies on Innovad Inc. v. Microsoft Corp., 260 F.3d 1326, 1333 (Fed. Cir. 2001).  Properly applied, Innovad does not support HTC's construction; it supports DataQuill's.  The part of the quotation from Innovad that HTC emphasized in its brief is instructive:

| Innovad, 260 F.3d at 1333 | Innovad, 260 F.3d at 1333 With Claim Language At Issue Here Inserted |
|---|---|
| "The term '**single**,' however, precludes the use of **multiple** switches to perform the **activating** function for one phone number. Only **a single** switch activates the **dialing** function for a preprogrammed number." | "The term **['one or two']**, however, precludes the use of **[three or more]** switches to perform the **[scrolling]** function…. Only **[one or two]** switch[es] activate[] the **[scrolling]** function…." |

The limitation includes at least one or two, but requires only one or two, manually operable switches to perform the scrolling function.  So long as this limitation is met, it does not

---

[25] DataQuill has amended its proposal from that in the Joint Chart as shown for clarification of its position.

1   preclude other manually operable switches on the device "for scrolling."

2       <u>Switch</u>. HTC provides no argument to support its proposal to narrow the definition of

3   "switch" by omitting alternative language of also "changing" connections.  HTC gives no reason

4   for departing from the ordinary meaning, and cites no support for its assertion that its proposal is

5   the ordinary meaning.  HTC's unsupported proposal should be rejected.

6       <u>Scrolling said display</u>.  HTC proposes to add language narrowing the ordinary meaning of

7   what can be included in "scrolling".   HTC cites examples of scrolling describing use of a

8   compact, 2-line display and "Up" and "Down" keys.  This description, however, is directed to a

9   preferred embodiment, and is not a general purpose definition.  It does not constitute a "clearly

10  stated" "special definition" as the law requires.  <u>E.g.</u>, <u>Vitronics</u>, 90 F.3d at 1582 (a "special

11  definition" must be "clearly stated in the patent specification or file history").   Moreover, as

12  pointed out in DataQuill's Opening Brief, there are other descriptions of scrolling in the

13  specification beyond up and down.  (<u>E.g.</u>, 12:14-15, "scrolling function" described as "used for

14  stepping through items"); (3:33-34, "scrolling the display in a first and/or second direction");

15  (7:16-17, "the sequential display of stored information (scrolling of the display)").   HTC's

16  unsupported proposal should not be adopted.

### Conclusion

18      For all of the above reasons, the Court should reject HTC's proposed claim constructions

19  and adopt DataQuill's positions on claim construction as stated herein and in the Joint Chart.

21  December 17, 2010                          Respectfully Submitted,

22

23                                             <u>/s/ Greg Smith            /</u>
                                               Greg Smith
24                                             Competition Law Group LLC
                                               Counsel for Plaintiff / Counterdefendant
25                                             DATAQUILL LTD.

## Certificate of Service

The above document and was served this day of December 17, 2010, via email attachment to counsel for HTC Pete Chassman and Gregg Duffey.

/s/ Greg Smith_____/
Greg Smith
Counsel for Plaintiff / Counterdefendant
DATAQUILL LTD.