**WILSON TURNER & KOSMO LLP**
FREDERICK W. KOSMO, JR. (138036)
550 West C Street, Suite 1050
San Diego, California  92101
Tel:  619.236.9600
Fax:  619.236.9669
E-mail: fkosmo@wilsonturnerkosmo.com
E-mail: tstevenson@wilsonturnerkosmo.com

**HOWREY LLP**
PETER J. CHASSMAN *(admitted pro hac vice)*
GREGORY A. DUFFEY *(admitted pro hac vice)*
1111 Louisiana, 25th Floor
Houston, Texas  77002
Tel:  713.787.1400
Fax:  713.787.1440
E-mail: chassmanp@howrey.com
E-mail: duffeyg@howrey.com

Attorneys for Defendant and Counterclaimant
HTC Corporation

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DATAQUILL LIMITED,<br><br>                    Plaintiff,<br><br>V.<br><br>HIGH TECH COMPUTER CORP.,<br><br>                    Defendant. | Case No.  08CV543-IEG<br><br>**HTC CORPORATION'S RESPONSIVE BRIEF ON CONSTRUCTION OF CLAIMS OF (REEXAMINED) U.S. PATENT NOS. 6,058,304 AND 7,139,591**<br><br>DEMAND FOR JURY TRIAL<br><br>Complaint filed:  March 24, 2008 |
| HTC CORPORATION,<br><br>                    Counterclaimant,<br><br>V.<br><br>DATAQUILL LIMITED,<br><br>                    Counterdefendant. | Hearing Date:   February 11, 2011<br>Hearing Time:  9:00 a.m.<br><br>Location:       Courtroom 1<br>Judge:          Hon. Irma E. Gonzalez<br><br>Magistrate<br>Judge:          Hon. Bernard G. Skomal<br><br>Trial Date:     Not Set |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ...........................................................................................1

II.     RESPONSE TO DATAQUILL'S OPENING BRIEF AND ANY
        EVIDENCE SUPPORTING DATAQUILL'S CONSTRUCTION ..........................2

        A.      Claim Terms ...............................................................................3

                1.      Terms Involving "Reading Sensors" and Other Types of
                        "Sensors"...........................................................................3

                        a.      "Sensor" terms..........................................................3

                        b.      "Reading Sensor" terms ............................................4

                2.      "Process said input signals" ................................................8

                3.      "Camera" terms ..................................................................9

                4.      "Carrier" terms ................................................................11

                5.      "Up to date" and "Updating" terms ...................................11

                        a.      The prosecution history supports HTC's proposed construction of
                                these terms ...........................................................14

                        b.      DataQuill never "*retracted*" its April 13, 2000 statements to the
                                USPTO in the '565 application in which it represented to the public
                                how the "updating" terms were understood by one of ordinary skill in
                                the art ....................................................................16

                        c.      USPTO Examiner Foster Refused to Consider DataQuill's
                                submissions related to prior claim construction orders .....................18

                        d.      "Programs …are updatable remotely…"..............................................22

                        e.      DataQuill's objection to groupings of similar terms is unfounded ....23

                6.      "Means for Displaying" Terms ...........................................25

                        a.      Means for displaying a plurality of selectable items ..........................25

                        b.      Additionally comprising as well as or instead of said display screen,
                                and separate from said hand holdable unit, means for displaying a
                                selectable item with associated data sources for user selection of an
                                item by operation of said hand holdable unit [or data entry device, as
                                used in claims 94, 95, 103, and 104] ..................................................28

                7.      "Written text" terms..........................................................31

                8.      "Natural language" terms...................................................33

HTC'S RESPONSIVE BRIEF ON CLAIM CONSTRUCTION

9.      "Comprises one or two manually operable switches for scrolling said display in a first and/or second direction" ...............................33

10.     "Downloading" and "to Download" Terms .....................................................35

III.    DATAQUILL HAS IMPROPERLY RELIED ON PRIOR COURT ORDERS ....................35

IV.     CONCLUSION................................................................................................................36

HTC'S RESPONSIVE BRIEF ON CLAIM CONSTRUCTION

1

# TABLE OF AUTHORITIES

## CASES

*Altiris, Inc. v. Symantec Corp.,*
    318 F.3d 1363 (Fed. Cir. 2003)................................................................26, 27

*Ethicon v. Quigg,*
    849 F.2d 1422 (Fed. Cir. 1988)..............................................................18

*Hakim v. Cannon Avent Group, PLC,*
    479 F.3d 1313 (Fed. Cir. 2007)..............................................................17

*ICU Med., Inc. v. Alaris Med. Sys.,*
    558 F.3d 1368 (Fed. Cir. 2009)..........................................................7, 13

*In re Morris,*
    127 F.3d 1048 (Fed. Cir. 1997)..............................................................18

*In re Yamamoto,*
    740 F.2d 1569 (Fed. Cir. 1984)..............................................................18

*Innova/Pure Water, Inc. v. Safari Water Filtrations Systems, Inc.,*
    381 F.3d 1111 (Fed. Cir. 2004)..........................................................5, 31

*Markman v. Westview Instruments,* Inc.,
    517 U.S. 370 (1996)...........................................................................6, 26

*Merck & Co., v. Teva Pharms. USA, Inc.,*
    395 F.3d 1364 (Fed. Cir. 2005).................................................................5

*Phillips v. AWH Cop.,*
    415 F.3d 1303 (Fed. Cir. 2005)..............................................................18

*Rackman v. Microsoft Corp.,*
    102 F. Supp. 2d 113 (E.D.N.Y. 2000) ..................................................5, 31

## STATUTES

35 U.S.C. § 112 ¶ 6 ............................................................................ 25-28

## OTHER AUTHORITIES

MPEP § 2106....................................................................................18

MPEP § 2256....................................................................................19

CASE NO. 08cv543 IEG
HTC'S RESPONSIVE BRIEF ON CLAIM CONSTRUCTION

I.      INTRODUCTION

HTC Corporation ("HTC") responds to DataQuill's Opening Brief on Claim Construction as follows.

In an attempt to distract the Court from performing its own analysis, DataQuill continually cites to stale claim construction orders from prior cases.  As this Court has already stated in a written decision, HTC is entitled to its own claim construction ruling, and the Court stated during the December 16, 2010 telephonic status conference that it would not consider prior claim construction rulings.  As HTC explained, such prior orders are not binding on this Court, nor are any decisions binding on HTC where HTC was not a party.  Further, the prior courts issued the orders long before each of the patents-in-suit was reexamined by the USPTO.  Thus, those courts did not consider and could not have considered much of the intrinsic record for the patents-in-suit, such as from the continuation '565 application and the application leading to the '591 patent, as well as the reexamination prosecution histories for each of the patents-in-suit.

Further, the prior orders are inconsistent with each other in many respects.  Additionally, DataQuill argues that this Court should adopt the prior court orders because DataQuill submitted those orders to the United States Patent and Trademark Office ("USPTO") during the reexamination of the patents-in-suit.  However, DataQuill could not convert those otherwise irrelevant prior orders properly part of the "intrinsic record" for consideration in claim construction, simply by submitting them to the USPTO during reexamination.  Moreover, the standards used for construction of terms in proceedings before the USPTO and the standards of claim construction in district courts are not the same.  Finally, the Examiner refused to consider the prior orders anyway.

DataQuill's proposed constructions and strained arguments in support of those constructions generally break basic canons of claim construction:  that claims should be given their ordinary meaning; that a claim term must be considered in the context of the other language of the claim in which it appears; that every word in a claim is to be given meaning; and that

means-plus-function terms are to be construed concretely by the Court, as explained in more detail below.  For example, DataQuill tries to broaden the construction of terms relating to "updating" by attempting to disavow its own statements made in the prosecution history – statements upon which the public is supposed to able to rely as to what one of ordinary skill in the art would understand such terms to mean.  For terms such as "reading sensor" and "written text," DataQuill omits modifiers and construes only the terms "sensor" and "text," respectively, in an improper attempt to broaden the constructions of these terms.  Finally, for the means-plus-function terms, DataQuill would have this Court provide construction for means-plus-function terms to include full 150 word citations to the specification, instead of providing the jury with a concrete construction to aid the jury in its deliberations.  As such, HTC's proposed claim constructions should be adopted.

## II. RESPONSE TO DATAQUILL'S OPENING BRIEF AND ANY EVIDENCE SUPPORTING DATAQUILL'S CONSTRUCTION

DataQuill has protested to HTC's grouping of the claim terms, stating that this is somehow improper, *see* DataQuill's Opening Brief at 18, but it is DataQuill who chose to assert an unreasonable number of claims (141[1] claims for the reexamined '304 patent, and 18 claims of the reexamined '591 patent).  While the claims are heavily repetitive, they employ many variants of the same terms that necessitate consideration at the same time and construction in a manner that is internally consistent.  HTC has grouped the terms in a logical manner for the Court's convenience.

---

[1] Further, many of the independent claims have over 850 words.  *See, e.g*., Claim 62 of the '304 patent (873 words).  It is noted that DataQuill asserts 66 claims of the '304 patent, many of which are written in multiple-dependent form, and when those multiple dependencies are taken into account, 141 effective claims are asserted.

