1
2
3
4
5
6
7          **UNITED STATES DISTRICT COURT**
8        **SOUTHERN DISTRICT OF CALIFORNIA**
9

| | |
|---|---|
| DATAQUILL LIMITED, | CASE NO. 08cv543 - IEG (BGS) |
| Plaintiff-Counterdefendant, | **ORDER** |
| | **(1) GRANTING IN PART AND DENYING IN PART HTC'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF NON-INFRINGEMENT** |
| vs. | [Doc. No. 133] |
| | **(2) DENYING HTC'S MOTION FOR SUMMARY JUDGMENT OF NO WILLFUL INFRINGEMENT** |
| | [Doc. No. 130] |
| HIGH TECH COMPUTER CORP., | **(3) GRANTING IN PART AND DENYING IN PART HTC'S MOTION TO EXCLUDE THE EXPERT OPINIONS OF JOSEPH GEMINI** |
| Defendant-Counterclaimant. | [Doc. No. 129] |

        Presently before the Court is Defendant High Tech Computer Corp. ("HTC")'s motion for

partial summary judgment of non-infringement, motion for summary judgment of no willful

infringement, and motion to exclude the expert opinions of Joseph Gemini.  [Doc. Nos. 129, 130,

133.]  For the reasons stated below, the Court **GRANTS IN PART** and **DENIES IN PART**

HTC's motion for partial summary judgment of non-infringement; **DENIES** HTC' motion for

summary judgment of no willful infringement; and **GRANTS IN PART** and **DENIES IN PART**

1  HTC's motion to exclude the expert opinions of Joseph Gemini.

2  **BACKGROUND**

3  This is a patent infringement case concerning two patents.  On May 2, 2000, the United States

4  Patent and Trademark Office ("USPTO") issued U.S. Patent No. 6,504,304 ("the '304 Patent") to

5  Plaintiff DataQuill Limited ("DataQuill").  U.S. Patent No. 6,504,304 (filed May 2, 2000).  On

6  November 21, 2006, the USPTO issued U.S. Patent No. 7,139,591 ("the '591 Patent") to DataQuill.

7  U.S. Patent No. 7,139,591 (filed Nov. 21, 2006).  The '591 Patent is a continuation of the '304 Patent.

8  See id.  The technology at issue for both patents generally relates to handheld mobile devices with

9  remote access capability and optional features such as touch sensitive screens or integrated cameras.

10  On March 24, 2008, DataQuill filed the present action against HTC alleging infringement of

11  the '304 patent and the '591 patent.  [Doc. No. 1, Compl.]  Specifically, DataQuill alleges that HTC

12  devices with the Android Operating System and HTC devices with the Microsoft Windows Phone 6.5

13  and 7.0 Operating Systems infringe certain claims of the patents-in-suit.  [Doc. No. 149-4, Verified

14  Expert Report of Dr. Daniel Van der Weide ("Van der Weide Expert Report") at 5-6.]

15  Prior to the filing of the present action, the USPTO granted third-party requests for ex parte

16  reexamination of both the '304 Patent and the '591 Patent.  [Doc. No. 130-2, Declaration of William

17  Hicks ("Hicks Decl.") Exs. 1-2.]  On April 1, 2008, the USPTO issued two non-final office actions

18  rejecting all of the claims of the '304 Patent and the '591 Patent in light of certain prior art.  [Id. Exs.

19  3, 8.]  On May 14, 2009, the Court stayed the action pending the reexamination proceedings.  [Doc.

20  No. 29.]  On October 27, 2009, the USPTO issued a reexamination certificate for the '591 Patent, and

21  on April 13, 2010, the USPTO issued a reexamination certificate for the '304 Patent.  '591 Patent

22  (reexamination certificate) (filed Oct. 27, 2009); '304 Patent (reexamination certificate) (filed Apr.

23  13, 2010).  On April 1, 2010, the Court lifted the stay in light of the conclusion of the reexamination

24  proceedings.  [Doc. No. 43.]

25  The parties agree that as a result of the reexamination proceedings, five of the asserted claims

26  of the '304 Patent–claims 83, 86, 101, 113, and 115–were original claims of the patent that survived

27  the reexamination proceedings, and therefore have an effective date of May 2, 2000.  [Doc. No. 130-1

28  at 2; Doc. No. 151 at 3.]  The parties also agree that the remaining asserted claims of the '304 Patent

were added during the reexamination proceedings and have an effective date of April 13, 2010 and

all of the asserted claims of the '591 Patent were added during the reexamination proceedings and

have an effective date of October 27, 2009.  [Doc. No. 130-1 at 2-3; Doc. No. 151 at 3.]  DataQuill

alleges that HTC began selling infringing products in September 2008 with the introduction of its

"G1" Android mobile phone.  [Doc. No. 151 at 1; <u>see also</u> Doc. No. 135-2, <u>Expert Report of Joseph

Gemini</u> ("<u>Gemini Expert Report</u>") at 6.]

## DISCUSSION

### I.    Motion for Partial Summary Judgment of Non-Infringement

HTC moves for partial summary judgment of non-infringement on several grounds.  HTC

summarizes these grounds and its arguments in support as follows:

> 1.    HTC requests that the Court enter summary judgment of no direct
> infringement with respect to claims 12, 13, 44, 45, 83, 98, 113, and 115 of the '304
> patent and all claims dependent therefrom.  To satisfy the limitations of these
> claims, DataQuill relies on third-party software, server functionality, and/or other
> provisions over which HTC exercises no control or direction, and for which
> DataQuill has proffered no evidence (and indeed has not even argued) that such
> limitations are met by any of HTC's accused products or any activity conducted by
> HTC. Thus, summary judgment of non-infringement is warranted as to these
> claims.
>
> 2.    HTC requests that the Court enter summary judgment of no direct
> infringement with respect to all claims of the '304 patent for all of HTC's accused
> products except the Evo 4G, as DataQuill has failed to even identify the
> "controller" or otherwise state how HTC's accused products meet the "controller"
> limitation of the asserted claims of the '304 patent.
>
> 3.    HTC also requests that the Court enter summary judgment of no *in*direct
> infringement with respect to all asserted claims of the patents-in-suit, because
> DataQuill has failed and is unable to come forward with any evidence that could
> meet the legal requirements for either contributory infringement or active
> inducement of infringement by HTC.

[Doc. No. 133-1 at 1 (emphasis in original).]

### A.    Legal Standard for a Motion for Summary Judgment

Summary judgment is proper where the pleadings and materials demonstrate "there is no

genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  A material issue of fact

is a question a trier of fact must answer to determine the rights of the parties under the applicable

substantive law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A dispute is genuine

1  "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

2  The moving party bears "the initial responsibility of informing the district court of the basis

3  for its motion." <u>Celotex</u>, 477 U.S. at 323.  To satisfy this burden, the movant must demonstrate

4  that no genuine issue of material fact exists for trial. <u>Id.</u> at 322.  Where the moving party does not

5  have the ultimate burden of persuasion at trial, it may carry its initial burden of production in one

6  of two ways: "The moving party may produce evidence negating an essential element of the

7  nonmoving party's case, or, after suitable discovery, the moving party may show that the

8  nonmoving party does not have enough evidence of an essential element of its claim or defense to

9  carry its ultimate burden of persuasion at trial." <u>Nissan Fire & Marine Ins. Co., v. Fritz Cos.</u>, 210

10  F.3d 1099, 1106 (9th Cir. 2000).  To withstand a motion for summary judgment, the non-movant

11  must then show that there are genuine factual issues which can only be resolved by the trier of

12  fact. <u>Reese v. Jefferson Sch. Dist. No. 14J</u>, 208 F.3d 736, 738 (9th Cir. 2000).  The non-moving

13  party may not rely on the pleadings alone, but must present specific facts creating a genuine issue

14  of material fact through affidavits, depositions, or answers to interrogatories. Fed. R. Civ. P.

15  56(c); <u>Celotex</u>, 477 U.S. at 324.

16  The court must review the record as a whole and draw all reasonable inferences in favor of

17  the non-moving party. <u>Hernandez v. Spacelabs Med. Inc.</u>, 343 F.3d 1107, 1112 (9th Cir. 2003).

18  However, unsupported conjecture or conclusory statements are insufficient to defeat summary

19  judgment. <u>Id.</u>; <u>Surrell v. Cal. Water Serv. Co.</u>, 518 F.3d 1097, 1103 (9th Cir. 2008). Moreover, the

20  court is not required "'to scour the record in search of a genuine issue of triable fact,'" <u>Keenan v.</u>

21  <u>Allan</u>, 91 F.3d 1275, 1279 (9th Cir.1996) (citations omitted), but rather "may limit its review to

22  the documents submitted for purposes of summary judgment and those parts of the record

23  specifically referenced therein." <u>Carmen v. San Francisco Unified Sch. Dist.</u>, 237 F.3d 1026, 1030

24  (9th Cir. 2001).

25  **B.    Direct Infringement**

26  HTC argues that it is entitled to summary judgment of no direct infringement of various

27  claims of the '304 Patent. [Doc. No. 133-1 at 8-12.] Under 35 U.S.C. § 271(a), "whoever without

28  authority makes, uses, offers to sell, or sells any patented invention, within the United States . . .

1   infringes the patent."

2       A patent infringement analysis proceeds in two steps.  Markman v. Westview Instruments,

3   Inc., 52 F.3d 967, 976 (Fed. Cir. 1995), aff'd 517 U.S. 370.  In the first step, the court construes

4   the asserted claims as a matter of law.  See id.  In the second step, the factfinder compares the

5   claimed invention to the accused device.  Id.; see also Verizon Servs. Corp. v. Cox Fibernet Va.,

6   Inc., 602 F.3d 1325, 1340 (Fed. Cir. 2010) ("A determination of infringement is a question of fact .

7   . . .").  "'Summary judgment on the issue of infringement is proper when no reasonable jury could

8   find that every limitation in a properly construed claim either is or is not found in the accused

9   device either literally or under the doctrine of equivalents.'"  U.S. Philips Corp. v. Iwasaki Elec.

10  Co. Ltd., 505 F.3d 1371, 1374-75 (Fed. Cir. 2007) (quoting PC Connector Solutions LLC v.

11  SmartDisk Corp., 406 F.3d 1359, 1364 (Fed. Cir. 2005)).

12      "To prove literal infringement, the patentee must show that the accused device contains

13  every limitation in the asserted claims.  If even one limitation is missing or not met as claimed,

14  there is no literal infringement."  Riles v. Shell Exploration & Prod. Co., 298 F.3d 1302, 1308

15  (Fed. Cir. 2002) (quoting Mas-Hamilton Group v. LaGard, Inc., 156 F.3d 1206, 1211 (Fed. Cir.

16  1998)).  Specifically, "[t]o infringe an apparatus [or system] claim, the device must meet all of the

17  structural limitations."[1]  Cross Med. Prods. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293,

18  1311-12 (Fed. Cir. 2005); see also, e.g., Centillion Data Sys., LLC v. Qwest Communs. Int'l, 631

19  F.3d 1279, 1283-84 (Fed. Cir. 2011) (using the same standard to analyze infringement of both

20  system claims and apparatus claims).  Direct infringement may be proven through circumstantial

21  evidence.  See Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1318 (Fed. Cir. 2009).

