# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DATAQUILL LIMITED,<br><br>    Plaintiff-Counterdefendant,<br><br>vs.<br><br>HIGH TECH COMPUTER CORP.,<br><br>    Defendant-Counterclaimant. | CASE NO. 08cv543 - IEG (BGS)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART HTC'S MOTION TO EXCLUDE THE REVISED EXPERT OPINIONS OF JOSEPH GEMINI**<br><br>[Doc. No. 212] |

Presently before the Court is Defendant High Tech. Computer Corp. ("HTC")'s motion to exclude the revised expert opinions and testimony of Plaintiff DataQuill Limited ("DataQuill")'s damages expert, Joseph Gemini. [Doc. No. 212.] For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART** HTC's motion to exclude.

## BACKGROUND

This is a patent infringement case concerning two patents. On May 2, 2000, the United States Patent and Trademark Office ("USPTO") issued U.S. Patent No. 6,504,304 ("the '304 Patent") to DataQuill. U.S. Patent No. 6,504,304 (filed May 2, 2000). On November 21, 2006, the USPTO issued U.S. Patent No. 7,139,591 ("the '591 Patent") to DataQuill. U.S. Patent No. 7,139,591 (filed Nov. 21, 2006). The '591 Patent is a continuation of the '304 Patent. See id. The technology at issue for both patents generally relates to handheld mobile devices with remote access capability and optional features such as touch sensitive screens or integrated cameras.

1   On March 24, 2008, DataQuill filed the present action against HTC alleging infringement
2   of the '304 patent and the '591 patent. [Doc. No. 1, Compl.] Specifically, DataQuill alleges that
3   HTC devices with the Android Operating System and HTC devices with the Microsoft Windows
4   Phone 6.5 and 7.0 Operating Systems infringe certain claims of the patents-in-suit. [Doc. No.
5   149-4, Verified Expert Report of Dr. Daniel Van der Weide ("Van der Weide Expert Report") at
6   5-6.]

7   On September 26, 2011, HTC filed a motion to exclude the expert opinions and testimony
8   of DataQuill's damages expert, Mr. Gemini. [Doc. No. 135.] HTC moved to have Mr. Gemini's
9   testimony excluded on three grounds. [Id. at 1.] First, HTC argued that Mr. Gemini improperly
10  inflated his royalty calculation by relying on HTC licenses that were not comparable to the
11  hypothetical agreement at issue in this case. [Id.] Second, HTC argued that Mr. Gemini applied
12  enhanced royalty rates for certain groups of claims without any factual support. [Id.] Third, HTC
13  argued that Mr. Gemini used the total revenue of the accused products as his royalty base in
14  violation of the entire market value rule. [Id.]

15  On December 1, 2011, the Court granted in part and denied in part HTC's motion to
16  exclude Mr. Gemini's opinions and testimony. [Doc. No. 192.] The Court excluded Mr. Gemini's
17  testimony to the extent he relied on the "significant patent agreements" in determining the
18  reasonable royalty that would have been reached at the hypothetical negotiation. [Id. at 31-32.]
19  The Court found that Mr. Gemini had not provided any evidence or analysis showing that the
20  "significant patent agreements"–licenses between HTC and heavyweights in the
21  telecommunications industry such as Qualcomm, Ericson, Nokia, Lucent, and Motorola for entire
22  portfolios of patents–were economically comparable to the license that would have been reached
23  at the hypothetical negotiation–a domestic license between HTC and DataQuill for two patents.
24  [Id. at 31.] However, the Court declined to exclude Mr. Gemini's testimony on grounds two and
25  three–that he applied enhanced royalty rates without any factual support and that his testimony
26  violated the entire market value rule. [See id. at 32-37.]

