IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA


DATAQUILL LIMITED,                   )      08CV0543-IEG
          PLAINTIFF,                 )
                                     )
VS.                                  )      SAN DIEGO, CA
                                     )      APRIL 9, 2012
HIGH TECH COMPUTER CORP.,            )      10:30 A.M.
          DEFENDANT.                 )


REDACTED TRANSCRIPT OF MOTION HEARING/FINAL PRETRIAL
CONFERENCE

BEFORE THE HONORABLE IRMA E. GONZALEZ

UNITED STATES DISTRICT JUDGE



APPEARANCES:

FOR THE PLAINTIFF:   COMPETITION LAW GROUP LLC
                     BY:  GREG SMITH, ESQ.
                     55 W. MONROE STREET, SUITE 920
                     CHICAGO, ILLINOIS  60603

FOR THE DEFENDANT:   KEKER & VAN NEST LLP
                     BY:  LEO L. LAM, ESQ.
                          EUGENE M. PAIGE, ESQ.
                     633 BATTERY STREET
                     SAN FRANCISCO, CA  94111
                     AND
                     WINSTON & STRAWN LLP
                     BY:  PETER J. CHASSMAN, ESQ.
                     1111 LOUISIANA STREET, 25TH FLOOR
                     HOUSTON, TX  77002
                     AND
                     WILSON TURNER & KOSMO LLP
                     BY:  FREDERICK W. KOSMO, JR.
                     550 W. C STREET, SUITE 1050
                     SAN DIEGO, CA  92101

(APPEARANCES CONTINUED ON NEXT PAGE)

(APPEARANCES CONTINUED)

COURT REPORTER:          FRANK J. RANGUS, OCR
                         U. S. COURTHOUSE, RM. 4194
                         940 FRONT STREET
                         SAN DIEGO, CA  92101
                         (619) 531-0171

PROCEEDINGS RECORDED BY ELECTRONIC STENOGRAPHY; TRANSCRIPT
PRODUCED BY COMPUTER.

I N D E X

ARGUMENTS OF COUNSEL:          PAGE

MR. SMITH                       5

MR. PAIGE                      14

MR. SMITH                      30

MR. PAIGE                      38


PRETRIAL CONFERENCE            40


TRANSCRIPT REDACTIONS:

PAGE 10, LINE 15 TO PAGE 11, LINE 9

PAGE 13, LINES 8-20

PAGE 14, LINES 5-16

PAGE 19, LINE 17 TO PAGE 21, LINE 20

PAGE 22, LINES 9-25

PAGE 23, LINE 12 TO PAGE 25, LINE 19

PAGE 26, LINES 11-14

```
 1           THE DEPUTY CLERK:  NUMBER THREE ON CALENDAR, CASE

 2   08CV0543, DATAQUILL LIMITED VS. HIGH TECH COMPUTER

 3   CORPORATION, FOR A MOTION HEARING.

 4           THE COURT:  OKAY, YOUR APPEARANCES, PLEASE.

 5           MR. LAM:  GOOD MORNING, YOUR HONOR.

 6           LEO LAM, FROM KEKER & VAN NEST, FOR DEFENDANT HTC.

 7   WITH ME IS GENE PAIGE, FROM MY OFFICE, AS WELL AS FRED COSMO,

 8   AND ALSO PETE CHASSMAN, FROM WINSTON & STRAWN.

 9           THE COURT:  OKAY.  THANK YOU FOR BEING HERE.

10           GOOD MORNING.

11           MR. PAIGE:  GOOD MORNING, YOUR HONOR.

12           MR. COSMO:  GOOD MORNING, YOUR HONOR.

13           MR. CHASSMAN:  GOOD MORNING, YOUR HONOR.

14           MR. SMITH:  GOOD MORNING, YOUR HONOR.

15           GREG SMITH HERE FOR PLAINTIFF.

16           THE COURT:  GOOD MORNING.

17           YOU'RE BACK.  OKAY, THERE ARE TWO MAJOR THINGS THAT

18   WE WANT TO TAKE CARE OF TODAY.  FIRST OF ALL, HTC'S MOTION

19   AGAIN TO EXCLUDE THE OPINIONS AND TESTIMONY OF MR. GEMINI, AND

20   THEN TO TALK A LITTLE BIT MORE ABOUT THE PRETRIAL, THE

21   PROPOSED PRETRIAL ORDER, WHICH I'M WORKING HARD TO TRY TO

22   NARROW THE ISSUES IN THE CASE, BOTH THE CLAIMS AND THE

23   DEFENSES.  SO WE'LL GET TO THAT IN A FEW MINUTES.  WE'LL TALK

24   ABOUT MR. GEMINI'S REPORT, AND HE DID AMEND IT AND DID CHANGE

25   IT CONSIDERABLY.
```