## A.  Claim Terms

### 1.  Terms Involving "Reading Sensors" and Other Types of "Sensors"

| Term | Claims Containing Term | HTC's Proposed Construction | DataQuill's Proposed Construction |
|---|---|---|---|
| "sensor" | '591 Patent <u>Independent</u> 47, 61, 62 <u>Dependent</u> 35, 59, 60 | a structure capable of detecting a stimulus, such as light, temperature, radiation level, or the like, and that transmits a resulting signal. | means what it says, "a sensor" and no elaboration is needed.<br><br>In alternative, a structure capable of detecting a stimulus, such as light, temperature, radiation level, or the like, and that transmits a resulting signal. |
| "reading sensor" | '304 Patent <u>Independent</u> 62, 64, 78, 80, 81, 82, 83, 85, 86, 94, 95, 97, 98, 100, 101, 103, 104, 107, 109, 113, 115 <u>Dependent</u> 65, 76, 77, 9, 12, 40, 41, 44, 47<br><br>'591 Patent <u>Dependent</u> 62[2] | a structure capable of detecting a stimulus, visually, magnetically, or by locational movement of the structure across a surface, and that transmits a resulting signal for use by a controller to determine the data or commands represented by the stimulus. | a structure capable of detecting and reporting data;<br><br>Alternatively: a sensor capable of detecting and reporting commands or data. |

#### a.  "Sensor" terms

The Parties agree that the proper construction for "sensor" is "a structure capable of detecting a stimulus, such as light, temperature, radiation level, or the like, and that transmits a

---

[2] Each instance of "reading sensor" appearing in the claims should be construed consistently. Thus, while the Parties have attempted to highlight all instances of "reading sensor" on the Joint Claim Construction Chart (document 61) and Joint Claim Construction Worksheet (document 62), should a "reading sensor" term not appear bolded in the Chart or Worksheet, or not appear in this listing, such "reading sensor" term should nonetheless be construed as set forth herein.

HTC'S RESPONSIVE BRIEF ON CLAIM CONSTRUCTION

resulting signal."[3]   For the reasons set out in HTC's Opening Brief (Docket # 65), the Court should adopt the Parties agreed construction.  This agreement should form the baseline from which the Court should determine the differences added by the word "reading" in the term "reading sensor," as follows.

### b.    "Reading Sensor" terms

DataQuill argues that HTC attempts to import limitations from the preferred embodiment of the '304 patent into the construction of "reading sensor."  To the contrary, that simply is not HTC's intent.  The patents-in-suit disclose various types of sensors, some of which are reading sensors. The preferred embodiments of reading sensors are described in the patents-in-suit as including, a "reading head," which in some instances, can be "releasably attached" to the data entry device.   HTC does not attempt to limit the reading sensor term to that preferred embodiment.

DataQuill's examples of embodiments such as a touch screen are embodiments of types of sensors, but not types of a subset of that group: reading sensors.   DataQuill limited independent claims 62, 64, 78, 80, 81, 82, 83, 85, 86, 94, 95, 97, 98, 100, 101, 103, 104, 107, 109, 113, and 115, and dependent claims 65, 76, 77, 9, 12, 40, 41, 44, and 47 of the '304 patent to types of reading sensors; they are not directed more broadly to all types of sensors disclosed in the patent specification.  DataQuill elected to pursue claims that were broader with respect to the sensor limitation in prosecution of the '591 patent.

As HTC argues, the Court's focus here should be on the difference between the claimed "reading sensor" from other types of sensors described in the specification, a difference DataQuill fails to address.  DataQuill argues that "a reading sensor" does not have to be used to read information, ignoring the presence of the word "reading" in the term "reading sensor" — indeed, DataQuill works hard to eliminate the "reading" aspect of the term "reading sensor." DataQuill's proposal flies in the face of this basic claim construction principle that each word in a claim has meaning and is not superfluous.  *Merck & Co., v. Teva Pharms. USA, Inc.,* 395 F.3d

---

[3] Although DataQuill's initial position in the Joint Claim Construction Chart (document 61) is that this term should be construed to have its plain meaning, DataQuill's alternative definition is identical to HTC's proposed construction.

1364, 1372 (Fed. Cir. 2005). All words in a claim are presumed to have meaning. *See Innova/Pure Water, Inc. v. Safari Water Filtrations Systems, Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004). For instance, in *Innova/Pure*, a term in dispute was "operatively connected." *Id.* Patentee proposed a construction of "connected" for the "operatively connected" term. *Id.* The Federal Circuit rejected such a construction stating that the patentee's claim interpretation "largely reads the term 'operatively of the of phrase 'operatively connected.' While not an absolute rule, all claim terms are presumed to have meaning in a claim." *Id.* "If the patentee's construction were adopted, "the term 'operatively' is unnecessary and superfluous as the patentee could have as easily used the term 'connected ' alone." *Id. See also Rackman v. Microsoft Corp.*, 102 F. Supp. 2d 113, 121 (E.D.N.Y. 2000) ("To the extent plaintiff believes that 'insertable storage medium' should be construed to mean 'any storage medium,' the Court rejects that view because it seeks to read the term 'insertable' out of the claim)"). "Defining 'insertable storage medium' as 'any storage medium' would erase the distinction drawn in the claim between internal and insertable storage media." *Id.*

Similarly, DataQuill's broad proposed construction would erase "reading" from the "reading sensor" term. DataQuill had a choice of words to use in its claims, and DataQuill chose to claim a "reading sensor" in claims 9, 12, 40, 41, 44, 47, 62, 64, 65, 76, 77, 78, 80, 81, 82, 83, 85, 86, 94, 95, 97, 98, 100, 101, 103, 104, 107, 109, 113, and 115 of the '304 patent, while it chose to claim only a "sensor" in other claims (e.g., '591 patent claims 47, 61, 35, 59, and 60), and both "reading sensor" and "sensor" in still others (e.g., '591 patent, claim 62). This difference in choice of claim language has meaning and has legal implications.

The context of ***every usage*** of the term "reading sensor" in claims 9, 12, 40, 41, 44, 47, 62, 64, 65, 76, 77, 78, 80, 81, 82, 83, 85, 86, 94, 95, 97, 98, 100, 101, 103, 104, 107, 109, 113, and 115 of the '304 patent is such that the reading sensor must, when used in combination with a controller (i.e. processor) that processes the commands, be able to read, and therefore recognize, commands. DataQuill's argument acknowledges this ("the patent uses 'reading sensor' in an ordinary way to identify a device for sensing commands and/or data"), but its proposed definition does not ("a structure capable of detecting and reporting data"). In order for the

1  reading sensor to read information as data, it must be able to discern whether it has read a

2  command – if it does not recognize what it has read as a command, then it treats the sensed

3  information as data.  '304 patent, 10:10-24.

4        In *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 389-90 (1996), the Supreme

5  Court stressed that claims must be construed in a way that "comports with the instrument as a

6  whole" and "preserves the patent's internal coherence."   The specification, drawings, and

7  prosecution history all teach that a material aspect of the device is that the reading sensor, as

8  opposed to the broader "sensor," must be able to "read," and the patents have provided specific

9  ways that "reading" may be accomplished.  Further, DataQuill places much emphasis on the

10 prior orders in other cases.  DataQuill's reliance is misplaced, as discussed below.

11       DataQuill raises the issue dependent claim 9 includes the limitation: "The data entry

12 device according to any of claims [1, 2], 85, 86, 94, 97, 98, 100, 101, 103, or 104, wherein said

13 display screen comprises a touch sensitive screen forming a said[4] reading sensor."   That claim

14 was not filed with the September 27, 1994 application that became the '304 patent.  Rather, the

15 genesis of this claim limitation was in an amendment some four years later in November 1998, to

16 overcome a prior art rejection by Grombrich (U.S. Patent No. 4,916,441 (Exhibit P[2566-2584])

17 in the May 28, 1998 Office Action [640-652][5] at 7 [647].  This amendment[6] is presented below:

18           Claim ~~40~~ 95.  A data entry device according to any of claims ~~1, 2,~~
             ~~or 3,~~ <u>86, 87, or 88</u> wherein said display screen comprises a touch
19           sensitive screen <u>forming a said reading sensor</u>, said controller
             being arranged to be responsive to a location at which said screen
20           is touched for user input.

21 November 27, 1998 Response to Office Action [658-683] at 4 [662].

22

23

---

24 [4] Each of the "reading sensor" terms should be construed consistently.  As such, the term "a said reading sensor" refers to the " reading sensor" previously introduced in the independent claim from which claim 9 depends.

25 [5]  All citations to exhibits are to the Declaration of Gregg A. Duffey in Support of HTC's Responsive Brief filed concurrently.  For the convenience of the Court, the Exhibit numbering and page numbering continued from where

26 the Exhibits from the HTC's Opening Brief (Document 64) ended.  Thus, pages with [bracketed] page numbers before [2392] appear in Document 64; pages with [bracketed] page numbers after 2392 are filed concurrently.

27 [6] Instead of simply amending the claims in each subsequent amendment, DataQuill's practice was, and continues to be, to cancel all pending claims in response to each office action and to add new claims with various amendments,

28 which can make claim evolution difficult to follow, especially since the application claim numbers then change with each subsequent amendment.  Underlined text shows additions; stricken through text shows deletions.

CASE NO. 08cv543 IEG

1    The Federal Circuit has cautioned against using a claim differentiation argument based on

2    dependent claims that were added well after the original filing of the application leading to the

3    patent in suit. *See, e.g., ICU Med., Inc. v. Alaris Med. Sys.,* 558 F.3d 1368, 1376 (Fed. Cir.

4    2009) ("Claim differentiation is a guide, not a rigid rule.   If a claim will bear only one

5    interpretation, similarity will have to be tolerated.") (internal quotations omitted).

6    The specification discloses that the display 20 can be a touch sensitive display. *See, e.g.,*

7    '304 patent, Figure 8 and 12:65-13:2.   But it was during this subsequent prosecution, that

8    DataQuill, for the first time, claimed that the touch sensitive screen could be a reading sensor.

9    What DataQuill has done is obtained a blatantly invalid claim, because the reading sensor and

10   the touch sensitive screen are two distinctly separate types of sensors, and DataQuill's claim

11   deliberately confuses the two.

12   It is clear from the disclosure of the patent that the use of a touch sensitive screen is a

13   ***different*** aspect of the invention having a different type of sensor different from the ***reading***

14   ***sensor***:

15          FIG. 8 illustrates ***another example*** of pen 10 in accordance with the invention.   This
            example is substantially the same as pen 10 described with reference to FIGS. 1 and 3,
16          apart from the ***addition of a touch sensitive screen*** 90 for the display 20.