22

---

23      [1] In its motion, HTC argues that direct infringement "requires a party to perform or use each
    and every step or element of a claimed method or product."  [Doc. No. 133-1 at 6 (citing BMC Res.,
24  Inc. v. Paymentech, L.P., 498 F.3d 1373, 1378 (Fed. Cir. 2007)).]  Although HTC accurately cites
    BMC Research, BMC Research is a case explaining the standard for direct infringement of "process
25  patent or method patent claims."  498 F.3d at 1378.  The claims at issue in this case are system and
    apparatus claims, not method claims.  See '304 Patent, '591 Patent; cf. Hewlett-Packard Co. v. Bausch
26  & Lomb, 909 F.2d 1464, 1468 (Fed. Cir. 1990) ("apparatus claims cover what a device is, not what
    a device does").  "[A] rule that governs infringement of a method claim may not always govern
27  infringement of an apparatus claim."  Cross Med., 424 F.3d at 1311; see also Finjan, Inc. v. Secure
    Computing Corp., 626 F.3d 1197, 1204 (Fed Cir. 2010) (stating that system claims "do not require the
28  performance of any method steps").  Therefore, the direct infringement standard for apparatus claims
    from Cross Medical applies to the present case, not the standard from BMC Research.

1    <u>1.</u>    <u>The "reading sensor" limitation of claims 12, 13, 44, 45, and 83 of the '304 Patent</u>

2         HTC argues that it is entitled to summary judgment of no direct infringement of claims 12,

3    13, 44, 45, and 83 of the '304 Patent.  [Doc. No. 133-1 at 8-11.]  HTC argues that all of these

4    claims contain the limitation of a "reading sensor" and that DataQuill contends that the "reading

5    sensor" limitation is met by the digital camera on HTC's devices combined with third-party

6    software.  [<u>Id.</u> at 8.]  HTC further argues that because it does not sell or offer to sell this third-party

7    software, it is not liable for direct infringement.  [<u>Id.</u>]

8         Claims 12 and 44 of the '304 Patent are dependent claims that contain the limitation of

9    "wherein said reading sensor is a motion detector or scanning device."  '304 Patent (reexamination

10   certificate) col. 1 l. 59-62, col. 3 l. 4-6.  Claims 13 and 45 of the '304 Patent are also dependent

11   claims that add the limitation of "wherein said scanning device is a camera."  '304 Patent col. 19 l.

12   9-10, col. 25 l. 15-16.  DataQuill's technical expert Dr. Van der Weide states in his expert report

13   that all of the accused HTC handsets possess a digital camera that is capable of sensing and

14   capturing an image.  [Doc. No. 149-4, <u>Van Der Weide Expert Report</u> at 3-4, 10.]  Dr. Van der

15   Weide contends that these digital cameras satisfy the above claim limitations.  [<u>Id.</u> Ex. D at 18,

16   20.]  Therefore, DataQuill has created a genuine issue of fact as to whether the digital cameras on

17   HTC's accused handsets satisfy the above limitations in claims 12, 13, 44, and 45.  Indeed, HTC

18   concedes in its reply brief that it is not entitled to summary judgment on DataQuill's "camera

19   theory" of infringement.  [<u>See</u> Doc. No. 163 at 1.]

20        In addition to concluding that infringement is satisfied by the presence of a digital camera,

21   DataQuill's technical expert concludes in the alternative that the accused HTC handsets infringe

22   the above claims when they are combined with third-party applications such as Google Goggles,

23   Google Shopper or ShopSavvy.  [<u>See</u> Doc. No. 149-4, <u>Van Der Weide Expert Report</u> Ex. D at 18,

24   20 (stating "[o]r for example, HTC devices with apps like Google Shopper/Goggles or ShopSavvy,

25   can also scan bar codes" in the claim charts for claims 12, 13, 44, and 45).]  HTC argues that even

26   if the Court accepts DataQuill's "camera theory" of infringement, it is entitled to summary

27   judgment of no infringement to the extent DataQuill bases its infringement theory on the presence

28   of these third-party applications.  [Doc. No. 163 at 1-2.]

1    Claims 12, 13, 44, and 45 of the '304 Patent are apparatus or system claims.  As previously

2    stated, to infringe an apparatus or system claim, the device must meet all of the structural

3    limitations.  See Cross Med., 424 F.3d at 1311-12.  Further, "[t]hat a device is capable of being

4    modified to operate in an infringing manner is not sufficient, by itself, to support a finding of

5    infringement."  Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1330 (Fed. Cir.

6    2001).  Therefore, if DataQuill contends that the accused devices infringe only when they are

7    installed with certain third-party applications, DataQuill must show that HTC makes, uses, offers

8    to sell, or sells the accused devices with those third-party applications installed.

9    HTC has presented a declaration by its technical expert Mark Lanning stating that HTC

10   does not provide the accused devices pre-loaded with Google Goggles, Google Shopper, or Shop

11   Savvy.  [Doc. No. 133-3, Declaration of Mark R. Lanning ("Lanning Decl.") ¶ 8.]  HTC also notes

12   that DataQuill's technical expert does not state in his report that these applications are pre-loaded

13   on the accused devices and only states that they are available for download.  [Doc. No. 163 at 2;

14   see Doc. No. 149-4, Van Der Weide Expert Report Ex. D at 10-11 n.1.]  In response, DataQuill

15   has presented a HTC press release for the "G2" accused handset stating that the "G2" is "packed

16   with Google applications such as . . . Google Goggles."  [Doc. No. 145, Declaration of Greg Smith

17   ("Smith Decl.") Ex. 13 at 733.]  DataQuill has also presented a user guide for the "G2" containing

18   instructions on how to use Google Goggles.  [Id. Ex. 12 at 550, 552, 557-59.]

19   HTC admits that this evidence presented by DataQuill is sufficient to create a genuine issue

20   of fact as to whether HTC makes and sells the "G2" handset pre-loaded with Google Goggles.

21   [Doc. No. 163 at 1-2.]  However, HTC argues that this evidence is insufficient to create a genuine

22   issue of fact with respect to the other accused devices.  [Id.]  In response, DataQuill argues that

23   this evidence is sufficient to rebut the assertion in Dr. Lanning's declaration that no HTC devices

24   are pre-loaded with Google Goggles, Google Shopper, or Shop Savvy.  However, the Court agrees

25   with HTC.  To rebut HTC's motion for summary judgment, DataQuill was required to point to

26   facts in the record that demonstrate a genuine issue of fact.  See Reese, 208 F.3d at 738.  Even

27   though infringement may be proven through circumstantial evidence, see Lucent, 580 F.3d at

28   1318, the evidence presented by DataQuill is insufficient to show that the other accused HTC

1    handsets were pre-loaded with Google Goggles.  It is not reasonable for a jury to assume that all of

2    the approximately 30 accused devices are pre-loaded with Google Goggles based solely on

3    evidence that it may have been pre-loaded onto the "G2."  Therefore, because DataQuill has

4    presented insufficient evidence to show that the other accused devices come pre-loaded with

5    Google Goggles, DataQuill has only created a genuine issue of fact as to whether the "G2" is pre-

6    loaded with Google Goggles and that the presence of this application infringes the above claims.

7    Accordingly, to the extent DataQuill's theory of direct infringement of claims 12, 13, 44, and 45

8    requires that the accused devices are loaded with third-party applications, HTC is entitled to

9    summary judgment of no direct infringement with respect to all the accused devices except the

10    "G2."

11         Claim 83 of the '304 Patent is an independent claim that contains the limitation "a reading

12    sensor . . . wherein a [*sic*] said reading sensor is for reading coded data . . . wherein said coded

13    data comprises bar codes and/or binary dot codes and said sensor is a bar code and/or dot code

14    reader." '304 Patent (reexamination certificate) col. 13 l. 26-61.  DataQuill's theory of

15    infringement for this claim limitation is similar to its theory of infringement for claims 12, 13, 44

16    and 45, except that for claim 83, DataQuill contends that infringement occurs only when the

17    accused devices are loaded with third-party applications, such as Google Goggles, Google

18    Shopper, and Shop Savvy.  [Doc. No. 149 at 3; see Doc. No. 149-4, Van der Weide Expert Report

19    Ex. D at 11-12.]  Therefore, the analysis in the preceding paragraph also applies to claim 83.

20    DataQuill has created a genuine issue of fact only as to whether the "G2" is pre-loaded with

21    Google Goggles, but has not created a genuine issue of fact with respect to all the other accused

22    devices.  Accordingly, HTC is entitled to summary judgment of no direct infringement of claim 83

23    with respect to all the accused devices other than the "G2."

24         In sum, the Court **GRANTS IN PART** and **DENIES IN PART** HTC's motion for

25    summary judgment of no direct infringement of claims 12, 13, 44, 45, and 83 of the '304 Patent.

26    Specifically, the Court **DENIES** the motion with respect to direct infringement of claims 12, 13,

27    44, and 45 to the extent that infringement is alleged to occur solely due to the presence of a digital

28    camera in the accused devices and not the presence of third-party applications.  The Court

1   **DENIES** the motion with respect to direct infringement of claims 12, 13, 44, and 45 by the "G2"

2   handset to the extent that infringement is alleged to occur when the "G2" is loaded with third-party

3   applications.  The Court **GRANTS** the motion with respect to direct infringement of claims 12, 13,

4   44, and 45 by all the accused devices other than the "G2" handset to the extent that infringement is

5   alleged to occur when the devices are loaded with third-party applications.  The Court **DENIES**

6   the motion with respect to direct infringement of claim 83 by the "G2" handset.  The Court

7   **GRANTS** the motion with with respect to direct infringement of claim 83 by all the accused

8   devices other than the "G2" handset.

9          2.      The "processing center" limitation of claims 98, 113, and 115 of '304 Patent

10         HTC argues that it is entitled to summary judgment of no direct infringement of claims 98,

11  113, and 115 of the '304 Patent because DataQuill has not shown that HTC uses or controls the

12  third-party servers that are required to satisfy the claim limitation of "programs in said data entry

13  device are updateable remotely from a processing center."  [Doc. No. 133-1 at 11.]  In response,

14  DataQuill argues that these claims only require that the device be capable of interacting with a

15  processing center, not that the processing center is a component of the claimed system.  [Doc. No.

16  149 at 6-10.]  See Finjan, 626 F.3d at 1204 ("[T]o infringe a claim that recites capability and not

17  actual operation, an accused device 'need only be capable of operating' in the described mode.").

18  DataQuill argues that it is therefore not required to show that HTC uses or controls the third-party

19  servers.  [Id.]  DataQuill also argues that it has presented evidence showing that HTC's handsets

20  are capable of updating programs remotely from a processing center, specifically the "Android

21  Market" and the "Windows Marketplace."  [Id. at 10-13.]  In its reply, HTC concedes that

22  DataQuill has raised a genuine dispute of fact with respect to whether the "processing center"

23  limitation of claims 98, 113, and 115 of the '304 Patent are met, and HTC withdraws this portion

24  of its motion.  [Doc. No. 163 at 5.]  Accordingly, the Court **DENIES** HTC's motion for summary

25  judgment of no direct infringement of claims 98, 113, and 115 of the '304 Patent.

26         3.      The "controller" limitation of the '304 Patent

27         HTC argues that it is entitled to summary judgment of no direct infringement of the '304

28  patent for all of the accused products except for the "Evo 4G."  [Doc. No. 133-1 at 11-13.]

1  Specifically, HTC argues that DataQuill has put forth no evidence showing that the accused

2  products other than the "Evo 4G" satisfy the "controller" limitation of the '304 Patent.  [Id.]  In

3  response, DataQuill argues that the testimony of its technical expert Dr. Van der Weide is

4  sufficient to create a triable issue of fact as to whether the accused products satisfy the "controller"

5  limitation.  [Doc. No. 149 at 13-18.]