27  On December 22, 2011, the Court granted DataQuill leave to serve an amended damages
28  expert report. [Doc. No. 203] On January 31, 2012, DataQuill served on HTC Mr. Gemini's

amended expert report. [Doc. No. 212-2, Superseding Expert Witness Report of Joseph Gemini ("Amended Gemini Expert Report").] On March 12, 2012, HTC filed the present motion to exclude the opinions and testimony of Mr. Gemini contained in his amended report. [Doc. No. 212] In the present motion, HTC argues that Mr. Gemini's opinions and testimony should be excluded for three reasons. First, HTC argues Mr. Gemini continues to rely on prior licenses that are not comparable to the hypothetical agreement–specifically, the Glenayre, Novatel, and HP licenses. [Id. at 4-11.] Second, HTC argues that Mr. Gemini may not rely on the Google revenue sharing agreement to bolster his reasonable royalty analysis. [Id. at 11-13.] Finally, HTC argues that Mr. Gemini cannot rely on the MPEG LA license to value the patents-in-suit. [Id. at 13-14.]

## DISCUSSION

### I.  Legal Standard for a Motion to Exclude Expert Testimony

A district court's decision to admit expert testimony under Daubert in a patent case follows the law of the regional circuit. Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387, 1390-91 (Fed. Cir. 2003). When considering expert testimony offered pursuant to Rule 702, the trial court acts as a "gatekeeper" by "making a preliminary determination of whether the expert's testimony is reliable." Elsayed Mukhtar v. Cal. State Univ., Hayward, 299 F.3d 1053, 1063 (9th Cir. 2002); see Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999); Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993). Under Rule 702 of the Federal Rules of Evidence, a court may permit opinion testimony from an expert only if such testimony "will assist the trier of fact" and "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

The inquiry into admissibility of expert opinion is a "flexible one," where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." Primiano v. Cook, 598 F.3d 558, 564 (9th Cir. 2010) (citing Daubert, 509 U.S. at 594, 596). "Under Daubert, the district judge is 'a gatekeeper, not a fact finder.' When an expert meets the threshold established by Rule 702 as explained in Daubert, the expert may testify and the jury decides how much weight to give that testimony." Id. (quoting

1  United States v. Sandoval-Mendoza, 472 F.3d 645, 654 (9th Cir. 2006)).

## II.     Legal Standard for Calculating Patent Damages

"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. Two alternative methods exist for calculating damages in a patent case; they "are the patentee's lost profits and the reasonable royalty he would have received through arms-length bargaining." Lucent, 580 F.3d at 1324. DataQuill does not appear to contend that it is entitled to lost profits. [See generally Doc. No. 212-2, Amended Gemini Expert Report; Doc. No. 150.] Accordingly, damages is this case should be calculated by determining the reasonable royalty DataQuill would have received through arms-length negotiation. See Lucent, 580 F.3d at 1324.

To calculate the reasonable royalty, patentees generally consider a hypothetical negotiation, in which the asserted patent claims are assumed valid, enforceable, and infringed, and attempt "to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." Lucent, 580 F.3d at 1324-25; see also Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1554 n.13 (Fed. Cir.1995) (en banc). This hypothetical negotiation "necessarily involves an element of approximation and uncertainty." Lucent, 580 F.3d at 1325. In determining the reasonable royalty that would have been agreed to at the hypothetical negotiation, parties in patent cases frequently utilize the fifteen factors enunciated in Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). The Federal Circuit has expressly "sanctioned the use of the Georgia-Pacific factors to frame the reasonable royalty inquiry." Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1317 (Fed. Cir. 2011).

A hypothetical negotiation can result in either a lump-sum license or a running royalty license. See Lucent, 580 F.3d at 1326. A lump-sum license is an up-front payment in full for the invention that involves uncertainty about "whether the technology is commercially successful or even used." Id. In contrast, a running royalty license is directly tied to how often the invention is incorporated into products by the licensee and is calculated by multiplying the proposed royalty

rate by the proposed royalty base.  See id., 580 F.3d at 1326, 1338-39.

"The burden of proving damages falls on the patentee." Lucent, 580 F.3d at 1324.  To properly carry this burden, the patentee must sufficiently tie the expert testimony on damages to the facts of the case. Uniloc, 632 F.3d at 1315 (citing Daubert, 509 U.S. at 591).

### III.   Mr. Gemini's Damages Analysis

DataQuill's damages expert Mr. Gemini's analysis begins by giving a general overview of the two patents-in-suit and the accused products that allegedly infringe these two patents. [Doc. No. 135-2, Amended Gemini Expert Report at 4-7.]  Mr. Gemini then considers the revenue realized from the accused products, the demand for the patented technology in the accused products–specifically the demand for the Android Market and Windows Marketplace, the demand for camera phone capabilities, and the demand for web browsing–, and both the licensing of the patents-in-suit and licenses entered into by HTC. [Id. at 8-29.]  Mr. Gemini then takes this information and analyzes the fifteen Georgia-Pacific factors to determine the reasonable royalty the parties would have agreed to during the hypothetical negotiation. [Id. at 29-37.]