1          SO I'D LIKE TO, FIRST OF ALL, MAYBE TALK TO YOU, MR.

2     SMITH, ABOUT THE PRODUCTS.  FIRST OF ALL, I DON'T UNDERSTAND

3     WHAT PRODUCTS ARE COVERED BY GLENAYRE, NOVATEL, AND THE

4     NOVATEL LICENSES.  MAYBE YOU CAN EXPLAIN WHAT THE PRODUCTS ARE

5     AND HOW THEY'RE COMPARABLE TO THE HTC PRODUCTS.

6          MR. SMITH:  SURE, YOUR HONOR.  THERE ARE, IN THE

7     EXHIBITS THAT ARE ATTACHED TO DATAQUILL'S RESPONSE, THERE ARE

8     PHOTOGRAPHS OF AT LEAST SOME OF THOSE PRODUCTS.  LET'S SEE IF

9     I CAN GIVE YOU THE NUMBER.

10          IN ANY EVENT, GLENAYRE AND -- WELL, LET ME BACK UP.

11          THE COURT:  OKAY, I DO HAVE YOUR RESPONSE HERE.

12          OKAY, GO AHEAD.

13          MR. SMITH:  OKAY, HERE THEY ARE.  THEY'RE DISCUSSED

14     IN THE RESPONSE AT PAGES 12 AND 13, AND I WOULD REFER YOU TO

15     PLAINTIFF'S EXHIBIT 696.  THAT'S PAGES TWO AND THREE IN THE

16     APPENDIX, AND PX 697, WHICH ARE THE NEXT THREE PAGES.

17          AT THE TIME, HANDSPRING, WHO BECAME PALM, WAS

18     MANUFACTURING A PDA DEVICE, A HAND-HELD COMPUTER -- PERSONAL

19     DIGITAL ASSISTANT, I THINK, WAS THE GENERIC WAY THEY REFERRED

20     TO IT -- AND THAT DEVICE WAS A HAND-HELD COMPUTER THAT COULD,

21     HAD VARIOUS FUNCTIONS THAT PEOPLE COULD USE.  IT WAS LIKE THE

22     PALM PILOT, AND THERE WERE VARIOUS MODULES THAT COULD BE

23     ATTACHED TO IT.

24          SO, FOR INSTANCE, YOU COULD BUY A MODULE THAT

25     PROVIDED THE CAPABILITY OF CELLULAR COMMUNICATIONS.  IT COULD

1   BE A CELL PHONE.  YOU COULD ATTACH A MODULE THAT WOULD BE A

2   CAMERA.  YOU COULD ALSO ATTACH A MODULE THAT WOULD PROVIDE A

3   WIRELESS MODEM.  GLENAYRE AND NOVATEL MADE MODULES THAT

4   PROVIDED WIRELESS MODEM CAPABILITY.  SO YOU WOULD TAKE THE

5   NOVATEL DEVICE, WHICH IS CALLED THE MINSTREL, OR THE GLENAYRE

6   DEVICE, WHICH WAS CALLED THE @CTIVELINK MODULE, ONLY IT WAS,

7   IT WASN'T SPELLED WITH AN "A" -- IT WAS, THE FIRST LETTER WAS

8   AN AMPERSAND -- AND YOU COULD ATTACH THOSE THEN TO THE HT-, OR

9   THE HANDSPRING VISOR, AND THEN YOU WOULD HAVE A HAND-HELD

10  COMPUTER WITH WIRELESS CAPABILITIES.

11          AND SO JUST TO DESCRIBE IT TO YOU, IT WOULD HAVE A

12  TOUCH-SENSITIVE SCREEN, AND IF YOU LOOK AT THE SCREEN, IT

13  WOULD HAVE A LISTING OF DIFFERENT FUNCTIONALITIES, FOR

14  FINANCE, BUYING STOCKS, TRAVEL, MAKING TRAVEL PLANS, SHOPPING,

15  NEWS, SPORTS.  IT COULD DO E-MAIL.  IT ALSO HAD A WEB BROWSER,

16  SO YOU COULD ACCESS THE WEB WITH IT.

17          SO WHAT YOU ENDED UP WITH, THE COMBINATION WOULD BE A

18  HAND-HELD DEVICE THAT, ALTHOUGH IT WASN'T A SMART PHONE,

19  BECAUSE YOU'D HAVE TO SWITCH OUT AND PUT ON A DIFFERENT MODULE

20  TO MAKE IT INTO A PHONE.  IT DID PROVIDE THE WEB BROWSER.  IT

21  DID HAVE A TOUCH SCREEN.  IT DID HAVE THESE OTHER

22  CAPABILITIES.

23          THE COURT:  AND SO, THEREFORE, IT WAS COMPARABLE TO

24  THE HTC PRODUCTS EVEN THOUGH IT WAS AN ATTACHMENT.

25          MR. SMITH:  YES.  THE COMBINED DEVICE.  YOU'VE GOT A

1    HAND-HELD COMPUTER.  YOU'VE GOT SOMETHING THAT HAS A WEB

2    BROWSER.  YOU'VE GOT SOMETHING THAT, YOU KNOW, LIKE I SAY, YOU

3    CAN CHECK E-MAIL.  IT'S GOT A TOUCH SCREEN FOR AN INTERFACE.

4    SO IT HAS ALL THESE COMMONALTIES, WHICH MR. GEMINI NOTED, AND

5    IT DOES HAVE THE ONE BIG DIFFERENCE IN FUNCTIONALITY, AMONG,

6    I'M SURE, OTHERS, BUT THE MAIN ONE WOULD BE THAT IT, YOU DON'T

7    END UP WITH A SMART PHONE WITH THAT THING.  IT DIDN'T HAVE A

8    CELLULAR-TELEPHONE FUNCTIONALITY WHEN YOU COMBINED THAT

9    DEVICE.

10          THE COURT:  OKAY.  THANK YOU.

11          NOW, MR. GEMINI, EVEN THOUGH HE TALKS ABOUT QUITE A

12   FEW LICENSES, HE REALLY IS RELYING ON GLENAYRE, NOVATEL, THIS

13   GOOGLE AGREEMENT, AND MPEG LA, AND WE'LL GET TO THAT LATER,

14   BUT --

15          MR. SMITH:  WELL, ALSO THE HEWLETT-PACKARD.

16          THE COURT:  CORRECT.  BUT THAT'S BASICALLY WHAT HE'S

17   RELYING ON.  CORRECT?  IN DRAWING HIS CONCLUSIONS.

18          MR. SMITH:  WELL, I DON'T (PAUSE) -- I UNDERSTAND

19   WHAT YOU'RE SAYING, AND I DON'T WANT TO BE QUARRELSOME, BUT I

20   DON'T THINK THAT'S A FAIR CHARACTERIZATION --

21          THE COURT:  OKAY.

22          MR. SMITH:  -- OF HIS OVERALL REPORT.  I MEAN, HE

23   TALKS A LOT ABOUT EVIDENCE THAT COMES FROM HTC INDICATING THE

24   IMPORTANCE AND THE VALUE OF THE PATENTED TECHNOLOGY TO HTC AS

25   WELL.  SO IF YOU'RE SAYING, WELL, AS FAR AS CONSIDERING

1    LICENSES OR OTHER AGREEMENTS, THOSE ARE THE ONES.  I THINK

2    THOSE -- I THINK THE FAIR THING TO SAY WOULD BE THOSE ARE THE

3    ONES THAT, IN HIS WEIGHING OF THE EVIDENCE, THAT GET THE MOST,

4    GET THE MOST WEIGHT, BUT I DON'T WANT (PAUSE) -- I WANT TO BE

5    CLEAR.  THOSE AREN'T THE ONLY ONES HE'S CONSIDERING.  HE

6    CONSIDERED, FOR EXAMPLE, ALL OF THE OTHER DATAQUILL LICENSES

7    AND THE RECORDS OF THEIR NEGOTIATION IN DEPTH.

8         THE COURT:  WHAT'S YOUR BEST ARGUMENT IN OPPOSITION

9    TO THE MOTION?  (PAUSE)

10        I KNOW, YOU COULD GO ON FOREVER.

11        MR. SMITH:  I THINK THE BEST WAY OF --

12        THE COURT:  I MEAN, I WAS PRETTY SPECIFIC ON WHY I

13   GAVE MR. GEMINI ANOTHER OPPORTUNITY TO GO BACK, BASICALLY, TO

14   THE DRAWING BOARD AND MAYBE COME UP WITH SOME DIFFERENT

15   LICENSES THAT ARE COMPARABLE.  HAS HE DONE THAT?

16        MR. SMITH:  WELL, YES.  FIRST OF ALL, YOU KNOW, THE

17   DATA SET WAS REDUCED, AND SO THE LICENSES OF THE

18   PATENT-IN-SUIT, MR. GEMINI HAD TO REASSESS THOSE IN LIGHT OF

19   THE NEW UNIVERSE OF INFORMATION; AND WHEN YOU'RE LOOKING AT A

20   DIFFERENT DATA SET, INFORMATION THAT THE LAST TIME YOU LOOKED