17   '304 patent, 12:65-13:2 (emphasis added).   Nowhere in this passage does DataQuill state that a

18   touch sensitive screen is a type of reading sensor or reading head.

19   In addition, DataQuill tries to walk away from its statements in the reexamination

20   regarding the *Martinez* reference [2326-2333].  *See* DataQuill's Opening Brief at 8.  DataQuill

21   now alleges that the video camera disclosed in Martinez really is a camera, but that the Martinez

22   camera could not have satisfied the claimed reading sensor element, because the Martinez

23   camera cannot sense data or user visible codes, for example. *See id.* at 8, 27 ("Martinez does not

24   disclose a camera that is responsive to commands or to sensed commands."); *see also* June 2,

25   2008 Response to April 1, 2008 Office Action at 78 [1527].   That is exactly HTC's point.   A

26   "reading sensor" must be able to "read."   Otherwise, a camera is just a device for capturing an

27   image, and that is why the specification, when describing a camera for sensing data, always

28

-7-

HTC'S RESPONSIVE BRIEF ON CLAIM CONSTRUCTION

includes the additional requirement of optical recognition software.  Otherwise, an image from a camera is not read via the controller.

## 2.    "Process said input signals"

| Term | Claims Containing Term | HTC's Proposed Construction | DataQuill's Proposed Construction |
|---|---|---|---|
| "process said input signals" | '304 patent <br> Independent 62, 64, 78, 80, 81, 82, 83, 85, 86, 94, 95, 97, 98, 100, 101, 103, 104, 107, 109, 113, 115 | perform operations on the input signals, including, but not limited to determining the content represented by the stimulus detected by the reading sensor | Means what it says and no elaboration is needed. <br><br> Alternatively:  subject the input signals to examination or analysis. <br><br> Alternatively:  perform any operation or combination of operations on the input signals. <br><br> Alternatively: manipulate the input signals. |

DataQuill's arguments against HTC's proposed construction are not well founded.  First, DataQuill cites to a number of dictionary definitions for the word "process," a word that admittedly could have a number of different meanings when used in different contexts, both non-technical and technical.  But, the point here is that DataQuill has used a general term in specific context, and it is in the context of the claims that the Court must construe the term.  That is a basic rule of claim construction and one that even DataQuill cites.  As HTC has noted in numerous instances, the claims that require a reading sensor always require processing to determine whether the reading sensor has read commands or data (or neither).  Thus, there is a linkage between the terms.  While HTC does not disagree that the processing can include some or all of the operations that DataQuill proposes, processing must, at a minimum, include the functions necessary to discern data or commands.  Many items on DataQuill's laundry list of citations are inapplicable to the construction of the term "to process," but none are inconsistent with HTC's proposed constructions.

1   Second, DataQuill argues that HTC has pointed improperly to specific embodiments in

2   the specification to restrict the definition of the term "to process," but that is not what HTC has

3   done.   While HTC's proposed construction is consistent with the patent's disclosure and the

4   primary embodiment in the specification, HTC proposed construction is not limited by that.

5   Indeed, the language and structure of the claims themselves dictate the minimum requirement

6   HTC's construction concerning determination of the content of what is detected by the reading

7   sensor.

8   **3.      "Camera" terms**

| Term | Claims containing the term | HTC's Proposed Construction | DataQuill's Proposed Construction |
|------|---------------------------|------------------------------|-----------------------------------|
| "camera" | **'304 Patent** <u>Dependent</u> 13, 45 | a device that can capture an image, which could be an image of one or more characters, and recognize the contents of the image when used in combination with a processor which may execute image recognition software | means what it says and no elaboration is needed |
| | **'304 Patent** <u>Dependent</u> 73*  **'591 Patent** <u>Independent</u> 35*, 62*  *Revised from Joint Claim Construction Worksheet | a device that can capture an image* | means what it says and no elaboration is needed |

Both Parties have continued to refine their positions with respect to certain terms, and as

such, the Parties will file an amended Joint Claim Construction Chart and Worksheet to amend

the original filings.  However, for this term, despite being provided with HTC's revised proposed

constructions in advance of the opening briefs, DataQuill addressed only HTC's original

proposed construction.

1    DataQuill's brief appears to make HTC's main point as to '304 patent claims 13 and 45,

2    when it comes to citation to the patent specification.   DataQuill cites to the specifications'

3    description of use of a camera with character or image recognition logic when used as a reading

4    sensor.   That is entirely consistent with HTC's proposed construction.   For those claims, in

5    which the camera constitutes a reading sensor, the recognition logic must be present, because

6    those claims are directed to such an embodiment.   In contrast, '304 patent claim 73 and '591

7    patent claims 35 and 62 are not directed to such an embodiment.   When read in light of HTC's

8    modified constructions, DataQuill's Opening Brief is in agreement with HTC's proposed

9    construction.

10    Claims 13 and 45 each add the limitation that the reading sensor of various independent

11    claims is a camera.   So the camera must necessarily also be able to "read", when used in

12    conjunction with the controller.   Otherwise, the camera can only capture images.   As stated

13    above, DataQuill cannot now walk away from positions it took in the reexamination proceedings

14    that the Martinez reference is not the claimed reading sensor.   *See* DataQuill's Opening Brief at

15    8.   DataQuill now argues that the video camera disclosed in Martinez was a camera but could not

16    constitute the claimed reading sensor, because the Martinez camera could sense data or user

17    visible codes, for example.   *See id.* at 8, 27 "(Martinez does not disclose a camera that is

18    responsive to commands or to sensed commands.");   *see also* June 2, 2008 Response to April 1,

19    2008 Office Action at 78 [1527].   As discussed above with regard to the term "reading sensor,"

20    a "reading sensor" must be able to "read," requiring more of any camera used as a reading

21    sensor.   The disclosure in the patent of a camera for sensing data, always and consistently

22    includes the additional requirement of optical recognition software.   Without that, an image from

23    a camera is not read via the controller.

24

25

26

27

28

CASE NO. 08cv543 IEG

### 4.    "Carrier" terms

| Term | Claims containing the term | HTC's Proposed Construction | DataQuill's Proposed Construction |
|---|---|---|---|
| "carrier" | '304 patent <u>Independent</u> 100, 101 <u>Dependent</u> 20, 52, 53, 55 | a physical medium, separate from and external to the data entry device that carries coded data recognizable by the data entry device as corresponding to data or commands | a medium which carries one or more data and/or command code, character, image, or graphical or alphanumeric data representation; <br><br> Alternatively: a medium that carries one or more data and/or command codes |

In an attempt to salvage its broad construction of "carrier," DataQuill stretches the imagination to derive with examples of carriers that it believe support its construction, and would be excluded from HTC's construction. The first creative, yet inapplicable, example is an ATM in which a user inserts an external credit card into a scanner, which, when inserted, DataQuill argues is no longer external. This ATM example is not described in any fashion in the '304 patent and is completely inapplicable in the claim construction process. Second, DataQuill improperly argues that the touch sensitive screen can be a carrier. Yet, DataQuill's cited passage fails to even mention the word "carrier." These examples do not support DataQuill's proposed construction whatsoever. In properly construing the disputed term in light of the '304 patent specification, the carrier is a physical medium, separate from and external to the data entry device, that carries coded data recognizable by the data entry device as corresponding to data or commands.

### 5.    "Up to date" and "Updating" terms

| Term | Claims containing the term | HTC's Proposed Definition | DataQuill's Proposed Construction |
|---|---|---|---|
| *"downloading of information from a remote processing center as required for updating information previously stored in said data entry device"* | '304 patent <u>Independent</u> 64, 80, 82, 83, 85, 86, 94, 95, 97, 98, 100, 101, 103, 104 | transferring from the remote processing center only information that has changed from the information most recently stored in the data entry device | means what it says and no elaboration is needed |

-11-

In its Opening Brief, DataQuill argues that HTC's proposed construction unduly narrows the "updating" term. DataQuill once again has couched the argument incorrectly. HTC's proposed construction simply adopts the ordinary meaning of the term, a meaning that DataQuill expounded upon in great detail during the prosecution of an application leading to the '591 patent-in-suit.[7] Additionally, while not proposing its own definitive construction for these terms,[8] DataQuill has suggested using broader constructions for the "updating" terms, constructions which are well beyond their ordinary meanings or any meanings of the terms that would be supported in the specification. Moreover, as detailed in HTC's Opening Brief, DataQuill's suggested overly-broad constructions cannot be correct, as DataQuill **unequivocally** disclaimed these broader proposed constructions during the examination of the patents-in-suit.

While DataQuill refuses to provide a proposed construction for any of the "updating" terms, DataQuill has hinted as to what it proposes for the proper construction of the terms in this section. For instance, on page 18 of DataQuill's Opening Brief, DataQuill argues that "update" means "to bring up to date." Such a construction for the word "update" would hardly be helpful to a jury, as this proposed construction is using the same root words ("up" and "date") to define its composite form ("update"): such a rephrasing of the term would not be helpful to a jury. Another hint to DataQuill's proposed construction is found on page 18 of its Opening Brief: DataQuill the apparently believes that the term "downloading of information from a remote processing center as required for updating information previously stored in said data entry device" "can include information that has changed or has not changed." DataQuill's Brief at 18. Such a construction does not comport with the ordinary meaning of "update" and is not supported by the specification. Nowhere in the specification is an "update" discussed in the

---

[7] In an attempt to discredit its prior statements made during the prosecution of this intermediate application Serial No. 08/ USSN 09/548,565, DataQuill refers to this intermediate application the "abandoned application." However, it appears that the only reason that DataQuill abandoned that application was so that it could continue to prosecute the claims in the application that became the '591 patent. *See* Duffey Declaration In Support of HTC's Opening Brief (document 65) at Exhibit A (showing relationship between the related applications).