6          Every asserted claim of the '304 Patent has the limitation of a "controller."  [See Doc. No.

7  149-4, Van der Weide Expert Report Ex. D.]  For each of the asserted claims, Dr. Van der Weide

8  has provided an explanation in his report of how the accused products satisfy the "controller"

9  limitation.  [See id.]  For example, independent claim 80 of the '304 Patent has the limitation "a

10  controller coupled to said reading sensor to receive and process said input."  '304 Patent

11  (reexamination certificate) col. 11 l. 38-39.  Dr. Van der Weide states that the accused handsets

12  satisfy this limitation because "HTC devices include a controller; for example, processing circuitry

13  included in on-board chips, coupled to the touchscreen."  [Doc. No. 149-4, Van der Weide Expert

14  Report Ex. D at 7.]  Further, in another part of his report, Dr. Van der Weide states:

15          Controller; all accused HTC devices have a controller in the form of processing
           circuitry in one or more chips or chipsets that function, for example, to process
16         inputs from their touchscreen and access information for display (Block Diagram
           HTCDQ113869).  It is noted that in most devices, the processing circuitry of their
17         controller resides in a MSM or baseband processor chip; in some devices, such as
           the EVO 4G (code name Supersonic), their controller can also include processing
18         circuitry in an additional chip (e.g. the Atmel AT42QT6022), for example.

19  [Id. at 8.]  In addition, exhibit B to the report contains a table where Dr. Van der Weide lists for

20  each of the accused products its corresponding MSM chip.  [See Doc. No. 149-4, Van der Weide

21  Expert Report Ex. B.]

22          HTC argues that this evidence is insufficient to withstand a motion for summary judgment.

23  [Doc. No. 163 at 3-5.]  Specifically, HTC argues that although DataQuill's expert states that in

24  some of the accused devices the controller consists of circuitry in the MSM and circuitry in an

25  additional chip, he never states in his report or his deposition the specific names of the additional

26  chips for any accused products other than the "Evo 4G."  [Id.]  "Although Rule 26(a)(2)(B)

27  requires that experts disclose a 'complete statement of all opinions to be expressed and the basis

28  and reasons therefor' in their expert report, an expert is not required to 'recite each minute fact or

1   piece of scientific information that might be elicited on direct examination.'" <u>Single Chip Sys.</u>

2   <u>Corp. v. Intermec IP Corp.</u>, 495 F. Supp. 2d 1066, 1075 (S.D. Cal. 2007).  The deposition

3   testimony cited by HTC shows that DataQuill's expert was willing to provide the specific names

4   of the additional chips, but that he needed certain block diagrams to be able to do so.  [<u>See</u> Doc.

5   No. 133-15, <u>Declaration of Phillip Price</u> ("<u>Price Decl.</u>") Ex. 9 at 238-308.]  The transcript does not

6   show that HTC ever gave Dr. Van der Weide the block diagrams and asked him to identify the

7   names of the additional chips.  [<u>See id.</u>]  DataQuill has provided the Court with these block

8   diagrams and a block diagram cited by HTC's technical expert.  [<u>See</u> Doc. No. 149-5, <u>Declaration</u>

9   <u>of Dr. Daniel Van der Weide</u> ("<u>Van der Weide Decl.</u>") Exs. 2, 4.]  In addition, DataQuill has

10  provided a declaration from Dr. Van der Weide providing the names of the accused products

11  where the "controller" requires an additional chip and the names of these additional chips.[2]  [Doc.

12  No. 149-3, <u>Van der Weide Decl.</u> ¶ 12.]  DataQuill has also presented evidence from HTC's

13  technical expert Dr. Lanning listing the names of the chips in the accused devices.  [Doc. No. 149-

14  6, <u>Van der Weide Decl.</u> Ex. 3.]  Therefore, DataQuill has presented sufficient evidence to create a

15  triable issue of fact as to whether the accused products satisfy the "controller" limitation of the

16  '304 Patent.  Accordingly, the Court **DENIES** HTC's motion for summary judgment of no direct

17  infringement of the '304 Patent by all of the accused products in addition to the "Evo 4G."

18        **C.**    **Indirect Infringement**

19        HTC argues that it is entitled to summary judgment of no indirect infringement of the '304

20  Patent and the '591 Patent.  [Doc. No. 133-1 at 13-17.]  HTC first argues that to the extent

21  DataQuill is unable to establish direct infringement of a claim by HTC, HTC is entitled to

22  summary judgment of no indirect infringement.  [<u>Id.</u> at 13-14; Doc. No. 163 at 5.]  While HTC is

23  _____

24        [2] Although HTC does not formally move to strike the expert declaration, HTC asks that the
    Court not consider it because it contains additional information not found in his expert report.  [Doc.
25  No. 163.]  The Court concludes that it may properly consider the declaration.  First, it is arguable
    whether the declaration contains additional information because Dr. Van der Weide's expert report
26  does cite to the block diagrams.  [<u>See</u> Doc. No. 149-4, <u>Van der Weide Expert Report</u> Ex. B.]  Second,
    even assuming the declaration contains additional information, HTC has not shown that it would be
27  prejudiced by consideration of the declaration because Dr. Van der Weide was willing to provide this
    information to HTC during its deposition, but HTC chose not to elicit it.  [<u>See</u> Doc. No. 133-15, <u>Price</u>
28  <u>Decl.</u> Ex. 9 .]  <u>See</u> <u>Dukes v. Wal-Mart, Inc.</u>, 222 F.R.D. 189, 195 (N.D. Cal. 2004) (denying motion
    to strike expert testimony for failure to timely disclose the full extent of that testimony where the
    moving party failed to establish sufficient prejudice).

08cv543

1    correct that a finding of indirect infringement requires a threshold finding of direct infringement

2    by some entity, see Lucent, 580 F.3d at 1320, 1322, HTC fails to note that it itself does not have to

3    be found liable for the direct infringement in order for it to be liable for indirect infringement.  For

4    example, the threshold act of direct infringement can be performed by a consumer that uses the

5    infringing device.  See, e.g., Anton/Bauer, Inc. v. PAG, Ltd., 329 F.3d 1343, 1349 (Fed. Cir.

6    2003).  HTC does not argue anywhere in its motion or reply that consumers that use the accused

7    devices are incapable of directly infringing the asserted claims as a matter of law.  [See Doc. No.

8    113-1; Doc. No. 163.]  Indeed, given that infringement can be proven through circumstantial

9    evidence and DataQuill has produced a substantial number of HTC marketing materials and user

10   guides along with expert testimony, [see Doc. No. 145, Smith Decl. Exs. 12-16, 21, 23-25, 32;

11   Doc. No. 149-4, Van der Weide Expert Report], HTC would have a difficult time making that

12   argument.  See Lucent, 580 F.3d at 1318 (stating that a reasonable jury could find that it was

13   "more likely than not one person somewhere in the United States had performed the claimed

14   method" using the accused product where the jury was presented with expert testimony and

15   circumstantial evidence in the form of instruction manuals and documents related to sales of the

16   accused products).  Accordingly, HTC is not entitled to summary judgment of no indirect

17   infringement based on its argument that DataQuill has been unable to establish direct infringement

18   by HTC.

19                  1.      Contributory Infringement

20          HTC argues that DataQuill cannot establish liability for contributory infringement because

21   all of the accused products have substantial non-infringing uses.  [Doc. No. 133-1 at 14-15.]  At

22   the hearing, DataQuill stated that it is not pursuing a claim for contributory infringement against

23   HTC.  Accordingly, the Court **GRANTS AS MOOT** HTC's motion for summary judgment of no

24   contributory infringement.

25                  2.      Inducement

26          HTC argues that it is entitled to summary judgment on DataQuill's claim for active

27   inducement of infringement because DataQuill has presented no evidence to support the

28   requirement of specific intent.  [Doc. No. 133-1 at 15-17.]  A party who "actively induces

infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b).  Under this provision, the "plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements."  DSU Med. Corp. v. JMS Co., Ltd., 471 F.3d 1293, 1304 (Fed. Cir. 2006) (en banc).

        "[I]nducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities."  DSU Med., 471 F.3d at 1306.  The Supreme Court recently clarified that induced infringement "requires knowledge that the induced acts constitute patent infringement."  Global-Tech Appliances, Inc. v. SEB S.A., 131 S. Ct. 2060, 2068 (2011).  However, the Supreme Court explained that under this standard actual knowledge is not required, and that the intent may be shown under the willful blindness doctrine.  Id. at 2068-70.  Under this doctrine, the defendant must (1) believe subjectively that there is a high probability that a fact exists, and (2) take deliberate actions to avoid learning of that fact.  Id. at 2070-71.  A plaintiff may prove the intent element of inducement through circumstantial evidence.  Lucent, 580 F.3d at 1322.  "Evidence of active steps taken to induce infringement, such as advertising an infringing use, can support a finding of an intention for the product to be used in an infringing manner."  Id.

        DataQuill contends that HTC began selling infringing products in September 2008.  [Doc. No. 151 at 1; see also Doc. No. 135-2, Gemini Expert Report at 6 ¶ 19.]  Further, the parties agree that due to the reexamination of the two patents, the asserted claims of the '304 Patent that survived reexamination have an effective date of May 2, 2000 while the remaining asserted claims of the '304 Patent that were added during reexamination have an effective date of April 13, 2010 and all of the asserted claims of the '591 Patent were added during reexamination and have an effective date of October 27, 2009.  [Doc. No. 130-1 at 2-3; Doc. No. at 3.]  Therefore, the relevant dates for when the infringement–direct or indirect–allegedly began are September 2008, October 27, 2009, and April 13, 2010.

        To support its allegations of inducement, DataQuill presented a letter dated January 26, 2006 that it sent to HTC notifying it of the '304 Patent and a letter dated February 15, 2007 notifying HTC of the '591 Patent.  [Doc. No. 145, Smith Decl. Ex. 30 at 1251-52.]  In addition,

DataQuill filed the present lawsuit accusing HTC of infringing the '304 Patent and the '591 Patent on March 24, 2008.  [Compl.]  After this action was commenced, a reexamination certificate for the '591 Patent was issued on October 27, 2009 and a reexamination certificate for the '304 Patent was issued on April 13, 2010.  See '304 Patent (reexamination certificate); '591 Patent (reexamination certificate).  [See also Doc. Nos. 38, 42.]  DataQuill has also produced an expert report explaining how the accused products infringe the two patents, [Doc. No. 149-4, Van der Weide Expert Report], and DataQuill has produced a substantial number of HTC marketing materials and user guides related to the accused products.  [Doc. No. 145, Smith Decl. Exs. 12-16, 21, 23-25, 32.]  Based upon this evidence and drawing all reasonable inferences in favor of DataQuill, a reasonable jury could conclude that in September 2008, HTC knew that its products infringed the '304 Patent and that its marketing materials and user guides encouraged users of the accused products to infringe the '304 Patent.  See Lucent, 580 F.3d at 1322-23 (upholding jury finding of inducement).  A reasonable jury could also conclude that on October 17, 2009 and April 13, 2010, respectively, HTC knew its products infringed the new claims of the '591 Patent and the '304 Patent and that its marketing materials and user guides encouraged users of the accused products to infringe these claims that were added during reexamination.  See id.

In response to the evidence presented by DataQuill, HTC makes two arguments.  First, HTC argues that the evidence presented by DataQuill is insufficient to satisfy the intent requirement because DataQuill has only produced evidence related to the issue of whether HTC had knowledge of the allegedly induced acts.  [Doc. No. 163 at 6.]  HTC argues that DataQuill has presented no evidence related to the issue of whether HTC knew these acts infringed.  [Id.]  HTC is incorrect.  DataQuill has presented evidence that prior to any alleged infringement by HTC, HTC not only had knowledge of the patents-in-suit, it had knowledge of DataQuill's contention that HTC was infringing these patents because DataQuill had already filed the present lawsuit against HTC.  [See Doc. No. 145, Smith Decl. Ex. 30 at 1251-52; Compl.; Doc. Nos. 38, 42.]  This evidence bears on the issue of whether HTC knew the allegedly induced acts infringed the asserted claims of the '304 Patent and the '591 Patent.  See Global-Tech, 131 S. Ct. at 2068 (stating that "knowledge of the existence of the patent that is infringed" is needed for induced infringement);

1    DSU, 471 F.3d at 1305.  Therefore, based on this evidence, a reasonable jury could find that HTC

2    not only knew of the acts that it was allegedly inducing, but that it also knew that these acts

3    constituted infringement.