Mr. Gemini concludes that the parties during the hypothetical negotiation would have agreed to a running royalty license. [Doc. No. 212-2, Amended Gemini Expert Report at 35-36.]  Specifically, Mr. Gemini opines that in the event HTC is found liable for infringement of all of the patents-in-suit, the royalty rate owed would be 0.60% during the period of September 10, 2008 through October 26, 2009, 0.70% during the period of October 27, 2009 through April 12, 2010, and 1.00% for the period of April 13, 2010 going forward. [Id. at 44-45.]  Mr. Gemini then applies these royalty rates to the royalty base of $7.58 billion, which represents the total revenue of the accused products, and concludes that the reasonable royalty owed to DataQuill would be $67.8 million. [Id.]  Following this conclusion, Mr. Gemini provides an additional section in his report entitled "Additional Considerations in regard to Georgia-Pacific Factors" where Mr. Gemini analyzes HTC's revenue sharing agreement with Google. [Id. at 46-48.]

### IV.   Mr. Gemini's Reliance on the Novatel, Glenayre, and HP Licenses

HTC argues that Mr. Gemini's opinions and testimony should be excluded because he relies on DataQuill licenses, specifically the Novatel, Glenayre, and HP licenses, that are not

comparable to the hypothetical agreement that would have been reached between the parties. [Doc. No. 212 at 4-11.] In response, DataQuill argues that Mr. Gemini properly considered these licenses under Georgia-Pacific factor 1. [Doc. No. 215 at 1-19.]

Georgia-Pacific factor 1 considers: "The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty." Georgia-Pacific, 318 F. Supp. at 1120. However, the Federal Circuit has explained that for a damages expert to rely on a prior license, "there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case." Uniloc, 632 F.3d at 1317. Therefore, "licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit." Lucent, 580 F.3d at 1325. A patentee may not rely on license agreements that are "'radically different from the hypothetical agreement under consideration' to determine a reasonable royalty." Uniloc, 632 F.3d at 1316 (quoting Lucent, 580 F.3d at 1328); see also Wordtech Sys. v. Integrated Networks Solutions, Inc., 609 F.3d 1308, 1320 (Fed. Cir. 2010) (declining to find licenses comparable because they "arose from divergent circumstances and covered different material"); ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 870 (Fed. Cir. 2010) (criticizing damages expert for relying on licenses that showed no "discernible link to the claimed technology"). Further, "comparisons of past patent licenses to the infringement must account for 'the technological and economic differences' between them." Wordtech, 609 F.3d at 1320 (quoting ResQNet, 594 F.3d at 873); see also Finjan, 626 F.3d at 1211 ("[U]se of past patent licenses under factors 1 and 2 must account for differences in the technologies and economic circumstances of the contracting parties."). The testimony of a damages expert in a patent suit who relies on non-comparable licenses in reaching his royalty rate should be excluded. See, e.g., IP Innovation L.L.C. v. Red Hat, Inc., 705 F. Supp. 2d 687, 690-91 (E.D. Tex. 2010) (Rader, J.).

In his amended expert report, Mr. Gemini assesses DataQuill's twelve prior licenses to the patents-in-suit.[1] [Doc. No. 212-2, Amended Gemini Expert Report at 30.] Out of these twelve

---

[1] Mr. Gemini gives a more detailed description of DataQuill's licenses earlier in his expert report. [See Doc. No. 212-2, Amended Gemini Expert Report at 21-27.]