21   AT IT HAD ONE SIGNIFICANT CONTACT MAY TAKE ON A DIFFERENT

22   SIGNIFICANCE, GIVEN A NEW UNIVERSE OF INFORMATION.

23        SO HE LOOKED AT THOSE AND HE (PAUSE) -- THE BIGGEST

24   ARGUMENT HERE IN THE OVERALL, BIG PICTURE THAT I CAN SEE IS

25   THAT IT LOOKS LIKE HTC IS ARGUING THAT MR. GEMINI APPLIED ONE

1    STANDARD TO CONSIDER THE THREE LICENSES, TO GLENAYRE, NOVATEL,

2    AND HEWLETT-PACKARD, BUT APPLIED A DIFFERENT STANDARD IN

3    EVALUATING THE OTHERS.  HE DID NOT DO THAT.  HE FOLLOWED THE

4    CASE LAW IN LOOKING AT ALL OF THEM.

5            HE LOOKED AT, DO I HAVE A LICENSE HERE THAT RECITES A

6    RATE, A PERCENTAGE, SOMETHING THAT CAN BE APPLIED TO THE

7    INFRINGING SALES?  HE THEN LOOKED AT, FOR THE LUMP-SUM

8    AGREEMENTS, HE ASKED THE QUESTIONS, ARE WE, DO WE HAVE A

9    LICENSE WHERE THE PARTIES, WHERE THE RECORD INDICATES THAT THE

10   PARTIES AGREED ON AND IDENTIFIED WHAT ARE THE RELEVANT

11   PRODUCTS?  DO WE HAVE A RECORD THAT INDICATES THE PARTIES

12   AGREED ON HOW MANY OF THOSE PRODUCTS WERE SOLD?  DOES THE

13   RECORD INDICATE WHAT THOSE PARTIES' EXPECTATIONS WERE FOR THE

14   FUTURE?  WHICH IS ALL STUFF YOU NEED WHEN YOU'RE LOOKING AT A

15   LUMP-SUM AGREEMENT.

16           AND THEN, OF COURSE, YOU HAVE TO ACCOUNT FOR

17   DIFFERENCES IN TECHNOLOGIES AND THE ECONOMIC CIRCUMSTANCES,

18   AND HE DID ALL OF THOSE THINGS, AND THE FACT IS --

19           THE COURT:  MY UNDERSTANDING IS THERE'S NO ATTACK ON

20   HIS METHODOLOGY.

21           MR. SMITH:  WELL, IF THAT'S THE CASE, THEN I DON'T

22   UNDERSTAND WHAT WE'RE DOING.  I AGREE WITH YOU, YOUR HONOR.  I

23   THINK THAT THE HTC MOTION, IN THE MAIN, CONSISTS OF

24   CHARACTERIZING THE EVIDENCE DIFFERENTLY AND SAYING, WELL, WE

25   COME OUT WITH A DIFFERENT CONCLUSION ON HOW MUCH, FOR EXAMPLE,

1    THE EFFECTIVE ROYALTY RATE OF THE HEWLETT-PACKARD LICENSE

2    SHOULD HAVE BEEN, OR SOMETHING LIKE THAT.

3         THE COURT:  I GUESS THEY'LL EXPLAIN IT IN A MINUTE.

4         NO, BUT I'M GOING TO MOVE ON TO SOMETHING THAT I

5    THINK WAS MORE TROUBLING, AND THAT'S THE GOOGLE AGREEMENT, AND

6    IT WAS ONE LICENSE, AND YOU'RE SAYING THAT IT ESTABLISHED A

7    CUSTOMARY ROYALTY RATE UNDER FACTOR 12.  HOW CAN ONE LICENSE

8    ITSELF ESTABLISH A CUSTOMARY ROYALTY RATE?

9         MR. SMITH:  WELL, IT'S NOT A LICENSE.  LET'S BE

10   PRECISE.

11        THE COURT:  OKAY.

12        MR. SMITH:  AND I THINK --

13        THE COURT:  IT WAS AN AGREEMENT.  WE'LL CALL IT AN

14   AGREEMENT.  I MEANT AGREEMENT.  YES.

15        MR. SMITH:  [TRANSCRIPT REDACTED.]

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9    [END OF REDACTION]

10          THE COURT:  AND YOU'RE RELYING ON FACTOR 12, THE

11   GEORGIA-PACIFIC FACTOR 12.  IS THAT WHAT YOU'RE RELYING ON

12   MORE THAN ANY OF THE OTHERS?  I MEAN, 11 MAY FIT IT BETTER.  I

13   DON'T KNOW.

14          MR. SMITH:  WELL, I WAS JUST GOING TO SAY BOTH

15   FACTORS 11 AND 12, NEITHER OF WHICH WERE MENTIONED IN THE

16   OPENING MOTION.  HTC TALKS ABOUT FACTOR 12 IN ITS REPLY, BUT

17   STILL DOESN'T MENTION FACTOR 11.  HTC DIDN'T CITE ANY CASES IN

18   ITS ARGUMENT ABOUT FACTOR 12 IN ITS OPENING.  IN ITS REPLY, IT

19   CITES TO THESE TWO CASES THAT, IT SAYS, HOLD THAT FACTOR 12 IS

20   LIMITED TO LICENSES, THOSE BEING THE BOSTON SCIENTIFIC --

21          THE COURT:  MAYBE THAT'S WHY I SAID LICENSE, BECAUSE

22   I WAS LOOKING AT FACTOR 12 AND CALLED IT A LICENSE, BUT IT'S

23   NOT.  IT'S AN AGREEMENT.

24          MR. SMITH:  IT'S AN AGREEMENT.

25          AND FACTOR 12, IN ITS LANGUAGE, ISN'T LIMITED TO

1   LICENSES, AND THE CASES THAT HTC CITES THAT IT SAYS HOLD THAT

2   FACTOR 12 IS LIMITED TO LICENSES, THEY DON'T SAY THAT.  IN

3   NEITHER ONE OF THEM WAS THAT EVEN AN ISSUE.

4         SO ONE OF THEM WAS A TRADEMARK CASE WHERE THE

5   PLAINTIFF IN THAT CASE, FOR HIS DAMAGES THEORY, WAS BORROWING

6   FROM GEORGIA-PACIFIC AND ARGUING FOR A REASONABLE ROYALTY.  NO

7   EVIDENCE -- HE DIDN'T USE, THOUGH, HE DID NOT USE ALL OF THE

8   GEORGIA-PACIFIC FACTORS.  HE ONLY USED A FEW.  HE DID NOT USE

9   FACTOR 12.  NO EVIDENCE WAS SUBMITTED UNDER FACTOR 12, AND NO

10  ISSUES WERE DISCUSSED UNDER FACTOR 12.

11        THE ONLY REASON THAT CASE MENTIONS FACTOR 12 IS THAT

12  THE COURT, IN SETTING OUT ITS BACKGROUND, SAID, YOU KNOW, THE

13  EXPERT'S USING GEORGIA-PACIFIC FACTORS.  HERE'S WHAT THEY ARE,

14  AND IT LISTED THEM, AND IT PARAPHRASED THEM.  IT PARAPHRASED

15  FACTOR 12 AS LICENSES SHOWING CUSTOMARY ROYALTY RATES, OR

16  SOMETHING LIKE THAT.  IT'S A SHORTHAND PARAPHRASE.  IT'S NOT A

17  HOLDING, IT'S NOT A DISCUSSION OF WHAT EVIDENCE CAN BE UNDER

18  FACTOR 12 OR NOT.

19        IN THE BOSTON SCIENTIFIC CASE, SIMILARLY, THERE, AT

20  LEAST THAT WAS A PATENT CASE, BUT IN THAT CASE THE EVIDENCE

21  THAT WAS SUBMITTED UNDER FACTOR 12 WERE SOME LICENSES THAT I

22  THINK THE PLAINTIFF -- DON'T HOLD ME TO THAT -- BUT ONE OF THE

23  PARTIES SUBMITTED THESE LICENSES AND SAID, THESE ARE LICENSES

24  THAT SHOW A CUSTOMARY RATE FOR AN ANALOGOUS INVENTION.  SO THE

25  COURT SAID, WELL, HERE, THE INQUIRY IS WHETHER THOSE LICENSES

1    ESTABLISH A CUSTOMARY RATE.  THE COURT WAS NOT TALKING ABOUT

2    ESTABLISHING SOME KIND OF LIMITATION ON WHAT EVIDENCE CAN COME

3    IN UNDER FACTOR 12 IN GENERAL.  THE CASES DON'T ESTABLISH WHAT

4    THEY'RE SAYING THAT THEY DO.

5            THE COURT:  THEN WHY WOULD THE GOOGLE AGREEMENT BE,

6    HOW CAN IT BE USED TO ESTABLISH A ROYALTY RATE UNDER

7    FACTOR 11?

8            MR. SMITH:  [TRANSCRIPT REDACTED.]

9

10

11

12

13

14

15

16

17

18

19

20   [END OF REDACTION]