[8] DataQuill has proffered no evidence for its construction the many terms, including the "updating" terms discussed in this section, in its Opening Brief; indeed, DataQuill did not put for a proposed construction at all. Instead, in its Opening Brief, DataQuill has simply filed its rebuttal positions, positions which should have appeared in its Responsive Brief. HTC reserves the right to object further to DataQuill's attempt at a double-rebuttal brief, pending the statements and arguments presented in DataQuill's Responsive Brief.

CASE NO. 08cv543 IEG

HTC'S RESPONSIVE BRIEF ON CLAIM CONSTRUCTION

1   context of information that has not changed.  As stated above, if all information, including

2   unchanged information is re-downloaded into the data entry device, that is not an update.

3   DataQuill relies on claim 19 for support, a claim that DataQuill has not asserted and which was

4   not part of the original specification of the '304 patent as filed.  This limitation was presented for

5   the first time in a Preliminary Amendment filed on June 15, 2004, as application claim 21.  A

6   claim differentiation argument based on an amendment made almost 10 years after the

7   applications priority date of September 27, 1994, should fail.  *See, e.g., ICU Med., Inc. v. Alaris*

8   *Med. Sys.,* 558 F.3d 1368, 1376 (Fed. Cir. 2009).  Regardless, downloading information that has

9   not changed is not an update.

10          As explained in HTC's Opening Brief at 18-21, the '304 patent specification describes

11   the process of initially storing, in the data entry device, description information from one or more

12   merchandising catalogs.  *See* '304 patent, 10:35-39.   The complete catalog data can be

13   downloaded over the telecommunications interface, or, as an alternative to downloading, a

14   complete catalog into the pen via the telecommunication interface, other data entry means such

15   as a memory device such as a plug-in ROM or a smart card could be used to get the catalog

16   information into the pen and then the telecommunication interface is used only for updating the

17   data in the pen.  *See* '304 patent, 16:64-17:7 (full quotations in HTC's Opening Brief).

18          Regardless of how the original catalog data is stored in the device, once the original

19   catalog data is stored in the device, then, information related to a selected item, for example, can

20   be updated by sending only the information that has changed – and not information that remains

21   unchanged – from the remote processing center via the telecommunication interface.  *See* '304

22   patent, 10:49-61.  Each time information in the pen becomes obsolete and needs to be updated,

23   the entire catalog of information is *not* retransmitted to the pen, according the '304 patent: ***only***

24   the information that has ***changed*** from the information previously stored in memory is

25   transmitted by the remote processing center and downloaded into the pen to update the

26   information in the pen.

27

28

CASE NO. 08cv543 IEG

HTC'S RESPONSIVE BRIEF ON CLAIM CONSTRUCTION

Under DataQuill's theory, if the identical version of the catalog were simply reloaded into the pen, that would constitute an "update."  Such an absurd conclusion demonstrates the folly in DataQuill's proposed construction.

HTC agrees with DataQuill in one respect: the specification of the '304 patent does not demonstrate any intent to deviate from the ordinary meaning of the "updating" limitations described in this section.  However, it is HTC's proposed constructions that comports to the ordinary meanings of the "updating" terms; and DataQuill's broader construction simply is not supported by the specification.  Nowhere in the specification is an instance described as "updating" where unchanged information is reloaded into the pen.  Each of the passages cited on page 18 of DataQuill's Opening Brief shows that updating information relates to information that has changed; if no update is needed (i.e. if the information has not changed), the no information is transmitted from the remote processing center to the pen.

### a.    The prosecution history supports HTC's proposed construction of these terms

DataQuill's proposed construction cannot be correct, given the statements in the prosecution history.  It is unclear how DataQuill can represent to this Court that the bolded and/or underlined statements in DataQuill's April 13, 2000 Amendment explaining the ordinary meaning of the "updating" terms – a paper upon which the public and competitors are entitled to rely – would not sound the death knell for DataQuill's proposed construction.  DataQuill's April 13, 2000 amendment could not be clearer; DataQuill even provided an explanation of the purported benefits:

> [A]s the hand held unit only downloads information that has changed, the time taken to update the information in the rewritable storage is dramatically less than the time taken to update prior art devices where all the information stored in the device is replaced with a complete new set of information.  This is particularly advantageous when the invention is embodied in a mobile phone, for example, as use of expensive airtime (for which the user typically is charged) may be reduced.

April 13, 2000 Preliminary Amendment in '565 application [1031-1055], at 16-17 [1046-1047] (emphasis in original) [1046-1047]); *see also* HTC's Opening Brief at 23-24.

-14-

1    Thus, it is clear from the prosecution history that DataQuill's understanding of these

2  "updating" terms comports to the ordinary meaning of the term, which is identical to HTC's

3  proposed constructions.

4    Further, contrary to DataQuill's position that it retracted the statements listed above

5  (which it could not do effectively, as discuss later), the file history contains numerous statements

6  supporting HTC's proposed construction as the ordinary meaning of the "updating" terms.  For

7  example, DataQuill also urged the USPTO to adopt the ordinary meaning of "updating" when

8  DataQuill argued that its claims should be allowed because similar claims were allowed by the

9  European Patent Office:

10    Claims essentially corresponding to claims included in this amendment, were
    thoroughly considered by the European Patent Office (EPO) … and the EPO did
11    not cite any prior art which discloses or suggests the invention as defined by any
    of claims 31-75.

12
    The EPO cited as the closest prior art documents, WO-A-91/00574 ("D1") [363-
13    367], US-A-4,916,441 ("D4") [2566-2584] and WP-A-087/071065 ("D7") [262-
    282].  The [EPO-issued] International Preliminary Examination Report (IPER)
14    concluded:  "D1 and D7 do not disclose or suggest down-loading information
    from a remote processing center for updating information previously stored in the
15    rewritable storage for selectable items, where the selectable items are user
    selectable by means of the reading sensor."  The IPER further stated in relation to
16    claim 1 of the PCT application (which corresponds essentially to claim 31
    presented by this amendment):
17

18
        "Although D4 does down-load information for updating the
19        patent's data stored in the hand-held unit, the updating processing
        in D4 is initiated by scanning the patient's data or bar code.  It is
20        then the base station which sends a request to the central file server
        (remote processing center) to update the portable hand-held unit
21        with any new information relating to the patient.  In other words, in
        response to the selection of an item (a patient) by means of sensing
22        the data corresponding thereof (patient's bar code), the
        selected item is updated.  In Claim 1, the sensing of data merely causes the
23        selection of an item within the hand-held unit.  The input of a
        command is necessary to initiate updating of the information
24        previously stored for selectable items.  None of the other prior art
        documents suggests modifying the system in D4 to additionally
25        require the input of a command for initiating the updating of
        selectable items."
26

27

28

                                                        CASE NO. 08cv543 IEG

1    April 13, 2000 Preliminary Amendment in '565 Application [1031-1055] at 18-19 [1048-1049].

2         So once again, DataQuill utilized the "updating" term in a way that was consistent with

3    its ordinary meaning, as proposed by HTC: that updated information is information that has

4    changed, or is "new," as this passage states.  DataQuill argued that the European Patent Office

5    discussed that the "update" of the portable hand-held unit only pertained to any "new"

6    information relation to that patient.   And that the claims were allowed in Europe because of the

7    input of a command for initialing the updating of the selectable items.

8          The Examiner relied upon the ordinary meaning of terms throughout the reexamination

9    proceedings.  *See* August 31, 2009 Advisory Action in '304 Reexamination (Exhibit G [1801-

10   1900] at 4, 7, 8, and 9 [1807, 1810-1812] (showing the Examiner's bolding of the "updating"

11   terms as a reason for allowance of the claims).  In each of these passages, DataQuill expounds on

12   the ordinary meaning of "updating" information in the claimed hand held unit: only information

13   that has changed is downloaded, and this is extremely beneficial when used on a cellular

14   network, so that the user can keep costs minimized.

15        DataQuill also tries to walk away from its previous explanation, by attempting to

16   downplay its April 13, 2000 statements because the '565 application was "abandoned."  *See, e.g.,*

17   DataQuill's Opening Brief at 19 ("The '565 application was abandoned.  It appears that HTC

18   relies on patentee's arguments in the abandoned '565 application to justify its position.").

19   However, DataQuill only abandoned the '565 application to pursue similar claims in the '591

20   application.  Any statements made in related applications are relevant to the construction of

21   similar terms for the patents-in-suit.  *See* Declaration in Support of HTC's Opening Brief

22   (document 65) Tab 1 (showing the interrelationships of the patents-in-suit and the '565

23   application).

24              **b.    DataQuill never "*retracted*" its April 13, 2000 statements to the
                        USPTO in the '565 application in which it represented to the public
25                      how the "updating" terms were understood by one of ordinary skill in
                        the art**

26        DataQuill argues that the April 13, 2000 statements, somehow, were "retracted" by

27   various subsequent self-serving statements in the prosecution histories.  Those self-serving

28

                                              -16-
                                                                  CASE NO. 08cv543 IEG

1  statements were not retractions at all.  The fact remains that the Examiner issued an Office

2  Action on December 16, 2003 in the prosecution of the '565 application relying on DataQuill's

3  April 13, 2000 statements.  Only after that Office Action issued did DataQuill file its self-serving

4  statements, cited in DataQuill's Opening Brief.

5       DataQuill tries to distance itself from its April 13, 2000 affirmations by stating that it

6  made also statements contrary to the April 13, 200 statements in the prosecution history.  *See*

7  DataQuill's Opening Brief at 19.  Yet, the file history does not reflect that Examiner ever relied

8  on such statements.  For example, DataQuill attempts to rely on the USPTO's "Comments on

9  Reasons for Patentability" in the reexamination proceedings of the patents-in-suit.  *See*

10  DataQuill's Opening Brief at 24-25.  Yet, such statements are never reviewed, considered, or

11  commented on by the Examiner. *See* MPEP 1302.14 at part V (Exhibit M [2406-2407]) (stating

12  the application file will not be returned to the examiner after the publication office adds the

13  comments to the file: "Therefore, the absence of an examiner's response to applicant's comments

14  does not mean that the examiner agrees with or acquiesces in the reasoning of such comments.