4         HTC's second argument is that the undisputed facts show that it did not have the specific

5    intent to induce infringement.  [Doc. No. 133 at 15-17.]  In support of its argument, HTC relies on

6    the fact that the USPTO rejected all the claims of both the patents-in-suit in April 2008 in non-

7    final office actions.  [Id. at 15.]  HTC also relies on its contention that it has asserted substantial

8    defenses to DataQuill's claims throughout this litigation.  [Id. at 16.]  This evidence at best shows

9    that there is a triable issue of fact as to whether HTC is liable for induced infringement.  HTC cites

10   to no case law standing for the proposition that inducement can be foreclosed as a matter of law by

11   rejections in a non-final office action or by the assertion of substantial defenses during litigation of

12   the patents-in-suit.

13        In support of its argument, HTC cites to DSU Med. Corp. v. JMS Co., 471 F.3d 1293 (Fed.

14   Cir. 2006), Ecolab, Inc. v. FMC Corp., 569 F.3d 1335 (Fed. Cir. 2009), and Goss Int'l Ams., Inc.

15   v. Graphic Mgmt. Assocs., 739 F. Supp. 2d (N.D. Ill. 2010).  However, DSU and Ecolab are cases

16   dealing with post-trial motions where the Federal Circuit found that there was substantial evidence

17   to support the jury's findings of no inducement; not cases where the court found inducement

18   foreclosed as a matter of law.  See DSU, 471 F.3d at 1307; Ecolab, 569 F.3d at 1351.  Further, in

19   Goss the district court did grant summary judgment of no inducement, but Goss is distinguishable

20   from the present case.  The determination in Goss was based on a pre-litigation opinion letter that

21   defendants obtained from their patent counsel that the district court found to be competent.  See

22   Goss, 739 F. Supp. 2d at 1114-17, 1125-26.  HTC has not presented any evidence showing that it

23   obtained a competent opinion letter stating that it did not infringe the '304 Patent or the '591

24   Patent prior to the filing of this lawsuit.  HTC has only presented the opinions and arguments of its

25   trial counsel post-filing.  See SynQor, Inc. v. Artesyn Techs., Inc., 2011 U.S. Dist. LEXIS 91693,

26   at *39 (E.D. Tex. Aug. 17, 2011) (finding that an opinion letter obtained a year after the lawsuit

27   commenced had "no real probative value" for the defendant's defense to the plaintiff's inducement

28   allegations); see also In re Seagate Tech., LLC, 497 F.3d 1360, 1372 (Fed. Cir. 2007) (en banc)

1   ("communications of trial counsel have little, if any, relevance").  Accordingly, the Court

2   **DENIES** HTC's motion for summary judgment of no infringement by inducement.

3   **D.      Conclusion**

4   In conclusion, the Court **GRANTS IN PART** and **DENIES IN PART** HTC's motion for

5   partial summary judgment of non-infringement.

6   **II.     Motion for Summary Judgment of No Willful Infringement**

7   HTC moves for summary judgment of no willful infringement.  [Doc. No. 130-1.]  First,

8   HTC argues that DataQuill's claim for willful infringement is barred as a matter of law because

9   DataQuill's claim for willful infringement is only based on HTC's post-filing conduct and

10  DataQuill did not seek a preliminary injunction in this case.  [Id. at 5-8.]  Second, DataQuill

11  argues that no reasonable jury could find that HTC has acted recklessly with respect to the patents-

12  in-suit.  [Id. at 8-9.]

13  **A.      Legal Standard for a Motion for Summary Judgment**

14  See supra section I.A.

15  **B.      Legal Standard for Willful Infringement**

16  To establish willful infringement, a patentee must make a "showing of objective

17  recklessness."  In re Seagate Technology, LLC, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc).

18  Accordingly, to establish willful infringement, a patentee must show by clear and
    convincing evidence that the infringer acted despite an objectively high likelihood
19  that its actions constituted infringement of a valid patent.  The state of mind of the
    accused infringer is not relevant to this objective inquiry.  If this threshold objective
20  standard is satisfied, the patentee must also demonstrate that this
    objectively-defined risk (determined by the record developed in the infringement
21  proceeding) was either known or so obvious that it should have been known to the
    accused infringer.

22  Id. (citations omitted).  Whether infringement is willful is a question of fact and is determined

23  based on the totality of the circumstances.  ACCO Brands, Inc. v. ABA Locks Mfr. Co., 501 F.3d

24  1307, 1311-12 (Fed. Cir. 2007).

25  **C.      Failure to Obtain an Injunction as a Bar to Willful Infringement**

26  DataQuill alleges that HTC first began infringing the patents-in-suit in September 2008, a

27  few months after DataQuill filed the present lawsuit.  [Doc. No. 151 at 1.]  At no time during this

28  litigation has DataQuill moved for a preliminary injunction against HTC to stop the allegedly

infringing activities from occurring.  HTC argues that because DataQuill is only seeking damages for post-filing conduct and DataQuill has not sought a preliminary injunction in this case, DataQuill's claim for willful infringement is barred as a matter of law.  [Doc. No. 130-1 at 5-8.]  In making this argument, DataQuill relies on the following language from the Federal Circuit's *en banc* decision in Seagate:

> [W]hen an accused infringer's post-filing conduct is reckless, a patentee can move for a preliminary injunction, which generally provides an adequate remedy for combating post-filing willful infringement.  A patentee who does not attempt to stop an accused infringer's activities in this manner should not be allowed to accrue enhanced damages based solely on the infringer's post-filing conduct.  Similarly, if a patentee attempts to secure injunctive relief but fails, it is likely the infringement did not rise to the level of recklessness.
>
> We fully recognize that an accused infringer may avoid a preliminary injunction by showing only a substantial question as to invalidity, as opposed to the higher clear and convincing standard required to prevail on the merits.  However, this lessened showing simply accords with the requirement that recklessness must be shown to recover enhanced damages.  A substantial question about invalidity or infringement is likely sufficient not only to avoid a preliminary injunction, but also a charge of willfulness based on post-filing conduct.

Seagate, 497 F.3d at 1374 (citations omitted).

In its motion for summary judgment, HTC argues that the above language from Seagate creates a *per se* bar to any claim for willful infringement based on post-filing conduct where the patentee did not seek a preliminary injunction.  [Doc. No. 130-1 at 5-6.]  Although district courts have found that Seagate can create a bar to claims for post-filing willful infringement where an injunction was not sought, all the courts that have addressed the issue have found that bar is not absolute.  See Inv. Tech. Group, Inc. v. Liquidnet Holdings, Inc., 759 F. Supp. 2d 387, 412 & n.174 (S.D.N.Y. 2010) (listing cases).[3]  Further, at the hearing on these motions, HTC conceded

---

[3] See also WebMap Techs., LLC v. Google, Inc., 2010 U.S. Dist. LEXIS 104137, at *9-10 (E.D. Tex. Sept. 20, 2010); Netscape Communs. Corp. v. Valueclick, Inc., 684 F. Supp. 2d 699, 728 (E.D. Va. 2010); Affinity Labs of Tex., LLC v. Alpine Elecs. of Am., Inc., 2009 U.S. Dist. LEXIS 130147, at *10 (E.D. Tex. Sept. 2, 2009); St. Clair Intellectual Prop. Consultants v. Palm, Inc., 2009 U.S. Dist. LEXIS 49922, at *4 (D. Del. Jun. 10, 2009); Krippelz v. Ford Motor Co., 670 F. Supp. 2d 806, 812 (N.D. Ill. 2009); Novartis Pharms. Corp. v. Teva Pharms. USA, Inc., 2009 U.S. Dist. LEXIS 14632, at *8 (D. N.J. Feb. 25, 2009); Anascape, Ltd. v. Microsoft Corp., 2008 U.S. Dist. LEXIS 111828, at *12 (E.D. Tex. Apr. 25, 2008) rev'd on other grounds by Anascape, Ltd. v. Nintendo of Am., Inc., 601 F.3d 1333 (Fed. Cir. 2010).

In support of its proposition that there is a *per se* bar, HTC cites to Creative Compounds, LLC v. Starmark Labs., Inc., 2010 U.S. Dist. LEXIS 69795, at *12 n.19 (S.D. Fla. Jul. 13, 2010); Baxter

that Seagate did not create a *per se* bar to claims for post-filing willful infringement where an injunction was not sought.  Because Seagate did not create a *per se* bar, the determination of whether a patentee may pursue a claim for willful infringement based on post-filing conduct without seeking a preliminary injunction "will depend on the facts of each case."  Seagate, 497 F.3d at 1374; see also e.g., Netscape, 684 F. Supp. 2d at 728 (stating that failure to seek a preliminary inunction is relevant to but not dispositive of the willfulness determination); Inv. Tech. Group, 759 F. Supp. 2d at 412 (stating that "there are limited circumstances under which a patentee may sustain a claim of post-filing willful infringement despite the patentee's failure to first seek a preliminary injunction"); WebMap Techs., 2010 U.S. Dist. LEXIS 104137, at *9-10 (stating that "certain extenuating circumstances may exist to allow a plaintiff to sustain a claim of post-filing willful infringement despite the plaintiff's failure to first seek a preliminary injunction").

DataQuill argues that it was not required to obtain a preliminary injunction in this case because the Court likely would have denied it injunctive relief since it does not practice the patents-in-suit, is not a competitor of HTC, and has a history of licensing its patents.  [Doc. No. 151 at 11-12.]  Several district courts have recognized that a patentee who neither practices its invention nor directly competes with the accused infringer is excused from Seagate's rule that a patentee must seek an injunction to sustain a claim for post-filing willful infringement.  See Inv. Tech. Group, 759 F. Supp. 2d at 412; Krippelz, 670 F. Supp. 2d at 812; Affinity Labs, 2009 U.S. Dist. LEXIS 130147, at *10-11 & n.3.  The district court in Krippelz explained the reasoning for this exception:

> The pursuit of preliminary injunction may fail for reasons other than its lack of merit on the underlying claim.  Even a strong claim for injunctive relief will ordinarily fail when an inventor, who does not practice the invention and does not compete with the infringer, sues for injunction.  It is a general rule of equity that injunctions should not issue where money damages will suffice because irreparable injury cannot be shown.  This principle is applicable to patent injunctions.  eBay

Healthcare Corp. v. Fresenius Med. Care Holdings, Inc., 2010 U.S. Dist. LEXIS 21778, at *49-50 (N.D. Cal. Feb. 19, 2010); and GSI Group, Inc. v. Sukup Mfg. Co., 591 F. Supp. 2d 977, 984-85 (C.D. Ill. 2008).  However, these are merely cases where the Seagate bar was applied to the patentee's willfulness claims for post-filing conduct, but none of these cases specifically held that the Seagate bar is absolute and is not subject to any exceptions.  See id.  Indeed, none of these cases even addressed the issue of whether the Seagate bar is absolute.  See id.

1
2
3
4
5

> Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006).  I can envision a rare case where an inventor, while not in direct competition with an infringer, could secure a preliminary injunction if the inventor is entitled to a preliminary injunction, had well-formed plans to compete against the infringer and demonstrated, for example, that the infringer was effectively locking up, for a period of years, a substantial share of customers for the patented device.  There is no flavor of that in this case.  Krippelz could not have gotten an injunction in this case, and, while only I know that for a certainty, Krippelz could reasonably and wisely conclude that he would not win; that it would be a waste of time and resources, his own and the court's, to make the effort.