1  licenses, Mr. Gemini only deems three of them useful–the Glenayre, Novatel, and HP
2  licenses–because these three licenses are the only ones from which a royalty rate can be
3  determined.[2]  [Id.]  Mr. Gemini acknowledges that the Glenayre and Novatel licenses related to
4  "add-on wireless modules" and that those licenses involved lower sales than the accused HTC
5  products.  [Id.]  Mr. Gemini also notes that HTC was in a position where it needed to license the
6  technology to compete with other phone manufacturers.  [Id.]  Finally, Mr. Gemini states that he
7  did not find the remaining DataQuill lump-sum licenses useful because these licenses do not
8  describe how the negotiating parties came to calculate each lump-sum payment stated in the
9  license, nor how many products each licensee expected to produce, or other evidence of the parties
10 identifying or agreeing on actual and projected sales volumes, if any, that formed the basis of the
11 parties' calculation of the lump-sum payment.  [Id.]

12      HTC argues that the Novatel and Glenayre licenses are "radically different" than the
13 hypothetical agreement that would have been negotiated.  [Doc. No. 212 at 4-7.]  HTC specifically
14 argues that the Novatel and Glenayre licenses are radically different because (1) the licenses are
15 for "add-on wireless products" rather than mobile handsets; (2) the sales for HTC's products are
16 much larger than the sales described in the Novatel and Glenayre licenses; and (3) the total amount
17 paid under those two agreements is much smaller than the amount DataQuill is seeking from HTC.
18 [Id. at 5-7.]  Mr. Gemini states in his expert report that these two licenses relate to "add-on
19 wireless modules" used with handheld computers.  [Doc. No. 212-2, Amended Gemini Expert
20 Report at 26-27, 30.]  However, there is no explanation in his expert report of what is an "add-on
21 wireless module" and how it is technologically comparable to the HTC mobile handsets at issue in
22 this action.[3]  DataQuill has not presented to the Court any technical expert testimony explaining

---

[2] Later in his expert report, Mr. Gemini explains that in his opinion a running royalty as opposed to a lump-sum payment would be the most reasonable form of license that the parties would agree to under the hypothetical negotiation. [Doc. No. 212-2, Amended Gemini Expert Report at 36.]

[3] In a declaration attached to DataQuill's opposition, Mr. Gemini attempts to explain what an add-on wireless module is and how it is similar to a mobile handset. [Doc. No. 218-1, Declaration of Joseph Gemini ("Gemini Decl.") ¶¶ 3-10.]  However, none of this analysis is contained in Mr. Gemini's expert report, and Mr. Gemini has not shown that he is qualified to give such testimony as a technical expert.  Therefore, the Court declines to consider the statements contained in the declaration.

the technology contained in the "add-on wireless modules," such that a basis could be formed for comparing them to HTC's mobile handsets. Therefore, Mr. Gemini's report fails to provide any discernable link from which a jury could find that the two different products are technologically comparable. Accordingly, DataQuill has failed to meet its burden of proving license comparability, and the Court **EXCLUDES** Mr. Gemini's testimony to the extent he relies on the Novatel and Glenayre licenses in determining the reasonable royalty that would have been reached at the hypothetical negotiation. See IP Innovation, 705 F. Supp. 2d at 690-91; LaserDynamics, Inc. v. Quanta Computer, Inc., 2011 U.S. Dist. LEXIS 42590, at *10-11 (E.D. Tex. Jan. 7, 2011) ("Plaintiff must establish comparability of the licenses before integrating their royalty rates into Mr. Murtha's analysis in front of the jury.").

Turning to HTC's criticism of Mr. Gemini's reliance on the HP license, HTC argues that the royalty rate Mr. Gemini derived from that agreement is based on the incorrect assumptions that the agreement was limited to 195,000 units, that the average unit price of the products covered by the agreement was $349, and that HP did not sell any licensed products after the agreement was executed. [Doc. No. 212 at 7-10.] HTC may disagree with these underlying facts that Mr. Gemini relied on in reaching his conclusion, however, that is not a proper ground for seeking the exclusion of his testimony. See Micro Chem., 317 F.3d at 1392 ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."). HTC admits that the HP license covers mobile handsets that could compete with HTC's products. [Doc. No. 222 at 5.] Therefore, there is a sufficient factual basis for finding the HP license technologically comparable to the license that would have been reached at the hypothetical negotiation. Mr. Gemini also provides a thorough explanation in his expert report explaining how the two licenses are economically comparable. [Doc. No. 212-2, Amended Gemini Expert Report at 23-25.] Therefore, Mr. Gemini may properly rely on the HP license.