21           THE COURT:  ANYTHING ELSE ON THAT ISSUE, ON THE

22   GOOGLE AGREEMENT?

23           MR. SMITH:  NO.  WELL, THE ONLY OTHER THING I WOULD

24   POINT OUT, HTC HAS ARGUED THAT THERE'S A, YOU KNOW, THERE'S A

25   DIFFERENT PROFIT MARGIN FOR SOFTWARE THAN THERE IS FOR

1    HARDWARE.  THAT'S KIND OF BESIDE THE POINT, BECAUSE MR. GEMINI

2    IS NOT COMPARING THE PROFIT MARGIN ON SOFTWARE TO THE PROFIT

3    MARGIN ON HARDWARE.  HE'S LOOKING AT THE PORTION OF THE

4    PROFIT.

5              [TRANSCRIPT REDACTED.]

6

7

8

9

10

11

12

13

14

15

16   [END OF REDACTION]

17              THE COURT:  ANYTHING ELSE BEFORE I TURN TO (PAUSE) --

18   I WANT TO LEAVE MPEG FOR THE END, BUT I WANT TO HEAR FIRST

19   FROM HTC.

20              MR. SMITH:  NO, I'LL, I'LL (PAUSE) --

21              THE COURT:  YOU CAN HAVE ANOTHER OPPORTUNITY.

22              MR. SMITH:  YES.  I FIGURED I WOULD.

23              THANK YOU, YOUR HONOR.

24              THE COURT:  OKAY, MR. PAIGE.

25              MR. PAIGE:  YES.  THANK YOU, YOUR HONOR.

1              GOOD MORNING.

2              THE COURT:  GOOD MORNING.

3              YOU STILL DON'T THINK I SHOULD LET MR. GEMINI

4    TESTIFY?

5              MR. PAIGE:  NOT USING WHAT HE HAS COME UP WITH, YOUR

6    HONOR.  I DON'T THINK IT'S A PROPER METHODOLOGY.  I THINK THAT

7    WHEN A JURY COMES INTO THIS COURTROOM, THEY'RE GOING TO THINK

8    THAT THE METHODOLOGY HAS BEEN VETTED AND THAT IT'S SOMETHING

9    THAT IS LEGITIMATE, AND THAT WE NEED TO MAKE SURE THERE'S A

10   GATEKEEPING EXERCISE TO MAKE SURE THAT IT'S NOT JUST JUNK

11   SCIENCE BEING GIVEN TO THE JURY.

12             AND LET ME JUST SAY THAT, YOU KNOW, THE HYPOTHETICAL

13   NEGOTIATION IS SUPPOSED TO REPRESENT WHAT A WILLING LICENSOR

14   AND A WILLING LICENSEE WOULD AGREE TO AT THE TIME OF FIRST

15   INFRINGEMENT.  IT'S BASED ON REAL-WORLD FACTS AND

16   CIRCUMSTANCES, NOT ON THEORIES AND CALCULATIONS DIVORCED FROM

17   WHAT'S HAPPENING IN THE CASE, AND DATAQUILL ISN'T PAYING

18   ATTENTION TO THE REAL WORLD.

19             IN THE REAL WORLD, IT'S UNDISPUTED THAT NO ONE, NO

20   ONE HAS PAID IT A RUNNING ROYALTY.  THERE HAVE BEEN TWO

21   AGREEMENTS THAT CONTAIN RUNNING ROYALTIES ON AN N2 FOR SURE.

22   NEITHER OF THOSE COMPANIES PAID A RUNNING CENT IN ROYALTIES.

23             THE COURT:  WELL, OBVIOUSLY, MR. GEMINI IS TRYING TO

24   JUSTIFY A RUNNING ROYALTY IS APPROPRIATE HERE.

25             MR. PAIGE:  THAT DOESN'T CHANGE THE FACT WHEN I ASKED

1    MR. GEMINI IN HIS DEPOSITION WHETHER HE WAS AWARE OF DATAQUILL

2    EVEN ASKING, ASKING A HANDSET MANUFACTURER THAT'S LICENSED TO

3    PAY A RUNNING ROYALTY, HE COULDN'T TELL ME OF ANY SUCH

4    INSTANCE.  THAT LEAVES ASIDE THE FACT THAT THERE ARE NO

5    RUNNING ROYALTIES WITH MANUFACTURERS THAT ARE COMPETITORS.

6             THE COURT:  SO, DOES THAT CLOSE OUT THE WHOLE

7    INQUIRY?

8             MR. PAIGE:  I THINK THAT IT CASTS GRAVE DOUBT UPON

9    HIS METHODOLOGY TO BE SAYING THAT THERE MUST BE A RUNNING

10   ROYALTY WHEN THE FACT OF THE MATTER IS THAT DATAQUILL HASN'T

11   EVEN ASKED FOR THAT FROM OUR COMPETITORS.

12            THE COURT:  OKAY.  LET'S GO AHEAD.  LET'S STILL TALK

13   ABOUT IT.

14            MR. PAIGE:  SO I WANT TO ADDRESS WHAT YOUR HONOR HAD

15   ASKED ABOUT THE GLENAYRE AND NOVATEL LICENSES.  IT WON'T

16   SURPRISE YOU THAT WE VIEW THESE VERY DIFFERENTLY THAN MR.

17   SMITH AND DATAQUILL DO.  ALL THAT STUFF HE MENTIONED ABOUT

18   BEING ABLE TO HAVE A TOUCH SCREEN, YOU KNOW, GO TO THIS

19   CONTACT, GO ONTO THE INTERNET, THAT IS ALL PART OF THE

20   HANDSPRING DEVICE.  THE ONLY THING THAT THE NOVATEL DEVICE DID

21   WAS PUT A MODEM ONTO THAT SO IT COULD ACCESS A DIAL-UP NETWORK

22   SOMEWHERE.  SO WE HAVE VERY LIMITED FUNCTIONALITY OF THE

23   ACTUAL THING THAT WAS THE SUBJECT OF THESE LICENSES.

24            AND MAKE NO MISTAKE.  THE LICENSES ARE VERY CLEAR.

25   GLENAYRE LIMITS IT TO THAT PRODUCT ONLY, AND NOVATEL IS

1  SIMILARLY LIMITED IN THE SENSE THAT BOTH LICENSES SAY THE

2  AMOUNT YOU PAY IN ROYALTIES IS THE AMOUNT FOR THE ENTIRE

3  HANDSPRING PLUS ACCESSORY ITEM MINUS THE HANDSPRING PRICE.  SO

4  THEY'RE MAKING THEM PAY .5 PERCENT ON JUST THAT LITTLE, TINY

5  PIECE OF FUNCTIONALITY THAT'S BEING ATTACHED, NOT THE PRICE OF

6  THE ENTIRE DEVICE.

7          NOW, THEY SAY, WELL, THAT'S BECAUSE WE WERE SUING

8  HANDSPRING AT THE TIME.  WE WANTED TO GET A ROYALTY OUT OF

9  THEM.  YOU KNOW, GREAT, THAT WAS A 2.95 MILLION-DOLLAR LUMP

10  SUM AT THE END OF THE DAY, I BELIEVE.  BUT I WOULD SAY THAT TO

11  CALL THESE THINGS COMPARABLE TO AN HTC SMART PHONE OR SAMSUNG

12  SMART PHONE OR MOTOROLA SMART PHONE, ANY OF THESE MODERN

13  DEVICES, IS SIMPLY WRONG.  MR. SMITH HAS ADMITTED THEY

14  COULDN'T MAKE A PHONE CALL.  HE SAYS, WELL, THEY COULD PUT

15  SOMETHING ELSE, ATTACH IT ON THERE, AND MAKE A PHONE CALL WITH

16  IT, PERHAPS.  OF COURSE, THAT'S NOT WHAT EITHER GLENAYRE OR

17  NOVATEL SOLD.  SO SAYING THAT THESE THINGS ARE TECHNOLOGICALLY

18  COMPARABLE IS SIMPLY NOT CORRECT.

19          I THINK THE OTHER PROBLEM WITH THIS IS, WE'RE LOOKING

20  AT EXHIBITS THAT EXIST, I GUESS, FROM PAST CASES.  I KNOW THAT

21  MR. SMITH HAS BEEN LITIGATING THIS CASE FOR ABOUT A DECADE NOW

22  ON BEHALF OF VARIOUS COMPANIES, SO HE KNOWS A FEW THINGS ABOUT

23  THESE THINGS, BUT YOU KNOW WHO DOESN'T KNOW A FEW THINGS ABOUT

24  THESE THINGS?  THEIR TECHNICAL EXPERT.  THERE'S NOTHING IN HIS

25  OPINION ABOUT THE GLENAYRE DEVICE, NOTHING ABOUT THE NOVATEL

1    DEVICE.  WE DON'T HAVE ANYONE WHO CAN COME IN HERE AND EXPLAIN

2    THIS TO THE JURY.  WE'RE GOING TO HAVE A BUNCH OF ATTORNEY

3    ARGUMENT --

4              THE COURT:  THAT'S WHY I ASKED THAT QUESTION, WHAT IT

5    WAS.

6              MR. PAIGE:  YES.  WE'RE GOING TO COME IN HERE AND

7    HAVE A BUNCH OF ATTORNEY ARGUMENT ABOUT WHAT THESE PIECES OF

8    PAPER, WHAT THEY SAY, AND WE'RE NOT GOING TO HAVE DR. VAN DER

9    WIEDE GET UP THERE AND TALK ABOUT IT, BECAUSE HE NEVER

10   EXPRESSED AN OPINION AT ALL IN HIS EXPERT REPORT ON THIS.

11             I CAN TELL YOU IT'S VERY, VERY DIFFERENT, BUT MR.

12   GEMINI CAN'T TELL YOU.  HE'LL SAY, I'M NO TECHNICAL EXPERT.

13   I'VE ASKED HIM.  I'M NO TECHNICAL EXPERT.  I HAVE AN IDEA OF

14   WHAT THESE THINGS ARE AND HOW IT'S REALLY IMPORTANT TO THE

15   DEVICE, JUST AS IT IS IMPORTANT TO YOUR CLIENT'S INVENTION,

16   BUT HE'S NOT GOING TO BE ABLE TO GIVE A TECHNICAL OPINION.

17             SO WHAT WE'RE GOING TO HAVE IS ATTORNEY ARGUMENT

18   ABOUT HOW THESE ARE COMPARABLE, AND I CAN TELL YOU MY ARGUMENT

19   IS THAT THEY'RE NOT AT ALL COMPARABLE, AND I THINK THAT'S

20   PRETTY CLEAR FROM JUST THE RECORD OF EVEN WHAT MR. GEMINI SAYS

21   ABOUT HOW THESE THINGS WORK AND WHAT MR. SMITH SAYS ABOUT HOW

22   THEY WORK.

23             THE COURT:  SO THE SAME GOES -- YOU'VE TALKED ABOUT

24   NOVATEL IN THE SAME GROUP WITH GLENAYRE.

25             MR. PAIGE:  YES, BUT WE DON'T HAVE THE GLENAYRE

1   DEVICE IN THE EXHIBIT.  APPARENTLY, ONLY THE NOVATEL DEVICE IS

2   SOMETHING THAT THEY HAD, EXHIBITS ATTACHED TO THE DECLARATION.

3   I DON'T EVEN KNOW WHAT THEY SAY ABOUT GLENAYRE ASIDE FROM IT'S

4   NOT GOING TO BE ABLE TO MAKE A PHONE CALL AND IT'S GOING TO

5   HAVE MUCH MORE LIMITED FUNCTIONALITY, BECAUSE IT'S -- YOU

6   KNOW, WE HAVE HEARD MUCH TALK ABOUT THE ANDROID MARKET.

7   CERTAINLY, A PALM PILOT OR A HANDSPRING, THE SUCCESSOR TO PALM

8   PILOT, WASN'T ABLE TO ACCESS THE ANDROID MARKET.

9           THE COURT:  ANYTHING ELSE WITH REGARD TO THAT?

10          MR. PAIGE:  UNLESS YOUR HONOR WOULD LIKE TO HEAR

11  ABOUT THE HP AGREEMENT AND WHY (PAUSE) --

12          THE COURT:  WELL, GO AHEAD.  LET'S TALK ABOUT HP.

13          MR. PAIGE:  SURE.  HP AGAIN --

14          THE COURT:  AND THEN WE'LL GO TO GOOGLE AFTER THAT.

15          GO AHEAD.

16          MR. PAIGE:  YES.

17          [TRANSCRIPT REDACTED.]

18

19

20

21

22

23

24

25

1    [TRANSCRIPT REDACTION CONTINUING]

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20  [END OF REDACTION]

21         SO THAT'S WHY THERE'S A CHALLENGE TO THE METHODOLOGY

22  HERE.  THE METHODOLOGY CAN'T JUST BE, I WILL GO OUTSIDE THE

23  LICENSE FOR THE LICENSE I LIKE AND STAY INSIDE THE LICENSE FOR

24  ALL THE LICENSES I DON'T LIKE.  THAT'S NOT A METHODOLOGY;

25  THAT'S JUST PICKING AND CHOOSING.

1            THE COURT:  OKAY.  ANYTHING ELSE -- GO AHEAD.

2    ANYTHING ELSE BEFORE WE GET TO GOOGLE?  I MEAN WITH REGARD TO

3    GEMINI'S AMENDED REPORT.

4            MR. PAIGE:  NO, YOUR HONOR.  I THINK THAT, YOU KNOW,

5    THE STATEMENT THAT THIS WAS SOMETHING THAT HAD EXPECTATIONS OF

6    PRIOR USE, OR -- I'M SORRY -- FUTURE USE IN THE ANNOUNCEMENT

7    OF THE USE IS NOT CORRECT IF YOU LOOK AT THE RECORD, BUT I'LL

8    LEAVE THAT AT THAT.

9            [TRANSCRIPT REDACTED.]

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    [END OF REDACTION]

1           MR. PAIGE:  YES.

2           THE COURT:  CAN'T YOU USE THE, OR CAN'T GEMINI USE

3    THE GOOGLE AGREEMENT UNDER FACTOR 11 -- I'M GOING BACK TO

4    FACTOR 11 -- AS EVIDENCE OF THE VALUE OF HTC'S USE OF THE

5    PATENTED TECHNOLOGY?

6           MR. PAIGE:  I DON'T THINK SO, YOUR HONOR, FIRST

7    BECAUSE MR. GEMINI CAN'T TELL US HOW THAT'S USING THE PATENTED

8    TECHNOLOGY, AND IT SO HAPPENS THAT THIS IS SOMETHING THAT'S ON

9    AN ANDROID PHONE, BUT HE CERTAINLY CAN'T SAY, YOU KNOW, THIS

10   IS A USE OF THE PATENTED TECHNOLOGY BY GOOGLE OR A USE OF

11   PATENTED TECHNOLOGY BY HTC THAT LEADS TO THIS.

12           [TRANSCRIPT REDACTED.]

13

14

15

16

17

18

19

20

21

22

23

24

25

1    [TRANSCRIPT REDACTION CONTINUING]

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    [TRANSCRIPT REDACTION CONTINUING]

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19    [END OF REDACTION]

20            THE COURT:  AND ARE YOU SAYING YOU NEED TO CONDUCT

21   DISCOVERY, IF I WERE TO EVEN CONSIDER THAT, ON THE GOOGLE

22   AGREEMENT?

23            MR. PAIGE:  I'M SAYING THAT THAT'S THE REASON THAT

24   MR. GEMINI DOESN'T UNDERSTAND WHAT THE ACTUAL MARKET FACTS OF

25   THIS AGREEMENT ARE.  HE'S LOOKING AT THIS AGREEMENT.  JUST

1    LIKE IN THE LUCENT CASE WHERE YOU HAD SOMEBODY READ A BUNCH OF

2    THINGS FROM THE AGREEMENT INTO THE RECORD AND THE FEDERAL

3    CIRCUIT SAID, WELL, JUST THE FACT THAT THIS THING WAS BETWEEN

4    APPLE AND MICROSOFT AND IT WAS 800 MILLION DOLLARS ISN'T

5    ENOUGH TO SUPPORT THE DAMAGES THAT WERE AWARDED HERE.

6         THIS IS THE SAME SORT OF THING.  HE'S GOING TO TAKE A

7    LOOK AT THE AGREEMENT, AND I ASKED HIM THIS.  DO YOU HAVE ANY

8    INFORMATION ABOUT WHAT'S IN THIS AGREEMENT ASIDE FROM WHAT'S

9    PRINTED ON THE PAGE?  NO.  SO HE'S GOING TO TAKE THIS

10   AGREEMENT AND MAKE A FEW ASSUMPTIONS.  HE DIDN'T PICK UP ON

11   [TRANSCRIPT REDACTED.]

12

13

14   [END OF REDACTION]