15  *See* 37 C.F.R. 1.104(e).").

16       When an applicant makes a material misstatement during the prosecution of a prior

17  application, in a later application, the applicant is required to expressly point to the misstatement

18  in detail and state that the prior art previously considered by the Examiner must be revisited.  *See*

19  *Hakim v. Cannon Avent Group, PLC*, 479 F.3d 1313, 1317-1318 (Fed. Cir. 2007).  DataQuill's

20  litigation-directed, self-serving statements do not comport with this standard; as such,

21  DataQuill's never retracted its April 13, 2000 statements.

22       Further, DataQuill failed to note the fact that each of asserted independent claims 64, 80,

23  82, 83, 85, 86, 94, 95, 97, 98, 100, 101, 103, and 104 of the reexamined '304 patent includes the

24  identical limitation of "downloading of information from a remote processing center as required

25  for updating information previously stored" in the data entry device and each was derived from

26  and includes the ***identical*** language to that in the claims addressed in DataQuill's April 13, 2000

27  statements to the USPTO.

28

-17-

DataQuill concedes that a parent patent's prosecution history may inform the claim construction of its descendents.  *See* DataQuill's Opening Brief at 22, and cases cited therein.  However, DataQuill's argument misses the mark when it argues that the "updating" limitations discussed in its April 13, 2000 statements are inapplicable to the other "updating" terms of the reexamined claims, as each of the terms are derived from the same "updating" term, as discussed in HTC's Opening Brief.  And many of the asserted claims of the reexamined '304 patent are derived from the re-written forms of original claims 1, 2, 26, or 28 of the '304 patent.  See, e.g., July 27, 2009 Response to Office Action at 68 (independent claims 82-118 are simply claims 11, 14-18, 21, 24, 25, 50, and 51 re-written into independent form).  Further, the asserted claims from the '591 patent are derived from claim application claim of the '565 application, and DataQuill's April 13, 2000 Statements applied equally to claim 53.  Regardless, a simple comparison of the claim limitations in question shows the substantial similarity among these terms.  *See, e.g.*, Duffey Declaration (Document 65) at Tab 2 (exhibit pages 2-4).

### c.   USPTO Examiner Foster Refused to Consider DataQuill's submissions related to prior claim construction orders

DataQuill argues that, because DataQuill submitted prior court claim construction orders in the reexamination proceedings for the patents-in-suit, somehow are binding on the examiner during the reexamination or otherwise.  *See, e.g,* DataQuill's Opening Brief at 24 ("[DataQuill] submitted a 'Supplemental Response' …indicating that it was construing claims in the charts consistent with Judge Brewster's prior rulings…").  While DataQuill may have intended to rely on such prior orders, as explained below, the Examiner did not, and even ***refused*** to, consider such prior claim construction orders.[9]

---

[9] Unlike district court which utilize a variety of legal canons and legal principles to construe claims, the USPTO employs an entirely different standard when construing claims during examination: the "broadest reasonable interpretation" standard.  *In re Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997); *Phillips v. AWH Cop*., 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc); *See also In re Yamamoto*, 740 F.2d 1569 (Fed. Cir. 1984) (broadest reasonable interpretation standard also used in reexaminations); Manual of Patent Examining Procedure ("MPEP") to guide examiners during initial examination of an application.  *See* MPEP § 2106 (Rev. 8, July 2010) (Exhibit L [2393-2405]) ("USPTO personnel are to give claims their broadest reasonable interpretation in light of the supporting disclosure.").  *See also, e.g., Ethicon v. Quigg*, 849 F.2d 1422, 1428 (Fed. Cir. 1988) (describing the differences in the approaches to invalidity by the USPTO on one hand and district courts on the other).

In DataQuill's Opening Brief, DataQuill implies that the USPTO utilized the prior orders when performing the reexaminations because DataQuill submitted claim construction materials and the prior order on the Information Disclosure Statement.   While DataQuill may have intended to rely on such prior orders, the Examiner ***refused*** to consider such prior claim construction orders and claim construction materials, *inter alia*.  In its Opening Brief, DataQuill failed to mention that after it submitted the claim construction materials on Information Disclosure Statements to the USPTO, Examiner Foster expressly refused to consider such materials.  In response to DataQuill's submission of these materials, the Examiner stated, on page 32 of the First Office Action rejecting all claims in the '304 reexamination, control number 90/008,340:

### Information Disclosure Statement

On August 7, 2007 and subsequent dates, the Patent Owner submitted voluminous disclosure statements comprising over seven hundred and eighty references.  Where patents, publications, and other such items of information are submitted by a party (patent owner or requester) in compliance with the requirements of the rules, the requisite degree of consideration to be given to such information will be normally limited by the degree to which the party filing the information citation has explained the content and relevance of the information.  The initials of the examiner placed adjacent to the citations on the form PTO/SB/08A and 08B or its equivalent, without an indication to the contrary in the record, do not signify that the information has been considered by the examiner any further than to the extent noted above.  MPEP § 2256.

April 1, 2008 Office Action in '591 reexamination (Exhibit N [2408-2483 ]) at 18 [2427].  *See also* April 1, 2008 Office Action in '304 reexamination (Exhibit O [2484-2565]) at 32 [2517] (same statement).

After voicing his displeasure with DataQuill's submission of over 780 references, Examiner Foster then expressly refused to consider many of the references, including all of those that DataQuill relies on in its Opening Brief at 25.  Instead of initialing these materials, Examiner Foster crossed out the references upon which DataQuill relies, as shown below:

| EXAMINER INITIAL | | OTHER ART – NON PATENT LITERATURE DOCUMENTS (include name of author, title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date page(s), volume-issue number(s), publisher, city and/or country where published. |
|---|---|---|
| | D1 | Court's Order On Motions In Limine And Motion to Bifurcate Trial [115, 118-124, And 126], DataQuill Ltd. v. Kyocera Wireless, dated November 7, 2005 |
| | D2 | Defendant's Trial Exhibits, DataQuill Ltd. v. Kyocera Wireless, dated November 3, 2005 |
| | D3 | Plaintiff's Notice Of Reduced Number Of Asserted Claims For Trial Pursuant To Court's Request, DataQuill Ltd. v. Kyocera Wireless, dated November 3, 2005 |
| | D4 | Court's Order Granting In Part Defendant's Motion For Partial Reconsideration Of The Markman Ruling Construing The Claim Term "Reading Sensor" In United States Patent Number 6,058,304 [204-1 and 204-2], DataQuill Ltd. v. Kyocera Wireless, dated October 25, 2005 |
| | D5 | Court's (Second) Superseding Claim Construction Order, DataQuill Ltd. v. Kyocera Wireless, dated October 25, 2005 |
| | D6 | Defendant Kyocera's Points And Authorities In Support Of Motion To Augment Record on Kyocera's Motion In Limine No. 1 Of 7, DataQuill Ltd. v. Kyocera Wireless, dated October 5, 2005 |
| | D7 | Defendant Kyocera's 35 U.S.C. Section 282 Disclosure, DataQuill Ltd. v. Kyocera Wireless, dated September 30, 2005 |
| | D8 | Plaintiff's Response To Defendant's Seven Motions In Limine, DataQuill Ltd. v. Kyocera Wireless, dated August 15, 2005 |
| | D9 | Plaintiff's Notice Of Lodgment Of Exhibits In Response to Kyocera's Seven Motions In Limine, DataQuill Ltd. v. Kyocera Wireless [certain additional exhibits not under seal], dated August 15, 2005 [Exhs. Nos. 7, 8, 9, 10] |
| | D10 | Defendant Kyocera's Motion In Limine Number 1 Of 7, DataQuill Ltd. v. Kyocera Wireless, dated August 1, 2005 |

| EXAMINER | DATE CONSIDERED 3/27/08 |
|---|---|

EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

April 1, 2008 Office Action in '591 reexamination (Exhibit N at [2458];[10] *see also* April 1, 2008 Office Action in '304 reexamination (Exhibit O at [2548]).

---

[10] The USPTO's form states at the bottom of each page: "EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant."  *See id.*

CASE NO. 08cv543 IEG

HTC'S RESPONSIVE BRIEF ON CLAIM CONSTRUCTION

| FORM PTO-1449 | | PATENT NO. 7,139,591 | | | NO. 90/008,394 | |
|---|---|---|---|---|---|---|
| **LIST OF PATENTS AND PUBLICATIONS FOR APPLICANT'S INFORMATION DISCLOSURE STATEMENT** (use several sheets if necessary) | | ISSUE DATE: November 21, 2006 | | | GROUP ART UNIT 3992 | |
| | | APPLICANT(S): Callaghan et al. | | | | |

**REFERENCE DESIGNATION**     **U.S. PATENT DOCUMENTS**

| EXAMINER INITIAL | DOCUMENT NUMBER (Number-Kind Code if known) | DATE | NAME | CLASS/ SUBCLASS | FILING DATE |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**FOREIGN PATENT DOCUMENTS**

| EXAMINER INITIAL | DOCUMENT NUMBER (Number-Kind Code if known) | DATE | COUNTRY | CLASS/ SUBCLASS | TRANSLATION YES OR NO |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

| EXAMINER INITIAL | | **OTHER ART – NON PATENT LITERATURE DOCUMENTS** (Include name of author, title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date page(s), volume-issue number(s), publisher, city and/or country where published.) |
|---|---|---|
| | L1 | RIM's (AMENDED) OPENING BRIEF ON CONSTRUCTION OF CLAIMS OF U.S. PATENT NOS. 6,058,304 and 7,139,591, 50 pages, dated August 29, 2007 |
| | L2 | Amended Pending Claim Construction Chart, RIM, 60 pages, dated August 29, 2007 |
| | L3 | DataQuill's Claim Construction Brief, 48 pages, 9/11/07 |
| | L4 | Declaration of G. Smith in support of DQ Claim Construction Brief, 9 pages, 9/11/07 |
| | L5 | Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12 of G. Smith Declaration, 95 pages, 9/11/07 |
| | L6 | Amended Pending Claim Construction Chart, DataQuill, 102 pages, 9/11/07 |
| | L7 | DATAQUILL RESPONSE TO PLAINTIFFS FIRST SET OF INTERROGATORIES (NOS. 1-6), 29 pages, and Exhibit A, 35 pages, 9/20/07 |
| | L8 | Emails between RIM and DQ trial counsel re L1, L2, L3, L4, L5, L6, L7, 5 pages |
| | L9 | RIM's Claim Construction Reply Brief, 13 pages, 10/2/07 |
| | L10 | RIM and DataQuill Joint Claim Construction Chart, 97 pages, 10/2/07 |

| EXAMINER | /Roland Foster/ | DATE CONSIDERED | 03/26/2008 |
|---|---|---|---|

EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609;
Draw line through citation if not in conformance and not considered. Include copy of this form with next
communication to applicant.