6
7

Krippelz, 670 F. Supp. 2d at 812-13; see also Affinity Labs, 2009 U.S. Dist. LEXIS 130147, at

8

*11 ("There is little difference between the situation where the court denies a preliminary

9

injunction and that where counsel believes a motion for a preliminary injunction would be

10

inappropriate and opts instead not to file one after considering his or her ethical obligations under

11

Fed. R. Civ. P. 11.  The Seagate court explicitly declined to apply a *per se* rule in the first

12

situation, and the court sees no reason why a different result is mandated in the latter situation.").

13

The Court agrees with the reasoning of the district courts in Krippelz and Affinity Labs.

14

Therefore, the Seagate bar should not apply to DataQuill in this case because the Court agrees with

15

DataQuill's assertion; based on the facts in this case, DataQuill would not have been able to obtain

16

a preliminary injunction because it does not practice the patents-in-suit and it does not compete

17

with HTC.

18

    Although HTC admitted at the hearing that DataQuill would have a difficult time obtaining

19

a preliminary injunction in this case, HTC argues that it still should have been required to seek

20

one.  HTC makes several arguments in support of its position.  First, HTC argues that some district

21

courts have rejected the argument that a patentee should should not be required to seek a

22

preliminary injunction because it probably would have been denied one.  [Doc. No. 157 at 5-6.]

23

See WebMap Techs., 2010 U.S. Dist. LEXIS 104137, at *10-12; Anascape, 2008 U.S. Dist.

24

LEXIS 111828, at *11-12 ("A party should not waive its rights, and the court cannot make its

25

findings, based on a possible ruling in a hypothetical situation.").  However, the Court does not

26

find either WebMap Techs. or Anascape to be persuasive authority.  The district court did not

27

discuss whether the patentee was a non-practicing entity or a non-competitor of the accused

28

infringer in either case.  See id.  Therefore, it is not clear that those cases, like the present case,

involved a patentee that clearly would have been denied a preliminary injunction had it sought

08cv543

1    one.

2          Next, HTC notes that in some cases, it is possible for a non-practicing entity to be able to

3    obtain an injunction.  [Doc. No. 157 at 5.]  See eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388,

4    393 (2006); see, e.g., Commonwealth Sci. & Indus. Research Org. v. Buffalo, Inc., 492 F. Supp.

5    2d 600, 604, (E.D. Tex. 2007) (granting permanent injunction in favor of a non-competitor/non-

6    practicing entity).  However, this is of little consequence.  The Court recognizes that in some cases

7    a non-practicing entity might be entitled to a preliminary injunction, see id., and in those cases the

8    Seagate bar might apply if a preliminary injunction is not sought.  But, in the present case, it is

9    clear to the Court that DataQuill would have been denied a preliminary injunction had it sought

10   one.  See Krippelz, 670 F. Supp. 2d at 812-13 (noting that in some cases a non-practicing entity

11   can obtain a preliminary injunction, but finding "no flavor of that in [the present] case").

12         Finally, HTC relies on the Federal Circuit's language in Seagate.  HTC argues that in

13   Seagate, the Federal Circuit recognized that "in some cases a patentee may be denied a preliminary

14   injunction despite establishing a likelihood of success on the merits, such as when the remaining

15   factors are considered and balanced.  In that event, whether a willfulness claim based on conduct

16   occurring solely after litigation began is sustainable will depend on the facts of each case."

17   Seagate, 497 F.3d at 1374 (emphasis added).  HTC argues that this language implies that even

18   though a patentee might think that he will be denied a preliminary injunction, the patentee should

19   still request the injunction, and only after the Court denies the injunction, should the Court

20   determine whether the patentee may proceed on its willfulness claims.  However, the Court

21   declines to read Seagate in such a narrow manner as to require all patentees seeking claims for

22   post-filing willful infringement to file motions for preliminary injunctions in every situation no

23   matter how frivolous they may be.  The district court in Krippelz correctly noted that this "would

24   be a waste of time and resources, [the patentee's] and the court's."  Krippelz, 670 F. Supp. 2d at

25   813.  Accordingly, DataQuill's claim for willful infringement is not barred as a matter of law

26   because it did not seek a preliminary injunction in this case.[4]

27   ────────────────

28         [4] District courts have also recognized that a patent surviving reexamination constitutes an
     "extenuating circumstance" excusing Seagate's requirement of seeking a preliminary injunction.  See
     St. Clair, 2009 U.S. Dist. LEXIS 49922, at *4 (establishing exception); Inv. Tech. Group, 759 F. Supp.

1

**D.      Whether a Reasonable Jury Could Find That HTC Acted Recklessly**

2          HTC also argues that it is entitled to summary judgment because even if DataQuill's

3   willful infringement claims are not barred as a matter of law by Seagate, no reasonable jury could

4   find that HTC acted recklessly with respect to the patents-in-suit.  [Doc. No. 130-1 at 8-9.]  First,

5   HTC argues that it cannot be found to have acted recklessly because during the reexamination

6   proceedings all of the claims of both of the patents-in-suit were rejected in non-final office actions.

7   [Id. at 8.]  However, HTC's argument appear to be foreclosed by Federal Circuit precedent.  In

8   Hoechst Celanese Corp. v. BP Chems. Ltd., the Federal Circuit stated:

9          We take notice that the grant by the examiner of a request for reexamination is not
           probative of unpatentability.  The grant of a request for reexamination, although
10         surely evidence that the criterion for reexamination has been met (i.e., that a
           "substantial new question of patentability" has been raised, 35 U.S.C. § 303), does
11         not establish a likelihood of patent invalidity.  See Acoustical Design, Inc. v.
           Control Elecs. Co., 932 F.2d 939, 942 [(Fed. Cir. 1991)] ("initial rejection by the
12         Patent and Trademark Office of original claims that later were confirmed on
           reexamination hardly justifies a good faith belief in the invalidity of the claims") . .
13         . .

14   78 F.3d 1575, 1584 (Fed. Cir. 1996) (footnote omitted). The Federal Circuit then rejected the

15   defendant's contention that the grant of reexamination "supports the position that infringement

16   was not willful."  Id.; see also Krippelz v. Ford Motor Co., 675 F. Supp. 2d 881, 894 (N.D. Ill.

17   2009) ("Hoechst Celanese holds that the grant of a reexamination and interim PTO rejections are

18   not probative (i.e. not relevant, and therefore not admissible) evidence on the question of

19   patentability.").

20         HTC argues that Hoechst Celanese is distinguishable from the present case because it was

21   a case where reexamination proceedings were only initiated and not where claims were rejected

22   during the proceedings.  [Doc. No. 157 at 3.]  While this is true, it fails to recognize that the Court

23   in Hoechst Celanese relied on Acoustical Design, Inc. v. Control Elecs. Co., a case where the

24   claims were rejected during the reexamination proceedings.  See Acoustical Design, 932 F.2d at

25   _____

26   2d at 412 (recognizing exception); WebMap Techs., 2010 U.S. Dist. LEXIS 104137, at *9-10, 13
     (recognizing exception).  This exception likely applies to the asserted claims of the '304 Patent that
27   exited the reexamination proceedings without amendment, specifically claims 83, 86, 101, 113, and
     115.  However, because the Court has already determined that the Seagate bar does not apply to
28   DataQuill because it would not have been able to obtain a preliminary injunction, the Court need not
     engage in further analysis of this additional exception.

08cv543

942.  Further, courts have held that because PTO interim rejections are not binding, they are generally not relevant to issue of invalidity.  See Sigram Schindler Beteiligungsgesellschaft Mbh v. Cisco Sys., 726 F. Supp. 2d 396, 415 & n.31 (D. Del. 2010); Tesco Corp. v. Weatherford Int'l, Inc., 750 F. Supp. 2d 780, 793-94 (S.D. Tex. 2010); see also Krippelz, 675 F. Supp. 2d at 894 ("Interim rejections are the norm at the PTO.").  HTC also argues that Hoechst Celanese is distinguishable because in that case the alleged infringement occurred prior to the initiation of the reexamination proceedings unlike in the present case.  However, the Court does not see why this distinction is meaningful.  In Hoechst Celanese, the Federal Circuit clearly stated that the grant of a request for reexamination is not probative of unpatentability.  78 F.3d at 1584.  The Federal Circuit did not hold that the grant of a request for reexamination is not probative of unpatentability only if the reexamination proceedings are commenced after the alleged infringement has begun.

The Court also does not find the district court cases relied on by HTC persuasive.  The holding in Lucent Techs., Inc. v. Gateway, Inc., 2007 U.S. Dist. LEXIS 95934, at *17-19 (S.D. Cal. Oct. 30, 2007) that the mere granting of a request for reexamination forecloses as a matter of law a finding of willful infringement based on post-filing conduct is directly contradicted by Hoechst Celanese.  Further, the holding was based on the erroneous conclusion that the USPTO's "substantial new question of patentability" standard used for granting reexamination requests is the same as the "substantial question of validity" standard used for granting preliminary injunctions.  The Federal Circuit has held that these are two different standards and that the former is less stringent than the latter.  P&G v. Kraft Foods Global, Inc., 549 F.3d 842, 848 (Fed. Cir. 2008).  Moreover, Tesco Corp. v. Weatherford Int'l, Inc., 750 F. Supp. 2d 780, 818 (S.D. Tex. 2010) is self-contradicting.  In Tesco, the district court held that an interim rejection during reexamination proceedings is not probative of patentability.  Id. at 794.  However, later the Tesco court stated that "the fact that the examiners rejected the claims demonstrates that a major issue exists as to whether they are valid."  Id. at 818.  The Court agrees with Tesco's first conclusion rather than the second.  An interim rejection is not probative of patentability, and therefore, an interim rejection does not foreclose as a matter of law a jury from finding that HTC acted despite an objectively high likelihood that its actions constituted infringement of a valid patent.

1   Accordingly, the Court rejects HTC's argument that the interim rejections by the PTO during the

2   reexamination proceedings foreclose a finding of willful infringement as a matter of law.

3          HTC also argues that no reasonable jury could find that it acted recklessly because its

4   pleadings, discovery responses, invalidity contentions, and its motion for partial summary

5   judgment of non-infringement show that HTC has asserted in good faith numerous credible

6   defenses.  [Doc. No. 130-1 at 9.]  "[B]oth legitimate defenses to infringement claims and credible

7   invalidity arguments demonstrate the lack of an objectively high likelihood that a party took

8   actions constituting infringement of a valid patent."  Black & Decker, Inc. v. Robert Bosch Tool

9   Corp., 260 Fed. Appx. 284, 291 (Fed. Cir. 2008); see, e.g., Cohesive Techs., Inc. v. Waters Corp.,

10  543 F.3d 1351, 1374 & n.4 (Fed. Cir. 2008) (finding that a sufficiently close question of proper

11  claim construction foreclosed a finding of willfulness).

12         However, HTC has not shown at this point that it has legitimate defenses to infringement

13  and credible invalidity arguments.  HTC has not moved for summary judgment on the issue of

14  invalidity.  HTC also has not explained why its preliminary invalidity contentions are credible,

15  particularly in light of the fact that some of the claims survived reexamination proceedings.  See

16  Custom Accessories, Inc. v. Jeffrey-Allan Industries, Inc., 807 F.2d 955, 961 (Fed. Cir. 1986)

17  (stating that when a claim survives reexamination proceedings, an accused infringer's burden of

18  proving invalidity is "'made heavier'").  In addition, the Court has denied the majority of HTC's

19  motion for partial summary judgment of non-infringement.  See supra section I.  Although part of

20  the motion was granted, this is of no consequence because this only shows that HTC had

21  legitimate defenses with respect to those particular infringement allegations.  It does not show that

22  HTC has legitimate defenses to the remaining infringement allegations that will survive summary

23  judgment or the allegations for which HTC did not move for summary judgment.  Accordingly,

24  HTC has not shown that it is entitled to summary judgment of no willful infringement.

25         **E.     Conclusion**

26         In conclusion, the Court **DENIES** HTC's motion for summary judgment of no willful

27  infringement.