HTC also criticizes Mr. Gemini's failure to place more reliance on DataQuill's nine other lump-sum licenses for the patents-in-suit. [Doc. No. 212 at 4, 10-11.] However, as explained above, DataQuill has met its burden of showing that the HP license is a comparable license.

1  Federal Circuit caselaw only requires a damages expert to rely on comparable licenses. See
2  Uniloc, 632 F.3d at 1316; Wordtech, 609 F.3d at 1320; ResQNet.com, 594 F.3d at 870.  It does not
3  require an expert to rely on all comparable licenses, and HTC has not provided any authority to the
4  contrary.  Mr. Gemini has provided an explanation in his expert report for why he chose to rely
5  primarily on the HP license and not on the nine other DataQuill lump-sum licenses.  [Doc. No.
6  212-2, Amended Gemini Expert Report at 30-31.]  HTC may disagree with Mr. Gemini's
7  conclusion, but the proper recourse then is for HTC to present contrary evidence and attack Mr.
8  Gemini's testimony on cross-examination rather than for the Court to exclude Mr. Gemini's
9  testimony.  See Primiano 598 F.3d at 564.  Accordingly, the Court declines to exclude Mr. Gemini
10 from relying on the HP agreement in determining the reasonable royalty that would have been
11 reached at the hypothetical negotiation.

**V.     Mr. Gemini's Reliance on the Google Agreement**

HTC argues that Mr. Gemini cannot rely on HTC's revenue sharing agreement with Google to bolster his reasonable royalty opinion because this agreement is not a patent license and is not comparable in any way to the license that would have been reached at the hypothetical agreement. [Doc. No. 212 at 11-13.]  In response, DataQuill argues that Mr. Gemini properly considered the agreement under Georgia-Pacific factors 11 and 12.  [Doc. No. 215 at 20-22.]

Georgia-Pacific factor 11 considers: "The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use." Georgia-Pacific, 318 F. Supp. at 1120.  The Federal Circuit has explained that factor 11 "informs the court and jury about how the parties would have valued the patented feature during the hypothetical negotiation." Lucent, 580 F.3d at 1333.  "Factor 11 relies on evidence about how much the patented invention has been used.  Implicit in this factor is the premise that an invention used frequently is generally more valuable than a comparable invention used infrequently." Id.

Georgia-Pacific factor 12 considers: "The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions." Georgia-Pacific, 318 F. Supp. at 1120.  The inquiry under factor 12 is "whether there is a customary royalty rate for analogous inventions in this industry."

1  Boston Sci. Corp. v. Johnson & Johnson, 2009 U.S. Dist. LEXIS 35372, at *21 (N.D. Cal., Apr. 9,
2  2009); see also Tyco Healthcare Group Lp v. Applied Med. Res. Corp., 2011 U.S. Dist. LEXIS
3  154685, at *10 (E.D. Tex. Sept. 23, 2011) ("factor 12 . . . discuss[es] royalty rates for use of the
4  invention and similar inventions"); Ball Aerosol & Specialty Container, Inc., 514 F. Supp.2d 1051,
5  1065 (N.D. Ill. 2007), rev'd on other grounds, 555 F.3d 984 (Fed. Cir. 2009) (finding factor 12
6  neutral where "no industry royalty rate exists for a comparable invention").

7      Mr. Gemini's amended expert report contains a section in his report entitled "Additional
8  Considerations in regard to Georgia-Pacific Factors" where Mr. Gemini analyzes an agreement
9  between HTC and Google Ireland Ltd. entitled "Mobile Revenue Sharing Agreement – For OEMs
10 – (ANDROID)" ("the Google Agreement"). [Doc. No. 212-2, Amended Gemini Expert Report at
11 46-48.] Mr. Gemini states that this agreement describes a revenue sharing structure between
12 Google, HTC, and application developers regarding the use of the Android Market to download
13 Android Apps to HTC devices. [Id. at 46.] Mr. Gemini further states that the revenues/profits
14 shared under this agreement concern the use of Android Market capability on HTC devices and
15 relate to use of the DataQuill patented technology. [Id.] Mr. Gemini then proceeds to analyze the
16 Google agreement and concludes that the agreement indicates a customary 3.91% royalty rate.
17 [Id. at 47.] Mr. Gemini then states that this 3.91% royalty rate supports his ultimate conclusion
18 that a minimum royalty of 0.60% is reasonable and would provide a basis for upward adjustment
19 of the royalty rate. [Id.] In his deposition, Mr. Gemini admitted that there is no patent license
20 between the parties contained in the Google agreement. [Doc. No. 212-6, Deposition of Joseph
21 Gemini ("Gemini Depo.") at 466:23-467:8.]