15         THE COURT:  OKAY.  LET'S TALK ABOUT -- ANYTHING ELSE

16   WITH REGARD TO THE GOOGLE AGREEMENT?  I'M GOING TO HEAR FROM

17   MR. SMITH IN A MINUTE, BUT WITH REGARD TO THAT, BECAUSE I WANT

18   TO GET TO THE, TO THIS OTHER ISSUE, THE MPEG LA AGREEMENT,

19   BECAUSE THAT'S ONE, THAT'S SOMETHING THAT WAS IN THE ORIGINAL

20   EXPERT REPORT, BUT THERE WAS NO OBJECTION TO IT ORIGINALLY.

21   SO NOW YOU'RE DRAWING MY ATTENTION AND YOU'RE SAYING, WELL,

22   YOU KNOW, YOU SHOULDN'T RELY ON THAT AT ALL.  THE PLAINTIFF IS

23   SAYING, LOOK IT, YOU WAIVED ANY OBJECTION YOU MAY HAVE HAD

24   PREVIOUSLY.

25         MR. PAIGE:  RIGHT.  WELL, I WOULD, I WOULD ECHO WHAT

1   MR. SMITH SAID 15 MINUTES AGO, WHICH IS THAT, WHEN YOU CHANGE

2   THE UNIVERSE OF AGREEMENTS AT ISSUE, THINGS TAKE ON A

3   DIFFERENT COLOR, AND NOW WE'RE LOOKING AT THE DATAQUILL

4   AGREEMENTS, WHICH ARE, YOU KNOW, THE MUCH BETTER WAY TO

5   MEASURE THE WORTH OF THIS PATENT THAN THE SIGNIFICANT PATENT

6   AGREEMENTS, AND THE ONE OUTLIER, WELL, TWO OUTLIERS THAT ARE

7   STICKING OUT HERE NOW ARE THE MPEG LA AGREEMENT AND THE GOOGLE

8   AGREEMENT, BOTH OF WHICH ARE VERY, VERY DIFFERENT THAN WHAT HE

9   IS USING TO VALUE THE PATENTS IN THE MAIN, AND IT'S TRUE THAT

10  WE DIDN'T SPECIFICALLY CHALLENGE THE MPEG L.A. AGREEMENT IN

11  THE FIRST MOTION BASED ON IT BEING A HUGE PORTFOLIO LICENSE,

12  WHICH IT IS.  I DON'T THINK THERE'S ANY DISPUTE ABOUT THAT.

13          THE COURT:  RIGHT.

14          MR. PAIGE:  BUT WHAT WE DID DO IN THAT FIRST MOTION

15  WAS SAY THAT HE DIDN'T HAVE A FACTUAL BASIS ON WHICH TO USE

16  EITHER THE MPEG LA AGREEMENT OR WHATEVER HE USED FOR HIS

17  HALF-A-PERCENT ENHANCEMENT, BECAUSE HE DIDN'T UNDERSTAND WHAT

18  THE TECHNOLOGY THAT WAS BEING USED OR INFRINGED WAS.

19          AND I UNDERSTAND YOUR HONOR HAS DISAGREED WITH US ON

20  THAT, AND WE RESPECT THAT, BUT IT WAS A DIFFERENT ARGUMENT

21  ADDRESSED TO THAT, THE IDEA THAT BOTH OF THESE ENHANCEMENTS

22  HE'S PUT IN THERE ARE NOT BASED ON ANY SUPPORT, ANY EXPERT

23  KNOWLEDGE, ANY TECHNICAL KNOWLEDGE, AND SO WE HAD TO FOCUS ON

24  THE FACT THAT THE MPEG LA WAS, IN FACT, AN AGREEMENT OF THAT

25  SORT, EXCEPT FOR THE FOOTNOTE IN THE REPLY BRIEF NOTING THAT

1    IT WAS --

2              THE COURT:   THERE WAS THAT FOOTNOTE.

3              MR. PAIGE:  -- NO, NO, NO BETTER THAN THE OTHERS, BUT

4    CERTAINLY WAS NOT A FOCUS OF OUR MOTION, BECAUSE OUR MOTION

5    WAS FOCUSED ON THE BROADER ISSUE OF HIS USE OF ENHANCEMENT,

6    PERIOD, WITHOUT THE TECHNICAL BASIS FOR DOING SO.

7              THE COURT:  SO WHAT DO YOU WANT ME TO DO NOW?

8              MR. PAIGE:  I THINK, YOUR HONOR, IT'S APPROPRIATE TO

9    STRIKE THE USE OF THE MPEG LA AGREEMENT FOR THE SAME REASON

10   YOU STRUCK THE USE OF THE SIGNIFICANT PATENT AGREEMENTS.  IT'S

11   NOT SOMETHING THAT IS COMPARABLE IN ANY WAY.  THEY'RE USING IT

12   TO AWARD A .1-PERCENT BUMP WHEN THE MATH SHOWS THAT IT'S

13   REALLY, AT MOST, A THIRD OF A TENTH OF A PERCENT, OR

14   TWO-THIRDS OF A TENTH OF A PERCENT, IF I CAN SAY THAT

15   CORRECTLY.  IT'S .0675 PERCENT, I BELIEVE.

16             SO THEY'RE ENHANCING IT BEYOND THAT AND THEY'RE

17   SAYING, WELL, THAT'S OKAY BECAUSE (A) THE MPEG LA AGREEMENT

18   ACTUALLY PROVIDES FOR HIGHER ROYALTIES.  WELL, MR. GEMINI HAS

19   SAID THAT SEVERAL TIMES, INCLUDING AT HIS DEPOSITION, BUT HE

20   CAN'T POINT TO ANYTHING IN THE AGREEMENT THAT SAYS THAT.

21             AND THEN (B) THEY SAY, IT'S ALSO BECAUSE OUR PATENT

22   COVERS A CAMERA AND THIS THING JUST COVERS THE BASIC STANDARD

23   THAT'S USED TO TRANSMIT GRAPHICAL IMAGES FROM ONE PLACE TO

24   ANOTHER.  YOU KNOW, THERE ARE, I BELIEVE, FOUR MENTIONS OF THE

25   WORD CAMERA IN THE ENTIRETY OF THEIR SPECIFICATION, AND THE

1    IDEA OF JUST PUTTING THE WORD CELL PHONE PLUS A CAMERA INTO

2    THE CLAIMS SOMEHOW MAKES A LICENSE TO THEIR PATENT MORE

3    VALUABLE THAN A LICENSE TO THE STANDARDS PROMULGATED BY MANY,

4    MANY COMPANIES THAT ARE REQUIRED TO ACTUALLY INTERACT WITH

5    DIFFERENT, DIFFERENT DEVICES THAT ARE USING THE SAME

6    STANDARDS.  THAT'S JUST, THAT JUST ISN'T THE CASE.

7          THE COURT:  WELL, THAT'S YOUR SUBSTANTIVE ARGUMENT.

8    WHAT ABOUT YOUR PROCEDURAL ARGUMENT THAT IT'S BEEN WAIVED; IT

9    WOULD HAVE TO, YOU'D HAVE TO FILE, THERE SHOULD BE A MOTION

10   FOR RECONSIDERATION AND WE GO THROUGH A WHOLE HOST OF OTHER, I

11   GUESS, BRIEFING ISSUES?

12         MR. PAIGE:  SURE.  I THINK THE ANSWER TO THAT, YOUR

13   HONOR, IS THAT WE MOVED TO EXCLUDE EVERYTHING BEYOND THE

14   ONE-PERCENT ROYALTY THE FIRST TIME, AND SO THAT WAS AN ATTACK

15   UPON THE ENTIRETY OF HIS REASONING USING THOSE THINGS.

16         AS MR. SMITH SAID, WHEN YOU CHANGE THE UNIVERSE OF

17   AGREEMENTS THAT ARE BEING USED, THINGS TAKE ON A DIFFERENT

18   COLOR, AND WE NOW HAVE, YOU KNOW, HAD THIS TAKE ON A DIFFERENT

19   COLOR BECAUSE HE'S NO LONGER USING AN ACROSS-THE-BOARD,

20   SIGNIFICANT PATENT AGREEMENT, THINGS LIKE THAT.  HE IS NOW

21   USING THIS MPEG LA AGREEMENT, ONE OF TWO AGREEMENTS THAT

22   AREN'T TO THE PATENTS-IN-SUIT, AND SO IT REALLY HAS TAKEN ON A

23   DIFFERENT COMPLEXION.

24         WE THINK THAT BOTH THE GOOGLE AND THE MPEG LA ARE

25   INAPPROPRIATE TO BE USED IN THIS CASE, AND SO, YOU KNOW, WE

1    BELIEVE THAT THE MOTION SHOULD BE GRANTED AS TO THOSE TWO.

2              THE COURT:  OKAY.  ANYTHING ELSE RIGHT NOW?

3              MR. PAIGE:  NO, YOUR HONOR.  THAT'S ALL I HAVE FOR

4    RIGHT NOW.

5              THE COURT:  OKAY.  THANK YOU.

6              MR. PAIGE:  I'D BE HAPPY TO ANSWER ANY OTHER

7    QUESTIONS YOU HAVE.

8              THE COURT:  I HAVE NOTHING RIGHT NOW.

9              MR. SMITH.

10             WELL, THE ARGUMENT IS, I SHOULD JUST THROW OUT MR.

11   GEMINI'S, WELL, JUST PRECLUDE HIM FROM TESTIFYING.

12             MR. SMITH:  WELL, THAT'S RIGHT, YOUR HONOR, AND THE

13   LAST TIME WE WERE HERE HTC ASSURED YOU THAT THEY WERE GOING TO

14   FILE A MOTION ASKING YOU TO THROW OUT MR. GEMINI'S TESTIMONY

15   BEFORE THEY EVER SAW HIS REPORT.  SO IT'S THE AUTOMATIC

16   DAUBERT MOTION, AND THIS IS WHAT WE GET.

17             IN THE BIG PICTURE, HTC ARGUES REGARDING THE

18   HEWLETT-PACKARD AGREEMENT.  THEY SAY YOU CANNOT CONCLUDE THAT

19   THE PARTY'S EXPECTATIONS WERE OF MINIMAL SALES UNLESS THE

20   AGREEMENT EXPRESSLY PROMISES THAT THERE WON'T BE ANY FUTURE

21   SALES.  THAT'S WHAT THEY SAY WHEN THEY'RE TALKING ABOUT THE HP

22   AGREEMENT.  BUT THEN WHEN THEY'RE TALKING ABOUT THE GLENAYRE

23   AND NOVATEL AGREEMENTS, THEY SAY YOU MUST CONCLUDE THAT THE

24   PARTIES EXPECTED MINIMAL FUTURE SALES, IN FACT, THAT THEY KNEW

25   THERE WOULD BE NO FUTURE SALES, EVEN THOUGH THOSE AGREEMENTS

1    DON'T PROMISE THERE WON'T BE ANY FUTURE SALES AND EVEN THOUGH

2    THOSE AGREEMENTS ACTUALLY PROVIDE FOR A ROYALTY ON FUTURE

3    SALES.  SO, WHO'S BEING INCONSISTENT?  WHO'S CHERRY-PICKING?

4         IT GOES ON.  IN ARGUING ABOUT HEWLETT-PACKARD, HTC

5    SAYS, WELL, YOU KNOW, YOU CAN'T CONCLUDE THAT, JUST THAT THE

6    PAST U. S. SALES THAT ARE RECITED IN THE AGREEMENT AND THAT

7    ARE SHOWN IN THE RECORD, YOU CAN'T CONCLUDE THAT THOSE, YOU

8    CAN'T USE THOSE AS A ROYALTY BASE.  BUT THEN THEY TURN AND

9    LOOK AT THE OTHER DATAQUILL LUMP-SUM AGREEMENTS AND THEY SAY,

10   FOR THOSE YOU HAVE TO CONCLUDE THAT THE PAST SALES ARE THE

11   ROYALTY BASE, AND IT'S SIMPLY INCONSISTENT.

12        IN HP, HP WAS THE ONLY, IS, IS -- I'LL JUST TAKE OUT

13   WITH THAT ONE.  THE HEWLETT-PACKARD OF ALL OF THEM IS THE ONLY