April 1, 2008 Office Action in '591 reexamination (Exhibit N at [2477];[11] *see also* April 1, 2008

Office Action in '304 reexamination (Exhibit O at [2463]). Thus, regardless of DataQuill's

mistaken reliance on the prior orders, or materials related thereto,[12] such orders and materials

should not be considered by this Court.

The same holds true for the Declaration of John Donnelly to which DataQuill points. *See*

DataQuill's Opening Br. at 24. DataQuill filed its self-serving declaration of DataQuill's

Director (Mr. Donnelley) in a failed attempt to persuade the Examiner that the pending claims

were somehow not invalid as obvious since DataQuill had received $44 million dollars in

settlement payments. *See* Document 66-6. However, the Examiner totally disregarded the

---

[11] The USPTO's form states at the bottom of each page: "EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant." *See id.*

[12] In its Opening Brief at 25, DataQuill makes a similar argument related to claim construction materials DataQuill submitted to the USPTO. Again, the Examiner Foster refused to consider the materials. *See* [2477] and [2463]

declaration, stating that there was no nexus between the settlement amounts and the claimed invention, *inter alia.  See* Final Office Action in '591 reexamination, Exhibit H [2238-2277] at 32-34  [2271-2273] ("Finally, and very importantly, each of the settlement agreements provide evidence that the licensing program succeed[ed] from reasons other than non-obviousness, such as to reduce litigation expenses.  For example, each of the licensing agreements state on the first page that the agreement was reached as a compromise to avoid litigation expense, time, and cost.").    Further, the Donnelly declaration was submitted (in a 368-page supplemental submission), after the Examiner's statement that unless DataQuill pointed out why a particular reference were believed to be relevant, the examiner would not consider it in detail.  *See* above. And for DataQuill to now assert that, because a box in a few pages in the 368 page submission included a particular listing in a claim chart, the submission somehow supports its unduly broad construction is disingenuous.

### d.    "Programs …are updatable remotely…"

DataQuill singles out the final "updating" term for special attack.  The Parties proposed constructions from the Joint Claim Construction Chart and Worksheet are provided below:

| Term | Claims containing the term | HTC's Proposed Construction | DataQuill's Proposed Construction |
|---|---|---|---|
| wherein programs in said data entry device are updateable remotely from a processing center | 97, 98, 113, 115 | such that programs stored in the data entry device are made current by downloading only the changes to the most recently stored programs upon initiation by the remote processing center | means what it says and no elaboration is needed |

When read in the context of the claim and in light of the disclosures in the '304 specification, HTC's proposed construction for this term is proper.  According to the '304 patent, the programs that are stored in the data entry device are updatabable remotely from the remote processing center. The prosecution history supports the construction that when items are updated, only information that changed since the most recent download is downloaded again.  The same is true for programs.    The '304 specification describes the hand held unit that receives programming data from the programming center for storage in the hand held unit. '304 patent,

-22-

54:25-26.[13]   While the hand held unit transmits user selections to the remote processing center, in contrast the hand held unit is programmable remotely from the processing center.  *Id*. at 4:34-40.  Just like when the remote processing center sends commands to the hand held unit to have the unit ask the user to scan a PIN, programs similarly can be downloaded when updates are needed (i.e. when programs have changed).  *See id*. at 12:35-57.  As such, HTC's proposed construction is consistent with the ordinary meaning of the term, the claims, and the specification.

### e.   DataQuill's objection to groupings of similar terms is unfounded

DataQuill argues that the disputed "updating" and "up to date" terms cannot be grouped together, and every one of the thirteen disputed updating terms must be addressed in a separate section.[14]  Of course each term is to be construed; however, the terms are substantially similar in that each is related to "updating" and each is to given their ordinary meaning, in light of the claims, specification, and file history.  So it only makes sense, when reviewing those same passages, to do so with an eye toward all of the disputed terms related to "updating."  Requiring HTC to submit separate multi-page arguments for all thirteen terms would be a waste of judicial resources.  It is DataQuill who has asserted an unreasonable number of claims.  Nevertheless, all of independent claims 64, 80, 82, 83, 85, 86, 94, 95, 97, 98, 100, 101, 103, 104 include the *identical* language discussed in DataQuill's April 13, 2000 Response.  Further, the remaining twelve terms include clauses substantially similar to the passages cited above.

DataQuill also improperly objects to the grouping of terms from claims 62, 64, 81, 107, 113, and 59 of the '304 patent, and claims 38, 42, 44, 56, 61, and 62 of the '591 patent, each of which includes a "command" to cause downloading.  DataQuill's Opening Brief at 21 (application claims 31 and 76).  Yet DataQuill's April 13, 2000 discussed in detail above also discusses this "command" requirement consistent with the "updating" requirement presented above.  DataQuill argued that the entry of a command in application claims 31 and 76 was important to the claimed invention.  By requiring the user to enter a command to update the unit,

---

[13]  DataQuill's citation to 2:38-44 and 13:51-57 of the '304 patent to support its position, found in footnote 24, apparently is a typographical error, as such passages do not support its proposition.

[14]  Despite protesting as to HTC's grouping, DataQuill also grouped all terms but the claim 97 term together as well.

CASE NO. 08cv543 IEG

HTC'S RESPONSIVE BRIEF ON CLAIM CONSTRUCTION

updating occurs at the discretion of and under the control of the user.  April 13, 2000 Preliminary

Amendment [1031-1055] at 17 [1047].

> In claim 76, the controller is also operable to response to a ***download* command** to cause downloading of information from a remote processing center to the hand held unit (via the telecommunications interface) ***as required*** for updating information previously stored in rewritable storage of the hand held unit for selectable items.

> The input of a ***download command*** is necessary to initiate updating, as indicated above.  Otherwise, claims 76 and 77 are novel and patentable over Zook [sic] for generally similar reasons to those advanced with respect to claim 31.

*Id.*  DataQuill explained the advantages of such a feature as follows:

> Furthermore, by requiring an input command signal to update the unit, updating occurs at the discretion of and under the control of the user.  This avoids the disadvantages of some prior art systems in which all the information stored in the unit is automatically updated, regardless of whether or not the user wishes the information stored to be updated.  …  This arrangement is once again particularly advantageous when embodied in a mobile phone as it allows the user of the claimed system to delay updating (and the associated use of expensive airtime) until that user particularly require updating of stored information relating to selectable items, or until the cost of the airtime reduces – for example, when a phone is used outside of high-rate hours or at so-called off-peak times.

*Id.*

   Thus, it is proper to group each of these terms discussing the "command" feature for

updating.  HTC's constructions should be adopted.

6.      "Means for Displaying" Terms

a.      Means for displaying a plurality of selectable items

| Term | Claims containing the term | HTC's Proposed Construction | DataQuill's Proposed "Construction" |
|---|---|---|---|
| *means for displaying a plurality of selectable items* | **'304 Patent** <u>Independent</u> 100, 101 <br><br> <u>Dependent</u> 20, 53 | a display, a display screen, or a touch sensitive screen, and equivalents thereof | For example, see '304 patent 2:13-29 ("a display screen 20"); 6:51-7:9 ("a conventional two dimensional array of pixels which can be selectively activated in order to provide the display of a wide range of displayable items." "Any suitable display technology can be used which enables the displayed information to be read over a wide enough angular range such that it can be read by the user when the pen is held at an angle suitable for reading a bar code." '[A] 2 line by 16 character supertwist LCD display screen is employed in the preferred embodiment giving a viewing area of approximately 60 mm by 16 mm with a character size of approximately 3 mm by 5.5 mm."); 12:65-13:21 ("a touch sensitive screen"; '[A]ny applicable touch sensitive screen technology can be used, either through the use of an addition to an existing conventional display screen, or the use of a display screen with integral touch sensitivity") and their equivalents. |

DataQuill attempts to make a relatively easy task appear complicated.  Determining the proper construction of this term should not be as difficult as DataQuill is making it out to be. The Parties agree that this is a means-plus-function term governed by 35 U.S.C. § 112 ¶ 6; the Parties agree on the claimed function; the Parties essentially agree[15] on the structures in the specification which perform the claimed function: the display 20, the display screen 20, and the touch sensitive screen.  The Parties even cite to the identical quotations from the '304 specification for support.  Moreover, the Parties agree that the proper construction of a means-

---

[15] With the exception that DataQuill lists the structures as "examples" and adds the "equivalents thereof" language to the structures, not to a proposed construction (which is missing).

plus-function term is the structure described in the patent specification for performing the claimed function, *and equivalents thereof.  See* 35 U.S.C. § 112 ¶ 6.