28  ///

- 23 -

1   **III.    Motion to Exclude the Expert Opinions of Joseph Gemini**

2         HTC moves to exclude the expert opinions of DataQuill's damages expert, Joseph Gemini.

3   [Doc. No. 135.]  HTC argues that Mr. Gemini's testimony is unreliable for three reasons.  [Id. at

4   1.]  First, HTC argues that Mr. Gemini improperly inflates his royalty calculation by relying on

5   HTC licenses that are not comparable to the hypothetical agreement at issue in this case.  [Id.]

6   Second, HTC argues that Mr. Gemini applies enhanced royalty rates for certain groups of claims

7   without any factual support.  [Id.]  Third, HTC argues that Mr. Gemini uses the total revenue of

8   the accused products as his royalty base in violation of the entire market value rule.  [Id.]

9         **A.    Legal Standard for a Motion to Exclude Expert Testimony**

10        A district court's decision to admit expert testimony under Daubert follows the law of the

11  regional circuit.  Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387, 1390-91 (Fed. Cir. 2003).

12  When considering expert testimony offered pursuant to Rule 702, the trial court acts as a

13  "gatekeeper" by "making a preliminary determination of whether the expert's testimony is

14  reliable." Elsayed Mukhtar v. Cal. State Univ., Hayward, 299 F.3d 1053, 1063 (9th Cir. 2002);

15  see Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999); Daubert v. Merrell Dow Pharms.,

16  Inc., 509 U.S. 579, 597 (1993).  Under Rule 702 of the Federal Rules of Evidence, a court may

17  permit opinion testimony from an expert only if such testimony "will assist the trier of fact" and

18  "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

19  principles and methods, and (3) the witness has applied the principles and methods reliably to the

20  facts of the case."

21        The inquiry into admissibility of expert opinion is a "flexible one," where "[s]haky but

22  admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the

23  burden of proof, not exclusion."  Primiano v. Cook, 598 F.3d 558, 564 (9th Cir. 2010); (citing

24  Daubert, 509 U.S. at 594, 596).  "Under Daubert, the district judge is 'a gatekeeper, not a fact

25  finder.'  When an expert meets the threshold established by Rule 702 as explained in Daubert, the

26  expert may testify and the jury decides how much weight to give that testimony."  Id. (quoting

27  United States v. Sandoval-Mendoza, 472 F.3d 645, 654 (9th Cir. 2006)).

28  ///

**B.**     **Legal Standard for Calculating Patent Damages**

"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. Two alternative methods exist for calculating damages in a patent case; they "are the patentee's lost profits and the reasonable royalty he would have received through arms-length bargaining." Lucent, 580 F.3d at 1324. DataQuill does not appear to contend that it is entitled to lost profits. [See generally Doc. No. 135-2, Gemini Expert Report; Doc. No. 150.] Accordingly, damages is this case should be calculated by determining the reasonable royalty DataQuill would have received through arms-length negotiation. See Lucent, 580 F.3d at 1324.

To calculate the reasonable royalty, patentees generally consider a hypothetical negotiation, in which the asserted patent claims are assumed valid, enforceable, and infringed, and attempt "to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." Lucent, 580 F.3d at 1324-25; see also Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1554 n.13 (Fed. Cir.1995) (en banc). This hypothetical negotiation "necessarily involves an element of approximation and uncertainty." Lucent, 580 F.3d at 1325. In determining the reasonable royalty that would been agreed to at the hypothetical negotiation, parties in patent cases frequently utilize the fifteen factors enunciated in Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). The Federal Circuit has expressly "sanctioned the use of the Georgia-Pacific factors to frame the reasonable royalty inquiry." Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1317 (Fed. Cir. 2011).

A hypothetical negotiation can result in either a lump-sum license or a running royalty license. See Lucent, 580 F.3d at 1326. A lump-sum license is an up-front payment in full for the invention that involves uncertainty about "whether the technology is commercially successful or even used." Id. In contrast, a running royalty license is directly tied to how often the invention is incorporated into products by the licensee and is calculated by multiplying the proposed royalty rate by the proposed royalty base. See id., 580 F.3d at 1326, 1338-39.

1    "The burden of proving damages falls on the patentee." <u>Lucent</u>, 580 F.3d at 1324.  To

2    properly carry this burden, the patentee must sufficiently tie the expert testimony on damages to

3    the facts of the case.  <u>Uniloc</u>, 632 F.3d at 1315 (citing <u>Daubert</u>, 509 U.S. at 591).

4        **C.    Mr. Gemini's Damages Analysis**

5        DataQuill's damages expert Mr. Gemini's analysis begins by giving a general overview of

6    the two patents-in-suit and the accused products that allegedly infringe these two patents.  [Doc.

7    No. 135-2, <u>Gemini Expert Report</u> at 4-7.]  Mr. Gemini then considers the revenue realized from

8    the accused products, the demand for the patented technology in the accused products–specifically

9    the demand for the Android Market and Windows Marketplace, the demand for camera phone

10   capabilities, and the demand for web browsing–, and both the licensing of the patents-in-suit and

11   licenses entered into by HTC.  [<u>Id.</u> at 9-30.]  Mr. Gemini then takes this information and analyzes

12   the fifteen <u>Georgia-Pacific</u> factors to determine the reasonable royalty the parties would have

13   agreed to during the hypothetical negotiation.  [<u>Id.</u> at 30-37.]

14       Mr. Gemini concludes that the parties during the hypothetical negotiation would have

15   agreed to a running royalty license.  [Doc. No. 135-2, <u>Gemini Expert Report</u> at 36.]  Specifically,

16   Mr. Gemini opines that in the event HTC is found liable for infringement of all of the patents-in-

17   suit, the royalty rate owed would be 1.00% during the period of September 10, 2008 through

18   October 26, 2009, 1.10% during the period of October 27, 2009 through April 12, 2010, and

19   1.60% for the period of April 13, 2010 going forward.[5]  [<u>Id.</u>]  Mr. Gemini then applies these

20   royalty rates to the royalty base of $7.58 billion, which represents the total revenue of the accused

21   products, and concludes that the reasonable royalty owed to DataQuill would be $108.7 million.

22   [<u>Id.</u>]

23       **D.    License Comparability**

24       HTC argues that Mr. Gemini's analysis is unreliable because Mr. Gemini's royalty rates

25

26   _____

27       [5] These three different time periods represent the fact that only the original claims of the '304
     Patent that survived reexamination could have been infringed on September 10, 2008, the claims of
     the '591 Patent that were added during reexamination could not have been infringed until October 27,

28   2009, and the claims of the '304 Patent that were added during reexamination could not have been
     infringed until April 12, 2010, due to the effective dates of the respective claims. [Doc. No. 135-2,
     <u>Gemini Expert Report</u> at 4-5.]

1    are improperly inflated due to his reliance on HTC licenses to patents that are not comparable to

2    the patents-in-suit.[6]  [Doc. No. 135 at 7-13.]  In response, DataQuill argues that Mr. Gemini has

3    provided a sufficient factual basis to support his decision to rely on these HTC licenses.  [Doc. No.

4    150 at 9-19.]

5           "[T]here must be a basis in fact to associate the royalty rates used in prior licenses to the

6    particular hypothetical negotiation at issue in the case."  Uniloc, 632 F.3d at 1317.  Therefore,

7    "licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the

8    hypothetical license at issue in suit."  Lucent, 580 F.3d at 1325.  A patentee may not rely on

9    license agreements that are "'radically different from the hypothetical agreement under

10   consideration' to determine a reasonable royalty."  Uniloc, 632 F.3d at 1316 (quoting Lucent, 580

11   F.3d at 1328); see also Wordtech Sys. v. Integrated Networks Solutions, Inc., 609 F.3d 1308, 1320

12   (Fed. Cir. 2010) (declining to find licenses comparable because they "arose from divergent

13   circumstances and covered different material"); ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860,

14   870 (Fed. Cir. 2010) (criticizing damages expert for relying on licenses that showed no

15   "discernible link to the claimed technology").  Further, "comparisons of past patent licenses to the

16   infringement must account for 'the technological and economic differences' between them."

17   Wordtech, 609 F.3d at 1320 (quoting ResQNet, 594 F.3d at 873); see also Finjan, 626 F.3d at 1211

18   ("[U]se of past patent licenses under factors 1 and 2 must account for differences in the

19   technologies and economic circumstances of the contracting parties.").  The testimony of a

20   damages expert in a patent suit who relies on non-comparable licenses in reaching his royalty rate

21   should be excluded.  See, e.g., IP Innovation L.L.C. v. Red Hat, Inc., 705 F. Supp. 2d 687, 690-91

22   (E.D. Tex. 2010) (Rader, J.).

23          In conducting his analysis, Mr. Gemini relies on a number of patent license agreements that

24   HTC has entered into that he refers to as "significant patent agreements."  [Doc. No. 135-2,

25   Gemini Expert Report at 21-29.]  Mr. Gemini states that these "significant patent agreements" are

26

27          [6] In its motion to exclude, HTC also criticizes Mr. Gemini for placing no weight on
28   DataQuill's prior licensing of the patents-in-suit in his analysis of the Georgia-Pacific factors,
     specifically factor 1.  [Doc. No. 135 at 7.]  However, in its reply brief, HTC clarifies that it is not
     moving to exclude Mr. Gemini's expert opinions on this ground.  [Doc. No. 167 at 1.]

1   comparable to a license that would have been negotiated for the patents-in-suit.  [Id. at 22.]  Mr.

2   Gemini explains his basis for believing that the licenses are comparable as follows:

>   The patented technology licensed under these significant patent agreements provide
>   technology concerning the ability to provide a mobile delivery system, for example
>   the 3G network.  The DataQuill patents concern the smartphones that use and
>   exploit the capability of these delivery systems, such as, Android Market and Web
>   browsing.  The two technologies are coupled as you need the high speed delivery
>   system in order to take advantage of the advanced smartphone capabilities as
>   provided by the DataQuill patents advanced capabilities that utilize the system.

7   [Id.]

8           Turning to HTC's specific criticisms of Mr. Gemini's reliance on these licenses, HTC first

9   argues that Mr. Gemini has not provided any evidence that the patents in the "significant patent

10  agreements" are technologically comparable to the patents-in-suit.  [Doc. No. 135 at 8.]  In Lucent,

11  the Federal Circuit found that the jury's award of patent damages could not be supported by

12  license agreements where the patentee's expert "supplied no explanation . . . about the subject

13  matter or patents covered by those agreements."  580 F.3d at 1328.  However, HTC is incorrect

14  that Mr. Gemini has not provided any evidence at all of technological comparability.  The passage

15  quoted above from Mr. Gemini's expert report shows the factual basis for his contention that the

16  licenses are comparable.  The licenses involve mobile delivery system technology and the patents-

17  in-suit relate to technology that exploits those delivery systems.  [Doc. No. 135-2, Gemini Expert

18  Report at 22.]  Mr. Gemini further explains that the two technologies are coupled as they are both

19  are necessary to take advantage of advanced smart phone capabilities.  [Id.]  Therefore, Mr.

20  Gemini has provided a factual basis and an explanation for his contention that the licenses are

21  technologically comparable.

22          HTC argues that Mr. Gemini cannot conclude that the technologies are comparable

23  because he does not know what technology is covered by the "significant patent agreements."

24  [Doc. No. 135 at 9.]  HTC points to deposition testimony where Mr. Gemini admits that he did not

25  review every patent licensed in the "significant patent agreements."  [Id.]  However, HTC does not

26  explain why review of each and every patent is necessary to know what technology the licenses

27  relate to in general.  In his report, not only does Mr. Gemini state that these licenses relate to

28  "mobile delivery system" technology; for each agreement, Mr. Gemini states the specific mobile

1   technology to which the agreement relates.  [See Doc. No. 135-2, Gemini Expert Report at 24-27.]