22     HTC is correct that the Google agreement cannot be considered under factor 12. The
23 agreement is not a license agreement for a patent or patents. [Doc. No. 212-6, Gemini Depo. at
24 466:23-467:8.] Therefore, it is not evidence of a royalty rate for the use of the invention or
25 analogous inventions. See Boston Sci., 2009 U.S. Dist. LEXIS 35372, at *21; Tyco Healthcare,
26 2011 U.S. Dist. LEXIS 154685, at *10; Ball Aerosol, 514 F. Supp.2d at 1065. In addition, one
27 license or agreement by itself cannot establish a customary rate.
28     The Google agreement could be considered under factor 11 as evidence of the value of

1  HTC's use of the patented technology. However, a review of Mr. Gemini's analysis shows that he
2  is not considering the agreement under only factor 11. If Mr. Gemini was simply considering the
3  agreement under factor 11 he need only look at the revenue or profits HTC has derived from the
4  Google agreement as evidence of the value of its use of the patented technology. However, Mr.
5  Gemini does not look at the revenue or profits obtained under the agreement, but instead uses the
6  agreement to extrapolate an indicated royalty rate of 3.91%. [Doc. No. 212-2, Amended Gemini
7  Expert Report at 47.] Mr. Gemini then argues that the 3.91% rate indicated by the Google
8  agreement supports his suggested royalty rate of 0.60%. [Id.] Therefore, Mr. Gemini is
9  attempting to use the Google agreement as if it were a prior license under Georgia-Pacific factor 1
10 or 2 or a customary rate under factor 12. However, the Federal Circuit has made clear that
11 "licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the
12 hypothetical license at issue in suit." Lucent, 580 F.3d at 1325; see also Wordtech, 609 F.3d at
13 1319 (Lucent "explained general criteria for comparing patent licenses"); Uniloc, 632 F.3d at
14 1317-18. No reasonable jury could find the Google agreement sufficiently comparable to the
15 license that would have been reached at the hypothetical negotiation because the Google
16 agreement is not even a patent license, it is a revenue sharing agreement. Therefore, Mr. Gemini's
17 opinions and testimony are excluded to the extent he attempts to extrapolate a royalty rate from the
18 Google agreement and use that rate to support his suggested royalty rate of 0.60%. See, e.g., IP
19 Innovation, 705 F. Supp. 2d at 691.
20         Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** HTC's motion to
21 exclude Mr. Gemini's opinions and testimony to the extent he relies on the Google agreement.
22 Mr. Gemini may consider the Google agreement and the revenue or profits obtained under it as
23 evidence of the value of HTC's alleged use of the patented technology under Georgia-Pacific
24 factor 11. However, Mr. Gemini may not extrapolate a royalty rate from the Google agreement
25 and use that derived royalty rate as support for the reasonableness of his 0.60% royalty rate.
26 Accordingly, the Court **EXCLUDES** Mr. Gemini's testimony to the extent he attempts to derive a
27 royalty rate from the Google agreement.
28 ///

**VI.    Mr. Gemini's Reliance on the MPEG LA License**

HTC argues that Mr. Gemini cannot use the MPEG LA license to value the patents-in-suit because it is not a comparable license to the one that would have been reached at the hypothetical negotiation. [Doc. No. 212 at 13-14.] HTC also argues that Mr. Gemini's analysis of the MPEG LA license agreement is rendered unsound by his failure to properly perform simple mathematical calculations. [Id. at 14.] In response, DataQuill argues that HTC cannot object to Mr. Gemini's reliance on the MPEG LA agreement because that analysis was contained in his original expert report and the Court did not exclude it. [Doc. No. 215 at 22-23.] DataQuill also argues that Mr. Gemini's consideration of the MPEG LA agreement is proper. [Id. at 23-24.]