14   LICENSE WHERE THE RECORD SHOWS THAT THE LICENSEE AND

15   DATAQUILL, THE LICENSEE CAME FORWARD AND SAID, OKAY, WE WILL

16   AGREE WITH YOU THAT THESE ARE THE RELEVANT DEVICES, AND WE

17   WILL AGREE WITH YOU THAT, THAT HERE'S THE NUMBER OF RELEVANT

18   DEVICES WE'VE SOLD IN THE PAST, AND WE ALSO ARE GOING TO

19   CONSIDER OUR FUTURE EXPECTATIONS FOR SALES OF THE RELEVANT

20   DEVICES, AND IT'S CLEAR THAT THE RECORD SHOWS THE PARTY'S

21   EXPECTATIONS WERE, WAS THAT THERE WOULD BE MINIMAL FUTURE

22   SALES.  NOW, THAT'S WHY HE COULD USE THAT LUMP-SUM AGREEMENT,

23   BECAUSE YOU'VE GOT A DEFINABLE ROYALTY BASE.  YOU KNOW WHAT

24   THE PARTIES ARE DOING.

25        ONE PIECE OF INFORMATION, A COUPLE PIECES OF

1    INFORMATION THAT MR. GEMINI CONSIDERED THAT HTC DIDN'T

2    MENTION, IN ADDITION TO RECITING THE PAST, THE RELEVANT

3    DEVICES AND THEIR PAST U. S. SALES, PART OF THAT WAS, IT

4    DIDN'T JUST SAY THAT WE SOLD 195,000 TO DATE.  IT ALSO

5    INDICATED, AND IN THE MOST RECENT QUARTER WE ONLY SOLD 4,000

6    OF THEM, WHICH SUPPORTS AN INFERENCE THAT, YOU KNOW, THE LIGHT

7    IS, THE LIGHT BULB IS GOING OUT THERE.

8            ALSO --

9            THE COURT:  ISN'T THIS REALLY AN ATTACK ON THE

10   METHODOLOGY, THE METHODOLOGY THAT MR. GEMINI IS USING?

11           MR. SMITH:  IT'S NOT AT ALL.  THEY LOOK AT IT AND

12   SAY, WELL, WHEN WE LOOK AT THE EVIDENCE, WE DON'T THINK THAT

13   IT SUPPORTS THE EFFECTIVE RATE THAT MR. GEMINI CALCULATES.

14           THERE'S SOMETHING I SHOULD POINT OUT ABOUT THE HP

15   LICENSE AS WELL, AND THAT IS THIS.  HTC'S EXPERT WITNESS ON

16   DAMAGES, HE USES THE HEWLETT-PACKARD LICENSE IN HIS

17   CALCULATIONS.  HE CALCULATED AN EFFECTIVE RATE FOR IT AND HE

18   THEN APPLIED THAT, HE TOOK THAT EFFECTIVE RATE TO GET TO HIS

19   CONCLUSION, SO.  AND HIS DATA INDICATES, YOU KNOW, YOU'D GET A

20   SLIGHTLY DIFFERENT NUMBER, BUT IT'S NOT THAT MUCH DIFFERENT.

21   BUT THEY SAY HE CAN DO THAT, BUT MR. GEMINI CAN'T.

22           SO -- AND THIS NOTION OF, WELL, MR. GEMINI LOOKS

23   OUTSIDE THE AGREEMENT OR INSIDE THE AGREEMENT, THAT'S NOT WHAT

24   HE'S DOING.  THAT'S ANOTHER RED HERRING.  THE POINT ISN'T

25   WHAT'S IN THE AGREEMENT VS. WHAT'S OUT OF IT.  THE POINT IS,

1    WHAT DOES THE EVIDENCE SHOW?  AND MR. GEMINI HAS A PRETTY

2    DETAILED ANALYSIS OF ALL OF THE LUMP-SUM AGREEMENTS.

3         AND I KEEP SAYING THIS, BUT YES, YOU'RE RIGHT.  IT'S

4    NOT HIS METHODOLOGY.  THEY'RE NOT SAYING HE SHOULDN'T HAVE

5    LOOKED AT THESE THINGS THAT THE CASES SAY HE SHOULD LOOK AT.

6    THEY'RE SAYING THE EVIDENCE, HE SHOULD HAVE DRAWN DIFFERENT

7    CONCLUSIONS FROM THE EVIDENCE IN FRONT OF HIM.

8         THE COURT:  AND YOU'RE SAYING THAT'S THE JURY'S JOB.

9         MR. SMITH:  WELL, YES, I AM, UNLESS, I MEAN, IF YOU

10   WANT TO SHOW, FOR EXAMPLE, THAT, YOU KNOW, WHICH THEY CAN'T

11   DO.  LOOK IN THE CASE OF GLENAYRE AND NOVATEL.  THEY KEEP

12   SAYING, WELL, THEY KNEW THEY WERE GOING OUT OF BUSINESS, SO

13   THEY DIDN'T CARE WHAT THE ROYALTY WAS.  THAT'S THEIR THEORY OF

14   WHAT THE EVIDENCE SHOWS.  WE COULD ARGUE ABOUT HOW STRONG THE

15   EVIDENCE WOULD SUPPORT SUCH AN INFERENCE, BUT WHAT THEY HAVE

16   TO SHOW TO EXCLUDE MR. GEMINI IS THAT THAT'S NOT ONLY THE MOST

17   REASONABLE INFERENCE, THAT'S THE ONLY POSSIBLE INFERENCE, AND

18   ANY EXPERT WHO DOESN'T DRAW THAT CONCLUSION HAS TO BE THROWN

19   OUT.

20        THE COURT:  BUT THEIR MAIN ARGUMENT IS THAT THESE

21   PRODUCTS AREN'T COMPARABLE.  I MEAN, THAT'S WHAT THEY'RE

22   SAYING, RIGHT?  THAT GEMINI CAN'T USE ANY KIND OF LICENSING

23   AGREEMENTS REGARDING THE PRODUCTS.

24        MR. SMITH:  WELL, OKAY.  I MEAN, FIRST OF ALL, LET'S

25   TALK ABOUT THE GLENAYRE AND NOVATEL PRODUCTS.  YOU'VE GOT A

1   HAND-HELD COMPUTER, WHICH IS (PAUSE) --

2              THE COURT:  DOES IT MAKE A DIFFERENCE IF THEY'RE NOT

3   PHONES?

4              MR. SMITH:  IT DOES MAKE A DIFFERENCE, AND WHAT THE

5   FINJAN CASE SAYS IS, YOU NEED TO ACCOUNT FOR A TECHNOLOGICAL

6   DIFFERENCE.  THERE'S NOT A CASE THAT SAYS --

7              THE COURT:  AND GEMINI DOES THAT, DOESN'T HE?

8              MR. SMITH:  HE DOES.  HE DOES.  HE RECOGNIZES THAT

9   THERE ARE A COUPLE THINGS GOING ON, AMONG THEM BEING, WELL,

10  YOU KNOW, IF YOU'RE SITTING IN THE HYPOTHETICAL NEGOTIATION

11  AND YOU'RE LOOKING AT THE GLENAYRE AND NOVATEL AGREEMENTS, FOR

12  EXAMPLE, ONE OF THE THINGS THAT DATAQUILL MIGHT SAY IN THAT

13  HYPOTHETICAL NEGOTIATION IS, LOOK, THIS WAS ONLY FOR THE '403

14  PATENT, AND THE ONLY ASPECT OF THE PATENTED, THE MAIN ASPECT

15  OF THE PATENTED TECHNOLOGY THAT'S IMPLICATED IS THE WEB

16  BROWSER, AND THEY PAID A HALF-PERCENT, 1.75 PERCENT, DEPENDING

17  ON WHICH LICENSE YOU'RE TALKING ABOUT.  YOU, ON THE OTHER

18  HAND, HTC, ARE TALKING ABOUT USING A GREATER COMBINATION OF

19  THE PATENTED FEATURES, SO YOU OUGHT TO PAY MORE FROM THAT

20  PERSPECTIVE.

21             NOW, IT CUTS BOTH WAYS, TOO, BECAUSE HTC COULD ALSO

22  SAY, YES, BUT WE ALSO HAVE, YOU KNOW, JUST OVERALL FANCIER

23  PHONES.  THEY DO A LOT MORE STUFF, AND THEY HAVE A PHONE,

24  WHICH IS IMPORTANT.  SO THERE ARE OTHER THINGS THAT CONTRIBUTE

25  TO THE VALUE THAT WE HAVE, AND THAT WOULD TEND TO ARGUE FOR A

1   LITTLE BIT LOWER ROYALTY, AND THESE ARE ALL THINGS THAT MR.

2   GEMINI THREW IN THE MIX.  HE DISCUSSED THEM, AND HE CONSIDERED

3   THEM.  HE ACCOUNTED FOR THEM.  SO HE DID WHAT HE WAS SUPPOSED

4   TO DO.

5          THE COURT:  OKAY.  LET ME MOVE YOU ON TO MPEG.

6          MR. SMITH:  OKAY.

7          THE COURT:  WHY SHOULDN'T I GRANT THE MOTION AT LEAST

8   AS TO THAT ISSUE?  BECAUSE, I MEAN, REALLY, IT IS, IT'S THE

9   SAME ARGUMENT THAT I AGREE WITH IN MY PREVIOUS ORDER, THAT

10  THIS IS A WORLDWIDE LICENSE.

11         MR. SMITH:  LET ME ADDRESS THIS IN TWO PARTS.

12         FIRST OF ALL, HTC IN ITS ORIGINAL, IN THIS MOTION,

13  ITS OPENING BRIEF IN THIS MOTION, STATES ABOUT THE PREVIOUS

14  MOTION, IN ITS INITIAL MOTION, HTC DID NOT ATTACK MR. GEMINI'S

15  USE OF THE MPEG LA AGREEMENT AS A JUSTIFICATION FOR ENHANCED

16  ROYALTY RATES.  THAT'S IN THEIR BRIEF AT 14.  THAT'S NOT TRUE.

17  IT WASN'T TRUE WHEN THEY WROTE IT; IT'S NOT TRUE NOW.  THEY

18  DID.  AND SPECIFICALLY, DATAQUILL DISCUSSED THE MPEG LICENSE

19  AND SAID, MR. GEMINI CONCLUDED THAT THE PATENT LICENSE

20  CONCERNING THE CAMERA FEATURE WOULD BE OF COMPARABLE

21  IMPORTANCE TO HTC'S PATENT LICENSE FROM MPEG.  THAT'S AT PAGE

22  20 OF THEIR LAST RESPONSE.  HTC DID RESPOND TO THAT AND SAID,

23  HIS RELIANCE ON THAT AGREEMENT IS NO MORE JUSTIFIED THAN IS

24  CONSIDERATION OF THE SIGNIFICANT PATENT AGREEMENTS.  NOW,

25  THAT'S EXACTLY THE SAME ARGUMENT THEY'RE MAKING HERE.

1          SO, NUMBER ONE, I MEAN, YOU'LL DECIDE HOW YOU WANT TO

2     HANDLE THE MOTION FOR RECONSIDERATION, BUT I THINK IT FITS

3     SQUARELY INTO THAT.

4          GOING TO THE SUBSTANCE OF IT, HTC IGNORES A CASE

5     CITED BY DATAQUILL, THE PHILIPS CASE, AND THAT CASE POINTS OUT

6     THAT WHEN YOU HAVE A LICENSE, AND HERE WE'RE TALKING ABOUT ONE

7     LICENSE TO A SPECIFIC, DISCRETE, TECHNOLOGICAL FEATURE, AND

8     IT'S A PACKAGE LICENSE.  IT'S NOT A PORTFOLIO OF ONE COMPANY'S

9     LICENSES.  IT'S A PACKAGE, AND A COMPANY SIGNS ON TO THIS

10    LICENSE.  THEY PAY FOR, YOU KNOW, THEY PAY THE PRICE

11    REGARDLESS OF WHAT PATENTS THEY'RE USING.  IT'S NOT PRICED ON

12    THE VALUE OF THE PATENTS THAT ARE IN IT, AND THIS WAS WHAT THE

13    PHILIPS CASE SAYS.  IT SAYS GROUPING LICENSES IN A PACKAGE

14    ALLOWS THE PARTIES TO PRICE THE PACKAGE BASED ON THEIR