The only issue is DataQuill's refusal to provide a proposed construction for the term.  Instead, DataQuill's proposed construction requires a quotation of over 159 words to appear in the jury instructions for this term alone.  Such an approach invites jury confusion and reversible error.

DataQuill's proposed construction for this term is shown above.  Only five words in this entire 159-word passage actually lists the structures for performing the claimed function: the "display," the "display screen," and the "touch sensitive screen."  The remaining text is not a construction; it is mere surplus, and, as such, should be excluded from the construction.

DataQuill's Opening Brief, however, includes a different entry under the proposed construction (although, truly not a construction at all): "function: displaying a plurality of selectable items.  Structure: The corresponding structures described in the specification at 2:13-29, 6:51-7:9, 12:65-13:21, and equivalents thereof."  DataQuill's Opening Brief at 37.  This alleged construction would require the juror to understand what is meant by terms such as "2:13-29, 6:51-7:9, and 12:65-13:21."  Not only is such a quotation of the specification an improper construction, as described above, but such a shorthand reference to the specification would cause even more juror confusion.  Federal Circuit precedent requires the court to determine the structures for performing the claimed function as part of the claim construction process, and not leave such a determination to the jury in the form of a jury instruction.  *See, e.g, Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 389-90 (1996).

For instance, in *Altris*, an issue before the Federal Circuit was the proper construction of the means-plus-function term shown below:

> a means of booting said digital computer, said means of booting including a first set of commands, said first set of commands resident on said storage device of said digital computer for booting said digital computer, and a second set of commands resident on a storage device external to said digital computer for booting said digital computer.

*See Altiris, Inc. v. Symantec Corp.,* 318 F.3d 1363, 1375 (Fed. Cir. 2003).

This term was found to be a means-plus-function limitation because it described a function (booting a computer including a first set and a second set of commands) without providing the requisite structure that performs the booting function in the claim.  *Id*.  In performing the next step in the claim construction analysis, the district court and the Federal Circuit each ascertained the corresponding structure in the specification that is necessary to perform that function.  *Id*.  The district court identified the following structures as performing the booting function:  the normal operating system on the computer and the customized MBR or equivalent, two operating systems, and communications software (for the first set of commands); and for the second set of commands, batch fields, commands, or instructions on the service.  *Id*.  The Federal Circuit reversed, finding the following structures performed the claimed function:  for the first set of commands, each of the following and its equivalents: the normal operating system on the computer, another automation operating system, a customized or normal MBR, and communication software; and for the second set of commands, batch files, commands, or instructions on a storage device other than the main processor and long term storage device present in the digital computer.  *See id*.  Although arriving at different constructions, both the district court and the Federal Circuit provided a concrete construction of the means-plus-function term by identifying only the structures for performing the claimed functions and equivalents thereof, rather than merely repeating verbose passages from the patent specification.  Neither the Federal Circuit nor the district court in the *Altris* case simply regurgitated paragraphs from the specification, and added "and equivalents thereof" at the end, as urged by DataQuill.  Rather, the required analysis by the Court is to discern which structures are disclosed in the specification for performing the claimed function, and then construe the term to cover those structures, and equivalents thereof.  This is the proper analysis.

Under the proper legal analysis, the "means for displaying a plurality of selectable items" is "a display, a display screen, or a touch sensitive screen, and equivalents thereof."

b.  **Additionally comprising as well as or instead of said display screen, and separate from said hand holdable unit, means for displaying a selectable item with associated data sources for user selection of an item by operation of said hand holdable unit [or data entry device, as used in claims 94, 95, 103, and 104]**

| Term | Claims containing the term | HTC's Proposed Construction | DataQuill's Proposed Construction |
|---|---|---|---|
| *additionally comprising as well as or instead of said display screen, and separate from said hand holdable unit, means for displaying a selectable item with associated data sources for user selection of an item by operation of said hand holdable unit* | '304 Patent <u>Independent</u> 107, 109 | a television screen separate from the handholdable unit, and equivalents thereof | ***additionally comprising as well as or instead of said display screen, and separate from said data entry device,:*** means what it says and no elaboration is needed<br><br>***means for displaying a selectable item with associated data sources for user selection of an item by operation of said data entry device:*** means plus function term<br><br>**Function:** displaying a selectable item with associated data sources for user selection of an item by operation of the data entry device<br><br>**Corresponding structure:**<br>For example, see '304 patent, Col. 17:59-67 (e.g., "In a merchandising system, where bar codes or other codes are associated with merchandisable items, this could be achieved simply by means of a printed catalogue, or some other form of list, or as a result of codes applied to examples of the products in question, or as a result of codes displayed, for example, on a TV screen with images relating to those products. The only requirement is that the display of the codes are readable by the data entry system of the present invention"); Col. 4:62 to Col. 5:10 (e.g., "It enables the user to make shopping selections from a catalogue or from a series of options displayed on a television screen from the comfort of his or her home without the need to connect the device to a conventional telephone network. A hand held unit including a |

| | | | |
|---|---|---|---|
| | | | wireless telephone network interface such as a cellular network interface finds particular application where the user of the system is travelling from place to place and may need to perform data entry functions when they are far from a conventional wired telephone network socket."); and their equivalents. |
| *additionally comprising as well as or instead of said display screen, and separate from said data entry device, means for displaying a selectable item with associated data sources for user selection of an item by operation of said data entry device[16]* | **'304 Patent** <u>Independent</u> 94, 95, 103, 104 | a television screen separate from the data entry device, and equivalents thereof | *(Same as above; HTC is not repeating the text here for brevity)* |

Regarding these terms, DataQuill's Opening Brief is riddled with errors.  First, DataQuill miscopied HTC's proposed construction from the Joint Claim Construction Chart, which led DataQuill to conclude HTC's construction "invites legal error" because it fails to list the phrase "and equivalents thereof" language at the end, pursuant to 35 U.S.C. § 112 ¶ 6.  A quick glance above (and at the Joint Claim Construction Chart (Docket #61, p. 53) and Worksheet (Docket #62, p. 42) shows that DataQuill is again simply wrong.  HTC's proposed construction for the term includes the "and equivalents thereof" language: a television screen separate from the date entry device, *and equivalents thereof* (emphasis added).  Moreover, those same cited pages show DataQuill's failure to affirmatively propose any construction for this term whatsoever.  Rather, DataQuill simply parrots quotes from the specification, and adds "and their equivalents" at the end of the passages, apparently believing the inclusion of those words converts quotes from the specification to a proper claim construction.  For the same reason as stated above for the "means for displaying" term, specification quotations are not proper constructions.

---

[16] This limitation is identical to the immediately preceding limitation, with the replacement of "date entry device" for "hand holdable unit" and should therefore be construed consistently.

CASE NO. 08cv543 IEG

HTC'S RESPONSIVE BRIEF ON CLAIM CONSTRUCTION

Additionally, DataQuill addresses only a segment of the entire term.  DataQuill has impermissibly omitted the beginning of the term for construction:  "additionally comprising as well as or instead of said display screen, and separate from said data entry device."  DataQuill does not address these words, choosing instead to hide behind its "ordinary meaning" refrain used throughout its brief and the Joint Claim Construction Chart.  DataQuill's omission of those words would contribute to incomplete constructions and invite legal error, should the Court adopt DataQuill's construction.

The most glaring error in DataQuill's approach is its failure to focus on the structure that performs the function of displaying a selectable item *with associated data sources for user selection of an item* by operation of the data entry device.  Via its cited passages, and as best as can be determined by HTC, since DataQuill failed to provide any construction for this term, DataQuill is apparently asserting that a "printed catalog" or "some other form of list" is a structure described in the specification to perform the claimed function.  However, the passages quoted by DataQuill reciting a mere catalog or list do not describe either as performing the claimed function of displaying an item *with associated data sources for user selection* of an item by operation of the device.  If the '304 patent specification includes any structure for performing this claimed function, then it is only the television screen that the specification describes as having codes displayed thereon (associated data sources for user selection) and includes images related to those products (displaying selectable items).  Thus, the only structure in the specification for performing the claimed function is the television, and the television is also separate from the data entry device.

The proper construction of this term is therefore: a television screen separate from the handholdable unit, and equivalents thereof, for the same reasons as set out above.

### 7.      "Written text" terms

| Term | Claims containing the term | HTC's Proposed Construction | DataQuill's Proposed Construction |
|------|---------------------------|----------------------------|-----------------------------------|
| *written text* | '304 Patent<br><u>Independent</u><br>80, 81, 82, 83 | handwritten text | means what it says and no elaboration is needed |

Instead of proposing a construction for this term, DataQuill merely attacks HTC's proposed construction for "written text."  DataQuill proposes to rewrite the claim term "written text" as "text," contrary to HTC's proposed construction, which is consistent with ordinary meaning."  In the context of the claim, it is clear that the "written text" is not mere "text" (which DataQuill appears to assert is printed text).  By waiving its hands extensively, DataQuill has scrambled to try to create a battle of the dictionaries to support its proposed construction replacing "written text" with just "text."

However, DataQuill's focus on "text" is misplaced.  The focus should be on its adjective "written."  Like the "reading sensor" term discussed above, the question is, "if DataQuill really just meant 'text' instead of 'written text' in the context of the claims, why did DataQuill insert 'written' into the claim at all?"  Had DataQuill really meant this term to refer broadly to "text," it simply could have chosen not to insert the adjective "written" into the claims.  This is true especially in light of DataQuill's failure to use the "written text" term in the specification at all, as pointed out in HTC's opening brief.[17]

As stated above, all words in a claim are presumed to have meaning.  *See Innova/Pure Water, Inc.*, 381 F.3d at 1119 (Fed. Cir. 2004) (finding a construction of "opearatively connected" to mean "connected" would impermissibly read out "operatively" from the term); *see also Rackman*, 102 F. Supp.2d at 121 (E.D.N.Y. 2000) ("To the extent plaintiff believes that 'insertable storage medium' should be construed to mean 'any storage medium,' the Court rejects that view because it seeks to read the term 'insertable' out of the claim").