2   For example for the December 20, 2000 license HTC obtained from Qualcomm, Mr. Gemini states

3   that the technology in this license relates to "CDMA cellular communications."  [Id. at 24.]  HTC

4   does not appear to refute that these licenses are indeed related to the technology specified by Mr.

5   Gemini.  Accordingly, Mr. Gemini has supplied a sufficient explanation of the technology covered

6   by the agreements.

7        HTC argues that technology related to mobile delivery systems is not comparable to

8   technology that exploits or takes advantage of those systems.  [Doc. No. 135 at 9-10.]  While there

9   may be some differences between the two technologies, Mr. Gemini explains in his report that

10   based on his review of the materials cited in his report, the two technologies are of similar

11   importance to the accused devices overall.  [See Doc. No. 135-2, Gemini Expert Report at 22-24,

12   29.]  Therefore, Mr. Gemini has provided a factual basis and an explanation for his conclusion that

13   the technology in the "significant patent agreements" is comparable to the technology in the

14   patents-in-suit, and Mr. Gemini has provided a "discernable link" to the claimed technology.  See

15   ResQNet, 594 F.3d at 870; Synthes USA, LLC v. Spinal Kinetics, Inc., 2011 U.S. Dist. LEXIS

16   93093, at *29-30 (N.D. Cal. Aug. 19, 2011); Saffran v. Johnson & Johnson, 2011 U.S. Dist.

17   LEXIS 34858, at *32-36 (E.D. Tex. Mar. 31, 2011).  However, the Court's analysis does not end

18   here.

19        Although the Court finds that Mr. Gemini has sufficient factual support for his conclusion

20   that the "significant patent agreements" are technological comparable to the license reached at the

21   hypothetical negotiation, Mr. Gemini does not appear to have sufficient factual support for his

22   conclusion that they are economically comparable.  In considering licenses, a damages expert must

23   account for not only technological differences but economic differences as well.  See Wordtech,

24   609 F.3d at 1320; Finjan, 626 F.3d at 1211.  However, Mr. Gemini's report appears to have no

25   analysis at all of the economic differences between the "significant patent agreements" and the

26   license reached at the hypothetical negotiation.  Therefore, Mr. Gemini has failed to establish

27   economic comparability and his testimony regarding the "significant patent agreements" should be

28   excluded on this ground alone.  See, e.g., LaserDynamics, Inc. v. Quanta Computer, Inc., 2011

1   U.S. Dist. LEXIS 42590, at *9-11 (E.D. Tex. Jan. 7, 2011); IP Innovation, 705 F. Supp. 2d at 691.

2        Moreover, what is troubling about Mr. Gemini's lack of economic analysis is that "the

3   significant patent agreements" appear to be licenses between HTC and heavyweights in the

4   telecommunications industry such as Qualcomm, Ericson, Nokia, Lucent and Motorola for entire

5   portfolios of patents.  [See Doc. No. 135-1, Declaration of William Hicks ("Hicks Decl.") Exs. 15-

6   23.]  For example, HTC has shown the Court that one of the "significant patent agreements" is a

7   worldwide license between HTC and Motorola for hundreds of patents covering a broad range of

8   inventions.  [See id. Ex. 19; Doc. No. 167 at 2.]  The Motorola license appears to be "radically

9   different from the hypothetical agreement under consideration," which in this case is a domestic

10  license for two patents.  Lucent, 580 F.3d at 1328; see also id. ("[A] reasonable juror could only

11  conclude that the IBM-Dell license agreement for multiple patents to broad, PC-related

12  technologies is directed to a vastly different situation than the hypothetical licensing scenario of

13  the present case involving only one patent, the Day patent, directed to a narrower method of using

14  a graphical user interface tool known as the date-picker.").  "[W]here a license covers a portfolio

15  of patents or includes other intellectual property or services, Plaintiff must present evidence

16  sufficient to allow the jury to weigh the economic value of the patented feature against the

17  economic value of the features and services covered by the license agreement."  LaserDynamics,

18  2011 U.S. Dist. LEXIS 42590, at *11.  "It is not sufficient to state that both patents cover [similar]

19  technology."  Id.  As stated in the previous paragraph, Mr. Gemini has only stated that the

20  "significant patent agreements" and the license at issue in this case cover similar technology; he

21  has not presented sufficient evidence to allow the jury to weigh the economic differences between

22  the licenses.

23       At the hearing, DataQuill argued that it is difficult for Mr. Gemini analyze the economic

24  comparability of the "significant patent agreements" to the license at issue in this case because it is

25  difficult to decipher what is actually covered by the "significant patent agreements."  However,

26  Mr. Gemini bears the burden of proving comparability if he wants to rely on the "significant patent

27  agreements" in performing his reasonable royalty analysis.  See LaserDynamics, 2011 U.S. Dist.

28  LEXIS 42590, at *10-11 ("Plaintiff must establish comparability of the licenses before integrating

1    their royalty rates into Mr. Murtha's analysis in front of the jury."); IP Innovation, 705 F. Supp. 2d

2    at 691.  If Mr. Gemini cannot show that the "significant patent agreements" are economically

3    comparable, then he should not rely on those licenses in his analysis.  See id.

4         In addition, the Court rejects DataQuill assertion that Mr. Gemini did account for the

5    economic differences between the "significant patent agreements" and the license at issue in the

6    hypothetical negotiation simply because he picked a low royalty rate.  DataQuill points out that

7    Mr. Gemini calculated a reasonable royalty for the patents-in-suit between 1.0% and 1.6%, but the

8    royalty rate at the low end for all the agreements related to CDMA/TDMA technology is 7.9% and

9    the royalty rate at the low end for the all the agreements related to GSM/GPRS/EDGE technology

10   is 2.8%.  [Doc. No. 150 at 9-13; Doc. No. 135-2, Gemini Expert Report at 31, 44.]  However, the

11   Federal Circuit in Uniloc made clear that a faulty damages analysis cannot be cured "simply by

12   asserting a low enough royalty rate."  632 F.3d at 1320.  For Mr. Gemini to use 7.9% and 2.8% as

13   his starting points in determining the reasonable royalty, he must establish that the licenses are

14   comparable.  Lucent, 580 F.3d at 1325; LaserDynamics, 2011 U.S. Dist. LEXIS 42590, at *10-11.

15   Moreover, the Court notes that the 7.9% and 2.8% figures are not royalty rates from the individual

16   "significant patent agreements" but appear to be the rates from the agreements in aggregate,

17   separated only by whether they relate to CDMA/TDMA technology or GSM/GPRS/EDGE

18   technology.  [See Doc. No. 135-2, Gemini Expert Report at 31 (explaining that the "significant

19   patent agreements" contain royalty rates ranging from 0.75% to 6.50% of HTC's revenue base).]

20   This would appear to make Mr. Gemini's job more difficult because for his analysis to be sound,

21   he would have to show that these two categories of licenses–which would appear to be essentially

22   two worldwide licenses between HTC and multiple technology companies covering thousands of

23   patents–are economically comparable to the license at issue in this case, a domestic license for two

24   patents.  These would appear to be radically different agreements even if they cover technology

25   somewhat related to the technology covered by the patents-in-suit.  See Lucent, 580 F.3d at 1328.

26        In sum, because Mr. Gemini has not provided any evidence or analysis showing that the

27   "significant patent agreements" are economically comparable to the license that would be reached

28   at the hypothetical negotiation, the Court **EXCLUDES** Mr. Gemini's testimony to the extent he

1   relies on the "significant patent agreements" in determining the reasonable royalty that would have

2   been reached at the hypothetical negotiation.  Because the Court excludes this portion of Mr.

3   Gemini's testimony, the Court will entertain appropriate motions to repair and prepare the record

4   suitable for trial on the issue of damages.  <u>IP Innovation</u>, 705 F. Supp. 2d at 691.

5          **E.      Mr. Gemini's Enhanced Royalty Rates**

6          HTC argues that Mr. Gemini applies enhanced royalty rates for certain groups of claims

7   without any factual support.  [Doc. No. 135 at 13-15.]  In his report, Mr. Gemini concludes that the

8   reasonable royalty for the functionality covered in the original claims of the '304 Patent–Android

9   Market and Windows Market–would be 1.0%; the reasonable royalty for the additional

10  functionality covered in the claims of the '591 Patent–camera phone capabilities–would be 0.1%;

11  and the reasonable royalty for the additional functionality covered in the claims of the '304 Patent

12  that were added during reexamination–web browser capabilities–would be 0.5%.  [Doc. No. 135-2,

13  <u>Gemini Expert Report</u> at 36-44.]  HTC argues that Mr. Gemini's report contains no explanation at

14  all of how he arrived at these additional 0.1% and 0.5% figures.  [Doc. No. 135 at 13-15.]

15         First, as an initial matter, the Court notes that there is nothing inherently improper with

16  what Mr. Gemini did.  The hypothetical negotiation is supposed to occur just before infringement

17  began.  <u>See Lucent</u>, 580 F.3d at 1324.  Here, because there are three different effective dates for

18  the asserted claims, there are three different dates when DataQuill asserts that infringement began:

19  September 2008, October 27, 2009, and April 13, 2010.  [<u>See</u> Doc. No. 135-2, <u>Gemini Expert</u>

20  <u>Report</u> at 6-7.]  Therefore, there should be three different hypothetical negotiations.  <u>See Lucent</u>,

21  580 F.3d at 1324.  In addition, DataQuill contends that the asserted claims that were added during

22  the reexamination proceedings cover additional features of the accused products that were not

23  covered by the original claims in the '304 Patent.  [<u>See</u> Doc. No. 135-2, <u>Gemini Expert Report</u> at

24  5.]  Therefore, Mr. Gemini may apply different royalty rates to the different infringements that

25  occurred at the three different times.[7]  <u>See Applied Med. Res. Corp. v. United States Surgical</u>

26  <u>Corp.</u>, 435 F.3d 1356, 1362 (Fed. Cir. 2006) ("Because the determination of reasonable royalty

27  _____

28         [7] HTC points out that all of the asserted claims share the exact same specification.  [Doc. No. 167 at 7.]  However, it is unclear why that is relevant to this issue because infringement is determined by the claims of a patent, not by its specification.  <u>See</u> <u>Markman</u>, 52 F.3d at 976.

1   damages is tied to the infringement being redressed, a separate infringement beginning at a

2   different time requires a separate evaluation of reasonable royalty damages.").

3          Further, despite HTC's contention to the contrary, Mr. Gemini's report does explain how

4   he arrived at the additional 0.1% and 0.5% figures.  Mr. Gemini's report explains that these figures

5   are based on DataQuill's contention, supported by the testimony of their technical expert Dr. Van

6   der Weide, that the asserted claims of the '591 Patent and the asserted claims of the '304 Patent

7   that were added during reexamination covered additional functionality of the accused products,

8   specifically camera phone capabilities and web browser capabilities.  [Doc. No. 135-2, Gemini

9   Expert Report at 5, 36-44.]  Mr. Gemini explains that he reviewed materials showing the

10  importance of these capabilities to the HTC devices, [id. at 16-19], and in consideration of their

11  importance and what would be the likely result if the devices did not have these capabilities, he

12  determined what the royalty rate should be for the additional functionality.  [Doc. No. 135-2,

13  Gemini Expert Report at 5, 36-44.]

14         HTC's primary criticism of Mr. Gemini's analysis appears to be that Mr. Gemini was

15  unable to specifically state during his deposition whether certain functions of the HTC devices

16  infringed the asserted claims.  [Doc. No. 135 at 13-15.]  For example, Mr. Gemini could not

17  answer whether the use of Gmail on the accused devices infringes the patents-in-suit.  [Id. at 13.]