Mr. Gemini concluded in his amended expert report that the royalty rate for the '591 patent would be higher by 0.10% than the rate of the '304 patent pre-reexamination as a result of additional camera phone capabilities provided under the '591 patent. [Doc. No. 212-2, Amended Gemini Expert Report at 40-41.] In support of this conclusion, Mr. Gemini relies on HTC being a party to the MPEG LA agreement. [Id.] The MPEG LA agreement is a license to a patent portfolio of over 200 patents covering the MPEG-4 standard–a standard dealing with video compression technology. [Doc. No. 212-15, Hicks Decl. Ex. 13.]

As an initial matter, DataQuill argues that Mr. Gemini's reliance on the MPEG LA agreement was at issue in HTC's prior motion to exclude Mr. Gemini's opinions and testimony. [Doc. No. 215 at 22-23.] DataQuill argues, therefore, because the Court did not exclude Mr. Gemini's opinions and testimony on this ground, the Court's prior order condoned his use of the MPEG LA agreement and HTC would have to move for reconsideration of that prior order. [Id.] DataQuill is incorrect. HTC never mentioned the MPEG LA agreement in its original motion to exclude and only mentioned it briefly in a footnote in its reply brief. [See Doc. No. 135; Doc. No. 167 at 6.] In addition, the Court's prior order makes no mention of the MPEG LA agreement. [See Doc. No. 192 at 32-34.] Therefore, the MPEG LA agreement was not at issue during the prior motion, and HTC does not need to move for reconsideration of the Court's prior order.

HTC argues Mr. Gemini's use of the MPEG LA agreement, like his prior use of the "significant patent agreement," should be excluded because it is a radically different agreement

1  from the one that would have been reached at the hypothetical negotiation and Mr. Gemini has
2  provided no explanation of how the licenses are comparable. [Doc. No. 212 at 13-14.] The Court
3  agrees. Mr. Gemini's reliance on the MPEG LA agreement is similar to his reliance on the
4  "significant patent agreements." The MPEG LA agreement covers different technology–video
5  compression technology–than what Mr. Gemini asserts is covered by the '591 patent–camera
6  phone capabilities. In addition, the MPEG LA agreement is a worldwide license for hundreds of
7  patents covering an entire standard, and, therefore, is much larger in scope than the license that
8  would have been reached at the hypothetical negotiation. However, Mr. Gemini's amended expert
9  report contains no explanation of how the two licenses are technologically or economically
10 comparable.[4] [See Doc. No. 212-2, Amended Gemini Expert Report at 40-41.] Therefore, HTC is
11 correct that Mr. Gemini should be excluded from relying on the MPEG LA agreement. See, e.g.,
12 IP Innovation, 705 F. Supp. 2d at 691; LaserDynamics, 2011 U.S. Dist. LEXIS 42590, at *9-11
13 ("[W]here a license covers a portfolio of patents or includes other intellectual property or services,
14 Plaintiff must present evidence sufficient to allow the jury to weigh the economic value of the
15 patented feature against the economic value of the features and services covered by the license
16 agreement."). Accordingly, the Court **EXCLUDES** Mr. Gemini's testimony to the extent he relies
17 on the MPEG LA agreement in determining the reasonable royalty that would have been reached
18 at the hypothetical negotiation.

19                              **CONCLUSION**
20     For the reasons above, the Court **GRANTS IN PART** and **DENIES IN PART** HTC's motion
21 to exclude the amended opinions and testimony of Mr. Gemini.

22     **IT IS SO ORDERED.**
23 **DATED:**  April 16, 2012
24                              *Irma E. Gonzalez*
                                **IRMA E. GONZALEZ**
                                **United States District Judge**
25

---

[4] In a declaration attached to DataQuill's opposition, Mr. Gemini attempts to explain how the two licenses are comparable. [Doc. No. 218-1, Declaration of Joseph Gemini ("Gemini Decl.") ¶¶ 35-38.] However, none of this analysis is contained in Mr. Gemini's expert report, and HTC would be prejudiced by allowing DataQuill to present this new testimony after HTC has already deposed Mr. Gemini. Therefore, the Court declines to consider the statements contained in the declaration.