15    ESTIMATE OF WHAT IT'S WORTH TO PRACTICE A PARTICULAR

16    TECHNOLOGY.  THAT'S AS OPPOSED TO DETERMINING THE INDIVIDUAL

17    VALUE OF EACH OF THE PATENTS.

18         SO WE CAN COMPARE THE ESTIMATE OF WHAT IT'S WORTH TO

19    PRACTICE THE MPEG TECHNOLOGY AS REFLECTED IN THAT MPEG LICENSE

20    TO WHAT IT'S WORTH TO BE ALLOWED TO PUT THE CAMERA ON THE

21    PHONE.  AND THAT TO ME, YOUR HONOR, I MEAN, THAT SEEMS LIKE A

22    PERFECTLY PERMISSIBLE COMPARISON.

23         AND HTC'S COUNSEL KIND OF TERMS THE ECONOMICS OF HOW

24    PATENTS ARE VALUED UPSIDE DOWN WHEN HE SAYS, WELL, GEE, YOU

25    KNOW, THE MPEG PATENTS, THEY HAVE ALL THIS DETAILED

1    DISCLOSURE, SO THEY SHOULD BE CONSIDERED A LOT MORE VALUABLE

2    THAN JUST DATAQUILL, WHICH, YOU KNOW, THEY HAVE A CLAIM THAT

3    INCLUDES AN ELEMENT OF A CAMERA, BUT THAT MISUNDERSTANDS HOW

4    PATENTS GET THEIR VALUE.

5         PATENTS GET THEIR VALUE AND PATENT LICENSES GET THEIR

6    PRICING FROM THE FACT OF THE PATENT'S RIGHT TO EXCLUDE.  I

7    KEEP YOU FROM DOING IT.  AND SO, ON THE ONE HAND, I CAN STOP

8    YOU FROM PUTTING A CAMERA ON THERE, OR, ON THE OTHER HAND, IN

9    THE CASE OF THE MPEG LICENSE, I CAN STOP YOU FROM PUTTING MPEG

10   VIDEOS ON THERE.  AND IF YOU LOOK AT THE EVIDENCE, MR. GEMINI,

11   AS MR. GEMINI DID, THERE'S LOTS AND LOTS OF EVIDENCE FROM HTC

12   MARKETING MATERIALS TALKING ABOUT HOW IMPORTANT IT IS AND HOW

13   VALUABLE IT IS TO HAVE A CAMERA ON THE PHONE.  IT'S EXPECTED.

14   AND SO IF YOU'VE GOT A CLAIM THAT CAN PREVENT THAT, WHICH IS

15   WHAT THE PATENT CLAIM DOES, THEN THAT'S GOT A LOT OF VALUE,

16   AND THE LICENSE TO IT HAS A LOT OF VALUE.  ALLOWING PERMISSION

17   TO PUT IT ON THERE HAS A LOT OF VALUE.

18         SO THAT'S, I THINK THAT'S WHAT I WOULD HAVE TO SAY

19   ABOUT THE MPEG AGREEMENT.

20         THE COURT:  ANYTHING ELSE BEFORE YOU CONCLUDE?

21         MR. SMITH:  MAYBE NOT.  IF I CAN HAVE JUST A MINUTE

22   TO LOOK THROUGH MY NOTES, YOUR HONOR.

23         THE COURT:  THAT'S FINE.

24         MR. SMITH:  THE ONLY -- I GUESS THE ONLY OTHER THING

25   I WOULD ADD, AND I DON'T WANT TO BELABOR THIS, BUT THERE ARE A

1    LOT OF ALLEGATIONS AND STATEMENTS IN HTC'S PAPERS ACCUSING MR.

2    GEMINI OF DELIBERATELY DOING THINGS THAT HE KNOWS ARE

3    IMPROPER.

4            THE COURT:  NO, I'M NOT INTERESTED IN THAT.  SORRY.

5    I MEAN, I UNDERSTAND.

6            GO AHEAD.

7            MR. SMITH:  MY ONLY QUESTION IS WHETHER THAT'S OKAY

8    AND (PAUSE) --

9            THE COURT:  NO, IT'S NOT OKAY, BUT (PAUSE)

10           MR. SMITH:  LIKE I SAID, I DON'T WANT TO BELABOR IT,

11   BUT I'D BE REMISS IF I DIDN'T BRING IT UP --

12           THE COURT:  NO; I APPRECIATE THAT.

13           MR. SMITH:  -- BECAUSE IT'S GETTING A LITTLE OUT OF

14   HAND.

15           THE COURT:  I DON'T APPRECIATE LAWYERS DISPARAGING

16   WITNESSES OR OTHER LAWYERS, BUT SOMETIMES HARD-FOUGHT

17   ADVOCACY, I GUESS, GETS TO THE POINT WHERE YOU DON'T REALIZE

18   YOU'RE DOING IT.  SO, GIVE THEM THE BENEFIT OF THE DOUBT.

19           MR. SMITH:  I'M JUST TRYING TO HEAD IT OFF AT THE

20   PASS.

21           THAT'S ALL I'VE GOT, YOUR HONOR.

22           THE COURT:  YES.  HOPEFULLY, THERE'S NO MORE OF IT.

23           MR. PAIGE, ANYTHING ELSE?  I DON'T WANT YOU TO SPEND

24   TOO MUCH TIME.

25           MR. PAIGE:  I'LL TRY TO BE VERY BRIEF, YOUR HONOR.

1          I GUESS AS TO THE INITIAL COMMENT THAT MR. SMITH MADE

2     ABOUT US BEING INCONSISTENT, I BELIEVE THAT YOU UNDERSTAND

3     THIS, BUT WE'RE NOT SAYING THAT HE CAN'T USE THE HP LICENSE.

4     WE'RE SAYING HE CAN'T USE THE HP LICENSE AND IGNORE ALL THE

5     REST OF THE LICENSES AND NOT TREAT THEM IN THE SAME MANNER.

6     WE'RE FINE IF HE WANTS TO COME BACK AND SAY, HERE'S HP, HERE'S

7     THE REST, DOING THEM ALL THE SAME WAY AND TAKING THEM ALL INTO

8     ACCOUNT.  SO WE'RE NOT BEING INCONSISTENT IN SAYING, YOU MUST

9     USE THIS AND NOT USE THIS.  WE WANT THE SAME METHODOLOGY TO BE

10    APPLIED THROUGHOUT.

11         AND THEN AS TO THE MPEG AND THE PHILIPS CASE, I THINK

12    YOU'LL FIND THAT THIS IS A STANDARD TYPE OF AGREEMENT.  IN

13    OTHER WORDS, THE SIGNIFICANT PATENT AGREEMENTS ALSO STATE THAT

14    THEY WILL NOT BE (PAUSE) -- THERE'S NO NEED TO SAY THAT ONE

15    PARTICULAR PATENT IS INFRINGED OR THAT IF, YOU KNOW, A CERTAIN

16    NUMBER ARE INFRINGED AND YOU PAY A DIFFERENT AMOUNT.  I MEAN,

17    IT REALLY IS SORT OF YOU'RE PAYING THE LICENSE ON ALL OF THESE

18    PATENTS WHETHER OR NOT THEY ARE INFRINGED, BECAUSE  THEY COVER

19    ALL THESE TECHNOLOGIES, AND SO MPEG IS NO DIFFERENT THAN THE

20    REST OF THEM IN THAT REGARD.

21              THE COURT:  OKAY.

22              MR. PAIGE:  THANK YOU, YOUR HONOR.

23              THE COURT:  WELL, NEEDLESS TO SAY, I'M GOING TO ISSUE

24    ANOTHER WRITTEN ORDER, HOPEFULLY, AGAIN, WITHIN THE NEXT TWO

25    WEEKS.

1            DO YOU WANT TO TALK ABOUT THE PRETRIAL ORDER AND THE

2    TRIAL ITSELF?  I MEAN, I THINK WE HAVE OUR OPPORTUNITY.

3            FIRST OF ALL, I DID RECEIVE DATAQUILL'S

4    IDENTIFICATION OF PATENT CLAIMS, I GUESS, AS OF NOW THAT IT'S

5    GOING FORWARD ON, AND THEN THE IDENTIFICATION OF REDUCED

6    DEFENSES.  AS I MENTIONED EARLIER, I'M HOPING MAYBE YOU'LL

7    EVEN NARROW THEM FURTHER, IF YOU CAN.

8            I HAVE THE PROPOSED PRETRIAL ORDER, AND RIGHT NOW,

9    AND I NOTICE IN THE PRETRIAL, PROPOSED PRETRIAL ORDER THERE'S

10   A REQUEST THAT THE TRIAL, THAT I GIVE YOU TEN DAYS.  AT LEAST

11   THAT'S HTC'S POSITION, TEN DAYS FOR TRIAL, AND THEN, OF

12   COURSE, DATAQUILL'S IS (PAUSE) --

13            MR. SMITH:  I BELIEVE IT'S THE OTHER WAY AROUND.

14            THE COURT:  OR IT'S THE OTHER WAY AROUND.

15   DATAQUILL'S IS TEN DAYS.  I'M SORRY.  DATAQUILL ESTIMATES TEN

16   DAYS AND HTC FIVE DAYS.  I THINK THE LAST TIME YOU WERE HERE I

17   SAID EIGHT DAYS.  I CUT THE BABY IN HALF AND GAVE YOU EIGHT

18   DAYS.  I SAY EIGHT DAYS BECAUSE OUR TRIAL WEEKS ARE FOUR DAYS

19   EACH.  MONDAYS, I DON'T HAVE TRIAL.  SOMETIMES, WE CAN GO -- I

20   DON'T KNOW IF I WANT TO GO INTO A THIRD WEEK.  I'M HOPING WE

21   CAN LIMIT IT TO EIGHT DAYS, EIGHT WHOLE DAYS, AND TRY TO

22   SQUEEZE EVERYTHING IN.  I MEAN, SOMETIMES WE'LL GO LATE OR

23   START EARLY, AND I KNOW THAT MR. SMITH IS NOT REAL HAPPY, BUT,

24   HOPEFULLY, YOU CAN FIT IT ALL IN.

25            I'D LIKE TO GIVE YOU A DATE FOR MOTIONS *IN LIMINE*.

1           I ALSO WANT TO ASK IF YOU COULD TRY TO, MAYBE ONCE MY

2    ORDER COMES OUT, YOU CAN TRY TO SCHEDULE ANOTHER SETTLEMENT

3    CONFERENCE.  I KNOW YOU'VE HAD -- THE LAST ONE, I THINK, WAS

4    IN NOVEMBER, OR SO, IN FRONT OF JUDGE SKOMAL.  YOU'RE

5    CERTAINLY WELCOME TO GO TO ANY NEUTRAL YOU'D LIKE OUTSIDE OF

6    THE COURT, GO BACK TO JUDGE SKOMAL, OR, IF YOU WISH, TO ANYONE

7    ELSE.  JUST LET ME KNOW IF YOU'RE GOING TO DO THAT.  BUT I'M

8    GOING TO ENCOURAGE YOU TO DO THAT, PLEASE, BECAUSE I WANT TO

9    KNOW BY THE TIME WE GO TO TRIAL THAT YOU'VE MADE EVERY EFFORT

10   TO TRY TO RESOLVE THE CASE, BECAUSE TO SET ASIDE, EVEN TO

11   START WORKIN, AS YOU KNOW, ON A TRIAL IS PRETTY COSTLY, AND

12   NOT THAT YOU HAVEN'T SPENT A LOT OF MONEY ALREADY, BUT IT'S

13   CERTAINLY A LOT OF TIME FOR EVERYBODY, INCLUDING THE COURT.

14           SO, HAVING SAID THAT, I'M STILL GOING TO, I'M STILL

15   AFFIRMING THAT THE TRIAL DATE, UNLESS (PAUSE) -- I'D LIKE TO

16   KEEP IT AT JULY 10TH.  I STILL HAVE IT SCHEDULED FOR JULY

17   10TH.  I DON'T SEE ANY REASON WHY WE CAN'T GO FORWARD ON JULY

18   10TH, DO THAT WEEK AND THE FOLLOWING WEEK.