---

[17] Again, neither the specification nor the claims as filed on the priority date of September 27, 1994, included the verbiage in the claims as issued.  The first time "written text" was included in the claims was in the November 27, 1998 Amendment in the application leading to the '304 patent.  *See* November 27, 1998 Amendment [701-718] at [714].  As such, these claims are invalid for failing to be supported by the written description of the specification.

CASE NO. 08cv543 IEG

1    In a strained and convoluted argument, DataQuill tries to spin the fact that, because

2  "written text" does not appear in the '304 specification, "written text" should mean any kind of

3  "text."   DataQuill cites numerous passages from the '304 specification and then concludes that

4  "written text" should be construed broadly to be any kind of "text."   Of course, **none** of the

5  passages cited by DataQuill refer to "written text" at all, and most do not refer to even "text."

6  Rather, the passages are directed to types of "coded data," of which "written text" is a subset

7  according to claims.   *See, e.g.,* claim 80 "coded data such as fingerprints or signatures or written

8  text."

9    For example, DataQuill argues that "Fig. 6 shows written text (there coded by use of bar

10  codes) that is not handwritten."  Figure 6 is shown below.

11  

12

13

14

15  

16

17

18  *FIG. 6*

19    Nowhere in the '304 specification or file history is the text shown in Figure 6 ever

20  described as "written text."  Figure 6 shows text, which is to be differentiated from the claimed

21  "written text."  Similarly, the '304 patent includes one passage referring to "text," and is cited in

22  HTC's Opening Brief at 28 and DataQuill's Opening Brief at 33 ("text is displayed in an

23  orientation appropriate for the user.").   Again, this passage refers to "text," as opposed to the

24  claimed "written text."  Furthermore, if this term could be saved from a certain invalidity

25  challenge under 35 U.S.C. section 112, the only support for "written" portion of this term in the

26  '304 patent specification is the passage cited by DataQuill, referring to the reading head used to

27  write down characters in the form of a rolling ball in a holder in the reading head tracing.  '304

28  patent, 13:52-64.  Inexplicably, DataQuill argues that a person using the tracing head by hand to

-32-

HTC'S RESPONSIVE BRIEF ON CLAIM CONSTRUCTION

form characters is somehow not "hand written,"[18] because tracing a letter by hand is necessarily "hand written," which again supports HTC's proposed construction of this term.

Thus, given the ordinary meaning as understood by one of skill in the art, "written text" in the context of the asserted claims is "handwritten text" and not just any kind of "text" as argued by DataQuill.

### 8.    "Natural language" terms

| Term | Claims containing the term | HTC's Proposed Construction | DataQuill's Proposed Construction |
|---|---|---|---|
| *natural language characters* | '340 Patent <u>Independent</u> 80, 81, 82, 83, 100, 101 <u>Dependent</u> 20, 41, 53 | user understandable language characters such as common English | means what it says and no elaboration is needed; Alternatively: user understandable language characters such as common English |

While DataQuill states that no elaboration is needed, DataQuill agrees that this term is not in dispute.   Since HTC has requested construction of this term for the benefit of the jury, the Court should consider the term during the claim construction process.   The proper construction for "natural language characters" is: user understandable language characters such as common English.

### 9.    "Comprises one or two manually operable switches for scrolling said display in a first and/or second direction"

| Term | Claims containing the term | HTC's Proposed Construction | DataQuill's Proposed Construction |
|---|---|---|---|
| "comprises one or two manually operable switches for scrolling said display in a first and/or second direction…" | '304 patent <u>Dependent</u> claims 8, 39 | includes only one or only two devices that can be operated by hand to make or break an electrical connection for moving up or down through a sequential display of information | includes at least <u>but requires only</u> one or two <u>manually operable switches</u> (devices for making, breaking or changing the connections in an electrical circuit, which can be operated by hand), for stepping through text or graphics displayed on a display |

---

[18] HTC does not agree that this statement supports the claims including the "written text" limitation under 35 U.S.C. § 112. HTC provides this description only for the purposes of explaining how, even DataQuill's assertions were to be accepted, DataQuill's apparent proposed constructions are legally improper.

1    DataQuill made the underlined changes (identified above) to its proposed constructions

2   for the first time in its Opening Brief, without informing HTC in advance in any way.  *See* Joint

3   Claim Construction Chart (Docket #61) and Joint Claim Construction Worksheet (Docket #62),

4   and without informing HTC.[19]   Thus, HTC's Opening Brief does not address the specific

5   proposed construction that it learned of for the first time in DataQuill's Opening Brief.

6   Nevertheless, DataQuill's proposed revisions make its proposed construction even more

7   confusing than its originally proposed construction and does not change the actual issue between

8   the parties – whether "one or two" means "one or two."

9    DataQuill argues that DataQuill chose not to use the word "only" when drafting this

10  claim.  DataQuill Opening Brief at 40 ("In the claims, the drafters chose not to use 'only.'  It

11  would be error to import the modifier 'only' from a preferred embodiment into the claims.").

12  Yet, DataQuill's new proposed construction does just that: imports the word "only" into this

13  term.  DataQuill also objects to HTC's lack of definition of "switch."   HTC points out that

14  DataQuill did not include the word "switch" on the Joint Claim Construction Chart ever,

15  including now.

16    So, the core dispute between the parties is whether this term precludes more than two

17  switches for scrolling.  The term does not preclude the presence of other switches for other

18  functions, but the wording of this term does preclude the presence of other switches for the

19  scrolling function.  As cited in HTC's opening brief, the case law is clear on this.  Common

20  sense dictates the same result – "comprises one or two" means it "includes one or two" – the

21  term does not mean "three or four or more."   By DataQuill's proposed definition, any of the

22  above would satisfy this claim limitation, which would be an absurd result.  The use of the

23  specific "one or two" overrides any open-endedness normally created by the word "comprises."

24  If the patentee had meant to include more than two, it could have chosen to word the claim:

25  "comprises one or more manually operable switches for scrolling…" or "comprises at least one

26  manually operable switch for scrolling…."

27

28

---

[19] HTC does not object to DataQuill's intent to modify its proposed construction.

CASE NO. 08cv543 IEG

HTC'S RESPONSIVE BRIEF ON CLAIM CONSTRUCTION

10.    "Downloading" and "to Download" Terms

In advance of the opening briefs, HTC informed DataQuill that HTC was agreeable to DataQuill's proposal the "download" and "to download" terms be given their ordinary meaning, and yet, DataQuill failed to take HTC's modified position into account when briefing. As such, each of these terms should be given their ordinary meaning.  As stated above, each of the Parties has made some modifications to its proposed constructions previously presented in the Joint Claim Construction Chart (Docket #61) and Joint Claim Construction Worksheet (Docket #62), and the Parties will submit an updated chart prior to the hearing.

III.    DATAQUILL HAS IMPROPERLY RELIED ON PRIOR COURT ORDERS

DataQuill's repeated citations to prior constructions by various courts, rather than asking this Court to perform an independent analysis, is inappropriate.[20]   As stated in the Joint Claim Construction Chart, HTC objects to DataQuill's reliance on any prior claim construction orders from prior cases.  However, since DataQuill's Opening Brief relies extensively on such orders, HTC unfortunately feels compelled to respond for the record as to why such orders should not be considered by this Court in construing the claims of the reexamined patents-in-suit.

DataQuill's position is erroneous for several reasons.  First, HTC is entitled to have this Court construe the terms.  As this Court has already noted, HTC was not a party to any of the prior suits and such constructions are not binding on HTC.  *See* Order Granting HTC's Motion to Stay (document 29) at 4.  The Court appropriately stated during the December 16, 2010 telephonic status conference that it would not consider past claim construction rulings.  Second, and importantly, none of the prior tribunals had the benefit of the prosecution history provided in the reexamination proceedings for either of the patents-in-suit.  Further, in two of the cases, the courts did not have the benefit of the continued prosecution of the '565 application or the '591 patent, and none of the prior courts had the benefit of the prosecution history of the reexamination proceedings for the patents-in-suit.  Third, none of the prior orders were final; each case was settled before the Federal Circuit ever ruled as to whether such construction was

---

[20] DataQuill insisted on including these prior orders in the Joint Claim Construction Chart (Document 61) over HTC's objections. HTC maintains its objections.

CASE NO. 08cv543 IEG

HTC'S RESPONSIVE BRIEF ON CLAIM CONSTRUCTION

proper and free of legal error.  Finally, DataQuill cherry-picked selected constructions from various orders.

## IV.    CONCLUSION

For the foregoing reasons, this Court should adopt the claim constructions proposed by HTC.

Dated: December 17, 2010                    Respectfully submitted,

**WILSON TURNER & KOSMO LLP**

By:      /s/  Frederick W. Kosmo, Jr.
FREDERICK W. KOSMO, JR.
THERESA OSTERMAN STEVENSON
550 West C Street, Suite 1050
San Diego, California  92101
Tel:  619.236.9600
Fax: 619.236.9669
E-mail: fkosmo@wilsonturnerkosmo.com

**HOWREY LLP**
PETER J. CHASSMAN
*(admitted pro hac vice)*
GREGORY A. DUFFEY
*(admitted pro hac vice)*
1111 Louisiana, 25th Floor
Houston, Texas  77002
Telephone:  713.787.1400
Facsimile:   713.787.1440
E-mail: chassmanp@howrey.com
E-mail: duffeyg@howrey.com

*Attorneys for Defendant and Counterclaimant*
*HTC CORPORATION*

-36-

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on December 17, 2010 to all counsel of record who are deemed to have consented to electronic service via the Courts CM/ECF system per Civ LR 5.4(d).  Any other counsel of record will be served by U.S. mail.

<u>/s/ Gregg A. Duffey</u>
Gregg A. Duffey