18  Based on this, HTC argues that Mr. Gemini has no idea what functionality actually infringes the

19  asserted claims.  [Id.]  However, Mr. Gemini is not DataQuill's technical expert.  Mr. Gemini

20  relied on the assertions of DataQuill's technical expert Dr. Van der Weide that the asserted claims

21  of the '591 Patent and the asserted claims of the '304 Patent that were added during reexamination

22  covered additional functionality.  [Doc. No. 135-2, Gemini Expert Report at 5.]  An expert is

23  entitled to offer opinion testimony based on any materials "of a type reasonably relied on by

24  experts in the particular field."  See FED. R. CIV. 703.  It is routine and proper for a damages expert

25  in a technical patent case to rely on a technical expert for background.  See, e.g., Eolas Techs., Inc.

26  v. Microsoft Corp., 270 F. Supp. 2d 997, 1006-07 (N.D. Ill. 2003); see also United States v.

27  1014.16 Acres of Land, 558 F. Supp. 1238, 1242 (W.D. Mo. 1983) ("An expert cannot be an

28  expert in all fields, and it is reasonable to expect that experts will rely on the opinion of experts in

other fields as background material for arriving at an opinion.").  HTC cites no authority to the

contrary.  Moreover, HTC might dispute whether the asserted claims actually cover this additional

functionality, but the proper recourse then is for HTC to present contrary evidence and attack Mr.

Gemini's and Dr. Van der Weide's testimony on cross-examination rather than for the Court to

exclude Mr. Gemini's testimony.  See Primiano v. Cook, 598 F.3d at 564; see also Micro Chem.,

317 F.3d at 1392 ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the

role of the trial court to evaluate the correctness of facts underlying one expert's testimony.").

Accordingly, the Court declines to exclude Mr. Gemini's testimony on the grounds that he has no

factual support for his additional 0.1% and 0.5% royalty rates.

### F.      Entire Market Value Rule

HTC argues that Mr. Gemini improperly uses the total revenue of the accused products as

his royalty base in violation of the entire market value rule.  [Doc. No. 135 at 17.]  In response,

DataQuill argues that the entire market value rule does not apply to the present case, and that even

if it did apply, the rule has been satisfied.  [Doc. No. 167 at 23-25.]

"The entire market value rule allows a patentee to assess damages based on the entire

market value of the accused product only where the patented feature creates the 'basis for

customer demand' or 'substantially create[s] the value of the component parts.'"  Uniloc, 632 F.3d

at 1318 (emphasis added).  "[T]he patentee . . . must in every case give evidence tending to

separate or apportion the defendant's profits and the patentee's damages between the patented

feature and the unpatented features, and such evidence must be reliable and tangible, and not

conjectural or speculative," or show that "the entire value of the whole machine, as a marketable

article, is properly and legally attributable to the patented feature."  Id. (citing Garretson v. Clark,

111 U.S. 120, 121 (1884)); see also Lucent, 580 F.3d at 1336-37.  The patentee bears the burden of

proving that the entire market value rule has been satisfied.  See IP Innovation, 705 F. Supp. 2d at

690; see also Lucent, 580 F.3d at 1336 ("the patentee must prove that the patent-related feature is

the basis for customer demand." (quotation marks omitted)).  A damages expert that improperly

utilizes the entire market value rule in calculating the reasonable royalty should be excluded.  See,

e.g., IP Innovation, 705 F. Supp. 2d at 689-91.

1      DataQuill argues that the entire market value rule does not apply because the patents-in-

2  suit do not claim a "feature" or a "component," but instead claim an entire "apparatus," and the

3  accused HTC handsets constitute the apparatus.  [Doc. No. 150 at 23-24.]  DataQuill argues

4  therefore that the infringing devices are the HTC handsets themselves not a component of the

5  handsets.  [Id.]

6      Although the Court agrees with DataQuill's contention that the patents-in-suit claim an

7  entire apparatus, the HTC handsets, and not a component part, the Court disagrees with

8  DataQuill's contention that the patents-in-suit do not merely claim a "feature" of the handsets.

9  The HTC handsets are complex products with multiple features that are clearly not claimed by the

10  patents-in-suit, such as the ability to make phone calls and the ability to send and receive text

11  messages.  [See generally Doc. No. 149-4, Van der Weide Expert Report Exs. C-D (not

12  mentioning phone calls or text messaging during his infringement analysis).]  Indeed, later in its

13  opposition, DataQuill appears to concede that the devices have both infringing features and non-

14  infringing features.  [See Doc. No. 150 at 24 ("The patented structure and features that meet the

15  claim limitations, and unpatented structure and features, are physically part of a single device.")]

16  The entire market value rule applies when the accused products have both patented and unpatented

17  features.  See IP Innovation, 705 F. Supp. 2d at 689-90.  The Court further notes that the

18  application of the entire market value rule in the present case is in line with the purpose of the rule.

19  The entire market value is based on the idea that "'[w]hen a patent is for an improvement, and not

20  for an entirely new machine or contrivance, the patentee must show in what particulars his

21  improvement has added to the usefulness of the machine or contrivance.  He must separate its

22  results distinctly from those of the other parts, so that the benefits derived from it may be distinctly

23  seen and appreciated.'"  Lucent, 580 F.3d at 1337 (quoting Garretson v. Clark, 111 U.S. at 121).

24  DataQuill does not appear to contend that its patents are for an "entirely new machine or

25  contrivance."  Indeed, DataQuill would likely have a hard time arguing that its patents represent

26  the invention of the cell phone or even the smart-phone.  The patents-in-suit only represent an

27  improvement on an invention.  Therefore, the entire market value rule applies in this case, see

28  Lucent, 580 F.3d at 1337, and DataQuill can only use the total revenue of the accused devices as

1    the royalty base if it can show that the rule has been satisfied.  See Uniloc, 632 F.3d at 1318.

2         DataQuill argues that the entire market value rule has been satisfied.  First, DataQuill

3    appears to erroneously argue that there is an exception to the entire market value rule when the

4    patented and unpatented features are both parts of a single unitary device.  [Doc. No. 150 at 24.]

5    DataQuill quotes the following language from Rite-Hite:  "The entire market value rule has

6    typically been applied to include in the compensation base unpatented components of a device

7    when the unpatented and patented components are physically part of the same machine."  56 F.3d

8    at 1538.  While this statement is true, it is taken out of context.  One requirement of the entire

9    market value is that the patented and unpatented features be part of the same machine.  See Cornell

10   Univ. v. Hewlett-Packard Co., 609 F. Supp. 2d 279, 286-87 (N.D.N.Y. 2009) (Radar, J.) (listing

11   the three requirements for the satisfaction of the entire market value rule); accord. Lucent Techs.,

12   Inc. v. Microsoft Corp., 2011 U.S. Dist. LEXIS 75504, at *24 (S.D. Cal. Jul. 13, 2011) (same).

13   HTC does not appear to contest that this requirement is met in this case.  However, another

14   requirement is that the infringing feature be the "the basis for customer demand for the entire

15   machine."  Cornell, 609 F. Supp. 2d at 286; accord. Lucent, 580 F.3d at 1336.  HTC does contest

16   that this requirement has been met by DataQuill.

17        DataQuill argues that the entire market rule has been satisfied because in conducting his

18   analysis Mr. Gemini relied on various documents, including HTC documents, showing that the

19   features of the patented technology are vital to HTC's competitive position in the smart-phone

20   market.  [Doc. No. 150 at 25.]  In response, HTC argues that the entire market value rule has not

21   been satisfied because DataQuill erroneously equates the importance of the feature with the

22   different question of whether the feature creates the basis for customer demand, citing Oracle Am.,

23   Inc. v. Google Inc., 2011 U.S. Dist. LEXIS 80280, at *13-14 (N.D. Cal. Jul. 22, 2011) ("The fact

24   that Java may be a critical component of Android does not justify application of the entire market

25   value rule.  Wheels are critical to an automobile, but no one would apportion all of the demand for

26   a car to just the wheels.").  [Doc. No. 167 at 10.]

27        However, HTC misconstrues DataQuill's assertion.  DataQuill is not merely claiming that

28   the technology is vital to the operation of the handsets, but that it is vital to their competitive

position in the marketplace.  For example, in his expert report Mr. Gemini cites to articles showing

that the Android Market feature is important to HTC's ability to compete with the Apple iPhone.

[See Doc. No. 135-2, Gemini Expert Report at 13-14.]  A product's ability to compete with other

products in the marketplace is relevant to the consumer demand for the product.  See, e.g., Cornell,

609 F. Supp. 2d at 287-88 (requiring that the patentee present "market evidence" to satisfy entire

market value rule).  Because DataQuill has presented evidence showing the importance of the

allegedly patented technology to accused devices' ability to succeed in the marketplace, it has

presented sufficient evidence from which a reasonable jury could find that the entire market value

rule has been satisfied.  See, e.g., Bose Corp. v. JBL, Inc., 274 F.3d 1354, 1361 (Fed. Cir. 2001)

(upholding a district judge's use of the entire market value rule based on evidence that the

patented invention was integral to the overall performance and success of the accused products);

Fonar Corp. v. GE, 107 F.3d 1543, 1552-53 (Fed. Cir. 1997) (upholding a jury's use of the entire

market value rule where the accused infringer's technical literature emphasized the importance of

the patented feature); see also FED. R. EVID. 104(b).  Accordingly, because Mr. Gemini's use of

the entire market value rule is proper, the Court declines to exclude his testimony for using the

total revenue of the accused products as the royalty base when calculating the reasonable royalty.

     **G.     Conclusion**

     In conclusion, the Court **GRANTS IN PART** and **DENIES IN PART** HTC's motion to

exclude the expert opinions of DataQuill's damages expert Joseph Gemini.

**CONCLUSION**

1.    The Court **GRANTS IN PART** and **DENIES IN PART** HTC's motion for partial

    summary judgment of non-infringement.  Specifically, the Court

        a.    **DENIES** HTC's motion for summary judgment of no direct infringement of claims

                12, 13, 44, and 45 to the extent that DataQuill alleges that infringement occurs

                solely due to the presence of a digital camera in the accused devices and not the

                presence of any third-party applications;

        b.    **DENIES** HTC's motion for summary judgment of no direct infringement of claims

                12, 13, 44, and 45 by the "G2" accused handset to the extent that DataQuill alleges

- 37 -

08cv543

1        that infringement occurs when the "G2" is loaded with third-party applications;

2    c.   **GRANTS** HTC's motion for summary judgment of no direct infringement of

3        claims 12, 13, 44, and 45 by all the accused devices other than the "G2" handset to

4        the extent that infringement is alleged to occur when the devices are loaded with

5        third-party applications;

6    d.   **DENIES** HTC's motion for summary judgment of no direct infringement of claim

7        83 by the "G2" handset;

8    e.   **GRANTS** HTC's motion for summary judgment of no direct infringement of claim

9        83 by all the accused devices other than the "G2" handset;

10   f.   **DENIES** the remaining portions of HTC's motion for no direct infringement of the

11       '304 Patent;

12   g.   **GRANTS AS MOOT** HTC's motion for summary judgment of no contributory

13       infringement; and

14   h.   **DENIES** HTC's motion for summary judgment of no induced infringement.

15   2.   The Court **DENIES** HTC's motion for summary judgment of no willful infringement.

16   3.   The Court **GRANTS IN PART** and **DENIES IN PART** HTC's motion to exclude the

17       expert opinions of Joseph Gemini.  Specifically, the Court

18   a.   **EXCLUDES** Mr. Gemini's testimony to the extent he relies on the "significant

19       patent agreements" in determining the reasonable royalty that would have been

20       reached at the hypothetical negotiation; and

21   b.   **DENIES** the remaining portions of HTC's motion to exclude.

22       **IT IS SO ORDERED.**

23   **DATED:**  December 1, 2011

24       **IRMA E. GONZALEZ, Chief Judge**
         **United States District Court**

25

26

27

28