19           LET ME JUST LOOK AT MY CALENDAR HERE.

20           WE COULD, AND THAT WOULD BE -- I PROBABLY WOULD TELL

21   THE JURY THAT THEY COULD -- I WILL TELL THE JURY THAT THEY CAN

22   CONTINUE THEIR DELIBERATIONS EVEN INTO THE NEXT WEEK.  I WON'T

23   EVER TELL THEM THEY WILL HAVE TO END BY JULY 20TH, WHICH WILL

24   BE THE LAST DAY OF THE SECOND WEEK.  SO WE'RE GOING TO HAVE

25   EIGHT FULL DAYS OF TESTIMONY AND FINAL ARGUMENTS, AND THEN I

1   WILL, HOPEFULLY, BE ABLE TO INSTRUCT THE JURY BY THAT FRIDAY

2   AND THEY CAN START THEIR DELIBERATIONS.  BUT IF THEY NEED TO

3   GO INTO THE NEXT WEEK, THEN THAT'S WHAT THEY'LL HAVE TO DO.

4   SO MAYBE I'M GIVING YOU A LITTLE BIT MORE TIME THERE THAN

5   NORMAL.

6        I'D LIKE TO TRY TO SCHEDULE A DATE IN JUNE FOR

7   MOTIONS *IN LIMINE*, AND I'D LIKE TO DO IT ON AN OFF DAY, NOT A

8   MONDAY.  SO THAT MEANS YOU WOULD HAVE TO FILE YOUR MOTIONS --

9   I'D LIKE TO GET THEM AT LEAST -- HMM.  NORMALLY, I SAY TWO

10  WEEKS, BUT IN THIS TYPE OF A CASE I WOULD REALLY WANT MORE

11  TIME THAN THAT, AT LEAST THREE TO FOUR WEEKS IN ADVANCE, AND

12  MAYBE YOU CAN WORK SOMETHING OUT.  I'LL THROW OUT SOME DATES,

13  AND I USUALLY LIKE TO DO IT ON A FRIDAY.  WE'RE ALREADY IN

14  APRIL.  EITHER JUNE 15TH IS A FRIDAY.  IS THAT TOO SOON?  OR

15  JUNE 29TH.

16        MR. LAM:  YOUR HONOR, WHAT ABOUT THE FRIDAY IN

17  BETWEEN?  THAT WOULD BE THE TWENTY (PAUSE) --

18        THE COURT:  I'M NOT HERE.

19        MR. LAM:  I SEE.

20        THE COURT:  BUT MAYBE WE CAN (PAUSE) -- WE DON'T,

21  MAYBE WE DO NOT HAVE TO DO IT ON A FRIDAY.  I'M OUT OF TOWN,

22  THOUGH, THE 21ST.  JUNE 19TH IS A TUESDAY.  WE COULD DO IT

23  THEN.

24        MR. PAIGE:  THAT WOULD BE FINE WITH ME, YOUR HONOR.

25  I'M GOING TO BE IN TOWN THE 20TH TO THE 23RD AT THE FEDERAL

1    CIRCUIT BAR ASSOCIATION CONFERENCE HERE IN SAN DIEGO AT THAT

2    TIME.

3              THE COURT:  WE COULD DO IT IN THE AFTERNOON ON THE

4    19TH.

5              MR. SMITH:  THAT'S FINE WITH ME, YOUR HONOR.  TELL ME

6    WHEN I'VE GOT TO BE HERE, I'LL BE HERE.

7              THE COURT:  SO LET'S DO JUNE 19TH, AT 1:30, FOR

8    MOTIONS *IN LIMINE*.

9              NOW, I'D LIKE TO LIMIT THE NUMBER OF MOTIONS.  DO WE

10   REALLY NEED A LOT OF MOTIONS?  I WAS THINKING ABOUT SIX.  I

11   THINK I MENTIONED EIGHT, BUT MAYBE SIX EACH SIDE.

12             MR. SMITH:  FINE.

13             THE COURT:  SIX EACH SIDE.  NO MORE THAN TEN PAGES

14   EACH, INCLUDING ANY EXHIBITS, AND I TEND TO THINK -- I

15   HESITATE TO GIVE YOU MORE MOTIONS, BECAUSE LAWYERS TEND TO

16   START THROWING IN WHAT SHOULD BE MOTIONS FOR SUMMARY JUDGMENT

17   IN THE MOTIONS *IN LIMINE*.  THEY HAVE TO BE TRULY EVIDENTIARY

18   ISSUES THAT YOU'RE RAISING IN YOUR MOTIONS.  SO, NO MORE THAN

19   SIX MOTIONS EACH SIDE, AND I WOULD LIKE YOU TO SIMULTANEOUSLY

20   FILE YOUR MOTIONS *IN LIMINE* NO LATER THAN MAY 8TH.  LET'S SEE.

21   NO LATER THAN MAY 18TH?  THAT DOESN'T GIVE YOU ALL A LOT OF

22   TIME, DOES IT?  OR WE CAN SAY MAY 21ST.  LET'S SAY MAY 21ST.

23   IT'S A MONDAY.  AND ANY RESPONS IS DUE TWO WEEKS LATER, WHICH

24   WOULD BE JUNE 4TH.  NO REPLIES.  YOU CAN REPLY IN ORAL

25   ARGUMENT, AND THEN WE'LL JUST HAVE OUR HEARING ON JUNE 19TH,

1    AT TWO.  I MEAN AT 1:30.

2         HOW'S THAT?  THAT ONLY GIVES YOU TWO WEEKS TO

3    RESPOND, BUT, OR OPPOSE THE MOTION.  ANY QUESTIONS ABOUT THAT?

4         AND THEN ON JUNE 19TH, IF THE CASE IS STILL GOING TO

5    TRIAL, THEN WE WILL TALK A LITTLE BIT MORE SPECIFICALLY ABOUT

6    THE TRIAL ITSELF AND WHAT I EXPECT FROM THE LAWYERS AND JURY

7    INSTRUCTIONS AND THINGS LIKE THAT.

8         ANY QUESTIONS?

9         MR. PAIGE:  SO, YOUR HONOR, NO, NO JURY INSTRUCTIONS

10   SHOULD BE SUBMITTED OR ANYTHING LIKE THAT BEFORE JUNE 4TH?

11        THE COURT:  CORRECT.  I'M GOING TO GIVE YOU A DATE

12   BEFORE THE TRIAL, BUT IT WILL PROBABLY BE ABOUT, AT LEAST,

13   WELL, ABOUT A WEEK BEFORE OR TEN DAYS BEFORE.  I WOULDN'T BE

14   ABLE TO GET TO IT ANYWAY.  SO, NO, I JUST WANT TO CONCENTRATE

15   ON THE MOTIONS *IN LIMINE*, AND THEN, AFTER THAT, WE'LL TALK

16   ABOUT THE TRIAL ITSELF, JURY INSTRUCTIONS AND VOIR-DIRE AND

17   THINGS LIKE THAT.

18        ANY QUESTIONS?

19        MR. LAM:  YOUR HONOR, ABOUT THE MOTIONS *IN LIMINE*

20   SPECIFICALLY OR ANYTHING ELSE ABOUT THE TRIAL SCHEDULE?

21        THE COURT:  ANYTHING ELSE ABOUT THE TRIAL SCHEDULE OR

22   THE TRIAL, HOWEVER, WHATEVER YOU WANT TO RAISE RIGHT NOW.

23        MR. LAM:  YES, YOUR HONOR.  JUST ONE HOUSEKEEPING

24   ITEM ABOUT PHYSICALLY EXCHANGING TRIAL EXHIBITS.  I BELIEVE

25   THE PARTIES MAY HAVE ALREADY BYPASSED THE DATE THAT WOULD HAVE

1   BEEN REQUIRED UNDER THE RULES, WHICH MAY HAVE BEEN A FEW

2   MONTHS AGO, ACTUALLY, BUT WE THINK IT MAKES SENSE, ESPECIALLY

3   AT THIS STAGE, TO ACTUALLY AGREE ON A DATE TO EXCHANGE

4   PHYSICAL EXHIBITS BECAUSE, AS I UNDERSTAND IT, THERE IS STILL

5   A BIT OF CONFUSION OR DISCREPANCY BETWEEN THE WAY EXHIBITS ARE

6   CURRENTLY LISTED AND THE WAY LAWYERS ON BOTH SIDES ARE

7   CONTEMPLATING THEM, THAT WE MAY NOT BE LOOKING AT THE RIGHT

8   DOCUMENTS OR EXHIBITS, NOTWITHSTANDING THE WAY THEY'VE BEEN

9   LISTED IN THE SUBMISSIONS TO THE COURT.

10          THE COURT:  OKAY, BECAUSE I DID GET A LIST OF

11  EXHIBITS.  YES.  LET'S PICK A DATE.  DO YOU WANT TO THROW OUT

12  A DATE OR A TIME PERIOD?

13          MR. LAM:  YES.  WE WOULD PROPOSE TO DO SO WITHIN THE

14  NEXT TWO WEEKS.  TWO WEEKS FROM NOW WOULD BE IDEAL.

15          THE COURT:  ANY OBJECTION?

16          MR. SMITH:  NONE THAT I CAN THINK OF.  I MEAN, AS I

17  STAND HERE TODAY, I DON'T KNOW WHETHER THAT'S PRACTICAL OR NOT

18  PRACTICAL, BUT WE'LL JUST PICK TWO WEEKS.

19          THE COURT:  NO LATER THAN TWO WEEKS FROM TODAY.

20          MR. SMITH:  YES.

21          THE COURT:  TODAY IS -- THAT WOULD BE APRIL 23RD THE

22  PARTIES SHALL EXCHANGE EXHIBIT (PAUSE) -- LISTS OR THE ACTUAL

23  (PAUSE) --

24          MR. LAM:  THE ACTUAL PHYSICAL EXHIBITS, YOUR HONOR.

25          THE COURT:  THE ACTUAL PHYSICAL EXHIBITS ARE TO BE

1   EXCHANGED.

2           MR. LAM:  THANK YOU.

3           THE COURT:  ANYTHING ELSE RIGHT NOW?

4           OKAY, AND THEN WE'LL TALK ABOUT THE TRIAL THE NEXT

5   TIME WE'RE HERE, BUT I'LL GET, I'M SURE I CAN GET THE ORDER TO

6   YOU BY NEXT WEEK, BY THE END OF NEXT WEEK.  SO YOU'LL HAVE,

7   OBVIOUSLY, A GOOD IDEA WHERE YOU'RE GOING AFTER THIS.  OKAY?

8           THANK YOU.

9           (PROCEEDINGS ADJOURNED AT 12:02 P.M.)

10  ------------------------------------------------------------

11                    (END OF TRANSCRIPT)

12

13          I, FRANK J. RANGUS, OFFICIAL COURT REPORTER, DO

14  HEREBY CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND

15  ACCURATE TRANSCRIPTION OF MY STENOGRAPHIC NOTES.

16

17          S/FRANK J. RANGUS_____

18          FRANK J. RANGUS, OCR

19

20

21

22

23

24

25